1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Mark A. Neubauer (SBN 73728)
mneubauer@carltonfields.com
Valerie D. Escalante (SBN 281386)
vescalante@carltonfields.com
**CARLTON FIELDS JORDEN BURT, LLP**
2000 Avenue of the Stars
Suite 530 North Tower
Los Angeles, CA 90067
Tel: 310-843-6300
Fax: 310-843-6301

[**Additional counsel listed on signature page**]

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| METROPCS, a brand of T-MOBILE USA, Inc., Delaware Corporation,<br><br>Plaintiff,<br><br>v.<br><br>SD PHONE TRADER, a d/b/a of CARLOS ELIZONDO and RAMON ELIZONDO; CARLOS ELIZONDO a/k/a CARLOS ALBERTO ELIZONDO a/k/a CARLOS A. ELIZONDO a/k/a JOSE GOMEZ, individually and d/b/a EC WIRELESS, EC WIRELESS ONE TOUCH COMMUNICATIONS, and EC WIRELESS #3; and RAMON M. ELIZONDO a/k/a RAMON MANUEL ELIZONDO a/k/a RAMON ELIZONDO JR., individually and d/b/a EC WIRELESS, EC WIRELESS ONE TOUCH COMMUNICATIONS, and EC WIRELESS #3,<br><br>Defendants. | Docket No.: **'16 CV0098 DMS KSC**<br><br>**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

1

102645643.2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

Plaintiff T-Mobile USA, Inc., a Delaware corporation ("T-Mobile"), for itself and its MetroPCS brand (collectively referred to hereafter as "MetroPCS"), hereby files this Complaint for Damages and Injunctive Relief against CARLOS ELIZONDO a/k/a CARLOS ALBERTO ELIZONDO a/k/a CARLOS A. ELIZONDO a/k/a JOSE GOMEZ, individually and d/b/a EC WIRELESS, EC WIRELESS ONE TOUCH COMMUNICATIONS, EC WIRELESS #3, and SD PHONE TRADER; and RAMON M. ELIZONDO a/k/a RAMON MANUEL ELIZONDO a/k/a RAMON ELIZONDO JR., individually and d/b/a EC WIRELESS, EC WIRELESS ONE TOUCH COMMUNICATIONS, EC WIRELESS #3, and SD PHONE TRADER (collectively, "Defendants"), and states:

## JURISDICTION

1.      Jurisdiction in this Court is proper pursuant to 28 U.S.C. §§ 1331, 1332, and 1338 because MetroPCS's claims for violation of the United States Trademark Act, Title 15 of the United States Code and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq*. arise under federal law and because diversity exists between the parties and the amount in controversy exceeds $75,000.00 exclusive of costs, fees, and interest.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over MetroPCS's state law claims because those claims are so related to the federal claims that they form part of the same case or controversy.

2.      Defendant Carlos Elizondo a/k/a Carlos Alberto Elizondo a/k/a Carlos A. Elizondo a/k/a Jose Gomez ("Carlos Elizondo") is subject to the personal jurisdiction of the court because he is a resident of San Diego County, California.

/ / /

/ / /

102645643.2

3.     Defendant Ramon M. Elizondo a/k/a Ramon Manuel Elizondo a/k/a Ramon Elizondo Jr. ("Ramon Elizondo") is subject to the personal jurisdiction of the court because he is a resident of San Diego County, California.

4.     Defendants are also subject to the personal jurisdiction of this Court because they conducted, engaged in and carried out business ventures within the State of California; committed tortious acts within the State of California; and engaged in substantial and not isolated activity within the State of California.

**INTRODUCTION**

5.     T-Mobile sells wireless handsets under the brand MetroPCS ("MetroPCS Handsets" or "Handsets") for use with MetroPCS service on the T-Mobile wireless network.   These MetroPCS Handsets are sold at prices significantly below the wholesale cost to MetroPCS so that the Handsets are more widely accessible to consumers.   Defendants and their co-conspirators are perpetrators of an unlawful scheme (the "Handset Theft and Trafficking Scheme" or the "Scheme") to profit, at Plaintiff's expense, from the illegal acquisition and resale of new MetroPCS Handsets by stealing the substantial financial investments that Plaintiff makes in the Handsets.

6.     Defendants and their co-conspirators acquire new MetroPCS Handsets through various methods, including the use of "runners" and/or "mules."[1]   As part of their Scheme, the new Handsets, which may be purchased and sold multiple times before they are ever used, ultimately end up in the hands of someone other than a MetroPCS customer.   Along the way, the Handsets are

---

[1] A "Runner" is an individual or entity that makes multiple purchases of new MetroPCS Handsets on behalf of phone traffickers like Defendants.  A "Mule" is an individual or entity that signs up for wireless service with MetroPCS–never intending to comply with the terms and conditions–to obtain new, subsidized MetroPCS Handsets for resale by phone traffickers like Defendants.

"unlocked" so they will operate on other wireless networks.  Often the ultimate user of the phone is located overseas, in a country where the wireless service provider does not underwrite the cost of new phones. Defendants confirmed that their phones are shipped to Mexico.

7.    Defendants' Scheme takes advantage of the fact that while Plaintiff substantially invests in the Handsets to reduce the costs for legitimate MetroPCS consumers, other wireless service providers here or abroad do not.  By obtaining the MetroPCS Handsets through theft or fraud and diverting them to other markets where cell phones are not subsidized, the Scheme converts Plaintiff's investment dollars into profits for Defendants and their co-conspirators.  Each of Defendants' acts, individually as well as together, is a violation of Plaintiff's rights and causes significant damage.  Additionally, as participants in the conspiracy, Defendants are liable for the harm caused to Plaintiff by the entire Scheme.

8.    The Scheme causes tremendous harm to MetroPCS and to consumers.  In addition to the pecuniary losses caused by Defendants' theft of Plaintiff's investment in MetroPCS Handsets, falsely paid commissions, lost sales and market expenses, and lost expected customer revenue, Defendants' misconduct harms MetroPCS's relationships with its customers, dealers, retailers, and others, as detailed more fully below.  Defendants' Scheme also involves unlawfully accessing Plaintiff's protected computer systems and wireless network; trafficking of Plaintiff's protected and confidential computer passwords; and willful infringement of the MetroPCS trademarks.  Defendants have caused substantial damage to MetroPCS's brand, image, and reputation.

9.    Plaintiff seeks to recover damages for the harm caused by Defendants' Handset Theft and Trafficking Scheme, and to obtain an injunction prohibiting Defendants from continuing to perpetrate the Scheme.

10.    All conditions precedent to filing this action have been performed, waived or excused.

11. Plaintiff has retained the undersigned attorneys to represent them in this action and have agreed to pay those attorneys a reasonable fee for their services.

**PARTIES AND VENUE**

12. This is an action for damages in excess of $75,000.00, exclusive of interest, costs, and attorneys' fees.

13. T-Mobile is a Delaware corporation, with its principal place of business in Bellevue, Washington.

14. MetroPCS was acquired by T-Mobile USA, Inc. in 2013 and is an exclusive T-Mobile brand.

15. Defendant Carlos Elizondo is an individual and a resident of San Diego, California. Upon information and belief, Carlos Elizondo does business as d/b/a EC Wireless, EC Wireless One Touch Communications, EC Wireless #3, and SD Phone Trader and is personally engaged in, and helped facilitate, the improper conduct described herein. Upon information and belief, Carlos Elizondo resides at 360 S. 38th Street, San Diego, CA 92113.

16. Defendant Ramon Elizondo is an individual and a resident of San Diego, California. Upon information and belief, Ramon Elizondo does business as d/b/a EC Wireless, EC Wireless One Touch Communications, EC Wireless #3, and SD Phone Trader and is personally engaged in, and helped facilitate, the improper conduct described herein. Upon information and belief, Ramon Elizondo resides at 218 29th Street, San Diego, CA 92102.

17. The principal place of business for Defendants d/b/a EC Wireless, EC Wireless One Touch Communications, EC Wireless #3, and SD Phone Trader is 2150 Imperial Avenue, San Diego, CA 92102. Upon information and belief, Ramon Elizondo owns the property located at 2150 Imperial Avenue, San Diego, CA 92102, which he purchased for $1,100,000. Defendants have several other business operations throughout the San Diego area.

///

102645643.2

18.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) because Defendants reside in this district and all Defendants reside in California, and also, pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## PLAINTIFF'S BUSINESS MODEL

19.     T-Mobile, which is based in Bellevue, Washington, is a well-established telecommunications leader in product and service innovation. T-Mobile has invested heavily in developing and maintaining its reputation and the reputation of its brands.  It prides itself on its advanced nationwide 4G LTE network and low cost options provided for its customers. T-Mobile USA, Inc. provides services through its subsidiaries and operates its flagship brands, T-Mobile and MetroPCS. It currently serves approximately 57 million wireless customers and provides products and services through approximately 70,000 total points of distribution.

20.     MetroPCS, acquired by T-Mobile on May 1, 2013, has been in the forefront of telecommunications providers for decades by offering customers reduced-cost handsets and flat-rate wireless service plans.  MetroPCS prides itself on the value and variety of device choices from leading brands provided to its customers. The cornerstone of MetroPCS' business model is providing customers with affordable, reliable wireless products and services to match their needs and lifestyles.   A flagship brand operated by T-Mobile, MetroPCS products and services are available online and across the United States through a network of company-owned stores, authorized dealer locations, and leading national retailers, with whom MetroPCS has contractual relationships.

21.     T-Mobile and MetroPCS are leaders in prepaid wireless service.  T-Mobile and MetroPCS highly value the outstanding business reputation they have worked hard to develop. MetroPCS was recognized as a J.D. Power 2014 Customer Champion for the second time — one of only 50 high-performing companies

acknowledged for delivering service excellence after being evaluated across five categories including its people, presentation, process, product and price.

22.     MetroPCS's wireless program enables MetroPCS customers to choose from several flat-fee monthly voice and data plans for use with cutting edge devices on the T-Mobile wireless network.  For the benefit of its customers, MetroPCS offers budget-friendly Handsets, including the latest smartphones, for little or no upfront cost, with no annual service contract, no overages, and no hidden device costs.

23.     MetroPCS's business model is based upon the ability to deliver affordable, innovative, and desirable products and services to cost-conscious consumers.  Therefore, Plaintiff assists customers in their purchase of MetroPCS Handsets for use on its network by selling the Handsets for substantially less than what Plaintiff pays to the manufacturers for the Handsets.  Plaintiff recoups the money it loses on the Handsets and in dealer commissions through revenue earned on the sale of MetroPCS service, which customers must use to transmit and receive voice, text, and data on the MetroPCS Handsets.   In addition to subsidizing Handsets, MetroPCS provides discounts, rebates, and other incentive programs by which Plaintiff heavily invests in the Handsets to the ultimate benefit of legitimate MetroPCS customers.  This investment is worth making if these customers activate and purchase service on the MetroPCS network. MetroPCS is neither a manufacturer nor a wholesale distributor of Handsets.  If MetroPCS was in the business of selling Handsets and not a telecommunications service provider, it could not offer consumers these significantly lower purchase prices and stay in business.  Further, these types of substantial subsidies and investment programs are not offered by telecommunications carriers outside the United States; instead, foreign consumers pay full price for the phones from the manufacturers.  Handset traffickers profit from the difference between the full value of the Handset and the subsidized price offered by MetroPCS.

24.     MetroPCS Handsets are sold subject to terms and conditions ("Terms and Conditions") which restrict and limit the commercial resale and use of the Handsets.  A copy of the Terms and Conditions is attached hereto as **Exhibit A**. The packaging of MetroPCS Handset provides that by purchasing or opening the package, activating, using, or paying for MetroPCS service, the purchaser agrees to the MetroPCS Terms and Conditions posted on www.metropcs.com.  Purchasers have the option to return the MetroPCS Handset in accordance with the return policy if they do not agree to the Terms and Conditions.  The Terms and Conditions are legally valid and appropriate, and the Terms and Conditions constitute a valid and binding contract between MetroPCS and each of its customers.

25.     MetroPCS is able to offer its Handsets to customers at reduced prices only if the Handsets are used as intended with MetroPCS service.  Manufacturers that produce wireless phones for MetroPCS install proprietary software, requested and paid for by Plaintiff, on the MetroPCS Handsets.  Among other things, this software is intended to prevent the Handsets from being used for other than MetroPCS service, except under circumstance in which legitimate customers meeting the criteria to have the Handset unlocked.

26.     Wireless technology is constantly changing and improving, and the wireless industry is intensely competitive.  MetroPCS expends substantial resources to maintain its position as an industry leader and to ensure that its products and services are at the cutting edge of the latest technological developments.  Providing its cost-conscious customers with quality and advanced technology at an affordable price is a key differentiator for MetroPCS and central to its business strategy.

27.     Plaintiff invests heavily in efforts to provide MetroPCS customers with the most up-to-date wireless handsets, and shoulders most or all of the cost of purchasing a new phone for those customers.  MetroPCS makes phones available to new customers at a low cost when they initiate wireless service, and also to existing customers at regular intervals.

28.    As the demand, and therefore the price, for smartphones in various world markets skyrockets, the subsidized MetroPCS smartphones are a particularly attractive and lucrative target for participants in the Handset Theft and Trafficking Scheme.

### METROPCS TRADEMARK RIGHTS

29.    T-Mobile owns federal trademark registrations for the standard character and stylized MetroPCS® mark (collectively, the "MetroPCS Marks"). Copies of the certificates of registration issued by the United States Patent and Trademark Office ("USPTO") are attached hereto as **Composite Exhibit B**.[2] The stylized MetroPCS Marks are depicted below:



30.    Plaintiff uses the MetroPCS Marks on and in connection with telecommunications products and services.  Several of the MetroPCS Marks are incontestable trademarks.

31.    The MetroPCS Marks have become an intrinsic and essential part of the valuable goodwill and property of Plaintiff, who protects the MetroPCS Marks. The MetroPCS Marks are well-established and well-known to customers and the trade as a symbol identifying and distinguishing MetroPCS products and services, and signifying distinctive products and services of high quality.  Only Plaintiff and its expressly authorized, affiliated agents are permitted to use the MetroPCS Marks.

---

[2] On or around November 3, 2006, MetroPCS, Inc. assigned all of its MetroPCS Marks to MetroPCS Wireless, Inc. as part of a merger agreement.  The assignment was recorded with the USPTO on April 3, 2007. On or around May 1, 2013 MetroPCS Wireless, Inc. assigned all of its MetroPCS Marks to T-Mobile USA, Inc. as part of a merger agreement.  The assignment was recorded with the USPTO on May 2, 2013.

102645643.2

The MetroPCS Marks are valid, distinctive, protectable, have acquired secondary meaning, and are associated exclusively with Plaintiff and MetroPCS.

## DEFENDANTS' MISCONDUCT

32.    MetroPCS has discovered that, although large quantities of its Handsets are being purchased throughout the United States, a significant number of these Handsets are not being used in connection with its services.  Instead, entities and individuals such as Defendants and their co-conspirators, with no intention of lawfully connecting to or using MetroPCS services, are fraudulently acquiring and reselling MetroPCS Handsets in bulk quantities.  The Handsets are acquired, either directly by Defendants or through their co-conspirators, and then sold for a substantial profit and shipped directly overseas or shipped to other domestic traffickers who add them to larger shipments headed overseas, to be used on foreign carriers' networks.  Before being shipped overseas, the Handsets are usually taken out of their original packaging, and all accessories, warranties, and manuals are removed.  The Handsets are often wrongfully unlocked by Defendants or their co-conspirators, to raise their value and prepare them for use on foreign carriers.  Those new MetroPCS Handsets acquired through theft or fraud that are not shipped overseas are often sold in bulk domestically on the warranty market.  Defendants undertake these actions for their own profit.

33.    Once a MetroPCS Handset is unlocked and shipped overseas or resold domestically to be used on other wireless networks, Plaintiff no longer has a revenue source to recoup its investment in that Handset.

34.    If MetroPCS identifies a Handset as connected with theft, fraud, or other loss, the International Mobile Station Equipment Identity ("IMEI") is logged into MetroPCS's system and the Handset can no longer be activated or used on the MetroPCS network unless or until that designation is changed by MetroPCS.  This is done in attempt to deter criminal activity.  The Handset is thereafter referred to in the handset trafficking community as having a "Bad IMEI."  As it is no longer a

functioning MetroPCS Phone, the only value of a Bad IMEI Handset is in unlocking the handset for use on other domestic networks and for overseas resale—it is no longer a functioning MetroPCS Handset.

35.    Defendants are knowingly and willfully engaged in an enterprise that traffics in and resells MetroPCS Handsets.  Defendants have acquired and sold large quantities of MetroPCS Handsets through various co-conspirators.  While the complete extent of Defendants' activities in the Handset Theft and Trafficking Scheme is not yet known, Defendants are actively involved in several integral components of the conspiracy.

36.    Defendants are not authorized MetroPCS dealers or retailers. Defendants have no legitimate connection to MetroPCS.

37.    Defendants traffic illicitly-obtained new MetroPCS Handsets in bulk for resale and, by their own admission, for international shipment to Mexico.  MetroPCS uncovered Defendants' illegal activities through an advertisement on Craigslist, where Defendants offered to buy new MetroPCS Handsets.  Upon information and belief, Defendants use websites like Facebook, Instagram, Yelp.com, Buzzfile.com, Google Plus, and Craigslist.org, as well as their own website, to advertise and solicit new MetroPCS Handsets.  Copies of Defendants' advertisements on Craigslist are attached as **Exhibit C**.  Defendants' website at SDPhoneTrader.com advertises to buy new cellphones, including MetroPCS Handsets, and specifically advertises unlocking services.  Screenshots of Defendants' websites and online social media advertisements are attached hereto as **Exhibit D**.

38.    In response to Defendants' offer to buy new MetroPCS Handsets, investigators for MetroPCS began communicating with Carlos Elizondo, d/b/a SD Phone Trader and EC Wireless, at telephone number 619-992-XXXX.  On October 19, 2015, the investigators for MetroPCS confirmed that Defendants were looking to buy new MetroPCS LG L70 handsets.  On October 20, 2015, investigators for MetroPCS traveled to Defendants' store located at 1131 Broadway Street, San

Diego, CA 92101, believed to be owned by Ramon Elizondo, and met with a male who identified himself as "Sal" and said he worked in the store. The investigators showed Sal five (5) new MetroPCS LG L70 handsets. Sal contacted Carlos Elizondo and confirmed that Defendants wanted to purchase the Handsets.

39.     Sal indicated that the new MetroPCS Handsets would be sent to Mexico. He also stated that Defendants would be interested in buying new MetroPCS Handsets in bulk but directed the investigator to discuss that with his boss, Carlos Elizondo. Sal did not have enough cash on hand to purchase the five (5) MetroPCS Handsets and, therefore, called Carlos Elizondo, who came a few minutes later with cash to pay for the MetroPCS Handsets. Defendants purchased all five (5) MetroPCS Handsets.

40.     The investigators for MetroPCS continued contact with Defendants via text messages. Defendants expressed interest in purchasing new MetroPCS Handsets in bulk, and was particularly interested in handsets that could be unlocked. Defendants committed to buy another 120 new MetroPCS Handsets from the undercover investigator. Copies of the October 19, 2015 through November 24, 2015 text message communications between Defendants and the undercover investigators, including the photographs provided by Defendants, are attached hereto as **Composite Exhibit E**.

**SUBSTANTIAL HARM CAUSED BY DEFENDANTS' MISCONDUCT**

41.     Defendants' actions substantially harm Plaintiff in several ways, including *inter alia*: (1) Plaintiff is deprived of the opportunity to recoup its substantial investment in MetroPCS Handsets; (2) Plaintiff is deprived of the opportunity to earn profits by providing wireless service to legitimate MetroPCS consumers; (3) Plaintiff is hampered in its ability to migrate its customers from older to newer technology through legitimate timely upgrades, which negatively impacts the efficiency of its wireless network speed; (4) the MetroPCS brand, image and reputation are harmed by the inability to timely remove old Handset

models from circulation through legitimate upgrades; (5) Defendants' actions seriously and irreparably interfere with Plaintiff's relationships with its customers, retailers, and dealers; and (6) Defendants' infringement of the MetroPCS name and Marks causes significant ongoing and irreparable losses and harm to MetroPCS's brand, image, and reputation. All of these factors undermine Plaintiff's competitive edge in the wireless industry.

42. On information and belief, the conduct of Defendants, their unknown co-conspirators, and others who engage in the unlawful acquisition and resale of large quantities of new MetroPCS Handsets has also resulted in shortages of available MetroPCS Handsets, particularly the most in-demand models. This misconduct substantially harms Plaintiff and its relationship with dealers, retailers, and consumers because Plaintiff is not able to supply sufficient MetroPCS Handsets to satisfy the demand from legitimate consumers who, as a result, go elsewhere for their telecommunications services.

43. Plaintiff suffers additional, irreparable harm when the MetroPCS Handsets are removed from the original packaging and altered because Plaintiff is deprived of the means to control the quality of its product. This becomes especially damaging where a potential legitimate MetroPCS customer within the United States acquires a Handset from Defendants, such as through eBay, that the customer believes is a genuine MetroPCS Handset, with all of the attendant benefits and is later disappointed in MetroPCS because the Handset does not work as intended on the network because it has been denominated a Bad IMEI Handset or otherwise. Furthermore, the process of unlocking and reselling a MetroPCS Handset voids the manufacturer's warranty on the device. The unlocked repackaged MetroPCS Handsets are then resold without the original manufacturer's warranty documentation. Both consumers and Plaintiff are harmed when a MetroPCS Handset that has been altered or sold by Defendants or their co-conspirators is submitted for warranty repair. Consumers who purchase

13

MetroPCS Handsets from Defendants or their co-conspirators are unable to obtain warranty service in the event they experience problems with their Handsets.  As a result, the MetroPCS reputation suffers further.

44.    MetroPCS's reputation is further damaged by its inability to assist those consumers who buy MetroPCS Handsets from Defendants, because despite bearing the MetroPCS Mark, they are no longer valid MetroPCS Handsets because the actions of Defendants and their co-conspirators voided the warranties and/or as identified Bad IMEI phones, they cannot be activated on MetroPCS service.

45.    Defendants' conduct has resulted in substantial harm to Plaintiff's business reputation and goodwill; a greater likelihood of confusion, mistake, and deception as to the source of origin of MetroPCS products unlawfully sold by the Defendants and confusion as to what if any relationship exists between Plaintiff and Defendants.

## CIVIL LITIGATION AGAINST OTHER PHONE TRAFFICKERS

46.    Federal courts have recognized that conduct similar to Defendants' conduct is unlawful.

47.    In addition to MetroPCS and T-Mobile USA, Inc., Sprint Solutions, Inc. and Sprint Communications Company L.P. ("Sprint), TracFone Wireless, Inc., Nokia Corporation, and AT&T Mobility LLC have all filed lawsuits in numerous federal courts across the country against handset traffickers engaged in the practice of defrauding legitimate consumers and the telecommunications companies by acquiring large quantities of wireless telephones and reselling them for profit.  Each of those companies has succeeded in obtaining Final Judgments and Permanent Injunctions.  Copies of several examples of Final Judgments and Permanent Injunctions are attached hereto as **Composite Exhibit F**.  A defendant in one case who continued trafficking in phones in violation of an injunction issued by the U.S. District Court for the Southern District of Texas was charged

with criminal contempt of court and sentenced to serve 57 months in prison. Copies of the Memorandum Opinion and Order of Contempt, Application for Criminal Contempt, the Order finding cause to believe the defendant is guilty of criminal contempt, and Judgment of Criminal Contempt are attached hereto as **Composite Exhibit G**.

## CRIMINAL INVESTIGATION AND
## PROSECUTION OF PHONE TRAFFICKING

48.    Handset traffickers like Defendants have been the subject of numerous criminal investigations and prosecutions across the country.   Some recent examples are:

a.    In August 2014, the United States Attorney for the District of Minnesota announced the indictment of 20 individuals engaged in the illegal acquisition and resale of tens of thousands of Smartphones to the black markets of the Middle East and China.  A joint task force comprised of the U.S. Secret Service, the Minnesota Financial Crimes Task Force, and the St. Paul Police Department investigated and then apprehended members of the "Mustafa Organization," who had been using runners, engaged in contract and subscription fraud, and robbery to acquire large quantities of subsidized phones for overseas resale.

b.    In March, 2013 the California Attorney General charged two individuals with trafficking nearly $4M in wireless phones to Hong Kong over an 8 month period.

c.    On August 21, 2012, federal Homeland Security agents and SWAT teams conducted a raid on facilities operated by handset trafficker Ace Wholesale and on the home of the company's CEO, Jason Floarea.  On October 16, 2014, Mr. Floarea, pled

guilty to Interstate Transportation of Stolen Property and on April 16, 2015, Floarea was sentenced to twelve (12) months and one day in federal prison.

d.   On or about February 25, 2013, federal law enforcement authorities, including agents from the Federal Bureau of Investigation, the United States Secret Service, and the Bureau of Alcohol, Tobacco, Firearms and Explosives, raided a warehouse belonging to a phone trafficking company called Wireless Buybacks in Elkridge, Maryland, pursuant to a search warrant and found the facilities were being used to harbor stolen wireless phones.

e.   An FBI sting operation in Philadelphia that began with wireless phone trafficking resulted in the conviction of 16 individuals on terrorism charges, when it turned out that the proceeds from their phone trafficking and other illegal conduct was being funneled to the terrorist organization Hezbollah.

49.   Copies of court documents, press releases, and news reports regarding these incidents are attached hereto as **Composite Exhibit H.**

## COUNT ONE

### UNFAIR COMPETITION
### (Against all Defendants)

50.   Plaintiff reasserts the allegations set forth in Paragraphs 1 through 46 above as though fully set forth herein.

51.   Defendants' conduct in acquiring and/or inducing others to acquire the Handsets, disabling or unlocking, inducing others to disable or unlock, and/or assisting others to disable or unlock the Handsets, and reselling and/or assisting others to resell the Handsets as new for activation on other wireless networks constitutes unfair competition under the common law of the State of California.

102645643.2

52.     Defendants' conduct in selling, inducing others to sell, and/or conspiring with others to sell unlocked MetroPCS Handsets undermines Plaintiff's incentive programs, illegally appropriates Plaintiff's investment in the Handsets, and constitutes unfair competition under the common law of the State of California.

53.     Defendants' use of at least one of the MetroPCS Marks in connection with the sale of unlocked, materially-different MetroPCS Handsets has caused, and will further cause, a likelihood of confusion, mistake and deception as to the source of origin of Defendants' materially-different products and services, and the relationship between MetroPCS and Defendants.  Thus, Defendants have also engaged in unfair competition with Plaintiff in violation of the common law of the State of California by selling and/or offering, and promoting their products with the intention of trading upon the goodwill established by MetroPCS and are thereby misappropriating the benefits of substantial effort and money expended by Plaintiff in establishing its rights in and to the MetroPCS Mark.

54.     Defendants' actions were done in bad faith; they were intentional, malicious, and willful, and have caused substantial harm to Plaintiff.

55.     Plaintiff is entitled to appropriate relief, including injunctive relief.

## COUNT TWO

### TORTIOUS INTERFERENCE
### WITH BUSINESS RELATIONSHIPS AND PROSPECTIVE ADVANTAGE
### (Against all Defendants)

56.     Plaintiff reasserts the allegations set forth in Paragraphs 1 through 46 above as though fully set forth herein.

57.     A business relationship, and an expectancy of business relationships, exists between Plaintiff and authorized dealers of MetroPCS Handsets.

58.     A business relationship, and an expectancy of business relationships, exists between Plaintiff and authorized retailers of MetroPCS Handsets.

17

59.     A business relationship, and an expectancy of business relationships, exists between Plaintiff and current and prospective MetroPCS customers.

60.     There is a high probability of future economic benefit to Plaintiff as a result of these current and prospective business relationships.

61.     Defendants have knowledge of and have intentionally and unjustifiably interfered with, and/or have knowingly facilitated a conspiracy to interfere with, these current and prospective business relationships between Plaintiff, authorized dealers and retailers who sell MetroPCS products, and legitimate MetroPCS customers or prospective customers.

62.     Specifically, but without limitation, Defendants knew that Plaintiff has business relationships, and an expectancy of business relationships, with legitimate consumers of MetroPCS Handsets and wireless service.  Defendants interfered with these relationships by engaging in the Handset Theft and Trafficking Scheme and causing, at least in part, Plaintiff to have an insufficient supply of MetroPCS Handsets available to meet legitimate consumer demand. Defendants also interfered with the relationships that existed between MetroPCS and purchasers by inducing the purchasers, including runners and credit mules, to breach MetroPCS' terms and conditions.

63.     Defendants also knew that Plaintiff has business relationships with authorized dealers and retailers of MetroPCS Handsets to provide said dealers with sufficient quantities of MetroPCS Handsets for their legitimate consumers' use exclusively on MetroPCS's wireless network.  Defendants' Scheme has resulted in significant numbers of new MetroPCS Handsets that are diverted from service on MetroPCS, causing Handset shortages, thereby harming Plaintiff's relationship with its authorized dealers and retailers because MetroPCS is unable to fully and timely supply dealers with sufficient Phones to satisfy the demands from legitimate customers.

/ / /

64.    Defendants also knew that Plaintiff has business relationships with legitimate MetroPCS customers to provide them with Handsets and MetroPCS service.

65.    Defendants are intentionally interfering with Plaintiff's business relationships and prospective advantages through improper means and in violation of the law.

66.    Defendants engaged in the acts of interference set forth herein with a conscious desire to prevent the relationships from occurring or continuing, or Defendants knew that the interference was certain or substantially certain to occur as a result of their conduct.

67.    As set forth fully below, Defendants' intentional interference was committed through the use of fraud and fraudulent misrepresentations to Defendants' direct benefit and to the detriment of Plaintiff.

68.    Defendants' acts injured Plaintiff's business relationships.

69.    Plaintiff has been proximately damaged and continues to be damaged as a result of Defendants' interference.

70.    There is no adequate remedy at law to fully compensate Plaintiff for the harm caused by Defendants' tortious interference.

## COUNT THREE

### CIVIL CONSPIRACY
### (Against all Defendants)

71.    Plaintiff reasserts the allegations set forth in Paragraphs 1 through 46 above as though fully set forth herein.

72.    An agreement and conspiracy existed and continues to exist between and among the Defendants and other co-conspirators to unlawfully acquire in bulk, traffic, and resell unlawfully unlocked and altered MetroPCS Handsets under at least one of the MetroPCS Marks, which results in federal common law and statutory trademark infringement, common law unfair competition,

contributory trademark infringement, tortious interference with business relationships and prospective advantage, unjust enrichment, and violations of the Computer Fraud and Abuse Act, among other things.

73.     Each Defendant knowingly agreed to engage, and did engage, in one or more overt acts in pursuit of the conspiracy as set forth with more particularity in this Complaint.

74.     Plaintiff has been proximately damaged by the conspiracy and Defendants' actions in furtherance thereof.

75.     There is no adequate remedy at law to fully compensate Plaintiff for the harm caused by Defendants' conspiracy.

## COUNT FOUR

## UNJUST ENRICHMENT
### (Against all Defendants)

76.     Plaintiff reasserts the allegations set forth in Paragraphs 1 through 46 above as though fully set forth herein.

77.     By bulk acquisition of MetroPCS Handsets at less than the manufacturer cost of the Handsets with no intention of using the Handsets on MetroPCS service, Defendants have obtained benefits from Plaintiff which have caused significant harm to Plaintiff and resulted in significant financial gain to Defendants through their resale of the illicitly-acquired MetroPCS Handsets.

78.     Defendants have knowingly and voluntarily obtained the benefits.

79.     Defendants have retained the benefits under such circumstances that make it unjust and inequitable for Defendants to retain the benefits without paying Plaintiff the value of the benefits Defendants acquired.

80.     There is no adequate remedy at law to fully compensate Plaintiff for the harm caused by Defendants' unjust enrichment.

/ / /

/ / /

102645643.2

## COUNT FIVE

### CONSPIRACY TO INDUCE BREACH OF CONTRACT
### (Against all Defendants)

81.     Plaintiff reasserts the allegations set forth in Paragraphs 1 through 46 above as though fully set forth herein.

82.     Defendants solicit Runners and Mules to purchase MetroPCS Handsets in bulk for the benefit of Defendants.

83.     On information and belief, Defendants' active solicitation of Runners and Mules includes contacting these individuals and requesting that they obtain specific MetroPCS Handset models.

84.     Plaintiff had valid and existing contracts with these Runners and Mules and other original purchasers of the Handsets ("Purchasers").

85.     Defendants had knowledge of the contracts between Plaintiff and Purchasers, and intended to, and in fact did, induce Purchasers to breach their contracts with Plaintiff.

86.     The breaches of the contracts were proximately caused by Defendants' misconduct.

87.     Plaintiff suffered damages as a result.

## COUNT SIX

### COMMON LAW FRAUD AND FRAUDULENT MISREPRESENTATION
### (Against all Defendants)

88.     Plaintiff reasserts the allegations set forth in Paragraphs 1 through 46 above as though fully set forth herein.

89.     As part of the Handset Theft and Trafficking Scheme, each Defendant, directly or indirectly through co-conspirators, regularly and systematically misrepresent to Plaintiff that the MetroPCS Handsets are being acquired for a legitimate purpose, that the Handsets will be used by Defendants or

102645643.2

other legitimate consumers with MetroPCS service, and that they will perform in accordance with the Terms and Conditions.

90.   On information and belief, each Defendant participated in defrauding Plaintiff, and its legitimate customers, retailers, and dealers to acquire MetroPCS products, including the specific model identified *supra*, to be unlocked, resold, and ultimately shipped overseas for activation on foreign carrier networks.

91.   When Defendants, directly or through their co-conspirators, acquire MetroPCS Handsets as part of the Scheme, they do not intend to use the Handsets for a legitimate purpose or to activate them or maintain them as active on MetroPCS service, or otherwise perform in accordance with the Terms and Conditions.

92.   Defendants and their co-conspirators know that they are required to activate for use the MetroPCS Handsets on MetroPCS service, pay the monthly service charge, and otherwise comply with the Terms and Conditions.

93.   Defendants intended for Plaintiff to rely on their misrepresentations, and/or the misrepresentations of their co-conspirators, to allow Defendants to acquire and unlock the Handsets for improper purposes.

94.   Plaintiff's reliance on the misrepresentations of Defendants and their co-conspirators was reasonable under the circumstances.

95.   Plaintiff has been damaged and continues to suffer damages as a result of Defendants' actions.

96.   There is no adequate remedy at law to fully compensate Plaintiff for the harm caused by Defendants' fraud.  Each Defendant is guilty of fraud, malice and oppression in that each Defendant intentionally committed said acts either for the purpose of  injuring Plaintiff, or, in the alternative, acted in such conscious disregard of Plaintiff's rights, that by reason thereof, Plaintiff is entitled to exemplary or punitive damages in a sum according to proof.

/ / /

102645643.2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT SEVEN

### TRAFFICKING IN COMPUTER PASSWORDS
### 18 U.S.C. § 1030(a)(6)
### (Against all Defendants)

97.     Plaintiff reasserts the allegations set forth in Paragraphs 1 through 46 above as though fully set forth herein.

98.     The MetroPCS Handsets that are trafficked by Defendants are loaded with confidential codes/passwords that access: (a) Plaintiff's national telecommunications computer network to make and receive wireless voice calls and to transmit data, and (b) Plaintiff's computer billing network (collectively, "Plaintiff's protected computer networks").   As such, the Handsets act as a gateway to Plaintiff's protected computer networks.   Plaintiff restricts access to these protected computer networks through, among other things, the confidential codes/passwords contained in the Handsets and the confidential codes/passwords and security PINs protecting customer accounts ("security codes").

99.     Through their Scheme, Defendants are knowingly trafficking in the confidential codes contained in the Handsets and the associated security codes with the intent to defraud Plaintiff.

100.     Upon information and belief, once Defendants unlawfully acquire the MetroPCS Handsets, they use fraudulently-obtained confidential codes/passwords to gain additional access to Plaintiff's protected computer networks.   This additional access into Plaintiff's protected computer networks is not authorized in any way.   Upon information and belief, Defendants share these confidential codes/passwords and methodologies for unlocking MetroPCS Handsets among themselves and with their co-conspirators.

101.     Upon information and belief, Defendants acquire the unlocking codes/passwords and methodologies for unlocking MetroPCS Handsets by misrepresenting to Plaintiff, either directly or through one of their co-conspirators,

102645643.2

that the Handsets are being acquired and unlocked for a legitimate purpose for use by legitimate consumers with MetroPCS service, when, in fact, they are not.

102. Upon information and belief, Defendants unlawfully access Plaintiff's protected computer networks using fraudulently-obtained confidential codes/passwords to: (1) perform various tests to confirm that the Handset they are purchasing is, in fact, active MetroPCS Handsets; and/or (2) unlock the MetroPCS Handset, which requires the manipulation and oftentimes permanent deletion of the proprietary software that is installed in MetroPCS Handsets and make unauthorized changes in Plaintiff's protected computer networks so the MetroPCS Handset will operate on other networks.

103. Through the Handset Theft and Trafficking Scheme, Defendants are knowingly trafficking in the confidential codes/passwords contained in the Handsets with the intent to defraud and harm Plaintiff.

104. Defendants' transfer of the Handsets and confidential codes to others constitutes "trafficking" of the codes as defined in 18 U.S.C. § 1029 in that the codes/passwords were transferred, or otherwise disposed of, to others, or Defendants obtained control of the codes/passwords with intent to transfer or dispose of them.

105. Defendants' trafficking of the Handsets substantially affects interstate commerce and communication in that the codes/passwords contained in the Handsets are trafficked over the internet, throughout the United States, and around the world, and Plaintiff's protected computer networks are used in and affect interstate commerce and communication, and provide wireless communication services pursuant to licenses issued by the Federal Communications Commission.

106. Defendants' trafficking of illicitly-acquired codes/passwords to access Plaintiff's protected computer networks has caused and will continue to cause Plaintiff to suffer injury, with "damages" and "losses" – as those terms are

defined in Sections 1030(e)(8) and 1030(e)(11), respectively -- substantially in excess of $5,000 over a one-year period.

107. With respect to loss, Plaintiff has spent well in excess of $5,000 over a one-year period assessing its hacked protected computer networks for damage and taking steps to prevent future unauthorized access by Defendants and/or their co-conspirators.

108. Also with respect to loss, Plaintiff has spent well in excess of $5,000 over a one-year period investigating Defendants' intrusions into Plaintiff's protected computer networks, assessing the possible impairment to the integrity of its protected computer networks and conducting damage assessment regarding Defendants collection and dissemination of MetroPCS Handsets and security codes, as well as tracking down fraudulently sold Handsets.

109. Moreover, with respect to loss, Plaintiff has spent well in excess of $5,000 over a one-year period in costs to discover Defendants' identity and/or the method by which Defendants' access Plaintiff's protected computer networks without authorization.

110. With respect to damage, by infiltrating Plaintiff's computer and telecommunications network and collecting and disseminating the illegally activated Handsets and codes/passwords, Defendants have substantially impaired the integrity of Plaintiff's protected computer networks in an amount in excess of $5,000. Moreover, Defendants' actions have deprived Plaintiff of the means to control the quality of its products and services.

111. Defendants' activities constitute trafficking in computer passwords in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(6).

112. Defendants' conduct is intentional, malicious and willful.

113. Pursuant to 18 U.S.C. § 1030(g), Plaintiff is entitled to maintain this civil action against Defendants to obtain compensatory damages and injunctive and other equitable relief for the reasons identified above, and because

102645643.2

Defendants' conduct involves at least one of the factors identified in 18 U.S.C §
1030(c)(4)(A)(i), including the factor set forth in subclause (I): the loss to Plaintiff
and its MetroPCS customers as a result of Defendants' conduct during any one
year period aggregated at least $5,000 in value.

## COUNT EIGHT

### UNAUTHORIZED ACCESS
### 18 U.S.C. § 1030(a)(5)(C)
### (Against all Defendants)

114.    Plaintiff reasserts the allegations set forth in Paragraphs 1 through 46
above as though fully set forth herein.

115.    The MetroPCS Handsets that are trafficked by Defendants are loaded
with confidential codes/passwords that access: (a) Plaintiff's national
telecommunications computer network to make and receive wireless voice calls
and to transmit data, and (b) Plaintiff's computer billing network (collectively,
"Plaintiff's protected computer networks").   As such, the Handsets act as a
gateway to Plaintiff's protected computer networks.  Plaintiff restricts access to
these protected computer networks through, among other things, the confidential
codes/passwords contained in the Handsets and the confidential codes/passwords
and security PINs protecting customer accounts ("security codes").

116.    In general, MetroPCS Handsets are connected to and activated on
Plaintiff's protected computer networks when purchased from MetroPCS.

117.    Plaintiff's proprietary computer system holds confidential
information, is connected to the internet, and assists in providing federally-
regulated telecommunications services.   Plaintiff's computer systems are
"protected computers" as that term is defined in Section 1030(e)(2)(B) of the
Computer Fraud and Abuse Act because they are used in interstate commerce and
communications.

/ / /

102645643.2

118.   In furtherance of their Handset Theft and Trafficking Scheme, Defendants and/or their co-conspirators use fraud and misrepresentation to acquire MetroPCS Handsets, including the most in-demand Smartphones, and in so doing void any purchase agreement and any legitimate access to Plaintiff's computer networks.   As such, Defendants' access to the Handsets and into Plaintiff's protected computer networks is not authorized in any way.

119.   Upon information and belief, once Defendants unlawfully acquire the MetroPCS Handsets, they use fraudulently-obtained confidential codes/passwords to gain additional access to Plaintiff's protected computer networks.   This additional access into Plaintiff's protected computer networks is not authorized in any way.

120.   Upon information and belief, Defendants acquire the unlocking codes/passwords and methodologies for unlocking MetroPCS Handsets by misrepresenting to Plaintiff, either directly or through one of their co-conspirators, that the Handsets are being acquired and unlocked for a legitimate purpose for use by legitimate consumers with MetroPCS service, when, in fact, they are not.

121.   Defendants knowingly and with the intent to defraud, cause Plaintiff to access its proprietary computer systems.   Defendants are not authorized to do so.

122.   Further, by illicitly acquiring and unlocking the Handsets, Defendants necessarily access Plaintiff's protected computer networks because the Handsets are connected to those networks when acquired from MetroPCS.

123.   Defendants acquire and, in some circumstances, unlock the Handsets by misrepresenting to Plaintiff, either directly or through a third-party agent, that the Handsets are being acquired and unlocked for a legitimate purpose and for use by legitimate consumers with MetroPCS service, when, in fact, they are not. Defendants use fraud and misrepresentation to acquire the Handsets from

MetroPCS, and, as such, Defendants' access of Plaintiff's protected computer networks is not authorized in any way.

124.    Upon information and belief, when Defendants acquire a MetroPCS Handset from Runners/Mules acting on their behalf; Defendants carefully examine the Phone, turn it on, and perform various tests to confirm that the Handset they are purchasing is, in fact, an active MetroPCS Handset and that the various electronic code numbers and access numbers loaded on the Handset are correct.  This too constitutes unauthorized access of Plaintiff's protected computer networks via a password, contained in the Handset, obtained through fraud and misrepresentation.

125.    By trafficking in activated MetroPCS Handsets, the Defendants are also knowingly, intentionally, and with the intent to defraud, facilitating the unauthorized access of Plaintiff's protected computer networks.

126.    Defendants' illegal and unauthorized access of Plaintiff's protected computer systems allows them to improperly steal Plaintiff's investment in MetroPCS Handsets.

127.    Defendants' activities substantially affect interstate commerce and communication in that the Handsets are trafficked over the internet, throughout the United States and around the world, and Plaintiff's computer system and telecommunications network are used in and affect interstate commerce and communication, as well as provide wireless communication services pursuant to licenses issued by the Federal Communications Commission.

128.    Defendants' unauthorized access of Plaintiff's protected computer systems has caused and will continue to cause Plaintiff to suffer injury, with "damages" and "losses" – as those terms are defined in Sections 1030(e)(8) and 1030(e)(11), respectively --   substantially in excess of $5,000 over a one-year period.

/ / /

102645643.2

129.   With respect to loss, Plaintiff has lost its investments in the illegally-acquired MetroPCS Handsets and security codes and spent well in excess of $5,000 investigating and assessing the possible impairment to the integrity of its protected computer systems, taking remedial action to counteract Defendants' intrusions, conducting a damage assessment regarding Defendants' collection and dissemination of MetroPCS Handsets, and tracking down fraudulently sold Handsets.

130.   Moreover, with respect to loss, Plaintiff has spent well in excess of $5,000 over a one-year period in costs to discover Defendants' identity and/or the method by which Defendants' accessed Plaintiff's protected computer networks without authorization.

131.   With respect to damage, by infiltrating Plaintiff's computer systems and collecting and disseminating the illegally-trafficked Handsets and security codes, Defendants have substantially impaired the integrity of Plaintiff's systems in an amount in excess of $5,000.  Moreover, Defendants' actions have deprived Plaintiff of the means to control the quality of its products and services, and have stolen Plaintiff's financial investment in MetroPCS Handsets.

132.   Defendants' activities constitute unauthorized access in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(5)(C).

133.   Defendants' conduct is intentional, malicious and willful.

134.   Pursuant to 18 U.S.C. § 1030(g), Plaintiff is entitled to maintain this civil action against Defendants to obtain compensatory damages and injunctive and other equitable relief because of the reasons identified above, and because Defendants' conduct involves at least one of the factors identified in 18 U.S.C § 1030(c)(4)(A)(i), including the factor set forth in subclause (I): the loss to Plaintiff and its MetroPCS customers as a result of Defendants' conduct during any one year period aggregated at least $5,000 in value.

/ / /

## COUNT NINE

### UNAUTHORIZED ACCESS WITH INTENT TO DEFRAUD
### 18 U.S.C. § 1030(a)(4)
### (Against all Defendants)

135.   Plaintiff reasserts the allegations set forth in Paragraphs 1 through 46 above as though fully set forth herein.

136.   The MetroPCS Handsets that are acquired by Defendants, directly and/or from their co-conspirators, in furtherance of the Handset Theft and Trafficking Scheme, are loaded with codes/passwords that access: (a) Plaintiff's national telecommunications computer network to make and receive wireless voice calls and to transmit data, and (b) Plaintiff's computer billing network (collectively, "Plaintiff's protected computer networks").   In addition, manufacturers that produce MetroPCS wireless phones for Plaintiff install proprietary and confidential software, ordered and paid for by Plaintiff, on the MetroPCS Handsets to lock the Handsets to Plaintiff's protected computer networks and prevent the Handsets from being used other than with MetroPCS service.

137.   In general, MetroPCS Handsets are connected to and activated on Plaintiff's protected computer networks when purchased from MetroPCS.

138.   In furtherance of their Handset Theft and Trafficking Scheme, Defendants and/or their co-conspirators use fraud and misrepresentation to acquire MetroPCS Handsets, including the most in-demand Smartphones, and in so doing void any purchase agreement and any legitimate access to Plaintiff's computer networks.   As such, Defendants' access to the Handsets and into Plaintiff's protected computer networks is not authorized in any way.

139.   Upon information and belief, once Defendants unlawfully acquire the MetroPCS Handsets, they use fraudulently-obtained confidential codes/passwords to gain additional access to Plaintiff's protected computer networks.   This

102645643.2

additional access into Plaintiff's protected computer networks is not authorized in any way.

140. Upon information and belief, Defendants acquire the unlocking codes/passwords and methodologies for unlocking MetroPCS Handsets by misrepresenting to Plaintiff, either directly or through one of their co-conspirators, that the Handsets are being acquired and unlocked for a legitimate purpose for use by legitimate consumers with MetroPCS service, when, in fact, they are not.

141. Upon information and belief, Defendants unlawfully access Plaintiff's protected computer networks using fraudulently-obtained confidential codes/passwords to: (1) perform various tests to confirm that the Handset they are purchasing is, in fact, active MetroPCS Handsets; and/or (2) unlock the MetroPCS Handset, which requires the manipulation and oftentimes permanent deletion of the proprietary software that is installed in MetroPCS Handsets and make unauthorized changes in Plaintiff's protected computer networks so the MetroPCS Handset will operate on other networks.

142. Defendants are knowingly, intentionally, and with the intent to defraud, facilitating the unauthorized access of Plaintiff's protected computer networks.

143. Defendants' access of Plaintiff's protected computer systems allows them to improperly steal Plaintiff's substantial financial investment in MetroPCS Handsets.

144. Plaintiff's protected computer systems are "protected computers" as that term is defined in Section 1030(e)(2)(B) of the Computer Fraud and Abuse Act because they are used in interstate commerce and communications.

145. Defendants' activities substantially affect interstate commerce and communication in that the Handsets are trafficked over the internet, throughout the United States, and around the world, and Plaintiff's computer system and telecommunications network are used in and affect interstate commerce and

102645643.2

communication and provide wireless telecommunications service pursuant to licenses issued by the Federal Communications Commission.

146.    Defendants' unauthorized access of Plaintiff's protected computer systems has caused and will continue to cause Plaintiff to suffer injury, with "damages" and "losses" – as those terms are defined in Sections 1030(e)(8) and 1030(e)(11), respectively --  substantially in excess of $5,000 over a one-year period.

147.    With respect to loss, Plaintiff has spent well in excess of $5,000 over a one-year period assessing its protected computer networks for damage and taking steps to prevent future unauthorized access by Defendants and/or their co-conspirators.

148.    In addition, with respect to loss, Plaintiff has spent well in excess of $5,000 over a one-year period identifying the impairment of or damage to Plaintiff's protected computer networks that Defendants' and/or their co-conspirators accessed with authorization.

149.    Further, with respect to loss, Plaintiff has spent well in excess of $5,000 over a one-year period in costs associated with investigating Defendants' and/or their co-conspirators' intrusions into Plaintiff's protected computer networks and taking subsequent remedial measures.

150.    Moreover, with respect to loss, Plaintiff has spent well in excess of $5,000 over a one-year period in costs to discover Defendants' identity and/or the method by which Defendants' accessed Plaintiff's protected computer networks without authorization.

151.    With respect to damage, by infiltrating Plaintiff's computers systems and collecting and disseminating the illegally-obtained Handsets, Defendants have substantially impaired the integrity of Plaintiff's systems in an amount in excess of $5,000.  Moreover, Defendants' actions have deprived Plaintiff of the means to

control the quality of MetroPCS products and services, and have stolen Plaintiff's financial investment in its Handsets.

152.    Defendants' activities constitute unauthorized access in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(4).

153.    Defendants' conduct is intentional, fraudulent, malicious and willful.

154.    Pursuant to 18 U.S.C. § 1030(g), Plaintiff is entitled to maintain this civil action against Defendants to obtain compensatory damages and injunctive and other equitable relief because of the reasons identified above, and because Defendants' conduct involves at least one of the factors identified in 18 U.S.C § 1030(c)(4)(A)(i), including the factor set forth in subclause (I): the loss to Plaintiff and its MetroPCS customers as a result of Defendants' conduct during any one year period aggregated is at least $5,000 in value.

## COUNT TEN

### FEDERAL TRADEMARK INFRINGEMENT
### 15 U.S.C. § 1114 [§ 32(1) of the Lanham Act]
### (Against all Defendants)

155.    Plaintiff reasserts the allegations set forth in Paragraphs 1 through 46 above as though fully set forth herein.

156.    Defendants' and/or their co-conspirators' aforementioned conduct constitutes use of certain federally-registered MetroPCS Marks without authorization in connection with their conspiracy to sell and offer for sale unlocked, materially-different MetroPCS Handsets, which downstream customers will discover have been altered from their original state and do not include the warranties, accessories, manuals and related items that constitute part of the MetroPCS Handset package.

157.    Defendants' and/or their co-conspirators' use of certain federally-registered MetroPCS Marks in connection with the sale of MetroPCS Handsets has caused, and will further cause, a likelihood of confusion, mistake and

33

deception as to the source of origin of Defendants' infringing products, and the relationship between Plaintiff and Defendants.

158.   Defendants' and/or their co-conspirators' unauthorized use of certain federally-registered MetroPCS Marks in connection with their participation in the Scheme is likely to continue in the future, all to the great and irreparable damage to the business, reputation and goodwill of Plaintiff.

159.   Defendants' and/or their co-conspirators' use of certain federally-registered MetroPCS Marks in connection with the unlocked, materially-different MetroPCS Handsets, which do not include warranties, manuals, accessories and related items made part of the MetroPCS Handset package, and may have been flagged as "Bad IMEI" Handsets and not able to be activated with MetroPCS service, constitutes a misappropriation of Plaintiff's distinguishing and identifying federally-registered trademarks that were created as a result of significant effort and expense by Plaintiff and its predecessor-in-interest over a long period of time.

160.   Defendants' and/or their co-conspirators' use of certain federally-registered MetroPCS Marks evokes an immediate, favorable impression or association and constitutes a false representation that the products and business of Defendants have some connection, association or affiliation with Plaintiff, and is likely to mislead the trade and public into believing that Defendants' products and services originate from, are affiliated with, or are sponsored, authorized, approved or sanctioned by Plaintiff.

161.   Defendants, in committing the foregoing acts in commerce, have damaged, and will continue to damage, Plaintiff and the reputation and goodwill of Plaintiff, and have been unjustly enriched and will continue to unjustly enrich themselves at the expense of Plaintiff.

162.   Plaintiff is without an adequate remedy at law to redress such acts, and will be irreparably damaged unless Defendants are enjoined from committing and continuing to commit such acts.

163.   Defendants' aforesaid acts constitute willful infringement of Plaintiff's aforementioned federally registered trademarks in violation of 15 U.S.C. § 1114.

## COUNT ELEVEN

**FEDERAL COMMON LAW TRADEMARK INFRINGEMENT
AND FALSE ADVERTISING
15 U.S.C. § 1125 (a)(1)(A) and (B) [§ 43(a) of the Lanham Act]
(Against all Defendants)**

164.   Plaintiff reasserts the allegations set forth in Paragraphs 1 through 46 above as though fully set forth herein.

165.   Defendants' and/or their co-conspirators' aforementioned conduct constitutes use of at least one of the MetroPCS Marks without authorization in connection with their conspiracy to sell and offer for sale unlocked, materially-different MetroPCS Handsets, which downstream customers will discover have been altered from their original state, are inoperable on MetroPCS service, and do not include the warranties, accessories, manuals and related items that constitute part of the MetroPCS Handset package.

166.   Defendants' and/or their co-conspirators' use of at least one of the MetroPCS Marks in connection with the sale of unlocked, materially-different MetroPCS Handsets has caused, and will further cause, a likelihood of confusion, mistake and deception as to the source of origin of Defendants' materially-different products, and the relationship between Plaintiff and Defendants.

167.   Defendants' and/or their co-conspirators' unauthorized use of at least one of the MetroPCS Marks is likely to continue in the future, all to the great and irreparable damage to the business, reputation, and goodwill of Plaintiff.

168.   Defendants' and/or their co-conspirators' use of at least one of the MetroPCS Marks in connection with the unlocked, materially-different MetroPCS Handsets, which do not include warranties, manuals, accessories and related items made part of the MetroPCS Handset package, and, in some cases, have been

35

flagged as "Bad IMEI" Handsets and not able to be activated on MetroPCS service, constitutes a misappropriation of at least one of the distinguishing and identifying MetroPCS Marks that was created as a result of significant effort and expense.

169.  Defendants' and/or their co-conspirators' use of at least one of the MetroPCS Marks evokes an immediate, favorable impression or association and constitutes a false representation that the products and business of Defendants have some connection, association or affiliation with MetroPCS, and thus constitutes false designation of origin and is likely to mislead the trade and public into believing that Defendants' products and services originate from, are affiliated with, or are sponsored, authorized, approved or sanctioned by MetroPCS. Defendants are not affiliated with MetroPCS in any way.

170.  Defendants, in committing the foregoing acts in commerce, have damaged and will continue to damage Plaintiff and Plaintiff's reputation, and have been unjustly enriched and will continue to unjustly enrich themselves at Plaintiff's expense.

171.  Plaintiff is without an adequate remedy at law to redress such acts, and will be irreparably damaged unless Defendants are enjoined from committing and continuing to commit such acts.

172.  Defendants' use of at least one of the MetroPCS Marks in advertising or promotion misrepresents the nature, characteristics, and/or qualities of their infringing products.  Defendants' advertising and promotion is false and/or misleading.  Defendants' advertising and promotion deceives or has the capacity to deceive consumers.  The deception and misrepresentations have a material effect on the purchasing decisions and affect interstate commerce.

173.  Defendants' activities constitute false designation of origin, false descriptions and representations, and false advertising in commerce in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A) and (B).

174.   Plaintiff is entitled to appropriate relief as prayed for hereinafter, including preliminary and permanent injunctive relief.

175.   Defendants knew or should have known that Plaintiff is the owner of the MetroPCS Marks and that Defendants have no legal right to use any of the MetroPCS Marks on their infringing products.

176.   Defendants are engaged in and continue to engage in the alleged activities knowingly, willfully and deliberately, so as to justify the assessment of exemplary damages and an award of Plaintiff's lost profits, Defendants' profits, and Plaintiff's attorneys' fees.

## COUNT TWELVE

### CONTRIBUTORY TRADEMARK INFRINGEMENT
### (Against all Defendants)

177.   Plaintiff reasserts the allegations set forth in Paragraphs 1 through 46 above as though fully set forth herein.

178.   By misappropriating and using at least one of the MetroPCS Marks in connection with the Handset Theft and Trafficking Scheme, Defendants knowingly aided and enabled distributors and/or sellers of their products to market them to members of the general public in a way that infringes at least one of the MetroPCS Marks by placing in the hands of distributors and/or sellers an instrument of consumer deception.

179.   Defendants' unlawful, unauthorized, and unlicensed sale of unlocked MetroPCS Handsets has contributed to the creation of express and implied misrepresentations that the MetroPCS Handsets, as sold by Defendants, were created, authorized or approved by Plaintiff, may be activated on MetroPCS service, and include warranties.

180.   Upon information and belief, Defendants' conduct leads to post-sale confusion by causing consumers who purchase MetroPCS Handsets from

37

Defendants or their co-conspirators to believe that they are purchasing legitimate MetroPCS handsets approved by Plaintiff that can be activated on MetroPCS service and contain original warranties.

181.   Defendants' conduct constitutes contributory infringement in violation of the Trademark Act.  Defendants' conduct is intentional, malicious and willful.

182.   Plaintiff has been damaged and continues to suffer damages as a result of Defendants' actions.

183.   There is no adequate remedy at law to fully compensate Plaintiff for the harm caused by Defendants' actions.

## COUNT THIRTEEN

## CONVERSION
### (Against all Defendants)

184.   Plaintiff reasserts the allegations set forth in Paragraphs 1 through 46 above as though fully set forth herein.

185.   Defendants have and are engaged in acts of conversion in violation of the law of the State of California.

186.   Plaintiff has the right to provide MetroPCS Handsets and wireless service to the public.  Defendants have no such privilege or right.

187.   Defendants knew or should have known that they obtained the Handsets through illegitimate means and had no legal right to advertise, use or resell them.

188.   Defendants are wrongfully interfering with Plaintiff's rights by engaging in the Handset Theft and Trafficking Scheme.

189.   Defendants intentionally and willfully exerted dominion and ownership over the MetroPCS Handsets.

190.   Defendants' conversion of Plaintiff's property has caused and continues to cause Plaintiff to suffer irreparable injury, loss of reputation, and

exemplary damages to be proved at trial.   Unless enjoined by this Court, Defendants will continue these acts, thereby causing Plaintiff further immediate and irreparable damage.

## COUNT FOURTEEN

### UNFAIR COMPETITION IN VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200, *et seq.*
### (Against all Defendants)

191.   Plaintiff reasserts the allegations set forth in Paragraphs 1 through 46 above as though fully set forth herein.

192.   Defendants' conduct constitutes unfair competition within the meaning of California Business & Professions Code § 17200, *et seq.*   Plaintiff is informed and believes that the Defendants will continue to perform said acts unless the court orders the Defendants to cease and desist.

193.   Defendants' conduct is unlawful, violating, among other things, 15 U.S.C. § 1125 of the Federal Trademark Act and California Business & Professions Code § 17200, *et seq*.

194.   Plaintiff has lost money and property as a proximate result of Defendants' unfair competition and unlawful acts and is entitled to restitution in an amount to be proven of the money and property lost.

195.   Plaintiff has been injured and will continue to be irreparably injured unless the unlawful and unfair conduct of Defendants is enjoined by this Court. Plaintiff seeks a permanent injunction enjoining the Defendants, and the Defendants' agents, servants, and employees, and all persons and entities acting

/ / /

/ / /

/ / /

/ / /

/ / /

under or in concert with them, to cease and desist from the acts set forth in this complaint.

WHEREFORE, Plaintiff respectfully requests that this Court enter final judgment and permanent injunctive relief in favor of Plaintiffs and against Defendants, as follows:

a) awarding Plaintiffs their compensatory, consequential, statutory and special damages including, without limitation, their lost profits, Defendants' profits, loss of goodwill and damage to its reputation, as well as exemplary damages, together with pre and post judgment interest, as provided by law;

b) awarding Plaintiffs their reasonable attorneys' fees and costs associated with this action;

c) granting permanent injunctive relief in favor of Plaintiffs and against Defendants enjoining Defendants from engaging in the unlawful practices described in this Complaint;

d) requiring Defendants, pursuant to the Lanham Act, to deliver to Plaintiffs their entire inventory of phones and products bearing or infringing the MetroPCS Marks or a confusingly similar copy thereof; and

e) granting such further relief as this Court deems just and proper.

Respectfully submitted this 14th day of January, 2016.

CARLTON FIELDS JORDEN BURT

By: _s/Mark A. Neubauer_____
Mark A. Neubauer
Valerie D. Escalante

102645643.2

James B. Baldinger (FL Bar No. 869899)
jbaldinger@carltonfields.com
*To be admitted pro hac vice*
Stacey K. Sutton (FL Bar No. 0289530)
ssutton@carltonfields.com
*To be admitted pro hac vice*
Alana Zorrilla-Gaston (FL Bar No. 27256
azorrilla@carltonfields.com
*To be admitted pro hac vice*
CARLTON FIELDS JORDEN BURT, P.A.
525 Okeechobee Boulevard, Suite 1200
West Palm Beach, Florida  33401
Phone: (561) 659-7070
Fax: (561) 659-7368

*Attorneys for Plaintiff*
METROPCS, a brand of T-MOBILE USA,
Inc.
E-mail:  mneubauer@carltonfields.com

41

102645643.2

# DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all triable issues.


Respectfully submitted this 14th day of January, 2016.


CARLTON FIELDS JORDEN BURT

By: _s/Mark A. Neubauer_____

Mark A. Neubauer
Valerie D. Escalante


James B. Baldinger (FL Bar No. 869899)
jbaldinger@cfjblaw.com
*To be admitted pro hac vice*
Stacey K. Sutton (FL Bar No. 0289530)
ssutton@cfjblaw.com
*To be admitted pro hac vice*
Alana Zorrilla-Gaston (FL Bar No. 27256
azorrilla@cfjblaw.com
*To be admitted pro hac vice*
CARLTON FIELDS JORDEN BURT, P.A.
525 Okeechobee Boulevard, Suite 1200
West Palm Beach, Florida  33401
Phone: (561) 659-7070
Fax: (561) 659-7368

*Attorneys for Plaintiff*
METROPCS, a brand of T-MOBILE USA,
Inc.
E-mail:  mneubauer@carltonfields.com

42

1
2

## TABLE OF CONTENTS OF EXHIBITS TO
## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

3
4

**Page Nos.**

5
6

**Exhibit A**   Copy of Terms and Conditions ..................................................... 43

7
8

**Exhibit B**   Copies of Certificates of Registration Issued by United States
Patent and Trademark Office ........................................................ 64

9
10

**Exhibit C**   Copies of Defendants' Advertisements on Craigslist .................. 75

11
12

**Exhibit D**   Screenshots of Defendants' Websites and Online Social Media
Advertisements ............................................................................. 77

13
14
15

**Exhibit E**   Copies of the October 19, 2015 through November 24, 2015
Text Message Communications Between Defendants and the
Undercover Investigators, including the Photographs Provided
by Defendants................................................................................ 85

16
17

**Exhibit F**   Copies of Several Examples of Final Judgments and Permanent
Injunctions .................................................................................... 107

18
19
20
21

**Exhibit G**   Copies of Memorandum Opinion and Order of Contempt,
Application for Criminal Contempt, the Order Finding Cause
to Believe the Defendant is Guilty of Criminal Contempt, and
Judgment of Criminal Contempt .................................................. 186

22
23

**Exhibit H**   Copies of Court Documents, Press Releases, and News
Reports Regarding These Incidents ............................................. 209

24
25
26
27
28

103303323.1

# EXHIBIT A



Coverage Map | Store Locator | Make a Payment | Activate Device |
En Español | En Español | 🛒 Cart (0 items)



Additional Options/Sign Up ▾

**Why MetroPCS**     **Shop Products**     **Shop Plans**     **Shop Services**     **Manage & Pay**

Home > Terms and Conditions > MetroPCS Terms And Conditions

# MetroPCS Terms And Conditions

**MetroPCS Terms and Conditions of Service**

MetroPCS
Terms
and
▶ Conditions
of
Service

**Network Disclosure**

**Wireless Emergency Alerts**

**eWallet Terms and Conditions**

**Online Terms of Use**

**Privacy Policy**

**MetroPCS Ad Options**

Welcome to MetroPCS. We are pleased that you have selected us as your wireless carrier. Please use this page as a reference for questions about your service and the terms and conditions of service that govern the service(s) you have purchased from MetroPCS. These Terms and Conditions of Service apply to all devices and wireless services provided by us to you and consist of several parts, which may be amended from time to time:

The MetroPCS Terms and Conditions of Service

·    eWallet Terms and Conditions

·    MetroPCS Start of Service Form

·    Your MetroPCS Rate Plan

·    The MetroPCS Privacy Policy

·    eWallet Privacy Policy

·    The MetroPCS Online Terms of Use

·    The MetroPCS Wi-Fi Terms of Use

·    MetroPCS Open Internet Transparency Disclosures

·    MetroWEB Terms of Use

The terms and conditions relating to any additional features you may have selected or as may be included in your Rate Plan, including, but not limited to:

- Pocket Express Terms of Use
- Metro411 Terms of Use
- MyExtras Terms of Service

EXHIBIT A

for
Your
Device

eWallet
PrivacyPolicy

MetroWEB
Terms
of
Use

Consumer
Protection
Terms
of
Use

Wi-
Fi
Terms
And
Conditions

Third-
Party
Services

Long
Distance
Terms
and
Conditions

MetroPCS
Marks
Rules

Metro411
Terms
and
Conditions

Ringback
Tones
Terms
and
Conditions

Premium
Handset
Protection
Terms
and
Conditions

- Premium Handset Protection®Terms and Conditions
- MetroPCS International Long Distance Terms and Conditions

In the event that the terms and conditions relating to a feature you may have selected or that may be included in your Rate Plan conflicts with the MetroPCS Terms and Conditions of Service, your Rate Plan shall control. You accept our Terms and Conditions by doing any of the following (a) giving us a written or electronic signature or telling us orally that you accept the MetroPCS Terms and Conditions of Service; (b) activating Service (if you are a new subscriber); (c) using your Service after your Service is activated or after you make a change or addition to your Service; (d) paying for the Service; or (e) failing to activate Service within 30 days after the purchase of your MetroPCS wireless device.  You also agree to the terms and conditions of service and use related to any feature(s) you may have selected or that may be included in your Rate Plan.  By accepting the MetroPCS Terms and Conditions of Service, you agree to the following (see full MetroPCS Terms and Conditions of Service for all terms):

·    You waive your right to a jury trial in disputes with MetroPCS.

·    Your disputes with MetroPCS will be decided by an arbitrator.

·    You waive your right to institute or participate in class action litigation against MetroPCS.

·    You will provide MetroPCS with accurate information about yourself.

·    MetroPCS may communicate with you from time to time about your Service.

·    You will pay all taxes and regulatory fees even if your rate plan is inclusive of taxes and regulatory fees.

·    MetroPCS may terminate your Service if you fail to timely pay for your Service or violate the Terms and Conditions of Service in any way, including abuse of the Service or violations of applicable laws.

**MetroPCS Terms and Conditions of Service**

Revised: June 12, 2015

When you initiate Service with MetroPCS, you may receive a Start of Service form and this Agreement. These materials, including applicable supplemental terms and conditions, and your Rate Plan terms, are part of your Agreement with MetroPCS (collectively, the "Agreement"). This Agreement governs the sale, use, and delivery of MetroPCS wireless services ("Service" or "Services") to you (the purchaser or user of the Services) by T-Mobile USA, Inc. and any of its controlled subsidiaries, assignees, and agents ("us," "we," "our" or "MetroPCS"). Certain other laws may also govern our provision of Services to you and such laws are incorporated in their entirety by this reference into this Agreement as if set forth in this Agreement. Your Service is also subject to, and you agree to adhere to, our business policies, practices, and procedures, which we can change at any time without notice to you (collectively, the "Policies"). Offers may not be available everywhere or combinable with other promotions/options. Your Rate Plan includes your allotments for minutes, messages or data, rates, coverage and other terms ("Rate Plan"). The Agreement makes up the complete agreement between you and us, and supersedes any and all prior and contemporaneous agreements, arrangements, representations, advertising, contracts, statements, offers, and understandings relating to the subject matter of the Agreement, whether oral or written, including, but not limited to, all previous versions of the Terms and Conditions of Service. You cannot rely on any other documents or statements by any sales person, service representative or other agent. You acknowledge and agree that you have not relied on any representation, assertion, guarantee, warranty, contract or other assurance, stated or made by anyone except those set out in this Agreement.

https://www.metropcs.com/terms-conditions/terms-conditions-service.html[8/20/2015 1:01:55 PM]

**MetroZone and MyExtras Terms of Service**

**Pocket Express Terms of Use**

**Rhapsody Unlimited Music Terms and Conditions**

**International Long Distance Terms and Conditions**

**San Francisco 408 Area Code Overlay Notification**

**Start of Service Forms**

**MetroPCS Phone Unlock Policy**

**415 Area Code Overlay Notification**

**IMPORTANT**: READ THIS AGREEMENT CAREFULLY. IT REQUIRES THE USE OF INDIVIDUAL ARBITRATION RATHER THAN JURY TRIALS OR CLASS ACTIONS TO RESOLVE DISPUTES. ARBITRATION IS MORE INFORMAL THAN LITIGATION BECAUSE IT USES A NEUTRAL ARBITRATOR INSTEAD OF A JUDGE OR JURY AND ALLOWS FOR LESS DISCOVERY AND LESS APPELLATE REVIEW THAN IN COURT.

1. **Acceptance.** YOUR AGREEMENT WITH METROPCS STARTS WHEN YOU ACCEPT THESE TERMS AND CONDITIONS. YOU AGREE TO COMPLY WITH ALL APPLICABLE LAWS AND POLICIES BY DOING ANY OF THE FOLLOWING: (A) GIVING US A WRITTEN OR ELECTRONIC SIGNATURE, OR TELLING US ORALLY THAT YOU ACCEPT; (B) ACTIVATING OR CONTINUING SERVICE; (C) USING YOUR SERVICE AFTER YOUR SERVICE IS ACTIVATED OR YOU MAKE A CHANGE OR ADDITION TO YOUR SERVICE; (D) PAYING FOR THE SERVICE; OR (E) FAILING TO ACTIVATE SERVICE WITHIN 30 DAYS AFTER THE PURCHASE OF YOUR WIRELESS DEVICE. **IF YOU ARE A NEW CUSTOMER AND YOU DO NOT AGREE TO THIS AGREEMENT, DO NOT DO ANY OF THESE THINGS.**

IF YOU ARE AN EXISTING CUSTOMER AND THE SERVICE IS PROVIDED TO YOU UNDER A PRIOR AGREEMENT AND YOU DO NOT AGREE TO THIS AGREEMENT, YOU MUST TERMINATE SERVICE AS SET FORTH IN THE PRIOR AGREEMENT; PROVIDED, HOWEVER, THAT IF YOU CHOOSE TO TERMINATE SERVICE YOU WILL STILL BE BOUND BY THE PRIOR AGREEMENT, INCLUDING YOUR OBLIGATION TO PAY ANY OUTSTANDING AMOUNTS AND YOUR AGREEMENT TO ARBITRATE DISPUTES. IF YOU HAVE ANY QUESTIONS, DO NOT ACTIVATE OR USE YOUR SERVICE, AND CONTACT METROPCS OR ITS AUTHORIZED DEALERS TO HAVE YOUR QUESTIONS ANSWERED.

2. * **Dispute Resolution and Arbitration. We each agree that, except as provided below, any and all claims or Disputes between you and us, in any way related to or concerning the Agreement, our Privacy Policy, our Services, devices or products, will be resolved by binding arbitration.** This includes any claims against other parties relating to Services or wireless devices provided or billed to you (such as our suppliers, Dealers or third party vendors) whenever you also assert claims against us in the same proceeding. "Dispute" shall be given the broadest possible meaning and shall include any dispute, claim, or controversy arising from or relating to this Agreement or Services and/or Products provided under this Agreement, including but not limited to: (1) all claims for relief and all theories of liability, whether based in contract, tort, statute, regulation, ordinance, fraud, or misrepresentation; (2) all disputes regarding the validity, enforceability or scope of this arbitration agreement (with the exception of its class action waiver); (3) all disputes that arose before this Agreement; (4) all disputes that arise after the termination of this Agreement; and (5) all disputes that are the subject of a putative class action in which no class has been certified. References in this provision to "us" include our parents, subsidiaries, affiliates, predecessors, successors, and assigns and our and their directors, officers, employees and agents. References in this provision to "you" include all beneficiaries of this Agreement and all users of the Services provided under this Agreement. Notwithstanding the foregoing, either party may bring an individual action in small claims court or bring Disputes to the attention of federal, state, or local agencies, including, but not limited to, the Federal Communications Commission.

If you do not wish to be bound by this arbitration agreement, you must notify us in writing at the address set forth in the "Notices" section above within 30 days of initiating Service or, if you never had the opportunity to opt out of arbitration, within 30 days of the date of the change notice giving you that opportunity. Your written notification to us must include your full name, MetroPCS account number and current address and must clearly state that you do not wish to be bound by this arbitration agreement. Your decision to opt out of this arbitration agreement will not adversely affect our relationship with or delivery of Service to you. If you have previously notified us of your decision to opt out of this arbitration agreement, you need not do so again.

https://www.metropcs.com/terms-conditions/terms-conditions-service.html[8/20/2015 1:01:55 PM]

For all disputes, whether pursued in court or arbitration, you must first give us an opportunity to resolve your claim by sending a written description of your claim to the address in Section 16 below. We each agree to negotiate your claim in good faith. If we are unable to resolve the claim within 60 days after we receive your claim description, you may pursue your claim in arbitration. We each agree that if you fail to timely pay amounts due, we may assign your account for collection, and the collection agency may pursue, in small claims court, claims limited strictly to the collection of the past due amounts and any interest or cost of collection permitted by law or this Agreement.

Notwithstanding any provision in this Agreement to the contrary, if we change this arbitration agreement, you may reject the change without terminating or adversely affecting your Service by notifying us in writing at the address set forth in the "Notices" section below within 30 days of the date of the change notice. If you do, you shall arbitrate any Dispute in accordance with the terms of this arbitration agreement. If you do not, you will be bound by the changes.

Because this Agreement and the Services provided under this Agreement concern interstate commerce, this arbitration agreement shall be governed by the Federal Arbitration Act ("FAA").

The party initiating arbitration may choose from the following independent, impartial arbitration administrators:

**American Arbitration Association**
335 Madison Avenue,
Floor 10
New York, NY 10017
1-800-778-7879
www.adr.org

Copies of their respective rules for consumer disputes and forms and instructions for initiating arbitration may be obtained by contacting them or visiting their websites. Any arbitration shall be conducted pursuant to the arbitration administrator's rules for consumer disputes in effect when the arbitration is initiated except to the extent they are inconsistent with this arbitration agreement. If the arbitration administrator will not enforce this arbitration agreement as written, the parties shall agree on or mutually petition a court of competent jurisdiction to appoint a substitute arbitration administrator who will do so. The arbitrator shall enforce contractual, statutory and other limitation periods and shall honor claims of privilege recognized at law. Judgment upon any arbitration award may be entered in any court having jurisdiction.

If we initiate the arbitration, we will notify you in writing at your then-current account address or (if your account is closed) the last address at which we contacted you. If you initiate the arbitration, you must notify us in writing at the address set forth in the "Notices" section below.

If your Dispute does not exceed $10,000, we will promptly reimburse your filing fee and will pay the arbitrator's other fees, costs and expenses. (If you cannot pay the filing fee, you may request that we pay the filing fee directly.) If, however, the arbitrator finds that your Dispute is frivolous or brought for an improper purpose, you shall reimburse the filing fee to us and the payment of the arbitrator's others fees, costs and expenses shall be governed by the arbitration administrator's rules.

You may hire an attorney to represent you in the arbitration proceeding and may recover your reasonable attorneys' fees and costs in arbitration to the same extent as you could in court if the arbitration proceeding is decided in your favor. We may hire an attorney to represent us in the arbitration proceeding but waive any right to recover our attorneys' fees and costs if the arbitration proceeding is decided in our favor.

Unless you and we agree otherwise in writing, any arbitration hearings will be held in the county of your then-current account address or (if your account is closed) the last address at

which we contacted you.

**If the arbitration provision applies or you choose arbitration to resolve your disputes, then either you or we may start arbitration proceedings.** You must send a letter requesting arbitration and describing your claim to our registered agent (see Section 16) to begin arbitration. The American Arbitration Association ("AAA") will arbitrate all disputes. For claims less than $75,000, the AAA's Supplementary Procedures for Consumer-Related Disputes will apply; for claims over $75,000, the AAA's Commercial Arbitration Rules will apply. The AAA rules are available at www.adr.org or by calling 1-800-778-7879. Upon filing of the arbitration demand, we will pay all filing, administration and arbitrator fees for claims that total less than $75,000. For claims that total more than $75,000, the payment of filing, administration and arbitrator fees will be governed by the AAA Commercial Arbitration Rules. An arbitrator may award on an individual basis any relief that would be available in a court, including injunctive or declaratory relief and attorneys' fees. In addition, for claims under $75,000 as to which you provided notice and negotiated in good faith as required above before initiating arbitration, if the arbitrator finds that you are the prevailing party in the arbitration, you will be entitled to a recovery of reasonable attorneys' fees and costs. Except for claims determined to be frivolous, Metro PCS agrees not to seek an award of attorneys' fees in arbitration even if an award is otherwise available under applicable law.

**CLASS ACTION WAIVER**. **WE EACH AGREE THAT ANY DISPUTE RESOLUTION PROCEEDINGS, WHETHER IN ARBITRATION OR COURT, WILL BE CONDUCTED ONLY ON AN INDIVIDUAL BASIS AND NOT IN A CLASS OR REPRESENTATIVE ACTION OR AS A MEMBER OF A CLASS, CONSOLIDATED OR REPRESENTATIVE ACTION.** If a court or arbitrator determines in an action between you and us that this Class Action Waiver is unenforceable, the arbitration agreement will be void as to you. **If you choose to pursue your claim in court by opting out of the arbitration provision as specified above, this Class Action Waiver provision will not apply to you. Neither you, nor any other customer, can be a class representative, class member, or otherwise participate in a class, consolidated or representative proceeding without having complied with the opt out requirements above.**

**JURY TRIAL WAIVER**. If a claim proceeds in court rather than in arbitration, **WE EACH WAIVE ANY RIGHT TO A JURY TRIAL**.

ARBITRATION INVOLVES A FAIR HEARING BEFORE A NEUTRAL ARBITRATOR RATHER THAN A JUDGE OR JURY. THE ARBITRATOR MAY AWARD DECLARATORY OR INJUNCTIVE RELIEF ONLY IN FAVOR OF THE INDIVIDUAL PARTY NAMED IN THE ARBITRATION PROCEEDING AND ONLY TO THE EXTENT NECESSARY TO PROVIDE RELIEF WARRANTED BY THAT PARTY'S INDIVIDUAL CLAIM.

Unless otherwise provided by applicable law, or otherwise in this Agreement, neither party has the right to bring a Dispute or other legal action under this Agreement more than one (1) year after the Dispute arose.

**3. * Your Term of Service.** You are a month-to-month customer. If you terminate your Service, your termination will be effective at the end of your current month of Service (unless you port-out your number), and you will remain responsible for all fees and Charges for your Service and usage through the end of that period. If we terminate your Service, we will determine the date of termination, and you will be responsible for all usage and Charges through the date of termination. You can request that we port your number to another carrier, and Service for that number will be terminated when the porting is complete.  If you port your number, you will be responsible for all usage and Charges until the port-out is complete.

The Services are provided via Rate Plans under which you do not pay metered "per minute" charges for service. In an effort to offer this Service on a reliable basis, MetroPCS may discontinue providing Service to you, change the services provided to you, change your Rate Plan, reduce the speed of any service provided, restrict the amount of use of any service, change the services and features in your Rate Plan, discontinue your account, or discontinue or limit providing connections to particular telephone numbers, countries, destinations,

providers, features, requested or called by you or the provision of certain services in certain areas, such as pursuant to roaming arrangements, or services that appear likely to generate abnormally high use, or other disproportionate use when compared to those of other customers of MetroPCS (as described below under Section 24 "Your Use Of The Service") or which may be harmful, disruptive, or interfere with MetroPCS' system or services to other customers. We may provide notice to you prior to taking any of the foregoing actions, but you acknowledge and agree that we are not required to provide notice and you agree that we may take any of the foregoing actions without providing notice you. By initiating service and placing calls or using any other service on the MetroPCS system, you acknowledge and agree to MetroPCS' ability to modify or terminate your Service under these circumstances.

**4. Return Policy and Refund Policy.** For MetroPCS Device and accessory returns and exchanges, see the applicable return policy, which is available at your place of purchase. Amounts paid for Service charges are non-refundable. If your Service is terminated for any reason and you have a positive balance in your Service account, you will not be entitled to receive any refund.

**5. Changes to Your Service.** This Section describes how changes may be made to your Agreement, is subject to requirements and limitations imposed by applicable law, and will not be enforced to the extent prohibited by law. We may change the price and structure of your Rate Plan, modify the various Rate Plans, change the price of the various Rate Plans, change the services included in a Rate Plan, or change the requirements of eligibility for Rate Plans, at any time without prior notice to you. You may designate others to manage or make changes to your account ("Authorized Users"). You and any Authorized Users on your account will have access to all account information. If you give your personal account validation information to someone, they can access, and may be able to make changes to your account just as you can, including incurring charges for which you are responsible. Those changes will be binding on you. MetroPCS takes no responsibility for changes made to your account by any Authorized User.

With respect to domestic long distance, roaming, international long distance, and any other service provided by us (or to us by third parties), we may change the locations and destinations where such Services may be used or where calls can be placed or placed in specific Rate Plans, or the rates and terms applicable to such locations and destinations, without prior notice to you. Certain charges may be imposed by third parties and MetroPCS may, as an accommodation, allow such charges to be paid through MetroPCS.

YOU HAVE THE RIGHT TO REFUSE TO ACCEPT THESE RATE PLAN CHANGES. IF YOU DO NOT WANT TO ACCEPT THE RATE PLAN CHANGES, YOU MUST NOTIFY US IN WRITING WITHIN TEN (10) DAYS OF THE DATE OF THE CHANGE THAT YOU WISH TO TERMINATE SERVICE. IF YOU DO NOT NOTIFY US THAT YOU WISH TO TERMINATE SERVICE WITHIN THAT TIME AND/OR IF YOU CONTINUE TO USE THE SERVICE AFTER THE RATE PLAN CHANGES, YOU ACCEPT THE CHANGES. NOTWITHSTANDING ANY TERMINATION, AMOUNTS PREVIOUSLY PAID ARE NON-REFUNDABLE.

**6. Our Rights to Make Changes.** We may change this Agreement at any time. If you are an existing customer, you will be notified at least ten (10) days, unless a longer period is required, in advance of any proposed changes that may result in more restrictive terms or conditions in this Agreement. Any such changes to this Agreement will be effective after that time period.

YOU HAVE THE RIGHT TO REFUSE TO ACCEPT THE CHANGES. IF YOU DO NOT WANT TO ACCEPT THE CHANGES, YOU MUST NOTIFY US IN WRITING WITHIN TEN (10) DAYS OF THE DATE OF THE CHANGE NOTICE THAT YOU WISH TO TERMINATE SERVICE. IF YOU DO NOT NOTIFY US THAT YOU WISH TO TERMINATE SERVICE WITHIN THAT TIME AND/OR IF YOU CONTINUE TO USE THE SERVICE AFTER NOTIFICATION OF THE CHANGES, YOU ACCEPT THE CHANGES.

https://www.metropcs.com/terms-conditions/terms-conditions-service.html[8/20/2015 1:01:55 PM]

**7. * Your Wireless Device and Compatibility with Other Networks and Equipment.** You may buy a wireless device to use on our Service from us or someone else, but it must, as solely determined by us, comply with Federal Communications Commission regulations, be certified for use on our network, and be compatible with, and not potentially harm, our Service or our network. Our Services will only work with wireless devices compatible with our network and not all services are available with all wireless devices or on all networks. Some features and Rate Plans will be available only on MetroPCS wireless devices purchased from us. At times we may remotely change your wireless device's software, applications or programming, without notice to address security, safety, or other issues that impact our network or your device. These changes will modify your wireless device and may affect or erase data you have  stored on your wireless device, or how you have programmed or use your wireless device. A MetroPCS wireless device is designed to be used only with our service and on our network. Your wireless device may not work with another wireless network, or the other wireless carrier may not accept your wireless device on its network. If your wireless device was purchased from MetroPCS or an authorized MetroPCS dealer, the wireless device has a software programming lock that will prevent the wireless device from operating with other compatible wireless telephone carriers' services. Please see www.metropcs.com/unlockpolicy for information regarding our software programming unlocking policy. Your wireless device may contain sensitive or personal information. MetroPCS is not responsible for any information on your wireless device, including sensitive or personal information. If possible, you should remove or otherwise safeguard any sensitive or personal information when your wireless device is out of your possession or control, including, but not limited to, relinquishing, exchanging, returning or recycling your wireless device. By providing your wireless device to us, you agree that our employees, contractors or vendors may access all of the information on your wireless device.

**8.  Service Availability.** Service is limited to the operating range, spectrum, and capacity of our, or our roaming partners', wireless system in your service area. Your Service area is the area depicted in the coverage map available to you when you activated Service and may change from time to time without notice. Since MetroPCS uses different spectrum in different areas of the country, service may not be available on all wireless devices in all areas. We may, but are not obligated to, provide notice when you are being served by a carrier other than ourselves. The specific network coverage you get will depend on the radio transmissions your wireless device can receive and use, and the Services you have chosen. **Specific Services may not be available on all wireless devices at all points in time due to wireless device hardware and/or software, changes to our network, network infrastructure, cessation of specific Services, or service by carriers other than ourselves.** Except for 911 calls and any "roaming" service to which you have subscribed, you will not be able to use your wireless device outside of your service area for any calls, including local, long distance and international calls. Further, since services outside MetroPCS' area are provided by third parties, not all services may work outside your service area. **Service depends on over-the-air radio transmissions. Our coverage maps provide high level estimates of our coverage areas when using Services outdoors under optimal conditions. Coverage is not available everywhere and depends on the Service purchased and the wireless device used. Service speeds are not guaranteed and actual speeds will vary. Estimating wireless coverage, signal strength and Service speed is not an exact science. There are gaps in coverage within our estimated coverage areas that may result in dropped and/or blocked connections, slower Service speeds, or otherwise impact the quality of Service. Many factors beyond our control affect your ability to make and receive calls on your wireless device, the quality of those calls, and the speed of your Service including, but not limited to, your location, the conditions of the atmosphere, terrain, nearby buildings and other structures, network capacity issues, system outages, failure of equipment to operate as expected, spectrum used, problems that occur with service we purchase from third parties, system upgrades, performance of system maintenance, accidents, network problems, network or Internet congestion, software, signal strength, your wireless device, weather, geography,**

049

**topography, server speeds of the websites you access or other events outside of our control. As a result, sometimes Service, including calls or attempted calls to emergency services like 911, may be unavailable, interrupted or may fail, and the quality of calls may sometimes be poor.** MetroPCS takes no responsibility for Service interruptions or problems caused by factors beyond our control. Any statements by MetroPCS, its employees, representatives or agents about the coverage of our system are intended only to describe MetroPCS' approximate coverage in your service area. You should not interpret any such statement to mean that Service will be available or without interruption in any service area.

**9.  Location Based Services; Important Emergency and 9-1-1 Information; and Emergency Alerts.**  When making a 911 call, always state the nature of your emergency and provide both your location and phone number, as the operator may not automatically receive this information. **MetroPCS is not responsible for failures to connect or complete 911 calls or if inaccurate location information is provided. 911 service may not be available or reliable and your ability to receive emergency services may be impeded.** Services that rely on location information, such as E911, GPS navigation, and our wireless network depend on your wireless device's ability to acquire satellite signals and network coverage. Unlike traditional wireline telephones, depending on a number of factors (for example, where you are, whether local emergency service providers have upgraded their equipment, etc.), 911 operators may not know your telephone number, your location or the location of your wireless device. Other third party entities are involved in connecting a 911 call. MetroPCS makes no guarantee that emergency 911 calls will be routed to a specific Public Safety Answering Point ("PSAP") or any particular public safety organization (for example, police department, fire department, ambulance services, etc.). MetroPCS takes no responsibility for the acts or omissions of any PSAP or any public safety organization (for example, police department, fire department, ambulance services, etc.). In certain circumstances, an emergency call may be routed to a state patrol dispatcher or alternative location set by local emergency service providers. Enhanced 911 service ("E911"), where enabled by local emergency service authorities, uses GPS or network technologies to provide location information. Even when available, however, E911 does not always provide accurate location information, and in some cases may not generate a location at all. If your wireless device is indoors or for some other reason cannot acquire a satellite signal, you may not be located. Some wireless devices have a safety feature that prevents use of the keypad after dialing 911. You should follow voice prompts when interacting with emergency service providers employing Interactive Voice Response ("IVR") systems to screen calls. While your wireless device is receiving a software update, you may be unable to use your wireless device in any manner until the software update is complete. If you are porting a phone number to or from us, we may not be able to provide you with some Services, such as 9-1-1 location services, while the port is in process. Your wireless device may require you to elect to use location based services, or you may choose to use location based services, other than E911. If you elect to use non-E911 location based services, you agree that we may use the location information transmitted from your wireless device to improve our location services. Your personal, biographical and calling information will not be used by us. By electing to use location based services, you agree and authorize us to send targeted, location based information to your mobile device and also to use or provide to third parties your location information in an aggregate form. **Emergency Alerts.** MetroPCS has chosen to offer wireless emergency alerts, within portions of its coverage area, on wireless alert capable Devices. There is no additional charge for these wireless emergency alerts. For details on the availability of this service and wireless emergency alert capable Devices, please visit https://www.metropcs.com/terms-conditions/wireless-emergency-alerts.html .

**10. * Data Plans and Other Features. Data Access.** Depending on your Rate Plan, your usage of Data Access may be metered by Us. Your Rate Plan may include a Data Access usage limit, such as 2 GB per service cycle. We shall determine in our sole discretion what

data usage constitutes Data Access and reserve the right to alter, make additions to or deletions to what type of data usage, or protocols, constitute Data Access without notification to you. Data Access may include, for example, multimedia streaming and video on demand services, as well as certain multimedia uploads, downloads and gaming services and applications. Uploads are data sessions where the data is transferred from your Wireless Device to some other computer or wireless device, while downloads are data sessions where the data is transferred from some other computer or wireless device to your Wireless Device. Depending on your Rate Plan, certain usages may not count against your Data Access limit. Data Access does not include any data services or uses which are prohibited by Us under this Agreement, such as in the MetroWEB Terms of Use. Data Access usage includes, but is not limited to, the actual data sent and received along with overhead, header packets, and may include other information sent in connection with a data session in which Data Access occurs. Data Access on networks not owned by us, such as when you are roaming, may not be available or may be further limited. Charges and availability are based on the location of the cell site receiving and transmitting the Data Access service and not your location.

The absolute capacity of the wireless data network is limited. Accordingly, Data Access is only provided for prescribed purposes and pricing for Data Access is device dependent and based on the transmit and receive capacity of each device. A Data Access pricing plan designated for one type of device may not be used with another device. Compatible data-enabled wireless devices are required.

You acknowledge and agree that your Data Access usage and speed may vary depending on certain factors outside of our control. Such factors may include the amount of users on the service, network congestion, the distance to the serving cell site, the number of users served by your serving cell site, the management of backhaul at the serving cell site, any application(s) you are using for your data session, the screen size of your Wireless Device, the bit rate(s) of your data session, the type(s) and amount(s) of compression used by the computers or wireless devices involved in the data session, and any error(s) that might occur in the data session. We also manage our network to facilitate the proper functioning of services that require consistent high speeds, such as video calling, which may, particularly at times and in areas of network congestion, result in reduced speeds for other services. Additionally, we may implement other network management practices, such deploying streaming video optimization technology.  This technology is intended to manage data usage on the network, reduce the risk of streaming video stalling and buffering, and reduce the amount of high-speed data consumption used for streaming video.  Streaming video optimization improves streaming video reliability as well as makes room for other users to enjoy higher browsing speeds.  The streaming video optimization process is agnostic as to the streaming video content itself and to the website that provides it.  While most changes to streaming video files are likely to be indiscernible, the optimization process may minimally impact the appearance of the streaming video as displayed on a user's device. These practices operate without regard to the content itself or the source of the content, and do not discriminate against offerings that might compete against those offered by MetroPCS on the basis of such competition. In order to assess your usage during an applicable service cycle, you may obtain approximate usage information by using one of our automated systems. Any application on your Wireless Device which describes the amount of data usage does not necessarily reflect your usage of Data Access. We may provide a meter for your use in one or more locations accessible by you. Any meter provided for your use may deliver readings higher or lower than your actual Data Access usage, or deliver readings that are higher than your actual Data Access usage because of the units of measurement used by Us. Any reading delivered by any meter we provide for your use will have inherent inaccuracies and may not provide up to the minute or second accuracy. Further, any reading delivered by any meter We provide for your use may only be completely accurate if your Wireless Device is turned off and not transmitting or receiving any data from any data session.

**Network Traffic Management.** MetroPCS reserves the right to manage our network and the traffic on our network in the way we believe best benefits our customers and best enables us to maintain Service of the nature described in this Agreement. We have determined that our ability to provide Service to our customers is disrupted when you place an abnormally high number of calls, repeatedly place calls which result in abnormally long call lengths, high or disproportionate use, or otherwise use our Services or network in excess of our expectations for the normal amount of use by our customers. Other examples of prohibited uses can be found in Section 17. If you use your service in a manner that could interfere with other customers' service, affect our ability to allocate network capacity among customers or degrade service quality for other customers, we may suspend, terminate, or restrict your Service.  Some elements of multimedia messages may not be accessible, viewable, or heard due to limitations on certain wireless phones, PCs, or e-mail. We reserve the right to change the multimedia message size limit at any time without notification. Text message notifications may be sent to non-multimedia messaging subscribers if they subscribe to text messaging. You may receive unsolicited messages from third parties as a result of visiting Internet sites, and a per-message charge may apply whether the message is read or unread, solicited or unsolicited.

To differentiate the services we sell, at times and at locations where there are competing customer demands for network resources, we give the data traffic of customers who choose T-Mobile-branded services precedence over the data traffic of customers who choose non-T-Mobile-branded services such as MetroPCS.  Where the network is lightly loaded, a MetroPCS customer will notice little, if any, effect from having lower priority. This will be the case in the vast majority of times and locations. At times and at locations where the network is heavily loaded in relation to available capacity, however, MetroPCS customers will likely see reductions in data speeds, especially if they are engaged in data-intensive activities. MetroPCS constantly works to improve network performance and capacity, but there are physical and technical limits on how much capacity is available, and at constrained locations, the frequency of heavy loading in relation to available capacity may be greater than at other locations. When network loading goes down or the MetroPCS customer moves to a location that is less heavily loaded in relation to available capacity, the MetroPCS customer's speeds will likely improve.  See metropcs.com/openinternet for details.

MetroPCS also reserves the right to restrict, or otherwise prevent access to services, countries, carriers, destinations that MetroPCS determines, in its sole discretion, are inconsistent with the nature of Service provided by MetroPCS, are indicative of uses not permitted hereunder, or result in abnormally long calls, or abnormally high usage. We also may block calls to telephone numbers at the request of the called party.

**11. * Content and Applications.** You can purchase Content and Applications (for example, downloadable, streaming or networked applications, wallpapers, ringtones, games, productivity tools and video) ("Content and Apps") for and with your compatible wireless device. Some Content and Apps that you can purchase with your wireless device are not sold by MetroPCS and for such Content and Apps, you can identify the third party seller at the point of purchase. MetroPCS is not responsible for such Content and Apps, including download, installation, use, transmission failure, interruption, or delay, or any content or website you may be able to access through the Content and Apps. Any support questions for such Content and Apps should be directed to the third party seller identified at the point of purchase. When you download or install any Content and Apps sold by a third party seller, you may be subject to license terms between you and the third party seller and Content and Apps creator/owner. When you use, install, display, run, or listen to Content and Apps that you purchase from MetroPCS, the Content and Apps are licensed to you by MetroPCS and may be subject to additional license terms between you and the creator/owner of the Content and Apps. Whether purchased from MetroPCS or a third party seller, any Content and Apps you purchase are licensed for personal, lawful, non-commercial use on your wireless device only. You may not transfer, copy, or reverse engineer any Content and Apps, or alter, disable or circumvent any digital rights management security features embedded in the Content and Apps. Content and Apps may not be transferable from one wireless device to another

https://www.metropcs.com/terms-conditions/terms-conditions-service.html[8/20/2015 1:01:55 PM]

wireless device. You understand and agree that the Content and Apps contain the intellectual property of third parties. You understand and agree that the Content and Apps are protected by law (including copyright law) and are solely for your personal, non-commercial use. You agree to comply with all applicable laws (including copyright law), and may only make such copies as are reasonably necessary for your personal and non-commercial use. You agree that any other redistribution, reproduction, transmission, communication, sale, use (including, except in the case of Ringtones, as a "ringer" for a telephone), broadcast, public performance, rental or lending, adaptation, sub-license or other use of the Content and Apps without the prior written consent of the copyright owner is prohibited. You understand and agree that all rights not expressly granted herein are reserved by the applicable content owner. **Third Party Applications.** Your location can be identified while using GPS applications. It is your responsibility to notify Authorized Users that their location can be identified while using GPS applications. If you use a third party application, the application may access, collect, use or disclose your personal information or require MetroPCS to disclose your information, including location information (when applicable), to the application provider or some other third party. If you access, use or authorize third party applications through the Services, you agree and authorize MetroPCS to provide information related to your use of the Services or the application(s). You understand that your use of third party applications is subject to the third party's terms and conditions and policies, including the third party's privacy policy. You agree that any Authorized User may access, use or authorize MetroPCS or third party location-sensitive applications through the Services. You understand that your use of such location-sensitive applications is subject to the application's terms and conditions and policies, including its privacy policy. If you activate location-sensitive services for wireless devices used by other Authorized Users, you agree to inform the Authorized User(s) of the terms of use for location-sensitive applications and that the wireless device may be located. For additional information on location-sensitive services, see our Privacy Policy at our website.

**12. * Off-Net Usage and Roaming. Off-Net Usage.** Your wireless device may connect to another provider's network ("Off-Net") even when you are within our service area. Our Services and Rate Plans are designed for you to use your Service each month predominantly using our networks. You must use your wireless device predominantly within the MetroPCS owned network coverage area. If your minutes of use, text messaging usage, or data usage are not predominantly on our networks ("Off-Net Usage"), or are excessive, abnormally high, or cause MetroPCS to incur too much cost, MetroPCS may, at its option and sole discretion, limit or terminate your service, deny your continued use outside the areas served by our network or on other carriers' coverage, or change your Rate Plan. MetroPCS will provide you with advance notice that it intends to take any of the above actions. **Roaming.** Nationwide roaming requires multi-band wireless devices and is not available with single-band wireless devices, certain other wireless devices, or to customers residing outside their home area. Data services and certain features (for example, Voicemail, Caller ID, Call Waiting, Location Services, etc.) may not be available in all roaming areas. The term "roaming" typically refers to coverage on another carrier's network that we may make available to you based on our agreements with other carriers. These agreements may change from time to time and roaming coverage and available services are subject to change without notice. Your ability to roam depends on the radio transmissions your wireless device can receive and use, and the availability of roaming coverage. We make no guaranty that roaming coverage will be available. Roaming coverage may exist both within and outside our network coverage areas. Depending on your Services, separate charges or limits on the amount of minutes used while roaming may apply. We may, but you agree we are not obligated to, provide you with notice when you are roaming. **YOU AGREE TO HOLD METROPCS HARMLESS AGAINST ANY AND ALL CLAIMS, DEMANDS, ACTIONS, OR OTHER CAUSES OF ACTION (INCLUDING ACTIONS BY THIRD PARTIES) ARISING OUT OF, RELATING TO, OR IN CONNECTION WITH THE USE OR ATTEMPTED USE OF THE SERVICE.**

https://www.metropcs.com/terms-conditions/terms-conditions-service.html[8/20/2015 1:01:55 PM]

**13. * Charges; Taxes and Fees.** You agree to pay for all charges for Service ("Service Charges"), including, but not limited to the following: (1) recurring monthly or weekly access charges; (2) charges and taxes for optional Service features that you select, including long distance and directory assistance (411) calls and other optional features, such as ringtone downloads; (3) any Service reconnection charges that may apply, such as a reactivation fee; and (4) all applicable taxes and regulatory charges whether assessed directly on you or us; provided, however, that for certain tax inclusive Rate Plans, only applicable taxes and regulatory charges may be included in the Rate Plan price. You must pay all taxes, fees and surcharges set by federal, state and local governments. To determine taxes, fees and surcharges, we will use the street address you identified as your Place of Primary Use ("PPU"). If you did not identify the correct PPU, or provided an address that is not a recognized street address, such as a PO Box, does not identify the applicable taxing jurisdictions or does not reflect the Service area associated with your telephone number, you may be assigned a default PPU for tax purposes. You acknowledge and agree that a default PPU may affect your ability to receive E-911 assistance and you agree to indemnify and hold us harmless for any claims relating to your failure to provide a valid PPU. In addition, if you are not on a tax-inclusive plan, you agree to pay all regulatory administration charges ("Regulatory Administration Charges"), which may include, but are not limited to, Federal Universal Service, various regulatory charges, our administrative charges, gross receipts charges, margin taxes, and charges for the costs we incur in complying with governmental programs. Regulatory Administration Charges are not taxes and are not required by law. We set these charges, and the amounts and what they include may change without notice. They are rates we choose to collect from you and are kept by us in whole or in part. The number and type of Regulatory Administration Charges may vary depending upon the PPU of the wireless device and can change over time. We determine the rate for these charges and these amounts are subject to change as are the components used to calculate these amounts. Changes to taxes, fees and surcharges will become effective as provided by the taxing authority and changes to Regulatory Administration Charges shall be effective immediately. You are responsible for all Charges to your account, whether or not you were the user of the wireless device. If your wireless device gets lost or stolen, you agree to notify us immediately, so we can suspend your Service to prevent someone else from using it. After your Service is suspended, you will not be responsible for additional usage charges incurred in excess of your Rate Plan Charges, applicable taxes, fees, and Surcharges. If you request that we not suspend your Service, you will remain responsible for all usage, Charges incurred, and applicable taxes and fees. We may prevent a lost or stolen wireless device from registering on our and other networks. Wireless access to corporate/employee email may require additional server or server access, licenses, or additional requirements which may incur additional charges. By requesting wireless access to corporate/employee email, you agree to pay any of these additional charges. **Billing for Third-Party Services.** Certain parties besides MetroPCS have the ability to place charges on your bill for their services. You may access these services and authorize the placement of charges on your bill through your phone or online account. MetroPCS also provides customers, at no additional cost, with the ability to restrict the placement of charges for third-party services on your account. Contact customer care at 1-888-8metro8 or go to www.metropcs.com/blocking for more information.

**14. * Payments and Late Fees.** Service Charges must be paid in advance and are due before the first day of your service cycle. Service Charges cannot be paid in arrears. Unless otherwise specified in your Rate Plan, monthly service cycles are approximately 30 days long. The dates of your monthly or weekly service cycle and other dates related to your account may change from time to time. You must promptly notify us of any change in your billing address. As a convenience, you may authorize recurring payment of your Service Charges through a credit or debit card or bank transfer authorization; this authorizes us to charge all amounts you owe us to the credit or debit card or bank transfer authorization up to five (5) days prior to the due date and to demand immediate payment from the card or debit issuer or bank. Unless required by law, we will not give any additional notice to you or obtain additional consent from you before charging Service Charges to that credit or debit card. You must promptly notify us of any change in the credit or debit card or bank transfer

https://www.metropcs.com/terms-conditions/terms-conditions-service.html[8/20/2015 1:01:55 PM]

authorization you want to use for payment. You may also make a payment by credit or debit card online at www.metropcs.com or through the automated MetroPCS IVR. In addition, you may pay your Service Charges by sending a check or money order by mail to P.O. Box 5119, Carol Stream, Illinois, 60197-5119, or by bringing cash, check, or money order in person to any MetroPCS store or authorized payment center. You may be required to pay an additional service charge, depending on the payment method you choose. This information is available at MetroPCS.com. In addition, we may charge an additional fee up to the maximum amount permitted by law for any check or other negotiable instrument tendered by you and returned unpaid by a financial institution for any reason. We reserve the right, in our sole discretion, to require that you pay your Service Charges with cash, certified check, cashier's check, or money order. We also reserve the right to report any check returned to us to reporting and credit agencies and law enforcement.

**15. * Your right to Dispute Charges.** Your payment will be considered late if we do not receive it before the first day of the service cycle for which the payment is due. If you do not make all payments when they are due, you will be in default under this Agreement, and MetroPCS will be entitled to exercise any rights it may have under this Agreement, including the suspension or termination of Service to you. If we accept a late or partial payment, even if you mark the payment "paid in full," we do not waive our rights to suspend or terminate your Service or any other rights we may have. If your Service is terminated and you promptly pay amounts that are overdue, MetroPCS, in its sole discretion, may reconnect your Service after you have paid any reconnection fees we have imposed. In such case, your service cycle anniversary date will not change, which will result in fewer days of service for that month. If you have a dispute regarding the Charges to your account, or about the Services provided to you, you agree to notify us of the dispute within 60 days after the date you first receive the disputed Charge ("Dispute Period"), unless otherwise provided by law. If you do not notify us of your dispute in writing within the Dispute Period, you have waived such claim and will be forever barred and estopped from raising, or making a claim for such dispute and you may not pursue a claim in arbitration or in court. Unless otherwise provided by law, you must pay disputed Charges until the dispute is resolved. If you accept a credit, refund or other compensation or benefit to resolve a disputed Charge, you agree that the issue is fully and finally resolved and such credit shall act as an accord and satisfaction.  In the event of a lost or stolen wireless device, for Charges incurred before you notify us, you are not liable for charges you did not authorize, but the fact that your wireless device or service was used is some evidence of authorization. You may request that we investigate Charges you believe were unauthorized. We may ask you to provide information and you may submit information to support your request. If we determine the charges were unauthorized, we will credit your account. If we determine the charges were authorized, we will inform you within 30 days and you will remain responsible for the charges.

**16. * Notices and Customer Communications.** You expressly consent to be contacted, by MetroPCS or anyone calling on its behalf, for any and all purposes, at any telephone number, or physical or electronic address where you may be reached, including any wireless telephone number. You agree that MetroPCS may contact you in any way, including, pre-recorded or artificial voice or text messages delivered by an automatic telephone dialing system, or e-mail messages delivered by an automatic e-mailing system. You agree that we also have the consent to contact any Authorized User on your account for Service or payment related reasons. Any such notice will be treated as provided to you when left with you, on your wireless device, on your answering/voicemail service, or by email or fax to any email or fax number you provided to us, or 3-days after mailing to your last known address as shown in our records. Your consent to be contacted may be revoked only if it is in writing and is with MetroPCS's express agreement. You must notify us of any address changes. Failure to notify us of a change in your address constitutes a breach of this Agreement and grounds for possible suspension or termination of your Service. If you have any questions regarding your Service or information in this Agreement, you may contact our Customer Care department at www.metropcs.com, by calling 1-888-8metro8, or by writing us at MetroPCS, P.O. Box 601119, Dallas, Texas 75360-1119.

https://www.metropcs.com/terms-conditions/terms-conditions-service.html[8/20/2015 1:01:55 PM]

**17. * Misuse of Service or Device. By activating or renewing Service with MetroPCS, you agree that you do so because you want Service from MetroPCS and not for any other purposes. You agree not to misuse the Service or Device, including but not limited to: (a) reselling or rebilling our Service; (b) using the Service or Device to engage in unlawful activity, or in conduct that adversely affects our customers, employees, business, or any other person(s), or that interferes with our operations, network, reputation, or ability to provide quality service, including, but not limited to, the generation or dissemination of viruses, malware or "denial of service" attacks; (c) using the Service as a substitute or backup for private lines or dedicated data connections; (d) tampering with or modifying your MetroPCS Device; (e) "spamming" or engaging in other abusive or unsolicited communications, or any other mass, automated voice or data communication for commercial or marketing purposes; (f) reselling MetroPCS Devices for profit, or tampering with, reprogramming or altering MetroPCS Devices for the purpose of reselling the MetroPCS Device; (g) using the Service in connection with server devices or host computer applications; (h) using applications which automatically consume unreasonable amounts of available network capacity; (i) using applications which are designed for unattended use, automatic data feeds, automated machine-to-machine connections, or applications that are used in a way that degrades network capacity or functionality; or (j) assisting or facilitating anyone else in any of the above activities. Unless authorized by MetroPCS, you agree that you won't install, deploy, or use any regeneration equipment or similar mechanism (for example, a repeater or signal booster) to originate, amplify, enhance, retransmit or regenerate a transmitted RF signal and, unless authorized by MetroPCS, you agree that you will not use a telephone number on the MetroPCS network for any purpose but for access to the public switched telephone network.**

**MetroPCS also reserves the right, in its sole discretion, to exclude from your Service, 9xx, 7xx, 5xx, and 8xx telephone numbers as well as other telephone numbers or services. We also may block calls to telephone numbers at the request of the called party.**

You can't use our Services: (a) in a way that could cause damage or adversely affect any of our other customers or our reputation, network, property or Services; or (b) in any way prohibited by the terms of our Services, the Agreement or our Policies. We can take any action to: (1) protect our network, our rights and interests, or the rights of others; (2) optimize or improve the overall use of our network and Services; or (3) prevent usage that is indicative of uses not permitted hereunder. Some of these actions may interrupt or prevent legitimate communications and usage, such as message filtering/blocking software to prevent spam, viruses, or autodialed calls or SMS messages.  For additional information on what we do to protect our customers, network, Services and equipment, see our Privacy Policy, MetroWEB Terms of Use, and Online Terms of Use at our website at www.metropcs.com. We use filters to block spam messages, but we do not guarantee that you will not receive spam or other unsolicited messages, and you agree that we are not liable for such messages. You agree that a violation of this Section harms MetroPCS, which cannot be fully redressed by money damages, and that we shall be entitled to immediate injunctive relief in addition to all other remedies available without the requirement to post a bond.

You agree you will not use our messaging services to send messages that contain advertising or a commercial solicitation to any person or entity without their consent. You will have the burden of proving consent with clear and convincing evidence if a person or entity complains you did not obtain their consent. Consent cannot be evidenced by third party lists you purchased or obtained. You further agree you will not use our messaging service to send messages that: (a) are bulk messages; (b) are automatically generated; (c) can disrupt our network; (d) harass or threaten another person; (e) interfere with another customer's use or enjoyment of our Services; (f) generate significant or serious customer complaints; (g) that falsify or mask the sender/originator of the message; or (h) violate any law or regulation. We reserve the right, but are not obligated, to deny, disconnect, suspend, modify and/or terminate your messaging service or messaging services with any associated account(s), or

to deny, disconnect, suspend, modify and/or terminate the account(s), without notice, as to anyone using messaging services in any manner that is prohibited. Our failure to take any action in the event of a violation shall not be construed as a waiver of the right to enforce such terms, conditions, or policies. Advertising and commercial solicitations do not include messaging that: (1) facilitate, complete, or confirm a commercial transaction where the recipient of such message(s) has previously agreed to enter into with the sender of such message(s); or (2) provides account information, service or product information, warranty information, product recall information, or safety or security information with respect to a commercial product or service used or purchased by the recipient of such message. Although it is illegal for unauthorized people to intercept wireless device calls intended for others, MetroPCS cannot guarantee the complete privacy of your calls. Wireless calls by nature may be intercepted by third parties. METROPCS SHALL NOT BE LIABLE TO YOU OR TO ANY THIRD PARTY FOR ANY INTERCEPTION BY THIRD PARTIES OF COMMUNICATIONS FROM ITS SYSTEM. Additionally, MetroPCS does not necessarily encrypt your calls.

You agree that a violation of this Section harms MetroPCS, which cannot be fully redressed by money damages, and that MetroPCS shall be entitled to immediate injunctive relief in addition to all other remedies available.

**18. Our Rights to Limit or End Service or the Agreement.** WE MAY LIMIT, SUSPEND OR TERMINATE YOUR SERVICE OR AGREEMENT WITHOUT NOTICE FOR ANY REASON, including, but not limited to: (1) if you, any user of your wireless device, or any user on your account: (a) breaches this Agreement; (b) lives in an area where we don't provide Service; (c) have Off-Net Usage which makes it uneconomical for us to provide Service to you; (d) resells your Service; (e) uses your Service for any purpose or in any way not permitted under this Agreement or for any illegal purpose, including uses that violate trade and economic sanctions and prohibitions promulgated by any U.S. governmental agency or engages in conduct that adversely affects our customers, employees, business, or any other person(s), or that interferes with our operations, network, reputation, or ability to provide quality service; (f) tampers with or modifies your wireless device; (g) engages in "spamming" or other abusive or unsolicited communications; (h) resells MetroPCS wireless devices for profit, or tampers with, reprograms or alters wireless devices for the purpose of reselling the wireless device; (i) installs, deploys or uses any regeneration equipment or similar mechanism (for example, a repeater) to originate, amplify, enhance, retransmit or regenerate an RF signal without our permission; (j) steals from or lies to us; (k) interferes with our operations; (l) fails to follow our Policies; (m) provides false, inaccurate, dated or unverifiable identification or credit information; (n) modifies a wireless device from its manufacturer specifications; (o) fails to use our Services for an extended period of time; (p) fails to maintain an active wireless device in connection with the Service; (q) attempts to transfer Service to another person without our consent; (r) misuses your Service or wireless device; (s) uses your Service or wireless device in a manner that is excessive or unusually burdensome; (t) uses your service other than predominantly on our networks; (u) uses our Service in a way that exceeds our stated Policies for use; or (v) assists or facilitates anyone else in any of the above activities. You agree that you, any user of your wireless device or any account manager on your account won't (1) install, deploy, or use any regeneration equipment or similar mechanism (for example, a repeater) to originate, amplify, enhance, retransmit or regenerate a transmitted RF signal, unless authorized by Us; (2) threaten, harass, abuse, offend or use vulgar and/or inappropriate language toward our representatives or any person whom you call or contact using our Service; (3) interfere with our operations; (4) "spam," or engage in other abusive messaging or calling; (5) modify your wireless device from its manufacturer's specifications; or (6) use your Service in a way that negatively affects our network or other customers. We can also temporarily limit your Service for any operational or governmental reason; or if we have reason to believe that you are using our Service for any fraudulent, obscene, illegal, harassing, commercial or abusive purpose, such as for the transmission of or access to pornography or other services or materials that are obscene, cater to a prurient interest in sex, are patently offensive or are without redeeming social value, or if we believe the action protects our interests, any customer's interests or our network. MetroPCS is not required to provide you with any notification before suspending, restricting, or terminating your Service.

We may impose usage or other limits to your Service, suspend your Service, or exclude certain types of calls, messages or sessions (such as international, 900 or 976 calls), in our sole discretion and without notice. If you promptly pay amounts that are overdue or cure any other breach of this Agreement, MetroPCS, in its sole discretion, may reconnect your Service after you have paid any reconnection fees we have imposed. In addition, you may terminate Service at any time by notifying us in writing at the address listed in Section 16 "Notices".

**19. \* Intellectual Property.** You agree not to infringe, misappropriate, dilute or otherwise violate the intellectual property rights or goodwill of MetroPCS or any third party. Except for a limited license to use the Services or wireless devices arising from the sale of a product, your purchase of MetroPCS wireless devices and Services does not grant you any license or right to copy, modify, reverse engineer, download, redistribute, or resell the intellectual property of MetroPCS or others related to the Services and MetroPCS wireless devices (or other wireless devices), which may be used only with MetroPCS Service unless expressly authorized in writing by MetroPCS. You agree that a violation of this Section harms MetroPCS, which cannot be fully redressed by money damages, and that MetroPCS shall be entitled to immediate injunctive relief in addition to all other remedies available. In conjunction with our rights under Section 18, it is MetroPCS' policy, in appropriate circumstances and in its sole judgment, to suspend, or terminate the Service of any subscriber, account holder or user who is deemed to be a repeat or blatant infringer of copyrights.

**20.  Digital Millennium Copyright Act ("DMCA") Notice.** If you believe that material residing on our system or network infringes the copyright of you or any third party for whom you are authorized to act, notify us by using the notice procedure under the DMCA and described at https://www.t-mobile.com/Company/CompanyInfo.aspx?tp=Abt_Tab_ConsumerInfo&tsp=Abt_Sub_CopyrightDMCA and http://es.t-mobile.com/DMCA.htm for T-Mobile's Spanish website. After receiving notice, we may remove or disable access to any infringing material as provided for in the DMCA. There are substantial penalties for sending false notices.

**21. \* Privacy Information; CPNI.** Our Privacy Policy describes how we collect, use and share information related to your use of our Service and is available online at metropcs.com/terms-conditions/privacy. We may change our Privacy Policy at any time to provide updates to or clarification of our practices. You should refer to our Privacy Policy often for the latest information and the effective date of any changes. In providing service to you, MetroPCS will receive information classified as "customer proprietary network information" or "CPNI" under federal law that is considered confidential, such as information regarding your usage of the Service, the technical configuration of such Service, the destination of telephone calls you make and the type of services you purchase. MetroPCS may use this information for certain purposes without further disclosure or consent, including the following: to provide you with Service; to market service offerings to you related to the Services you purchase; or to protect you, other MetroPCS users, MetroPCS and other carriers from fraud, abuse or unlawful use of its Service, and in aggregate not personally identifiable form to provide other Services. MetroPCS also may share such information with its affiliates, contractors, dealers, and third party agents for the limited purpose of making available to you communications-related offers and information that may be of interest to you. You have the right under federal law to request MetroPCS not to disclose your confidential information for the purpose of mailing communications-related offers, and MetroPCS has the duty to honor any such request. You may "opt out" of disclosure of your CPNI to MetroPCS affiliates and third party agents for the purpose of mailing communications related offers by sending a request in writing to: P.O. Box 601119, Dallas, Texas 75360-1119. Opting out will not affect MetroPCS' provision of Service to you. Additional information regarding our use of CPNI and other subscriber information is set forth in our Privacy Policy, which we incorporate herein by reference.

**22. \* Disclaimer of Warranties: Wireless Devices, Accessories, and Retailed Equipment.** METROPCS DOES NOT MANUFACTURE WIRELESS DEVICES OR RELATED ACCESSORY EQUIPMENT. YOUR WIRELESS DEVICES AND RELATED ACCESSORY EQUIPMENT COME WITH A SEPARATE WRITTEN LIMITED WARRANTY

FROM THE MANUFACTURER. STATEMENTS BY METROPCS OR METROPCS EMPLOYEES AND AGENTS REGARDING THE WIRELESS DEVICES OR RELATED ACCESSORY EQUIPMENT SHOULD NOT BE INTERPRETED AS A WARRANTY BY METROPCS. METROPCS MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, ABOUT YOUR WIRELESS DEVICES OR ANY RELATED ACCESSORY EQUIPMENT, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. THIS DISCLAIMER DOES NOT DEPRIVE YOU OF ANY RIGHTS YOU MAY HAVE AGAINST THE MANUFACTURER. WITHOUT LIMITATION, METROPCS WILL NOT BE LIABLE TO YOU IN CONNECTION WITH: (1) THE MANUFACTURER'S WARRANTY; (2) ANY ACTIONS OR OMISSIONS OF THE MANUFACTURER; OR (3) ANY MALFUNCTION OR FAILURE OF THE WIRELESS DEVICE OR RELATED ACCESSORY EQUIPMENT.

**Disclaimer of Warranties: Services.** METROPCS AND ITS VENDORS AND SUPPLIERS ("METROPCS PARTIES") MAKE NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, TO YOU IN CONNECTION WITH, ARISING OUT OF, OR RELATING TO YOUR USE OF THE SERVICE. YOU ACKNOWLEDGE THAT SERVICE INTERRUPTIONS WILL OCCUR FROM TIME TO TIME AND AGREE TO HOLD THE METROPCS PARTIES HARMLESS FOR ALL SUCH INTERRUPTIONS. IN NO EVENT SHALL METROPCS PARTIES BE LIABLE FOR ECONOMIC LOSS, PERSONAL INJURIES, OR PROPERTY DAMAGE SUSTAINED BY YOU OR ANY THIRD PARTY ARISING FROM USE OF THE SERVICE OR THIS AGREEMENT. WE DO NOT GUARANTEE THAT YOUR COMMUNICATIONS WILL BE PRIVATE OR SECURE; IT IS ILLEGAL FOR UNAUTHORIZED PEOPLE TO INTERCEPT YOUR COMMUNICATIONS, BUT SUCH INTERCEPTIONS CAN OCCUR.

**23. * Exclusive Remedy; Waivers and Limitations of Liability.** YOU AGREE THAT YOUR SOLE AND EXCLUSIVE REMEDY FOR (i) OUR, OR OUR DEALER'S, AGENT'S, REPRESENTATIVE'S, VENDOR'S, SUPPLIER'S, OR OTHER CARRIER'S FAILURE TO PROVIDE YOU WITH SERVICE, OR METROPCS' FAILURE TO PERFORM HEREUNDER SHALL BE YOUR RIGHT TO HAVE METROPCS RE-PERFORM SUCH SERVICE; OR (ii) UNLESS THE LAW FORBIDS IT IN ANY PARTICULAR CASE ANY FAILURE, MALFUNCTION, OR DEFECT RELATED TO, ARISING OUT OF, OR IN CONNECTION WITH ANY DEVICE, HANDSET, OR OTHER EQUIPMENT OR PRODUCT SUPPLIED OR PROVIDED BY US, SHALL BE YOUR RIGHT TO HAVE METROPCS REPAIR, OR HAVE REPAIRED, REPLACE, OR HAVE REPLACED, SUCH DEVICE, HANDSET, OR OTHER EQUIPMENT OR PRODUCT. UNLESS THE EXCLUSIVE REMEDY SET FORTH IN THE PREVIOUS SENTENCE IS PROHIBITED UNDER APPLICABLE LAW, YOU AGREE TO LIMIT CLAIMS FOR DAMAGES OR OTHER MONETARY RELIEF AGAINST THE METROPCS PARTIES, OR ANY SUPPLIER, AGENT, DEALER, REPRESENTATIVE, CARRIER, VENDOR OR MANUFACTURER, TO THE LESSER OF: (A) YOUR DIRECT DAMAGES; OR (B) THE PRORATED MONTHLY OR OTHER CHARGES YOU PAID OR OWE US FOR THE APPLICABLE SERVICE OR WIRELESS DEVICE FOR ONE MONTH'S SERVICE CHARGES. AS A MATERIAL PART OF THE CONSIDERATION PAID BY YOU FOR THE SERVICES PROVIDED BY METROPCS OR ANY SUPPLIER, AGENT, DEALER, REPRESENTATIVE, CARRIER, VENDOR OR MANUFACTURER OF METROPCS, UNDER THIS AGREEMENT, AND NOTWITHSTANDING ANY OTHER PROVISION HEREOF, YOU AGREE THAT UNDER NO CIRCUMSTANCES ARE WE LIABLE FOR ANY INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, TREBLE, PUNITIVE OR SPECIAL DAMAGES OF ANY NATURE WHATSOEVER ARISING OUT OF, RELATED TO, OR IN CONNECTION WITH, INCLUDING, BUT NOT LIMITED TO, LOST PROFITS, LOSS OF BUSINESS, OR COST OF REPLACEMENT PRODUCTS AND SERVICES, TO THE FULLEST EXTENT THE SAME MAY BE DISCLAIMED BY LAW. THIS MEANS THAT NEITHER OF US WILL SEEK ANY INDIRECT, SPECIAL, CONSEQUENTIAL, TREBLE, OR PUNITIVE DAMAGES FROM THE OTHER. THIS EXCLUSIVE REMEDY, LIMITATION AND WAIVER ALSO APPLIES TO ANY CLAIMS EITHER PARTY MAY BRING AGAINST THE OTHER PARTY TO THE EXTENT THAT IT WOULD BE REQUIRED TO INDEMNIFY THAT PARTY FOR SUCH CLAIM. THIS

LIMITATION AND WAIVER WILL APPLY REGARDLESS OF THE THEORY OF LIABILITY, WHETHER FRAUD, MISREPRESENTATION, BREACH OF CONTRACT, PERSONAL INJURY, NEGLIGENCE, PRODUCT LIABILITY, OR ANY OTHER THEORY. YOU AGREE THAT THE FOREGOING ALLOCATION OF RISK SHALL, IN THE EVENT OF METROPCS' INABILITY, DESPITE GOOD FAITH EFFORTS, TO PROVIDE THE SERVICES OR THE PRODUCTS, REMAIN IN EFFECT REGARDLESS OF WHETHER THE EXCLUSIVE REMEDIES PROVIDED FOR UNDER THIS SECTION THEN SATISFY THE ESSENTIAL PURPOSES FOR WHICH THETY WERE INTENDED, OR OTHERWISE PROVIDE YOU WITH A FAIR QUANTUM OF RELIEF.

You agree that neither we nor our vendors, suppliers or licensors are responsible for any damages resulting from: (a) any action or omission by a third party; (b) providing or failing to provide Services, including, but not limited to, deficiencies or problems with a wireless device or network coverage (for example, dropped, blocked, interrupted Services, etc.); (c) traffic or other accidents, or any health-related claims relating to our Services; (d) data content or information accessed while using our Services; (e) an interruption or failure in accessing or attempting to access emergency services from a wireless device, including through 911, Enhanced 911 or otherwise; (f) interrupted, failed, or inaccurate location information services; (g) information or communication that is blocked by a spam filter; and (h) damage to your wireless device or any computer or equipment connected to your wireless device, or damage to or loss of any information stored on your wireless device, computer, equipment, or MetroPCS storage space from your use of the Services or from viruses, worms, or downloads of malicious content, materials, data, text, images, video or audio. You agree we aren't responsible for problems caused by you or others, or by any act of God or other events beyond our control, including acts of God (for example, weather-related phenomena, fire, earthquake, hurricane, etc.), riot, strike, war, terrorism or government orders or acts. You also agree we aren't liable for missed or deleted voice mails or other messages, or for any information, such as pictures, that gets lost or deleted if we service your wireless device. If another wireless carrier is involved in any problem (for example, while you're roaming), you also agree to any limitations of liability in its favor that it imposes. You should implement appropriate safeguards to secure your wireless device, computer or equipment and to back-up your information stored on each.

**24. * Your Use Of The Service and Indemnification.** You agree to use the Service in accordance with this Agreement and to comply with all applicable laws. YOU AGREE TO DEFEND, INDEMNIFY, AND HOLD HARMLESS METROPCS FROM ANY CLAIMS ARISING OUT OF, RELATING TO, OR IN CONNECTION WITH, USE OF THE SERVICE OR YOUR DEVICE, YOUR ACTS OR OMISSIONS, INCLUDING, BUT NOT LIMITED TO, ANY VIOLATION BY YOU OF THE TERMS AND CONDITIONS OF THIS AGREEMENT, THE POLICIES, OR OF ANY APPLICABLE STATUTES, ORDINANCES, LAWS OR REGULATIONS OF ANY LOCAL, STATE, OR FEDERAL AUTHORITY, YOUR USE OF THE SERVICE OR DEVICE AND ANY INFORMATION YOU SUBMIT, POST, TRANSMIT OR MAKE AVAILABLE VIA THE SERVICE, FAILING TO PROVIDE APPROPRIATE NOTICES REGARDING LOCATION-SENSITIVE SERVICES, FAILURE TO SAFEGUARD YOUR PASSWORDS, BACKUP SECURITY QUESTION TO YOUR PASSWORD OR ANY OTHER ACCOUNT INFORMATION, OR THE RIGHTS OF ANY THIRD PARTY. MetroPCS may deny a request for Service from you for any lawful reason. MetroPCS also reserves the right to cease serving you if you are not acting in accordance with the terms of this Agreement or the Policies, to disconnect calls that are not in accordance with the terms and conditions of this Agreement or the Policies, and to cease providing services that are inconsistent with the terms and conditions of this Agreement or the Policies and the nature of the Service.

**25. * Enforceability and Assignment.** A waiver of any part of this Agreement in one instance is not a waiver of any other part or any other instance and must be expressly provided in writing. If we don't enforce our rights under any provisions of the Agreement, we may still require strict compliance in the future. Except as provided in Section 2, if any part of this Agreement is held invalid that part may be severed from the Agreement. You can't assign this Agreement or any of your rights or duties under it without our written consent. We may

assign all or part of the Agreement or your debts to us without notice. Upon its transfer or assignment of this Agreement, MetroPCS shall be released from all liability with respect to this Agreement. This Agreement is the entire agreement between us and defines all of the rights you have with respect to your Service or wireless device, except as provided by law, and you cannot rely on any other documents or statements by any sales, service representatives or other agents. If you purchase a device, services or content from a third party, you may have a separate agreement with the third party; MetroPCS is not a party to that agreement. Any determination made by us pursuant to this Agreement, shall be in our sole reasonable discretion. Paragraphs marked "*" continue after termination of our Agreement with you.

**26. * Choice of Law.** This Agreement is governed by the Federal Arbitration Act, applicable federal law, and the laws of the state in which your billing address in our records is located, without regard to the conflicts of laws rules of that state. Foreign laws do not apply. Arbitration or court proceedings must be in the county and state in which your billing address in our records is located, but not outside the U.S. If any provision of this Agreement is invalid under the law of a particular jurisdiction, that provision will not apply in that jurisdiction.

**27.  Other Terms.**

**27.1  TTY.** TTY (also known as TDD or Text Telephone) is a telecommunications device that allows people who are deaf or hearing-impaired or who have speech or language disabilities to communicate by telephone. If you have a digital wireless device that is TTY-compatible, it is possible to make calls, including 911 calls, with a TTY. If you have questions concerning the capabilities of your wireless device, please contact us toll-free at 1-888-8metro8.

**27.2  Risk of Loss or Damage to Wireless Devices.** Upon your acceptance of delivery of your wireless device, all risk of loss, damage, theft, or destruction of your wireless device is borne by you. In the event of any loss, damage, theft, or destruction of your wireless device, in whole or in part, you are responsible for purchasing a replacement wireless device from MetroPCS at your expense, and you remain responsible for your obligations under this Agreement, including, without limitation, your responsibility for the payment of Service Charges.

**27.3  Premium Handset Protection®**

"Premium Handset Protection" is an equipment insurance program provided by Old Republic Insurance Company and administered by Asurion Insurance Services, Inc. Phone Recovery features are available as well on select phones. Please see the Premium Handset Protection brochure available at any participating retail location or click here for complete Terms and Conditions of Coverage. The Premium Handset Protection Terms and Conditions of Coverage are subject to change. "Premium Handset Protection" may not be available in all states and eligibility varies by wireless device.

**27.4.  California Customers.** Our Utility number is U-3079-C. If you file a billing-related claim with the Consumer Affairs Branch ("CAB") of the California Public Utilities Commission you must, within 24 hours of filing, inform us by writing to the Customer Service address set forth below. If we resolve your dispute, you agree to withdraw your claim with the CAB.

**27.5  Start of Service Form/Rate Plan/Coverage Brochure.** The Rate Plan selected by you determines the charges for the Services. The Start of Service form may identify the Rate Plan you have chosen and set forth the charges you are required to pay for Service, including monthly or other cyclical access fees, as well as any applicable surcharges or other fees. If you did not receive a Start of Service form, you can find details on the Rate Plan, services, or features you selected by visiting our stores, authorized dealers, or at www.Metropcs.com. Unused Rate Plan allotments, bundles, or buckets expire at the end of your service cycle and do not roll over to the next service cycle. We will determine what types of Service and Rate Plans are available to you. The Rate Plan to which you subscribe when you initiate Service, as modified by us from time to time in accordance with this Agreement, will remain in effect for the term of your Service until or unless we change your Rate Plan or you choose to

subscribe to a different Rate Plan, if available to you. If we offer more than one Rate Plan in your area and you wish to change the Rate Plan to which you subscribe, you may contact us to request a change in your Rate Plan to any other Rate Plan for which you are eligible. Rate Plan changes may not be effective immediately, and you may be required to pay to make such changes.

**27.6  Account Activity and Information Verification.** This Agreement shall be contingent upon our verification and approval of certain information about you. We reserve the right to deny or limit the provision of Service on the basis of any information that we gather. We may require that you provide us with additional or updated information we reasonably need to determine if you qualify for Service, to manage the Service, or to determine if you are using the Service in accordance with this Agreement. If you do not provide us the information we request within the time period that we specify, we may choose not to provide Service to you, or, if you are an existing customer, we may suspend or terminate Service to you. You warrant and represent that all information furnished to us by you is current, complete, accurate and true as of the time you provide it, and you will update it as necessary to keep it complete, accurate, and true. At any time, we may take any action that we believe necessary to verify or review your account activity or information you provide to us, including: (1) verification of your account information; (2) review of your use of Services and of your account to help assess the Services we provide and the performance of our systems; and (3) investigation of suspected prohibited use or violation of this Agreement or the Policies. We may share information we gather about you as provided elsewhere in this Agreement and in our Privacy Policy which is available at www.metropcs.com or by writing to us at the address in Section 16 "Notices". We also may share your information, including your personal information and customer proprietary network information, with any person who may purchase our business.

You (the account holder) may password protect your account information by establishing a personal identification number ("PIN"). You may also set a backup security question and answer in the event you forget your PIN. You agree to protect your PIN, passwords and other account access credentials like your backup security question from loss or disclosure. It is your sole responsibility to protect your account by creating a password that is unknown to any other person. This password should never be shared nor should it be written down and kept in a place that is accessible to others. Should you feel that your password has been compromised you should immediately call MetroPCS to change your password. You further agree that MetroPCS may, in our sole discretion, treat any person who presents your credentials for account access as you or an Authorized User on the account for the purposes of disclosure of information or changes in your Rate Plan or Service.

**27.7  Telephone Numbers.** We will assign a telephone number (the "Number") to your wireless device. You do not own nor have any rights to the Number or any personal identification number ("PIN") that you may use in connection with your Service, except for any right you may have to port the Number to another carrier. We also may assign an Internet Protocol address ("IP Address") to your wireless device. You do not own or have any rights to the IP Address. We can change, reassign, or eliminate any Number or PIN by giving you notice and your IP Address without giving you notice. If your account is deactivated, we can reassign the Number or IP Address without giving you any notice. You may not assign the Number, PIN or IP Address to any wireless device, other equipment or to any other party except as approved by us. If you assign the Number, PIN or IP Address to any wireless device, other equipment or to any other party without our approval, we reserve the right to terminate your Service. You can request that we port your number to another carrier, and Service for that number will be terminated when the porting is complete.  If you port your number, you will be responsible for all usage and Charges until the port-out is complete.  If you port a Number to us, please be aware that we may not be able to provide some services right away, such as 911 location services. You may be required to purchase a new wireless device and you may be without Service for some period of time. MetroPCS may charge a fee to reimburse MetroPCS for the costs MetroPCS incurs to meet the equipment, technology and infrastructure requirements necessary to enable number porting. MetroPCS may also charge a fee to reimburse MetroPCS for the cost MetroPCS incurs to perform a port. As a

https://www.metropcs.com/terms-conditions/terms-conditions-service.html[8/20/2015 1:01:55 PM]

standard service feature, MetroPCS transmits your Number, account name, and address with each call or data session you make from your MetroPCS wireless device. Your account name, Number, and IP Address may be displayed on the telephone or other device of the party called if that person uses caller identification. Your Number and location may also be transmitted to public safety officials if you dial 911 or other emergency service numbers. Your name and Number for most calls can be blocked on a call-by-call basis by dialing *67 before the telephone area code and telephone number (on certain devices there may be a different number). In addition, you may elect to have your name and Number permanently blocked, at no charge, by sending a request in writing to: MetroPCS, P.O. Box 601119, Dallas, Texas, 75360-1119.

## Shop Products

All Phones
All Tablets
All Accessories
4G LTE & 4G devices
Android™ devices
Deals

## Shop Plans

All phone plans
All tablet plans
$40 phone plan
$50 phone plan
$60 phone plan

## Shop Services

All Services
Premium Handset Protection®

## Manage & Pay

My Account
Make Payment
Activate
Track Order
Rebate Center

## About Us

Press Center
Leadership Team
Become a Dealer
Investor Relations

## MetroNews   sign up!

Get the latest news alerts, special deals and more.

**Go**





FAQs   |   Contact Us   |   Careers   |   WEA Compliance   |   Accessibility   |   Privacy Policy   |   Terms & Conditions
Consumer Protection   |   Network Disclosure   |   Signal Booster   |   Interest Based Ads   |   Site Map

© 2002-2015 T-Mobile USA, Inc. All rights reserved.

# EXHIBIT B

Int. Cl.: 9

Prior U.S. Cls.: 21, 23, 26, 36, and 38

United States Patent and Trademark Office

Reg. No. 2,784,778
Registered Nov. 18, 2003

## TRADEMARK
### PRINCIPAL REGISTER



METROPCS, INC. (DELAWARE CORPORATION)
8144 WALNUT HILL LANE
SUITE 1250
DALLAS, TX 75225

FOR: TELECOMMUNICATION HARDWARE, NAMELY, WIRELESS TELEPHONES, BATTERIES, CHARGERS, HANDS-FREE DEVICES, AND WIRELESS HANDHELD COMMUNICATION DEVICES TO TRANSMIT, RECEIVE, OR OTHER WISE ACCESS COMMUNICATIONS NETWORKS, FOR USE IN WIRELESS TELEPHONY AND IN THE PROVISION OF WIRELESS BROADBAND COMMUNICATION SERVICES FOR THE TRANSMISSION OF VOICE AND DATA, IN CLASS 9 (U.S. CLS. 21, 23, 26, 36 AND 38).

FIRST USE 2-1-2002; IN COMMERCE 2-1-2002.

SN 76-337,467, FILED 11-14-2001.

ELISSA GARBER KON, EXAMINING ATTORNEY

EXHIBIT B

**Int. Cl.: 38**

**Prior U.S. Cls.: 100, 101, and 104**

**Reg. No. 2,792,316**

## United States Patent and Trademark Office

Registered Dec. 9, 2003

### SERVICE MARK
#### PRINCIPAL REGISTER



METROPCS, INC. (DELAWARE CORPORATION)
8144 WALNUT HILL LANE
SUITE 1250
DALLAS, TX 75225

   FOR: TELECOMMUNICATIONS SERVICES, NAMELY, WIRELESS TELEPHONY AND WIRE-LESS BROADBAND COMMUNICATIONS SERVI-CES FOR THE TRANSMISSION OF VOICE AND DATA, IN CLASS 38 (U.S. CLS. 100, 101 AND 104).

   FIRST USE 2-1-2002; IN COMMERCE 2-1-2002.

   SN 76-344,650, FILED 12-3-2001.

ELISSA GARBER KON, EXAMINING ATTORNEY

**Int. Cl.: 38**

**Prior U.S. Cls.: 100, 101, and 104**

**Reg. No. 2,803,097**

## United States Patent and Trademark Office

Registered Jan. 6, 2004

## SERVICE MARK
### PRINCIPAL REGISTER

## METROPCS

METROPCS, INC. (DELAWARE CORPORATION)
8144 WALNUT HILL LANE, SUITE 1250
DALLAS, TX 75225

FOR: TELECOMMUNICATIONS SERVICES, NAMELY, WIRELESS TELEPHONY AND WIRELESS BROADBAND COMMUNICATIONS SERVI-CES FOR THE TRANSMISSION OF VOICE AND DATA, IN CLASS 38 (U.S. CLS. 100, 101 AND 104).

FIRST USE 2-1-2002; IN COMMERCE 2-1-2002.

SN 76-345,024, FILED 12-3-2001.

ELISSA GARBER KON, EXAMINING ATTORNEY

**Int. Cl.: 9**

**Prior U.S. Cls.: 21, 23, 26, 36, and 38**

**United States Patent and Trademark Office**

Reg. No. 2,865,446

Registered July 20, 2004

## TRADEMARK
### PRINCIPAL REGISTER

# METROPCS

METROPCS, INC. (DELAWARE CORPORATION)
8144 WALNUT HILL LANE, SUITE 1250
DALLAS, TX 75225

FOR: TELECOMMUNICATION HARDWARE, NAMELY, WIRELESS TELEPHONES, BATTERIES, CHARGERS, HANDS-FREE DEVICES AND WIRELESS HANDHELD COMMUNICATION DEVICES TO TRANSMIT, RECEIVE OR OTHERWISE ACCESS COMMUNICATIONS NETWORKS, FOR USE IN WIRELESS TELEPHONY AND IN THE PROVISION OF WIRELESS BROADBAND COMMUNICATION SERVICES FOR THE TRANSMISSION OF VOICE AND DATA, IN CLASS 9 (U.S. CLS. 21, 23, 26, 36 AND 38).

FIRST USE 2-1-2002; IN COMMERCE 2-1-2002.

SN 76-337,997, FILED 11-14-2001.

ELISSA GARBER KON, EXAMINING ATTORNEY

Int. Cls.: 9 and 38

Prior U.S. Cls.: 21, 23, 26, 36, 38, 100, 101 and 104

**United States Patent and Trademark Office**

Reg. No. 3,542,846

Registered Dec. 9, 2008

## TRADEMARK
## SERVICE MARK
## PRINCIPAL REGISTER



METROPCS WIRELESS, INC. (DELAWARE CORPORATION)
2250 LAKESIDE BOULEVARD
RICHARDSON, TX 75082

FOR: TELECOMMUNICATION HARDWARE, NAMELY, WIRELESS TELEPHONES, BATTERIES, CHARGERS, HANDS-FREE DEVICES AND WIRELESS HANDHELD COMMUNICATION DEVICES TO TRANSMIT, RECEIVE OR OTHERWISE ACCESS COMMUNICATIONS NETWORKS, FOR USE IN WIRELESS TELEPHONY AND IN THE PROVISION OF WIRELESS BROADBAND COMMUNICATION SERVICES FOR THE TRANSMISSION OF VOICE AND DATA, IN CLASS 9 (U.S. CLS. 21, 23, 26, 36 AND 38).

FIRST USE 2-1-2002; IN COMMERCE 2-1-2002.

FOR: TELECOMMUNICATIONS SERVICES, NAMELY, WIRELESS TELEPHONY AND WIRE-

LESS BROADBAND COMMUNICATIONS SERVICES FOR THE TRANSMISSION OF VOICE AND DATA, IN CLASS 38 (U.S. CLS. 100, 101 AND 104).

FIRST USE 2-1-2002; IN COMMERCE 2-1-2002.

OWNER OF U.S. REG. NOS. 2,784,778, 2,803,097 AND OTHERS.

THE COLOR(S) PURPLE AND ORANGE IS/ARE CLAIMED AS A FEATURE OF THE MARK.

THE MARK CONSISTS OF THE LETTERS "METRO" IN PURPLE, FOLLOWED BY THE LETTERS "PCS" IN ORANGE.

SER. NO. 77-365,528, FILED 1-7-2008.

APRIL ROACH, EXAMINING ATTORNEY

# United States of America
## United States Patent and Trademark Office

# metroPCS

**Reg. No. 4,480,888**

**Registered Feb. 11, 2014**

**Int. Cls.: 9, 35, 36 and 38**

**TRADEMARK**

**SERVICE MARK**

**PRINCIPAL REGISTER**

T-MOBILE USA, INC. (DELAWARE CORPORATION)
12920 S.E. 38TH STREET
BELLEVUE, WA 98006

FOR: WIRELESS TELEPHONES; CELLULAR TELEPHONES; SMARTPHONES; SIM CARDS; MEMORY CARDS; MEMORY CARD READERS; CARRYING CASES FOR WIRELESS TELECOMMUNICATIONS DEVICES; GEL SKINS IN THE NATURE OF RUBBER COVER-INGS FOR PROTECTING WIRELESS TELEPHONES AND SMARTPHONES; REMOVABLE BACK COVERS FOR WIRELESS PHONES AND SMARTPHONES; PROTECTIVE TRANS-PARENT DISPLAY COVERINGS, NAMELY, PLASTIC TRANSPARENT FILMS FOR COV-ERING AND PROVIDING A SCRATCH PROOF BARRIER OR PROTECTION FOR DISPLAYS ON WIRELESS TELEPHONES AND SMARTPHONES; USB CABLES; HIGH-DEFINITION MULTIMEDIA INTERFACE ADAPTERS AND CABLES; WIRED AND WIRELESS HANDS-FREE MICROPHONE AND EARPHONE ADAPTERS; STEREO HEADPHONES; EAR BUDS; EAR BUD COVERS; CAR BATTERY CHARGERS; WALL BATTERY CHARGERS; POWER ADAPTORS; BELT CLIP HOLSTERS FOR CARRYING WIRELESS PHONES AND SMART-PHONES; DOCKING STATIONS FOR RECHARGING OF WIRELESS PHONES AND SMARTPHONES; IN-VEHICLE HOLDERS FOR HOLDING AND CHARGING WIRELESS PHONES AND SMARTPHONES; FITTED WIRELESS PHONE AND SMARTPHONE POUCHES; NEAR FIELD COMMUNICATIONS (NFC) TAGS; DOWNLOADABLE DATA FILES CON-SISTING OF AUDIO, VIDEO AND MULTIMEDIA WORKS CONTAINING MUSIC AND RINGTONES; SOFTWARE FOR USE IN CONTROLLING AND MONITORING PREPAID WIRELESS SERVICES; GAME SOFTWARE; SOFTWARE FOR IDENTIFYING REAL-TIME POINTS OF INTEREST DIRECTORIES, EVENT, TRAFFIC AND TRAVEL INFORMATION AND MAPPING AND DIRECTIONS INFORMATION FOR ACQUISITION OF GEOGRAPHIC LOCATION INFORMATION AND DIRECTIONS TO DESIRED LOCATIONS BY MEANS OF FOOT-PATH, STREET, CAR, BUS, TRAIN OR FERRY; SOFTWARE FOR MOBILE WALLET SERVICES AND MOBILE COMMERCE; SOFTWARE FOR UPLOADING, DOWNLOADING, STREAMING, PLAYING, PROGRAMMING, BROADCASTING, TRANSMITTING AND RE-PRODUCING DIGITAL MUSIC AND ENTERTAINMENT-RELATED AUDIO, VIDEO, TEXT AND MULTIMEDIA CONTENT; SOFTWARE FOR DOWNLOADING AND PLAYING DATA FILES CONSISTING OF AUDIO RECORDINGS OF VOICEMAIL MESSAGES; SOFTWARE FOR LOCATING, TRIGGERING AN ALARM ON, LOCKING ACCESS TO, ERASING DATA AND MEDIA ON AND INITIATION OF BACKUP OF DATA AND MEDIA ON MISPLACED OR STOLEN WIRELESS TELECOMMUNICATIONS DEVICES; SOFTWARE FOR BLOCKING INCOMING TELEPHONIC AND DATA COMMUNICATIONS FROM THIRD PARTIES, IN CLASS 9 (U.S. CLS. 21, 23, 26, 36 AND 38).



*Michelle K. Lee*

**Deputy Director of the United States
Patent and Trademark Office**

**Reg. No. 4,480,888**   FIRST USE 2-1-2002; IN COMMERCE 2-1-2002.

FOR: RETAIL STORE SERVICES AND ONLINE RETAIL STORE SERVICES IN THE FIELD OF WIRELESS TELECOMMUNICATIONS DEVICES, ACCESSORIES AND SERVICES; ONLINE RETAIL STORE SERVICES FEATURING DOWNLOADABLE DATA FILES CONSISTING OF AUDIO, VIDEO AND MULTIMEDIA WORKS, IN CLASS 35 (U.S. CLS. 100, 101 AND 102).

FIRST USE 2-1-2002; IN COMMERCE 2-1-2002.

FOR: PREPAID WIRELESS TELECOMMUNICATIONS CALLING CARD SERVICES; INSURANCE ADMINISTRATION SERVICES FOR MOBILE TELECOMMUNICATIONS DEVICES; PROVIDING EXTENDED WARRANTIES FOR MOBILE TELECOMMUNICATIONS DEVICES, IN CLASS 36 (U.S. CLS. 100, 101 AND 102).

FIRST USE 2-1-2002; IN COMMERCE 2-1-2002.

FOR: CELLULAR TELECOMMUNICATIONS SERVICES, NAMELY, TRANSMISSION OF VOICE, AUDIO, DATA, TEXT, IMAGES, VIDEO, MUSIC, INFORMATION, FACSIMILES, ADVERTISING, GAMING AND GRAPHICS VIA CELLULAR TELECOMMUNICATIONS NETWORKS AND THE INTERNET; CELLULAR TELECOMMUNICATIONS SERVICES, NAMELY, TWO-WAY REAL-TIME TRANSMISSION OF VOICE, AUDIO, VIDEO AND DATA BETWEEN WIRELESS TELECOMMUNICATIONS DEVICES; WIRELESS TELEPHONE TELECOMMUNICATIONS SERVICES, NAMELY, PROVIDING WIRELESS CALLING PLANS; TEXT MESSAGING AND MULTIMEDIA MESSAGING SERVICES; PROVIDING MULTIPLE-USER ACCESS TO A GLOBAL COMPUTER NETWORK; PROVIDING TECHNICAL SUPPORT REGARDING THE USAGE OF CELLULAR TELECOMMUNICATIONS SERVICES AND EQUIPMENT; WIRELESS ROAMING SERVICES, NAMELY, PROVIDING ACCESS TO A CELLULAR TELECOMMUNICATION NETWORK; ELECTRONIC MAIL SERVICES; TELEPHONE COMMUNICATION SERVICES, NAMELY, RINGBACK TONE SERVICES; ELECTRONIC VOICE MESSAGING SERVICES, NAMELY, RECORDING AND SUBSEQUENT TRANSMISSION OF AUDIO MESSAGES AND TRANSMITTING TEXTUAL TRANSCRIPTIONS OF AUDIO MESSAGES; CELLULAR TELECOMMUNICATIONS SERVICES, NAMELY, FILTERING AND BLOCKING OF INCOMING VOICE TELECOMMUNICATIONS; ELECTRONIC TRANSMISSION OF DATA TO TELECOMMUNICATION DEVICES, NAMELY, PROVIDING REAL-TIME TRANSMISSION OF POINTS OF INTEREST DIRECTORIES, EVENT, TRAFFIC AND TRAVEL INFORMATION, AND MAPPING AND DIRECTIONS INFORMATION FOR CONSUMER ACQUISITION OF GEOGRAPHIC LOCATION INFORMATION AND DIRECTIONS TO DESIRED LOCATIONS BY MEANS OF FOOT-PATH, STREET, CAR, BUS, TRAIN OR FERRY, IN CLASS 38 (U.S. CLS. 100, 101 AND 104).

FIRST USE 2-1-2002; IN COMMERCE 2-1-2002.

OWNER OF U.S. REG. NOS. 2,803,097, 3,542,846 AND OTHERS.

THE MARK CONSISTS OF THE WORD "METRO" IN BOLD LOWER-CASED LETTERS AND "PCS" IN CAPITAL LETTERS.

SER. NO. 86-001,523, FILED 7-3-2013.

DONALD JOHNSON, EXAMINING ATTORNEY

# United States of America

## United States Patent and Trademark Office

# metroPCS

**Reg. No. 4,480,891**

**Registered Feb. 11, 2014**

**Int. Cls.: 9, 35, 36 and 38**

**TRADEMARK**

**SERVICE MARK**

**PRINCIPAL REGISTER**

T-MOBILE USA, INC. (DELAWARE CORPORATION)
12920 S.E. 38TH STREET
BELLEVUE, WA 98006

FOR: WIRELESS TELEPHONES; CELLULAR TELEPHONES; SMARTPHONES; SIM CARDS; MEMORY CARDS; MEMORY CARD READERS; CARRYING CASES FOR WIRELESS TELECOMMUNICATIONS DEVICES; GEL SKINS IN THE NATURE OF RUBBER COVERINGS FOR PROTECTING WIRELESS TELEPHONES AND SMARTPHONES; REMOVABLE BACK COVERS FOR WIRELESS PHONES AND SMARTPHONES; PROTECTIVE TRANSPARENT DISPLAY COVERINGS, NAMELY, PLASTIC TRANSPARENT FILMS FOR COVERING AND PROVIDING A SCRATCH PROOF BARRIER OR PROTECTION FOR DISPLAYS ON WIRELESS TELEPHONES AND SMARTPHONES; USB CABLES; HIGH-DEFINITION MULTIMEDIA INTERFACE ADAPTERS AND CABLES; WIRED AND WIRELESS HANDS-FREE MICROPHONE AND EARPHONE ADAPTERS; STEREO HEADPHONES; EAR BUDS; EAR BUD COVERS; CAR BATTERY CHARGERS; WALL BATTERY CHARGERS; POWER ADAPTORS; BELT CLIP HOLSTERS FOR CARRYING WIRELESS PHONES AND SMARTPHONES; DOCKING STATIONS FOR RECHARGING OF WIRELESS PHONES AND SMARTPHONES; IN-VEHICLE HOLDERS FOR HOLDING AND CHARGING WIRELESS PHONES AND SMARTPHONES; FITTED WIRELESS PHONE AND SMARTPHONE POUCHES; NEAR FIELD COMMUNICATIONS (NFC) TAGS; DOWNLOADABLE DATA FILES CONSISTING OF AUDIO, VIDEO AND MULTIMEDIA WORKS CONTAINING MUSIC AND RINGTONES; SOFTWARE FOR USE IN CONTROLLING AND MONITORING PREPAID WIRELESS SERVICES; GAME SOFTWARE; SOFTWARE FOR IDENTIFYING REAL-TIME POINTS OF INTEREST DIRECTORIES, EVENT, TRAFFIC AND TRAVEL INFORMATION AND MAPPING AND DIRECTIONS INFORMATION FOR ACQUISITION OF GEOGRAPHIC LOCATION INFORMATION AND DIRECTIONS TO DESIRED LOCATIONS BY MEANS OF FOOT-PATH, STREET, CAR, BUS, TRAIN OR FERRY; SOFTWARE FOR MOBILE WALLET SERVICES AND MOBILE COMMERCE; SOFTWARE FOR UPLOADING, DOWNLOADING, STREAMING, PLAYING, PROGRAMMING, BROADCASTING, TRANSMITTING AND REPRODUCING DIGITAL MUSIC AND ENTERTAINMENT-RELATED AUDIO, VIDEO, TEXT AND MULTIMEDIA CONTENT; SOFTWARE FOR DOWNLOADING AND PLAYING DATA FILES CONSISTING OF AUDIO RECORDINGS OF VOICEMAIL MESSAGES; SOFTWARE FOR LOCATING, TRIGGERING AN ALARM ON, LOCKING ACCESS TO, ERASING DATA AND MEDIA ON AND INITIATION OF BACKUP OF DATA AND MEDIA ON MISPLACED OR STOLEN WIRELESS TELECOMMUNICATIONS DEVICES; SOFTWARE FOR BLOCKING INCOMING TELEPHONIC AND DATA COMMUNICATIONS FROM THIRD PARTIES, IN CLASS 9 (U.S. CLS. 21, 23, 26, 36 AND 38).



*Michelle K. Lee*

**Deputy Director of the United States
Patent and Trademark Office**

**Reg. No. 4,480,891** FIRST USE 2-1-2002; IN COMMERCE 2-1-2002.

FOR: RETAIL STORE SERVICES AND ONLINE RETAIL STORE SERVICES IN THE FIELD OF WIRELESS TELECOMMUNICATIONS DEVICES, ACCESSORIES AND SERVICES; ONLINE RETAIL STORE SERVICES FEATURING DOWNLOADABLE DATA FILES CONSISTING OF AUDIO, VIDEO AND MULTIMEDIA WORKS, IN CLASS 35 (U.S. CLS. 100, 101 AND 102).

FIRST USE 2-1-2002; IN COMMERCE 2-1-2002.

FOR: PREPAID WIRELESS TELECOMMUNICATIONS CALLING CARD SERVICES; INSURANCE ADMINISTRATION SERVICES FOR MOBILE TELECOMMUNICATIONS DEVICES; PROVIDING EXTENDED WARRANTIES FOR MOBILE TELECOMMUNICATIONS DEVICES, IN CLASS 36 (U.S. CLS. 100, 101 AND 102).

FIRST USE 2-1-2002; IN COMMERCE 2-1-2002.

FOR: CELLULAR TELECOMMUNICATIONS SERVICES, NAMELY, TRANSMISSION OF VOICE, AUDIO, DATA, TEXT, IMAGES, VIDEO, MUSIC, INFORMATION, FACSIMILES, ADVERTISING, GAMING AND GRAPHICS VIA CELLULAR TELECOMMUNICATIONS NETWORKS AND THE INTERNET; CELLULAR TELECOMMUNICATIONS SERVICES, NAMELY, TWO-WAY REAL-TIME TRANSMISSION OF VOICE, AUDIO, VIDEO AND DATA BETWEEN WIRELESS TELECOMMUNICATIONS DEVICES; WIRELESS TELEPHONE TELECOMMUNICATIONS SERVICES, NAMELY, PROVIDING WIRELESS CALLING PLANS; TEXT MESSAGING AND MULTIMEDIA MESSAGING SERVICES; PROVIDING MULTIPLE-USER ACCESS TO A GLOBAL COMPUTER NETWORK; PROVIDING TECHNICAL SUPPORT REGARDING THE USAGE OF CELLULAR TELECOMMUNICATIONS SERVICES AND EQUIPMENT; WIRELESS ROAMING SERVICES, NAMELY, PROVIDING ACCESS TO A CELLULAR TELECOMMUNICATION NETWORK; ELECTRONIC MAIL SERVICES; TELEPHONE COMMUNICATION SERVICES, NAMELY, RINGBACK TONE SERVICES; ELECTRONIC VOICE MESSAGING SERVICES, NAMELY, RECORDING AND SUBSEQUENT TRANSMISSION OF AUDIO MESSAGES AND TRANSMITTING TEXTUAL TRANSCRIPTIONS OF AUDIO MESSAGES; CELLULAR TELECOMMUNICATIONS SERVICES, NAMELY, FILTERING AND BLOCKING OF INCOMING VOICE TELECOMMUNICATIONS; ELECTRONIC TRANSMISSION OF DATA TO TELECOMMUNICATION DEVICES, NAMELY, PROVIDING REAL-TIME TRANSMISSION OF POINTS OF INTEREST DIRECTORIES, EVENT, TRAFFIC AND TRAVEL INFORMATION, AND MAPPING AND DIRECTIONS INFORMATION FOR CONSUMER ACQUISITION OF GEOGRAPHIC LOCATION INFORMATION AND DIRECTIONS TO DESIRED LOCATIONS BY MEANS OF FOOT-PATH, STREET, CAR, BUS, TRAIN OR FERRY, IN CLASS 38 (U.S. CLS. 100, 101 AND 104).

FIRST USE 2-1-2002; IN COMMERCE 2-1-2002.

OWNER OF U.S. REG. NOS. 2,803,097, 3,542,846 AND OTHERS.

THE COLOR(S) PURPLE AND ORANGE IS/ARE CLAIMED AS A FEATURE OF THE MARK.

THE MARK CONSISTS OF THE WORD "METRO" IN BOLD, PURPLE LOWER-CASED LETTERS AND "PCS" IN ORANGE, CAPITAL LETTERS.

SER. NO. 86-001,544, FILED 7-3-2013.

DONALD JOHNSON, EXAMINING ATTORNEY

072

# United States of America

## United States Patent and Trademark Office

# METROPCS

**Reg. No. 4,484,674**

**Registered Feb. 18, 2014**

**Int. Cls.: 9, 35, 36 and 38**

**TRADEMARK**

**SERVICE MARK**

**PRINCIPAL REGISTER**

T-MOBILE USA, INC. (DELAWARE CORPORATION)
12920 S.E. 38TH STREET
BELLEVUE, WA 98006

FOR: WIRELESS TELEPHONES; CELLULAR TELEPHONES; SMARTPHONES; SIM CARDS; MEMORY CARDS; MEMORY CARD READERS; CARRYING CASES FOR WIRELESS TELECOMMUNICATIONS DEVICES; GEL SKINS IN THE NATURE OF RUBBER COVERINGS FOR PROTECTING WIRELESS TELEPHONES AND SMARTPHONES; REMOVABLE BACK COVERS FOR WIRELESS PHONES AND SMARTPHONES; PROTECTIVE TRANSPARENT DISPLAY COVERINGS, NAMELY, PLASTIC TRANSPARENT FILMS FOR COVERING AND PROVIDING A SCRATCH PROOF BARRIER OR PROTECTION FOR DISPLAYS ON WIRELESS TELEPHONES AND SMARTPHONES; USB CABLES; HIGH-DEFINITION MULTIMEDIA INTERFACE ADAPTERS AND CABLES; WIRED AND WIRELESS HANDS-FREE MICROPHONE AND EARPHONE ADAPTERS; STEREO HEADPHONES; EAR BUDS; EAR BUD COVERS; CAR BATTERY CHARGERS; WALL BATTERY CHARGERS; POWER ADAPTORS; BELT CLIP HOLSTERS FOR CARRYING WIRELESS PHONES AND SMARTPHONES; DOCKING STATIONS FOR RECHARGING OF WIRELESS PHONES AND SMARTPHONES; IN-VEHICLE HOLDERS FOR HOLDING AND CHARGING WIRELESS PHONES AND SMARTPHONES; FITTED WIRELESS PHONE AND SMARTPHONE POUCHES; NEAR FIELD COMMUNICATIONS (NFC) TAGS; DOWNLOADABLE DATA FILES CONSISTING OF AUDIO, VIDEO AND MULTIMEDIA WORKS CONTAINING MUSIC AND RINGTONES; SOFTWARE FOR USE IN CONTROLLING AND MONITORING PREPAID WIRELESS SERVICES; GAME SOFTWARE; SOFTWARE FOR IDENTIFYING REAL-TIME POINTS OF INTEREST DIRECTORIES, EVENT, TRAFFIC AND TRAVEL INFORMATION AND MAPPING AND DIRECTIONS INFORMATION FOR ACQUISITION OF GEOGRAPHIC LOCATION INFORMATION AND DIRECTIONS TO DESIRED LOCATIONS BY MEANS OF FOOT-PATH, STREET, CAR, BUS, TRAIN OR FERRY; SOFTWARE FOR MOBILE WALLET SERVICES AND MOBILE COMMERCE; SOFTWARE FOR UPLOADING, DOWNLOADING, STREAMING, PLAYING, PROGRAMMING, BROADCASTING, TRANSMITTING AND REPRODUCING DIGITAL MUSIC AND ENTERTAINMENT-RELATED AUDIO, VIDEO, TEXT AND MULTIMEDIA CONTENT; SOFTWARE FOR DOWNLOADING AND PLAYING DATA FILES CONSISTING OF AUDIO RECORDINGS OF VOICEMAIL MESSAGES; SOFTWARE FOR LOCATING, TRIGGERING AN ALARM ON, LOCKING ACCESS TO, ERASING DATA AND MEDIA ON AND INITIATION OF BACKUP OF DATA AND MEDIA ON MISPLACED OR STOLEN WIRELESS TELECOMMUNICATIONS DEVICES; SOFTWARE FOR BLOCKING INCOMING TELEPHONIC AND DATA COMMUNICATIONS FROM THIRD PARTIES, IN CLASS 9 (U.S. CLS. 21, 23, 26, 36 AND 38).



**Deputy Director of the United States Patent and Trademark Office**

**Reg. No. 4,484,674**   FIRST USE 2-1-2002; IN COMMERCE 2-1-2002.

FOR: RETAIL STORE SERVICES AND ONLINE RETAIL STORE SERVICES IN THE FIELD OF WIRELESS TELECOMMUNICATIONS DEVICES, ACCESSORIES AND SERVICES; ONLINE RETAIL STORE SERVICES FEATURING DOWNLOADABLE DATA FILES CONSISTING OF AUDIO, VIDEO AND MULTIMEDIA WORKS, IN CLASS 35 (U.S. CLS. 100, 101 AND 102).

FIRST USE 2-1-2002; IN COMMERCE 2-1-2002.

FOR: PREPAID WIRELESS TELECOMMUNICATIONS CALLING CARD SERVICES; INSURANCE ADMINISTRATION SERVICES FOR MOBILE TELECOMMUNICATIONS DEVICES; PROVIDING EXTENDED WARRANTIES FOR MOBILE TELECOMMUNICATIONS DEVICES, IN CLASS 36 (U.S. CLS. 100, 101 AND 102).

FIRST USE 2-1-2002; IN COMMERCE 2-1-2002.

FOR: CELLULAR TELECOMMUNICATIONS SERVICES, NAMELY, TRANSMISSION OF VOICE, AUDIO, DATA, TEXT, IMAGES, VIDEO, MUSIC, INFORMATION, FACSIMILES, ADVERTISING, GAMING AND GRAPHICS VIA CELLULAR TELECOMMUNICATIONS NETWORKS AND THE INTERNET; CELLULAR TELECOMMUNICATIONS SERVICES, NAMELY, TWO-WAY REAL-TIME TRANSMISSION OF VOICE, AUDIO, VIDEO AND DATA BETWEEN WIRELESS TELECOMMUNICATIONS DEVICES; WIRELESS TELEPHONE TELECOMMUNICATIONS SERVICES, NAMELY, PROVIDING WIRELESS CALLING PLANS; TEXT MESSAGING AND MULTIMEDIA MESSAGING SERVICES; PROVIDING MULTIPLE-USER ACCESS TO A GLOBAL COMPUTER NETWORK; PROVIDING TECHNICAL SUPPORT REGARDING THE USAGE OF CELLULAR TELECOMMUNICATIONS SERVICES AND EQUIPMENT; WIRELESS ROAMING SERVICES, NAMELY, PROVIDING ACCESS TO A CELLULAR TELECOMMUNICATION NETWORK; ELECTRONIC MAIL SERVICES; TELEPHONE COMMUNICATION SERVICES, NAMELY, RINGBACK TONE SERVICES; ELECTRONIC VOICE MESSAGING SERVICES, NAMELY, RECORDING AND SUBSEQUENT TRANSMISSION OF AUDIO MESSAGES AND TRANSMITTING TEXTUAL TRANSCRIPTIONS OF AUDIO MESSAGES; CELLULAR TELECOMMUNICATIONS SERVICES, NAMELY, FILTERING AND BLOCKING OF INCOMING VOICE TELECOMMUNICATIONS; ELECTRONIC TRANSMISSION OF DATA TO TELECOMMUNICATION DEVICES, NAMELY, PROVIDING REAL-TIME TRANSMISSION OF POINTS OF INTEREST DIRECTORIES, EVENT, TRAFFIC AND TRAVEL INFORMATION, AND MAPPING AND DIRECTIONS INFORMATION FOR CONSUMER ACQUISITION OF GEOGRAPHIC LOCATION INFORMATION AND DIRECTIONS TO DESIRED LOCATIONS BY MEANS OF FOOT-PATH, STREET, CAR, BUS, TRAIN OR FERRY, IN CLASS 38 (U.S. CLS. 100, 101 AND 104).

FIRST USE 2-1-2002; IN COMMERCE 2-1-2002.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

OWNER OF U.S. REG. NOS. 2,803,097, 3,542,846 AND OTHERS.

SER. NO. 86-001,508, FILED 7-3-2013.

DONALD JOHNSON, EXAMINING ATTORNEY

# EXHIBIT C

CL    san diego › city of san diego › for sale › cell phones - by dealer

Posted: 2 days ago

y g dw{ ri    r92 o gvt q    / &42 *4372 lo r gt lcncxg+





© craigslist - Map data © OpenStreetMap

2150 imperial ave

mobile OS: apple iOS

more ads by this user



eqo g kp vqf c{ cpf ugmwu {qwt o gvtq r j qpg cpf i gvkpucpvvecuj qp yj g ur qvcvqpg qhqwt uf r j qpgvcf gt rqecvkqpu0

cngti kc0

- do NOT contact me with unsolicited services or offers

EXHIBIT C

© 2015 craigslist    help  safety  privacy  feedback  cl jobs  terms  about  mobile

reply

☐ prohibited [?]     Posted: about 21 hours ago

◄ prev     ◄     next ►

☆ s6 galaxy get 😎 $300 cash now 😎😎😎😎😎 - $425 (2150 impeiral ave)

we are paying top dollar for your brand new samsung galaxy s6
sdphonetrader is the #1 phone buy back store with 5 store locations where you can come in and get
cash quick and easy for your phone
2150 imperiala ave 92102
1131 broadway 92101
5065 federal blvd 92102
521 e san ysidro blvd
2455 roll drive 92154
3034 imperial ave 92102
6199291501 joseel tune1

• do NOT contact me with unsolicited services or offers



mobile

more

# EXHIBIT D



EXHIBIT D







December 18 at 1:46pm

||WE BUY USED PHONES || METRO, CRICKET, OBAMA, AT&T, etc... +¦ Best p...
See More

Like · Comment · Share

**Valicia Villa**
May 22 at 6:04pm

This place is AMAZING! Quick and easy... No hassle and great prices!... See More

Like · Comment · Share

**Mike Cazarez**
December 20, 2014 at 4:37pm

thanks for buying my phones i really needed the quick cash for the holidays, cool good guys, thank you guys alot

Like · Comment · Share

**REVIEWS**

5.0     **5.0 of 5 stars**
52 reviews

Melissa Cañas
5     Great place to come sell you phone and they give u too dollar
November 1, 2015 ·

Tyresha Waters
5     Best place to sell your phone. Gave me top dollar for my phone.
December 7, 2015 ·

Tell people what you think

**PEOPLE ALSO LIKE**

**Howard County State's Attorney D...**
Government Official

**Suzanne Aunan Gallery**
Local Business

**Hip Pictures**
Home Decor

**See more Shopping & Retail in San Diego, California**

**LIKED BY THIS PAGE**

**Small Business Networking Group**

Like           Comment           Share

Austin Curtis likes this.

**Sdphonetrader** added **2 new photos.**
December 7 at 5:23pm ·

Like           Comment

Scheryl Johnson likes this.

See More Stories ▾

English (US) · Privacy · Terms · Cookies · Advertising · Ad Choices · More
Facebook © 2015



Email or Phone          Password

☐ Keep me logged in     Forgot your password?    [Log In]



Jose Gomez (Ecwireless)
is on Facebook.

To connect with Jose, sign up for Facebook today.

Jose Gomez
(Ecwireless)

**Favorites**

Other

Sdphonetrader, SO CAL CAR MEETS/SHOWS, Ventas.tijuana, Peoples Antro Bar, Mymatchafit, Dirección Legal


Sdphonetrader

**Others Named Jose Gomez**

 Jose Daniel Gomez Bautista

 Jose Gomez

 Jose David Mesa Gomez

 Jose Miller Rengifo Gomez

 Antonio Jose Gomez

 Jose Gomez

 Jose Iglesias Gomez

 Jose Armando Ramirez Gomez

**Others With a Similar Name**

 Jose Cardozo

 Jose Luis Garavito Zapata

 Miguel Gomez

 Victoria Gomez Popowicz

 Jose Romero



**Jose Luis Cedillo**

**Jose Daniel Pena Llanos**

**Jose Manuel Marquez Soto**

CONTACT INFORMATION

No contact info to show

Sign Up      Log In      Messenger      Facebook Lite      Mobile      Find Friends      Badges      People      Pages      Places
Games      Locations      About      Create Ad      Developers      Careers      Privacy      Cookies      Ad Choices
Terms      Help

Facebook © 2015
English (US)



# EXHIBIT E

Last month

Hey, how much can I get for a metro pcs LG L70

10/19 3:46 PM

20 if in perfect condition

10/19 3:50 PM

Enter message

160 / 1

Send

EXHIBIT E



3G 47% 10:42 AM

 1 619-992-9150 

Can you do 30, I have 4 brand new in box

10/19 3:52 PM

Wirh box and all yes

10/19 4:02 PM

Ok cool where you located

Enter message

  47% 10:42 AM

 1 619-992-9150 

What part of san Diego u at

10/19 4:17 PM

By the airpirt

10/19 4:26 PM

1131 broadway 92101

10/19 4:27 PM

087



1 619-992-9150



Ok cool does 11 tomorrow work

10/19 4:31 PM

Yes

10/19 4:32 PM

Ok

10/19 4:35 PM

Enter message

088



🔋 47% ⚡ 10:43 AM

1 619-992-9150 

Hey dude were you happy with the phones I sold you yesterday

10/21 11:47 AM

They were the 5 metro pc's LG l70's

10/21 12:57 PM

089

 

**1 619-992-9150**

Hey whats going on

10/21 1:03 PM

I wanted to see if the phones worked out?

10/21 1:04 PM

I havent check them yet. U have more??

090

Enter message



## 1 619-992-9150



I can get more you buy in bulk?

10/21 1:06 PM

Yeah whTs ur lrice

10/21 1:10 PM

Depends on how many you buy the move you

091

Enter message

 1 619-992-9150 

Depends on how many you buy the move you buy the cheaper it will be

10/21 1:12 PM

Sal said you send them to mexico is there one that sells better down there? I can get

092

Enter message



1 619-992-9150



to mexico is there one that sells better down there? I can get different ones

10/21 1:13 PM

I can buy any amount

10/21 1:32 PM

As long as its a good

093

Enter message

1-619-992-9150

I can buy any amount

10/21 1:32 PM

As long as its a good deal

10/21 1:33 PM

Ok cool I will get back

Enter message

160 / 1

Send

094







**1 619-992-9150**

How much

11/12 3:40 PM

Brand new. Can u do any better

11/12 3:55 PM

U cant unlock thise phones

Enter message

160 / 1

Send



097





1 619-992-9150

Yes
11/23 3:46 PM

Still paying 30? I can get, them brand new. In quantity
11/23 4:39 PM

Yes
11/23 4:40 PM

Enter message

160 / 1

Send







1 619-992-9150

Ok coo.  U want others when they come in tio?

11/24 3:16 PM

Yes

11/24 3:19 PM

When u bringing  them in

11/24 3:19 PM

Enter message

160 / 1

Send

102









11/24 4:28 PM

Do u get unlock codes? These are gonna be locked I think

11/24 4:28 PM

Fine

11/24 4:31 PM

106

# EXHIBIT F

2012 WL 4127296
Only the Westlaw citation is currently available.
United States District Court,
N.D. California.

SPRINT NEXTEL CORPORATION, Plaintiff,
v.
THUC NGO, Defendant.

No. C–12–02764 CW (EDL). | Sept. 18, 2012.

**Attorneys and Law Firms**

Rodger R. Cole, Joseph Stephen Belichick, Mountain View, CA, James Blaker Baldinger, Stacey Kim Sutton, Carlton Fields PA, West Palm Beach, FL, M. Derek Harris, Carlton Fields, P.A., Atlanta, GA, for Plaintiff.

**REPORT AND RECOMMENDATION REGARDING PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT**

ELIZABETH D. LAPORTE, United States Magistrate Judge.

*1 On May 30, 2012, Plaintiff Sprint Nextel Corporation filed a complaint against Defendant Thuc Ngo, alleging claims for breach of contract, trademark infringement, false advertising, contributory trademark infringement, unfair competition, unjust enrichment, civil conspiracy, conspiracy to induce breach of contract, tortious interference with business relationships and prospective advantage, fraud, violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, et seq.. In general, Plaintiff alleges that Defendant is engaged in, and knowingly facilitates and encourages others to engage in, unlawful business practices involving the unauthorized and deceptive bulk purchase and resale overseas of Plaintiff's phones, theft of Plaintiff's subsidy investment in the phones, unlawful access of Plaintiff's protected computer systems and wireless network, trafficking of Plaintiff's protected and confidential computer passwords, and willfully infringing Plaintiff's trademarks, collectively known as Defendant's "Bulk Handset Trafficking Scheme." Compl. ¶ 2. Defendant was served with the summons and complaint in this matter on June 8, 2012. See Docket No. 20. Defendant failed to answer the complaint or otherwise defend the action.

Upon Plaintiffs' request, under Federal Rule of Civil Procedure 55(a), the Clerk of this Court entered Defendant's

default on July 5, 2012. See Docket No. 7. By his default, Defendant is deemed to have admitted the well-pleaded averments of the complaint except those as to the amount of damages. See Fed.R.Civ.P. 8(b)(6).

On July 5, 2012, Judge Wilken ordered Plaintiff to file a motion for default judgment within thirty days of the date of her order, and referred that motion to this Court for a Report and Recommendation. See Docket No. 29. On August 3, 2012, Plaintiff filed a Motion for Default Judgment against Defendant, seeking a judgment of liability, a deferred judgment as to damages, a permanent injunction and leave to conduct post judgment discovery regarding damages.

The Court held a hearing on September 11, 2012. Plaintiffs appeared through counsel Jim Baldinger. There was no appearance for Defendant. For the reasons stated at the hearing and set forth below, it is recommended that the Court grant Plaintiff's motion and enter default judgment as described below.

**Background**

Plaintiff offers a comprehensive range of wireless and wireline communications services presently serving more than 56 million customers. Compl. ¶ 17. Plaintiff is widely recognized for developing, engineering and deploying innovative technologies. Id . Plaintiff's wireless program enables its customers to choose from a variety of monthly voice and data plans for use on phones such as the iPhone. Id. ¶ 18. Plaintiff subsidizes its customers' acquisition of phones by selling the phones for substantially less than the phones cost Plaintiff. Id. ¶ 19. Plaintiff recoups this subsidy through profits earned on the sale of monthly service, which is required to make and receive calls on, and transmit data through, the phones. Id. Plaintiff is able to offer its phones to customers at a reduced price only if the phones are used as intended on the Sprint wireless network. Id.

*2 Plaintiff's phones are sold subject to Terms and Conditions, which conspicuously restrict and limit the sale and use of the phones. Compl. ¶ 26; Ex. A. The limitations in the Terms and Conditions are intended to restrict the use of Plaintiff's phones to Plaintiff's wireless network. Id. ¶ 27.

There are two main competing network technologies worldwide, the Global System for Mobile Communications (GSM) and Code Division Multiple Access (CDMA). Compl. ¶ 22. The Sprint wireless network is based on the CDMA platform. Id. Manufacturers that produce phones for Plaintiff

EXHIBIT F

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works. 1

install proprietary software, paid for by Plaintiff, that prevents Plaintiff's phones from being used outside the CDMA network. *Id.* ¶¶ 21–22.

The iPhone 4S is a dual-band world phone, meaning that it supports both CDMA and GSM technologies. Compl. ¶ 23. Prior to November 11, 2011, iPhone 4S phones that were made for Plaintiff were locked to the CDMA network, but were not locked to any particular GSM network, so customers could purchase a SIM card when traveling internationally to enable their iPhone 4S to operate on GSM networks in foreign countries without CDMA service. *Id.* Plaintiff alleges that Defendant's Bulk Handset Trafficking Scheme exploits this feature and profits by reselling Plaintiff's iPhones for use on GSM networks in foreign countries. *Id.* On November 11, 2011, aware that handset traffickers were exploiting the GSM feature, Plaintiff began locking the iPhone SIM to Plaintiff's network, but Defendant's trafficking has continued. *Id.*

Plaintiff discovered that although large quantities of its phones were being purchased in the United States, a significant number of those phones were not being activated for use on Plaintiffs' network. Compl. ¶ 28. Instead, Plaintiff discovered that the phones were purchased in bulk for shipment overseas and sold as new for substantial profits, where they could be used on other wireless networks. *Id.* ¶ 29.In addition, some of the phones were removed from their original packaging, stripped of their accessories, warranties and manuals, and shipped overseas. *Id.* Once the phones are shipped overseas and become operable on other networks, Plaintiff no longer has a revenue source to recoup the invested subsidy on that phone. *Id.* ¶ 30.

Defendant has engaged in an enterprise that traffics in and resells Plaintiff's phones, and has purchased and sold large quantities of Plaintiff's phones through various co-conspirators. Compl. ¶ 31. On March 18, 2012, Defendant, who does business as "Tony Buy iPhone" advertised on www.craigslist.org, offering to buy phones, including the iPhone 4S. *Id.* ¶ 32; Ex. B. The advertisement also included a link directing potential sellers to Defendant's website at www.tonybuyiphones.com. *Id.*After viewing Defendant's advertisement, on March 24, 2012, Plaintiff's private investigators contacted Defendant and made arrangements to meet to sell him a Sprint iPhone.*Id.* ¶ 33.On March 25, 2012, Plaintiff's investigator met with Defendant and sold him an iPhone. *Id.* ¶ 34.During that meeting on March 25, 2012, Defendant turned on the phone to determine that it was not currently activated. *Id.* ¶ 35.Defendant explained

that he bundles, sells and ships the phones he purchases in bulk overseas to be resold and the SIM cards are replaced so the purchasers can use them overseas. *Id.* Defendant claimed to have almost enough phones to fulfill his next shipment. *Id.* Defendant demonstrated removing the SIM for Plaintiff's investigator and declared that the iPhones were easy to convert to other networks. *Id.* Defendant assured the investigator that the phone could not be traced back to the investigator, and expressed interest later in purchasing more iPhones from the investigator.*Id.* ¶¶ 35–36.

**\*3** Defendant's Bulk Handset Trafficking Scheme has caused harm to Plaintiff by depriving Plaintiff of the opportunity to recoup its subsidies on the sale of its phones and to earn profits by providing wireless service to legitimate customers. Compl. ¶ 37. Plaintiff has incurred harm specifically because Defendant is trafficking in iPhones, and Plaintiff has invested a significant amount of effort and time securing the rights to sell the iPhones and has staked a significant amount of its business on the iPhone brand. *Id.;* Ex. C. Defendant's conduct has also resulted in a shortage of available iPhones, thereby harming Plaintiff and its relationship with sealers and consumers because Plaintiff is not able to supply dealers with sufficient phones to satisfy demand. *Id.* ¶ 38.Plaintiff is also harmed because Defendant removes the iPhones from the original packaging and alters the phones, which deprives Plaintiff of the means to control its product. *Id.* ¶ 39.Plaintiff also sustained harm to its reputation because the process of unlocking and reselling a Sprint phone voids the manufacturer's warranty, which means that consumers are unable to obtain warranty service in the event they experience problems with their phones. *Id.* ¶ 40.Defendant's unauthorized resale of Plaintiff's phones may result in calls by confused consumers to Plaintiff's customer relations department, and Plaintiff incurs substantial costs associated with those calls and its reputation is further damaged because Plaintiff may be unable to assist those consumers. *Id.* ¶ 41.Finally, Defendant's conduct has resulted in the dilution of Plaintiff's marks, causing harm to Plaintiff's business reputation and goodwill and a greater likelihood of consumer confusion. *Id.* ¶ 42.

**Discussion**
A court may not enter a default judgment against an unrepresented minor, an incompetent person, or a person in military service. *See*Fed.R.Civ.P. 55(B)(2); 50 U.S.C. § 521(b)(1). Defendant is not a minor, incompetent person, or in the military. *See* Declaration of Derek Harris ¶ 5.

The general rule is that, upon default, the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true. *Televideo Systems, Inc. v. Heidenthal,* 826 F.2d 915, 917–18 (9th Cir.1987) (per curiam) (citing *Geddes v. United Financial Group,* 559 F.2d 557, 560 (9th Cir.1977)). Necessary facts not contained in the pleadings, and claims which are legally insufficient, however, are not established by default. *Cripps v. Life Ins. Co.,* 980 F.2d 1261, 1267 (9th Cir.1992).Rule 55(b)(2) allows, but does not require, the court to conduct a hearing on damages, as long as it ensures that there is an evidentiary basis for the damages awarded in the default judgment. *Action S.A. v. Marc Rich & Co. Inc.,* 951 F.2d 504, 508 (2nd Cir.1991). Relief is limited to the plaintiff's specific demand in his complaint. Fed.R.Civ.P. 54(c). Entry of default judgment requires the consideration of several factors, including: (1) the possibility of prejudice to the plaintiff; (2) the merits of plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits. *See Eitel v. McCool,* 782 F.2d 1470, 1471–72 (9th Cir.1986).

**\*4** Here, the *Eitel* factors weigh in favor of entry of default judgment. First, Plaintiff's breach of contract claim appears to have merit and the complaint is sufficient to state that claim. "A cause of action for damages for breach of contract is comprised of the following elements: (1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff."*Careau & Co. v. Security Pac. Bus. Credit, Inc.,* 222 Cal.App.3d 1371, 1388, 272 Cal.Rptr. 387 (1990). Here, as described above, Plaintiff's phones are sold subject to Terms and Conditions that restrict and limit the sale and use of the iPhones. Compl. ¶ 26. These Terms and Conditions are set forth in printed inserts that are included with the purchase of every Sprint phone and are available online. *See AT & T Mobility LLC v. S & D Cellular, Inc.,* 2009 WL 3233814, at \*2 (C.D.Cal. Sept.23, 2009) (holding that terms and conditions and the language on the packaging for a phone company's prepaid cell phones constituted a valid binding contract enforceable against purchasers, who allegedly engaged in an unlawful enterprise involving the acquisition, sale and alteration of large quantities of the cell phones). Among other things, the Terms and Conditions: (1) require that the customer pay his or her monthly service charges and other related fees; (2) require the customer to pay an Early Termination Fee for each line of service that is

terminated before the contract term is concluded; (3) indicate that the phone is designed to be activated on the Sprint CDMA network; (4) prohibit resale of Plaintiff's phones and related products and services; and (5) prohibit using the phones for a purpose that could damage or adversely affect Plaintiff. Compl. ¶ 27; Ex. A. Plaintiff has performed or tendered performance in full compliance with the Terms and Conditions. Compl. ¶ 52.

Defendant is in breach of the Terms and Conditions because he purchases and re-sells new Sprint phones in large quantities, failing to activate the phones on Plaintiff's wireless network, ignoring the monthly service charges and other related fees and ignoring the Early Termination Fee charges required under the contracts. Compl. ¶ 53. *See AT & T Mobility,* 2009 WL 3233814, at \*2 ("Facilitating others to use the phones in conjunction with service providers other than the phone company and tampering with or altering, or facilitating or assisting others to tamper with or alter, the cell phones constituted independent breaches of contract."). Defendant's conduct adversely affects Plaintiff's business model, and Plaintiff has been damaged because it cannot recoup its subsidy investment and is unable to obtain the monthly service fees it charges to legitimate customers. Compl. ¶¶ 37, 54. Thus, taking the factual allegations alleged in the complaint as true, the Court finds that Plaintiff has established a claim for breach of contract.

Second, Plaintiff's claims for trademark infringement, contributory trademark infringement and unfair competition appear to have merit and the complaint is sufficient to state those claims. Evidence supporting Plaintiff's federal claims is also sufficient to establish Defendant's liability under the state law claim for unfair competition. *See Cleary v. News Corp.,* 30 F.3d 1255, 1262–63 (9th Cir.1994) ("This Circuit has consistently held that state common law claims of unfair competition and actions pursuant to California Business and Professions Code § 17200 are 'substantially congruent' to claims made under the Lanham Act."); *Philip Morris v. Shalabi,* 352 F.Supp.2d 1067, 1072 (C.D.Cal.2004) (noting the identity between the essential elements and standard applied to three distinct claims of federal trademark infringement, federal false designation of origin, and state unfair competition). Thus, the Court need only focus on the legal merits of the trademark infringement claim. *See Williams–Sonoma, Inc. v. Friendfinder, Inc.,* 2007 WL 4973848, at \*6 (N.D.Cal. Dec.6, 2007) ("Therefore, as to these three claims, the Court need only focus on the legal merits of the claim for federal trademark infringement.

Analyzing the merits of the infringement claim is sufficient because the standard of infringement, i.e., the likelihood of confusion, is essentially implicated in the remaining federal and state causes of action.").

**\*5** To prove a claim of trademark infringement under 15 U.S.C. § 1114, Plaintiff must show that: (1) it owns the trademark at issue; (2) Defendant has used in commerce, without authorization, a copy, reproduction, counterfeit or colorable imitation of Plaintiff's mark in connection with the sale, distribution, or advertising of goods and services; and (3) Defendant's use of the mark is likely to cause confusion or to cause mistake or to deceive. *See* 15 U.S.C. § 1114(1); *Goto.com, Inc. v. Walt Disney Co.,* 202 F.3d 1199, 1205 (9th Cir.2000). To be liable for contributory trademark infringement, Defendant must have (1) "intentionally induced" the primary infringer to infringe, or (2) continued to supply an infringing product to an infringer with knowledge that the infringer is mislabeling the particular product supplied. *See Perfect 10, Inc. v. Visa Int'l Serv. Ass'n,* 494 F.3d 788, 807 (9th Cir.2007).

Here, Plaintiff alleges all the facts necessary to establish trademark infringement and contributory trademark infringement, as well as unfair competition, by Defendant. Plaintiff has the right to use and enforce the Sprint Marks, and it uses the Marks on and in connection with its telecommunications products and services. Compl. ¶¶ 24–25. Plaintiff alleges that Defendant, without authorization, has used the Sprint Marks in connection with his sale of unlocked, counterfeit phones. Compl. ¶ 146. Defendant's use of Plaintiff's Marks has caused, and will further cause, a likelihood of confusion, mistake and deception as to the source of origin of Defendant's counterfeit products, and the relationship between Plaintiff and Defendant. Compl. ¶ 147. By misappropriating and using Plaintiff's Marks, Defendant knowingly aided and enabled distributors and sellers of his infringing products to market them to the public in a way that infringes Plaintiff's Marks "by placing in the hands of distributors and/or sellers an instrument of consumer deception." Compl. ¶ 156. In engaging in this conduct, Defendant has damaged and will continue to damage Plaintiff and the reputation and goodwill of Plaintiff, and has been unjustly enriched. Compl. ¶ 150. Thus, taking the factual allegations alleged in the complaint as true, the Court finds that Plaintiff has established claims for trademark infringement, contributory trademark infringement, and state law unfair competition.

Third, Plaintiff's false advertising claim appears to have merit and the complaint is sufficient to state a claim. The Lanham Act, 15 U.S.C. § 1125(a), makes it unlawful for "any person who ... in commercial advertising or promotion, misrepresents the nature, characteristics, qualities or geographic origin or his or her or another person's goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B). Plaintiff alleges that Defendant used Plaintiff's Marks in commercial advertising and promotion and that such use misrepresented the nature, characteristics and/or qualities of the infringing products. Compl. ¶ 151. Thus, taking the factual allegations alleged in the complaint as true, the Court finds that Plaintiff has established a claim for false advertising.

**\*6** Fourth, Plaintiff's claims for civil conspiracy and conspiracy to induce breach of contract appear to have merit and the complaint is sufficient to state those claims. "The elements of a civil conspiracy are '(1) the formation and operation of the conspiracy; (2) the wrongful act or acts done pursuant thereto; and (3) the damage resulting.'" *Mosier v. S. Cal. Physicians Ins. Exch.,* 63 Cal.App.4th 1022, 1028, 74 Cal.Rptr.2d 550 (1998). In addition to alleging the formation of a conspiracy, to properly allege a claim for conspiracy to induce breach of contract, Plaintiff must also allege that: (1) Plaintiff had a valid and existing contract; (2) Defendant had knowledge of the contract and intended to induce its breach; (3) the contract was in fact breached by the contracting party; (4) the breach was caused by Defendant's unjustified or wrongful conduct; and (5) Plaintiff has suffered damage." *Dryden v. Tri–Valley Drowers,* 65 Cal.App.3d 990, 995, 135 Cal.Rptr. 720 (1977). Here, Plaintiff alleges that an agreement and conspiracy existed and continues to exist between Defendant and other coconspirators to unlawfully purchase, traffic and resell Plaintiff's phones in bulk, which results in unfair competition, tortious interference with business relationship and prospective advantage, unjust enrichment, trademark infringement, false advertising and violations of the Computer Fraud and Abuse Act, Compl. ¶ 72. Defendant engaged in one or more overt acts in pursuit of the conspiracy. Compl. ¶¶ 743. Further, Plaintiff's complaint alleges that Defendant solicited runners and others to purchase Plaintiff's phones in bulk for the benefit of Defendant. Compl. ¶ 82. Defendant's active solicitation of purchasers included instructing purchasers to enter into valid contracts with Plaintiff for provision of wireless services and subsidized phones on accordance with the Terms and Conditions. Compl. ¶¶ 82–83. Defendant then induced the purchasers to breach their contracts with Plaintiff by, among other things, failing to pay for the monthly service charge,

failing to pay the Early Termination Fee, reselling the phones and related products and services, and using the phones for a purpose that could damage or adversely affect Plaintiff. Compl. ¶ 84. Defendant had knowledge of the contracts between the purchasers and Plaintiff, and intended to, and did, induce the purchasers to breach their contracts. Compl. ¶ 85. The breach of the contracts was proximately caused by Defendant's conduct. Compl. ¶ 86. Plaintiff suffered damages as a result of Defendant's conspiracy. Compl. ¶¶ 74, 87. Thus, taking the factual allegations alleged in the complaint as true, the Court finds that Plaintiff has established claims for civil conspiracy and conspiracy to induce breach of contract.

Fifth, Plaintiff's claim for tortious interference with business relationships and prospective advantage appears to have merit and the complaint is sufficient to state this claim. The elements of a tort claim for intentional interference with prospective economic advantage are: (1) an economic relationship between Plaintiff and some third party, with the probability of future economic benefit to Plaintiff; (2) Defendant's knowledge of the relationship; (3) intentional acts on the part of Defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to Plaintiff proximately caused by the acts of Defendant. *Korea Supply Co. v. Lockheed Martin Corp.,* 29 Cal.4th 1134, 1153, 131 Cal.Rptr.2d 29, 63 P.3d 937 (2003). Here, there is a business relationship and an expectancy of business relationships that exists between Plaintiff and dealers of Plaintiff's phones, as well as between Plaintiff and purchasers of its phones. Compl. ¶¶ 61, 62. Defendant has knowledge of these relationships and has specifically and intentionally interfered with them by conducting his Bulk Handset Trafficking Scheme and causing Plaintiff to have an insufficient supply of phones to meet demand. Compl. ¶¶ 64–67. Plaintiff alleges that Defendant's intentional conduct has harmed Plaintiff and its relationships with dealers, customers and prospective purchasers. Compl. ¶¶ 69–70. Thus, taking the factual allegations alleged in the complaint as true, the Court finds that Plaintiff has established a claim for tortious interference with business relationships and prospective advantage.

**\*7** Sixth, Plaintiff's fraud claims appear to have merit and the complaint is sufficient to state these claims. To establish a cause of action for fraud and fraudulent misrepresentation, Plaintiff must plead and prove four elements: (1) a knowingly false representation by Defendant; (2) an intent to deceive or induce reliance; (3) justifiable reliance by Plaintiff; and (4) resulting damages. *See Nguyen v. Wells Fargo Bank,*

*749 F.Supp.2d 1022, 1036 (N.D.Cal.2010).* Plaintiff has alleged that as part of the Bulk Handset Trafficking Scheme, Defendant regularly and systematically misrepresented to Plaintiff that the phones were being purchased for a legitimate purpose, that the phones would be used by Defendant or other legitimate customers on Plaintiff's wireless network, and that Defendant would pay all fees. Compl. ¶¶ 90, 97. Despite these representations, Defendant did not intend to use the phones for a legitimate purpose or to activate them on Plaintiff's network or otherwise comply with the Terms and Conditions. Compl. ¶¶ 91–92, 98–99. Defendant intended for Plaintiff to rely on his representations and Plaintiff reasonably relied on those statements. Compl. ¶¶ 92–93, 100–101. Plaintiff has suffered damages as a result of Defendant's misrepresentations. Compl. ¶¶ 94, 102. Thus, taking the factual allegations alleged in the complaint as true, the Court finds that Plaintiff has established claims for fraud and fraudulent misrepresentation.

As stated at the hearing, default judgment as to Plaintiff's claim for violation of the Computer Fraud and Abuse Act ("CFAA"), *18 U.S.C. § 1030, et seq.* is denied without prejudice. Because Plaintiff's other claims provide all of the relief Plaintiff seeks, the Court need not reach this claim, which was insufficiently briefed.

Finally, Plaintiff's unjust enrichment claim is not viable. Notwithstanding earlier cases suggesting the existence of a separate, stand-alone cause of action for unjust enrichment, the California Court of Appeals has recently clarified that "[u]njust enrichment is not a cause of action, just a restitution claim."*Hill v. Roll Int'l Corp.,* 195 Cal.App.4th 1295, 1307, 128 Cal.Rptr.3d 109 (2011). In light of this recent persuasive authority, courts in this district have previously determined that "there is no cause of action for unjust enrichment under California law."*In re iPhone Application Litigation,* 844 F.Supp.2d 1040, 1075 (N.D.Cal.2012); *Fraley v. Facebook, Inc.,* 830 F.Supp.2d 785, 814 (N.D.Cal.2011); *Ferrington v. McAfee, Inc.,* 2010 WL 3910169, at \*17 (N.D.Cal.2010); *Robinson v. HSBC Bank USA,* 732 F.Supp.2d 976, 987 (N.D.Cal.2010) (dismissing with prejudice plaintiffs' unjust enrichment claim brought in connection with claims of misappropriation and violation of the UCL because unjust enrichment does not exist as a standalone cause of action). Thus, Plaintiff's unjust enrichment claim does not properly state an independent cause of action and must be dismissed. *See Levine v. Blue Shield of Cal. .,* 189 Cal.App.4th 1117, 1138, 117 Cal.Rptr.3d 262 (2010).

**\*8** The majority of the remaining *Eitel* factors also weigh in favor of granting default judgment. First, if the motion were denied, Plaintiff would likely be without a remedy. This is because if Defendant does not appear in court, Plaintiff has no method of addressing this matter. *See Pepsico, Inc. v. Cal. Security Cans,* 238 F.Supp.2d 1172, 1177 (C.D.Cal.2002) ("If Plaintiffs' motion for default judgment is not granted, Plaintiffs will likely be without other recourse for recovery."). Second, because Defendant did not file an answer to the complaint, there is nothing to suggest that there is a possibility of a dispute concerning material facts. Third, the sum of money at stake in this action is not yet determined; at this time, Plaintiff seeks a permanent injunction and leave to conduct post judgment discovery to ascertain its damages. Finally, there is no evidence that Defendant's default was due to excusable neglect. Thus, the Court recommends granting Plaintiff's motion for default judgment as to all claims except for the unjust enrichment claim.

**Injunctive relief**

Plaintiff requests injunctive relief against Defendant under the Lanham Act. The Lanham Act provides authority for the Court to issue an injunction. *See* 15 U.S.C. § 1116(a); *Century 21 Real Estate Corp. v. Sandlin,* 846 F.2d 1175, 1180–81 (9th Cir.1988) ("Injunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement."). A permanent injunction is warranted when there is no reason to believe that the infringing party will cease the infringement without an injunction. *Rio Properties, Inc. v. Rio Int'l Interlink,* 284 F.3d 1007, 1023 (9th Cir.2002). "As a general rule, a permanent injunction will be granted when liability has been established and there is a threat of continuing violation." *Mai Sys. Corp. v. Peak Computer, Inc.,* 991 F.2d 511, 520 (9th Cir.1993).

Injunctive relief is available as part of a default judgment. *See Philip Morris USA, Inc. v. Castworld Prods., Inc.,* 219 F.R.D. 494, 502 (C.D.Cal.2003); *see also Craigslist, Inc. v. Mesiab,* 2010 WL 5300883 (N.D.Cal. Nov.15, 2010) (noting that the court granted default judgment as to liability and permitted the plaintiff to conduct third-party post judgment damages discovery for six months). To establish entitlement to permanent injunctive relief, Plaintiff must establish: (1) that it suffered irreparable harm; (2) that remedies available at law are inadequate to compensate its injuries; (3) that the balance of hardships between Plaintiff and Defendant warrants an equitable remedy; and (4) that the public interest would not be disserved by a permanent injunction. *See eBay*

*Inc. v. MercExchange LLC,* 547 U.S. 388, 390, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006).

Here, Plaintiff has established that it is entitled to permanent injunctive relief. With respect to Plaintiff's trademark claims, Plaintiff has suffered irreparable harm, and will continue to do so, because Defendant's conduct has caused Plaintiff to suffer business-related injuries, including dilution of its marks and loss to its reputation. *See, e.g., eBay, Inc. v. Bidder's Edge,* 100 F.Supp.2d 1058, 1066 (N.D.Cal.2000) ("Harm resulting from lost profits and lost customer goodwill is irreparable because it is neither easily calculable, nor easily compensable and therefore is an appropriate basis for injunctive relief."). Moreover, given the ongoing nature of Defendant's conduct, Plaintiff would be forced to repeatedly file suit any time that Defendant engaged in infringing conduct. *See, e.g. Continental Airlines, Inc. v. Intra Brokers, Inc.,* 24 F.3d 1099, 1104–05 (9th Cir.1994) ("the multiplicity of suits necessary to be engendered if redress was sought at law, all establish the inadequacy of a legal remedy and the necessity for the intervention of equity."). Further, Defendant can sell the phones throughout the world, making it almost impossible for Plaintiff to retrieve the infringing products, thereby causing additional harm.

**\*9** In addition, the balance of hardships weighs in Plaintiff's favor. As stated in the complaint, Defendant's conduct has resulted in shortages of available phones, which harms Plaintiff's relationships with dealers and consumers. Compl. ¶ 36. In addition, with each phone that it shipped overseas, Plaintiff is unable to recoup its subsidy investment on that phone. Compl. ¶ 37. Defendant, by contrast, has no legitimate interest in trafficking in illicit phones acquired by fraud. Plaintiff notes that because it is unlikely that Defendant's business is maintained solely through trafficking of Plaintiff's phones, the injunctive relief would only affect Plaintiff's phones and Defendant should not consider it a burden to follow the law.

Finally, the public interest favors injunctive relief. *See, e.g., Apple, Inc. v. Psystar Corp.,* 673 F.Supp.2d 943, 950 (N.D.Cal.2009) (holding that an injunction preventing continuing infringemnt was in the public interest because "the public receives a benefit when the legitimate rights of copyright holders are vindicated."). There is no public interest in the fraudulent acquisition and sale of phones overseas, to the exclusion and detriment of Plaintiff's dealers and consumers. By contrast, there is a strong public interest in

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

obtaining legitimate Sprint phones rather than illegitimate phones from Defendant for telecommunications needs.

Accordingly, Plaintiff has made a showing that it is entitled to permanent injunction relief.

**Conclusion**

The Court recommends granting Plaintiff's motion for default judgment with respect to all claims except Plaintiff's claims for violation of CFAA and for unjust enrichment. Further, the Court recommends granting Plaintiff the relief it seeks, that is, a permanent injunction and leave to conduct post judgment discovery.

The Court recommends entering the following permanent injunction, as requested by Plaintiff:

Defendant, Thuc Ngo d/b/a Tony Buy iPhone, and all of his respective agents, employees, heirs, personal representatives, beneficiaries, relatives, and all other persons or entities acting or purporting to act for him or on his behalf, including but not limited to any corporation, partnership, proprietorship or entity of any type that is in any way affiliated or associated with Defendant or Defendant's representatives, agents, employees, independent contractors, associates, servants, and any and all persons and entities in active concert and participation with Defendant who receive notice of this Order, shall be and hereby are PERMANENTLY ENJOINED from:

a. purchasing, selling, reflashing, altering, advertising, soliciting and/or shipping, directly or indirectly, any Sprint Phones;

b. unlocking any Sprint Phones;

c. accessing, altering, erasing, tampering with, deleting or otherwise disabling the software contained in any Sprint Phones;

d. supplying Sprint Phones to or facilitating or in any way assisting other persons or entities who Defendant knows or should know are engaged in the purchase or sale of

Sprint Phones or hacking, altering, erasing, tampering with, deleting or otherwise disabling the software installed in Sprint Phones;

 **\*10**  e. supplying Sprint Phones to or facilitating or in any way assisting other persons or entities who Defendant knows or should know are engaged in any of the acts prohibited under this Permanent Injunction, including, without limitation, the buying and/or selling of Sprint Phones; and

f. knowingly using the Sprint Marks or any other trademark, service mark, trade name or trade dress owned or used by Sprint now or in the future, or that is likely to cause confusion with the Sprint Marks, without Sprint's prior written authorization.

The Court also recommends requiring Defendant to deliver and turn over all Sprint Phones and products in his possession, or subject to his custody or control, bearing or infringing any Sprint trademark or confusingly similar copy thereof, to Plaintiff within ten days of the date of the final judgment in this case, as requested by Plaintiff.

Further, the Court recommends permitting post judgment discovery. The Court recommends granting Plaintiff six months to conduct discovery, including third party discovery, to determine the appropriate amount of damages to be awarded against Defendant. The Court recommends retaining jurisdiction over this matter to address any discovery disputes that may arise. The Court recommends allowing Plaintiff to file a motion seeking entry of a judgment awarding damages against Defendant and retaining jurisdiction to enter a subsequent judgment in favor of Plaintiff and against Defendant.

Any party may serve and file specific written objections to this recommendation within fourteen (14) days after being served with a copy. *See* 28 U.S.C. § 636(b)(1)(C); Fed.R.Civ.P. 72(b); Civil Local Rule 72–3. Failure to file objections within the specified time may waive the right to appeal the District Court's order.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

SPRINT NEXTEL CORPORATION,   §
           §
  Plaintiff,       §
v.            §
           §   CASE NO.: 2:11-cv-15431-DPH-RSW
IBUY EXPRESS INC., WHOLESALE  §
EXPRESS, INC., ATHIR ORAHA PATTO,  §
NADINE MAWFEK PATTO, KOSAI SALIM  §
SHAMOON, TROY PATRICK HAGGARD,  §
JOSHUA MICHAEL HAGGARD, TAREK  §
HASSAN BAZZI, and WILLIAM LOUIS  §
JOHNSON,        §
           §
  Defendants.      §
_____ §

## FINAL JUDGMENT AND PERMANENT INJUNCTION

Plaintiff Sprint Nextel Corporation ("Sprint Nextel" or "Sprint"), brought the above-captioned lawsuit against Defendants iBuy Express Inc., Athir Oraha Patto, Nadine Mawfek Patto, Troy Patrick Haggard, and Joshua Michael Haggard ("Defendants")[1], alleging that Defendants are engaged in an unlawful enterprise involving the unauthorized and deceptive bulk purchase and resale overseas of specially-manufactured wireless telephones under the Sprint, Sprint Nextel, Boost Mobile, payLo, Assurance Wireless, and Virgin Mobile brands, as well as other specially-manufactured wireless telephones designed for use on Sprint's wireless service, including the Apple iPhone (collectively, "Sprint Nextel Phones" or "Sprint Nextel Handsets" or "Phones" or "Handsets"), the theft of Sprint's subsidy investment in the Phones, the unlawful access of Sprint's protected computer systems and wireless network, the trafficking of Sprint's protected and confidential computer passwords, the willful infringement of Sprint's trademarks,

---

[1] Plaintiff also named Wholesale Express, Inc., Kosai Salim Shamoon, Tarek Hassan Bazzi, and William Louis Johnson as Defendants in the Complaint. The claims against those Defendants are the subject of separate Final Judgments.

1

and insurance fraud (collectively, the "Bulk Handset Trafficking Scheme" or the "Scheme").

According to Sprint, Defendants perpetrate the Bulk Handset Trafficking Scheme by acquiring large quantities of Sprint Nextel Phones from Sprint Nextel and/or Sprint Nextel authorized dealers, and by soliciting others to purchase Sprint Nextel Phones in large quantities for the benefit of Defendants. Sprint further alleges that Defendants acquire the Sprint Nextel Phones with the knowledge and intent that the Phones will not be used on the Sprint Nextel wireless network (as required by the Sprint Nextel contracts); instead, the Phones are trafficked and the vast majority are resold as new overseas where the Phones are not subsidized by wireless carriers (as they are in the United States) and where the Phones are not as readily available. In some cases, Sprint contends, Defendants acquire the Sprint Nextel Phones with the knowledge and intent that the Phones will be computer-hacked. The purpose of this hacking, known as "unlocking," is to disable software installed in the Phones by the manufacturers at the request and expense of Sprint Nextel, which enables the activation of the Sprint Nextel Phones exclusively on Sprint's wireless system. The purpose of the software is to allow Sprint Nextel to offer the Phones at a discount to the consumer while protecting Sprint's subsidy investment in the Phone. The illegally unlocked Phones are trafficked and resold as new, at a premium, under the Sprint trademarks.

Sprint Nextel Phones are sold subject to terms and conditions ("Terms and Conditions") which conspicuously restrict and limit the sale and use of the Phones. These Terms and Conditions are set forth in printed inserts that are packaged with each Phones and are posted on the Sprint-Nextel website. The Terms and Conditions and language on the packaging constitute a valid binding contract. Pursuant to the Terms and Conditions, purchasers of Sprint Nextel Phones agree, among other things: (a) to pay the monthly service charges and other related fees;

(b) to pay an Early Termination Fee ("ETF") for each line of service that is terminated before the contract term is concluded; (c) to activate the Sprint Nextel Phones on the Sprint Nextel CDMA network; (d) not to resell the Sprint Nextel Phones and related products and services; and (e) not to use the Phones for a purpose that could damage or adversely affect Sprint Nextel.

As a result of Defendants' alleged involvement in the Bulk Handset Trafficking Scheme, Sprint Nextel asserted claims against Defendants for breach of contract, common law unfair competition, tortious interference with business relationships, civil conspiracy, unjust enrichment, conspiracy to induce breach of contract, common law fraud, fraudulent misrepresentation, violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*, federal trademark infringement and false advertising under 15 U.S.C. § 1125(a)(1)(A) and (B), and contributory trademark infringement. Based on the positions of the parties, and having reviewed the Complaint and file and being otherwise duly and fully advised in the premises, it is hereby

**ORDERED**, **ADJUDGED** and **DECREED** that:

1.     This Court has jurisdiction over all the parties and all of the claims set forth in Sprint Nextel's Complaint.

2.     The Court finds that Sprint Nextel has the right to use and enforce rights in the standard character mark Sprint and the stylized Sprint Mark (collectively, the "Sprint Nextel Marks"), as depicted below:



3

Sprint Nextel uses the Sprint Nextel Marks on and in connection with its telecommunications products and services. The Sprint Nextel Marks are valid, distinctive, protectable, famous, have acquired secondary meaning, and are associated exclusively with Sprint Nextel.

3. The Court finds that the Terms and Conditions and the language in and on the packaging constitute a valid and binding contract enforceable against Defendants. The Court finds that (a) failing to pay for monthly service charges; (b) failing to pay ETF fees; (c) failing to activate the Phones on the Sprint wireless network; (d) reselling the Sprint Nextel Phones and related products and services; and (e) using the Phones for a purpose that could damage or adversely affect Sprint, constitute independent breaches of contract for which Sprint Nextel is entitled to relief.

4. The Court finds that the conduct set forth in the Complaint constitutes violations of 15 U.S.C. § 1125(a)(1)(A) and (B) (federal trademark infringement and false advertising). The Court further finds that the conduct also constitutes contributory trademark infringement, common law unfair competition, tortious interference with business relationships, civil conspiracy, unjust enrichment, conspiracy to induce breach of contract, common law fraud, fraudulent misrepresentation, and violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq*., and has caused substantial and irreparable harm to Sprint Nextel, and will continue to cause substantial and irreparable harm to Sprint Nextel unless enjoined.

5. Sprint Nextel has suffered damages, including loss of goodwill and damage to its reputation, as a result of Defendants' conduct. On review and consideration of all relevant factors, Sprint Nextel is entitled to damages and injunctive relief on the claims as set forth in the Complaint.

6.      Final judgment is hereby entered against Defendant iBuy Express Inc., and in favor of the Plaintiff Sprint Nextel, on all of the claims set forth in Sprint Nextel's Complaint in the principal amount of Two Million Dollars and Zero Cents ($2,000,000.00 (U.S.)), which shall bear interest at the legal rate, for which let execution issue forthwith.

7.      Defendants and all of their past and present officers, directors, successors, assigns, parents, subsidiaries, affiliates, related companies, predecessors-in-interest, companies, respective agents, employees, heirs, personal representatives, beneficiaries, and all other persons or entities acting or purporting to act for them or on their behalf, including but not limited to any corporation, partnership, proprietorship or entity of any type that is in any way affiliated or associated with Defendants or Defendants' representatives, agents, assigns, parent entities, employees, independent contractors, associates, servants, affiliated entities, and any and all persons and entities in active concert and participation with Defendants or who receive notice of this Order, shall be and hereby are PERMANENTLY ENJOINED from:

a.      purchasing, selling, unlocking, reflashing, altering, advertising, refurbishing, soliciting and/or shipping, directly or indirectly, any wireless handset that was manufactured for use on any Sprint wireless network, including for wireless service provided by Sprint under the brands Sprint, Nextel, Boost Mobile, Virgin Mobile or Assurance Wireless, or any wireless handset that bears any of Sprint's logos or trademarks, regardless of whether such wireless handset is new or used (collectively referred to herein as "Sprint Phones");

b.      unlocking of any Sprint Phone;

    c.      supplying Sprint Phones to or facilitating or in any way assisting other persons or entities who Defendants know or should know are engaged in the purchase or sale of Sprint Phones or hacking, altering, erasing, tampering with, deleting or otherwise disabling the software installed in Sprint Phones;

    d.      supplying Sprint Phones to or facilitating or in any way assisting other persons or entities who Defendants know or should know are engaged in any of the acts prohibited under this Permanent Injunction, including, without limitation, the buying and/or selling of Sprint Phones;

    e.      engaging in any conduct described in the Complaint as related to the "Bulk Handset Trafficking Scheme;" and

    f.      knowingly using the Sprint Nextel Marks or any other trademark, service mark, trade name and/or trade dress owned or used by Sprint Nextel now or in the future, or that is likely to cause confusion with Sprint Nextel's Marks, without Sprint Nextel's prior written authorization.

8.     The purchase, sale or shipment of any Sprint Phones without Sprint Nextel's prior written consent within and/or outside of the continental United States is and shall be deemed a presumptive violation of this permanent injunction.

9.     The address of Defendant iBuy Express Inc. is 10185 Telegraph Road, Taylor, Michigan.

10.     The address of Defendants Athir Oraha Patto and Nadine Mawfek Patto is 1257 Loon Ridge, Commerce Township, MI 48390.

6

11. The address of Defendants Troy Patrick Haggard and Joshua Michael Haggard is 5393 Polk Street, Dearborn Heights, MI 48125.

12. The address of Plaintiff Sprint Nextel is 6200 Sprint Pkwy, Overland Park, Kansas 66251.

13. Defendants waive their right of appeal from the entry of this Final Judgment.

14. The Court retains jurisdiction over this matter and the parties to this action in order to enforce any violation of the terms of this Permanent Injunction by a finding of contempt and an order for payment of compensatory damages to Sprint Nextel in an amount of $5,000 for each Sprint Handset that a Defendant is found to have purchased, sold or unlocked in violation of this Injunction. The Court finds that these amounts are compensatory and will serve to compensate Sprint Nextel for its losses in the event Defendants violate the terms of this Order.

15. The Court retains jurisdiction over this matter to enter a subsequent judgment for damages against Defendants Athir Oraha Patto, Nadine Mawfek Patto, Troy Patrick Haggard, and Joshua Michael Haggard.

16. The Court hereby finds, pursuant to Fed. R. Civ. P. 54(b), that there is no just reason for delay and orders that Judgment shall be entered against Defendants as set forth herein.

DONE AND ORDERED this 21st day of June, 2012.

s/ Denise Page Hood
**UNITED STATES DISTRICT JUDGE**

Copies furnished to:

All Counsel of Record and pro se parties

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| SPRINT NEXTEL CORPORATION, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | |
| | § | CASE NO.: 2:11-cv-15431-DPH-RSW |
| IBUY EXPRESS INC., WHOLESALE | § | |
| EXPRESS, INC., ATHIR ORAHA PATTO, | § | |
| NADINE MAWFEK PATTO, KOSAI SALIM | § | |
| SHAMOON, TROY PATRICK HAGGARD, | § | |
| JOSHUA MICHAEL HAGGARD, TAREK | § | |
| HASSAN BAZZI, and WILLIAM LOUIS | § | |
| JOHNSON, | § | |
| | § | |
| Defendants. | § | |
| | § | |

## FINAL JUDGMENT AND PERMANENT INJUNCTION
## AGAINST WILLIAM LOUIS JOHNSON

Plaintiff Sprint Nextel Corporation ("Sprint Nextel"), brought the above-captioned lawsuit against William Louis Johnson ("Johnson"), among others (collectively, "Defendants"), alleging that Johnson and the other Defendants are engaged in an unlawful enterprise involving the unauthorized and deceptive bulk purchase and resale overseas of specially-manufactured wireless telephones under the Sprint, Sprint Nextel, Boost Mobile, payLo, Assurance Wireless, and Virgin Mobile brands, as well as other specially-manufactured wireless telephones designed for use on Sprint's wireless service, including the Apple iPhone (collectively, "Sprint Nextel Phones" or "Sprint Nextel Handsets" or "Phones" or "Handsets"), the theft of Sprint's subsidy investment in the Phones, the unlawful access of Sprint's protected computer systems and wireless network, the trafficking of Sprint's protected and confidential computer passwords, the willful infringement of Sprint's trademarks, and insurance fraud (collectively, the "Bulk Handset Trafficking Scheme" or the "Scheme").

Sprint Nextel alleges that Defendants perpetrate the Bulk Handset Trafficking Scheme by acquiring large quantities of Sprint Nextel Phones from Sprint Nextel and/or Sprint Nextel authorized dealers, and by soliciting others to purchase Sprint Nextel Phones in large quantities for the benefit of Defendants. Defendants acquire the Sprint Nextel Phones with the knowledge and intent that the Phones will not be used on the Sprint Nextel wireless network (as required by the Sprint Nextel contracts); instead, the Phones are trafficked and the vast majority are resold as new overseas where the Phones are not subsidized by wireless carriers (as they are in the United States) and where the Phones are not as readily available. In some cases, Defendants acquire the Sprint Nextel Phones with the knowledge and intent that the Phones will be computer-hacked. The purpose of this hacking, known as "unlocking," is to disable software installed in the Phones by the manufacturers at the request and expense of Sprint Nextel, which enables the activation of the Sprint Nextel Phones exclusively on Sprint's wireless system. The purpose of the software is to allow Sprint Nextel to offer the Phones at a discount to the consumer while protecting Sprint's subsidy investment in the Phone. The illegally unlocked Phones are trafficked and resold as new by Defendants, at a premium, under the Sprint trademarks.

Sprint Nextel Phones are sold subject to terms and conditions ("Terms and Conditions") which conspicuously restrict and limit the sale and use of the Phones. These Terms and Conditions are set forth in printed inserts that are packaged with each Phones and are posted on the Sprint-Nextel website. The Terms and Conditions and language on the packaging constitute a valid binding contract. Pursuant to the Terms and Conditions, purchasers of Sprint Nextel Phones agree, among other things: (a) to pay the monthly service charges and other related fees; (b) to pay an Early Termination Fee ("ETF") for each line of service that is terminated before the contract term is concluded; (c) to activate the Sprint Nextel Phones on the Sprint Nextel CDMA

network; (d) not to resell the Sprint Nextel Phones and related products and services; and (e) not to use the Phones for a purpose that could damage or adversely affect Sprint Nextel.

As a result of Johnson's involvement in the Bulk Handset Trafficking Scheme, Sprint Nextel has asserted claims against Johnson and the other Defendants for breach of contract, common law unfair competition, tortious interference with business relationships, civil conspiracy, unjust enrichment, conspiracy to induce breach of contract, common law fraud, fraudulent misrepresentation, violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*, federal trademark infringement and false advertising under 15 U.S.C. § 1125(a)(1)(A) and (B), and contributory trademark infringement. Based on the respective positions advocated by the parties, and having reviewed the Complaint and file and being otherwise duly and fully advised in the premises, it is hereby

**ORDERED**, **ADJUDGED** and **DECREED** that:

1. This Court has jurisdiction over all the parties and all of the claims set forth in Sprint Nextel's Complaint.

2. The Court finds that Sprint Nextel has the right to use and enforce rights in the standard character mark Sprint and the stylized Sprint Mark (collectively, the "Sprint Nextel Marks"), as depicted below:



Sprint Nextel uses the Sprint Nextel Marks on and in connection with its telecommunications products and services. The Sprint Nextel Marks are valid, distinctive, protectable, famous, have acquired secondary meaning, and are associated exclusively with Sprint Nextel.

3. The Court finds that the Terms and Conditions and the language in and on the packaging constitute a valid and binding contract enforceable against Johnson. The Court finds that (a) failing to pay for monthly service charges; (b) failing to pay ETF fees; (c) failing to activate the Phones on the Sprint wireless network; (d) reselling the Sprint Nextel Phones and related products and services; and (e) using the Phones for a purpose that could damage or adversely affect Sprint, constitute independent breaches of contract for which Sprint Nextel is entitled to relief.

4. The Court finds that the conduct set forth in the Complaint against Johnson constitutes violations of 15 U.S.C. § 1125(a)(1)(A) and (B) (federal trademark infringement and false advertising). The Court further finds that the conduct also constitutes contributory trademark infringement, common law unfair competition, tortious interference with business relationships, civil conspiracy, unjust enrichment, conspiracy to induce breach of contract, common law fraud, fraudulent misrepresentation, and violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*, and has caused substantial and irreparable harm to Sprint Nextel, and will continue to cause substantial and irreparable harm to Sprint Nextel unless enjoined.

5. Sprint Nextel has suffered damages, including loss of goodwill and damage to its reputation, as a result of Johnson's conduct. On review and consideration of all relevant factors, Sprint Nextel is entitled to damages and injunctive relief on the claims as set forth in the Complaint.

6. Final judgment is hereby entered against Defendant William Louis Johnson and in favor of the Plaintiff Sprint Nextel, on all of the claims set forth in Sprint Nextel's Complaint.

7.     Defendant William Louis Johnson and all of his past and present, agents, employees, heirs, personal representatives, beneficiaries, relatives, and all other persons or entities acting or purporting to act for him or on his behalf, including but not limited to any corporation, partnership, proprietorship or entity of any type that is in any way affiliated or associated with Johnson or Johnson's representatives, agents, assigns, parent entities, employees, independent contractors, associates, servants, affiliated entities, and any and all persons and entities in active concert and participation with Johnson who receive notice of this Order, shall be and hereby are PERMANENTLY ENJOINED from:

     a.    purchasing, selling, unlocking, reflashing, altering, advertising, soliciting and/or shipping, directly or indirectly, any Sprint Nextel Phones;

     b.    engaging in any of the conduct described in the Complaint as the "Bulk Handset Trafficking Scheme;" and

     c.    knowingly using the Sprint Nextel Marks or any other trademark, service mark, trade name and/or trade dress owned or used by Sprint Nextel now or in the future, or that is likely to cause confusion with Sprint Nextel's Marks, without Sprint Nextel's prior written authorization; and

     d.    supplying Sprint Nextel Phones to or facilitating or in any way assisting other persons or entities who Johnson knows or should know are engaged in any of the acts prohibited under this Permanent Injunction, including, without limitation, the buying and/or selling of Sprint Nextel Phones or hacking, altering, erasing, tampering with, deleting or otherwise disabling the software installed in Sprint Nextel Phones;

8. The purchase, sale or shipment of any Sprint Nextel Phones without Sprint Nextel's prior written consent within and/or outside of the continental United States is and shall be deemed a presumptive violation of this permanent injunction.

9. The address of Plaintiff Sprint Nextel is 6200 Sprint Pkwy, Overland Park, Kansas 66251.

10. The address of Defendant William Johnson is 44656 Northfield Drive, Apt 19, Sterling Heights, MI 48313.

11. Defendant Johnson waives his right of appeal from the entry of this Final Judgment.

12. The Court retains jurisdiction over this matter and the parties to this action in order to enforce any violation of the terms of this Permanent Injunction by a finding of contempt and an order for payment of compensatory damages to Sprint Nextel in an amount of $5,000 for each Sprint Nextel Handset that Johnson is found to have purchased, sold or unlocked in violation of this Injunction. The Court finds that these amounts are compensatory and will serve to compensate Sprint Nextel for its losses in the event Johnson violates the terms of this Order.

13. The Court hereby finds, pursuant to Fed. R. Civ. P. 54(b), that there is no just reason for delay and orders that Judgment shall be entered against Johnson as set forth herein.

DONE AND ORDERED this 13th day of March, 2012.


s/Denise Page Hood
**UNITED STATES DISTRICT JUDGE**


Copies furnished to: All Counsel of Record and pro se parties

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SPRINT NEXTEL CORPORATION, BOOST WORLDWIDE, INC., VIRGIN MOBILE USA, L.P., SPRINT SOLUTIONS, INC., AND BOOST MOBILE LLC, | § § § § § | |
| Plaintiffs, | § § | CASE NO.: 4:11-cv-3969 |
| v. | § § | |
| LFE DISTRIBUTION, INC., d/b/a LA FABRICA ELECTRONICS, and AMIT MANWANI, | § § § § | |
| Defendants. | § § | |

## FINAL JUDGMENT AND PERMANENT INJUNCTION

Plaintiffs Sprint Nextel Corporation, Boost Worldwide, Inc., Virgin Mobile USA, L.P.,

Sprint Solutions, Inc., and Boost Mobile LLC (collectively, "Sprint Nextel"), brought the above-

captioned lawsuit against Defendants LFE Distribution, Inc. d/b/a La Fabrica Electronics and

Amit Manwani ("Defendants"), alleging that Defendants are allegedly engaged in an unlawful

enterprise involving the acquisition, sale, and alteration of large quantities of Sprint Nextel,

Boost Mobile, and Virgin Mobile branded wireless telephones (collectively, "Sprint Nextel

Handsets" or "Handsets") and activation materials, including but not limited to SIM cards, that

causes substantial and irreparable harm to Sprint Nextel (the "Bulk Handset Trafficking and

Activation Scheme"). Defendants allegedly perpetrate the Bulk Handset Trafficking and

Activation Scheme by acquiring bulk quantities of Sprint Nextel Handsets, which often include

Sprint Nextel SIM cards, from retail stores, such as Best Buy, Wal-Mart or Target. Defendants

allegedly solicit others to purchase Sprint Nextel Handsets and SIM cards in bulk for their

benefit. Defendants allegedly acquire the Sprint Nextel Handsets with the actual or constructive knowledge and intent that the Handsets will not be activated for use on the Sprint Nextel prepaid wireless network, but that the Handsets will be computer-hacked. The alleged purpose of this hacking, known as "unlocking," is to erase, remove, and/or disable proprietary software installed in the Handset, which enables the use of the Sprint Nextel Handsets exclusively on Sprint Nextel's prepaid wireless system. It is alleged that the unlocked Handsets are then trafficked and resold overseas at a premium under the Sprint Nextel trademarks for unauthorized use outside of Plaintiff's prepaid wireless system, and the SIM cards that come with the handsets are illicitly sold and/or fraudulently activated to misappropriate airtime.

Sprint Nextel Handsets are sold subject to terms and conditions ("Terms and Conditions") which conspicuously restrict and limit the sale and use of the Sprint Nextel Handsets. These Terms and Conditions are set forth in printed inserts that are included in the packaging with every Sprint Nextel Handset and are also available to the public on the Sprint Nextel websites. The Terms and Conditions are also referenced in printed warnings that are placed on the outside of the retail packaging of the Handsets. The Terms and Conditions and language on the packaging constitute a valid and binding contract.

Pursuant to the Terms and Conditions and the language on the packaging, purchasers of Sprint Nextel Handsets agree, among other things, not to resell Sprint Nextel products or services (including the Handsets), and not to use the Handsets for any purpose that could damage or adversely affect Sprint Nextel.

As a result of the Defendants' alleged involvement in the Bulk Handset Trafficking and Activation Scheme, Sprint Nextel has asserted claims against Defendants for breach of contract, federal trademark infringement and false advertising under 15 U.S.C. § 1125(a)(1)(A) and (B),

unfair competition, contributory trademark infringement, tortious interference with business relationships and prospective advantage, harm to Sprint Nextel's goodwill and business reputation, civil conspiracy, unjust enrichment, conspiracy to induce breach of contract, and violation of the Texas Theft Liabilty Act. Based on the respective positions advocated by the parties, and having reviewed the Complaint and file and being otherwise duly and fully advised in the premises, it is hereby

ORDERED, ADJUDGED and DECREED that:

1. This Court has jurisdiction over all the parties and all of the claims set forth in Sprint Nextel's Complaint.

2. The Court finds that Sprint Nextel has the right to use and enforce said rights in the standard character marks Sprint, Boost Mobile, payLo, Assurance, and Virgin Mobile, and the stylized Sprint, Boost Mobile, and Virgin Mobile Marks (collectively, the "Sprint Nextel Marks"), as depicted below:





Sprint Nextel uses the Sprint Nextel Marks on and in connection with its telecommunications products and services. The Sprint Nextel Marks are valid, distinctive, protectable, famous, have

21614396.5                              5

acquired secondary meaning, and are associated exclusively with Sprint Nextel, Boost Mobile, and Virgin Mobile.

3.      The Court finds that the Terms and Conditions and the language in and on the packaging constitute a valid and binding contract enforceable against Defendants.  The Court finds that (a) facilitating others to use Sprint Nextel Prepaid Handsets in conjunction with service providers other than Sprint Nextel; (b) selling Sprint Nextel Prepaid Handsets, and (c) tampering with or altering Sprint Nextel Prepaid Handsets, SIM cards or the Handsets' software; and/or entering unauthorized activation codes in the Handsets for purposes of unlocking the Handsets or facilitating others in such acts, constitute independent breaches of contract for which Sprint Nextel is entitled to relief.

4.      The Court finds that the conduct set forth in the Complaint if proven constitutes violations of 15 U.S.C. § 1125(a)(1)(A) and (B) (federal trademark infringement and false advertising).  The Court further finds that the conduct if true constitutes contributory trademark infringement, tortious interference with business relationships and prospective advantage, common law unfair competition, harm to Sprint Nextel's goodwill and business reputation, civil conspiracy, and unjust enrichment, and has caused substantial and irreparable harm to Sprint Nextel, and will continue to cause substantial and irreparable harm to Sprint Nextel unless enjoined.

5.      Sprint Nextel alleges it has suffered damages, including loss of goodwill and damage to its reputation, as a result of Defendants' conduct.  On review and consideration of all relevant factors, Sprint Nextel is entitled to damages and injunctive relief on the claims as set forth in the Complaint.

6.      Final judgment is hereby entered against Defendants LFE Distribution, Inc. and Amit Manwani, and in favor of the Plaintiff Sprint Nextel, in the principal amount of Two Million Five Hundred Thousand Dollars and Zero Cents ($2,500,000.00 (U.S.)), jointly and severally, which shall bear interest at the legal rate, for which let execution issue forthwith.

7.      Defendants and all of their past and present officers, directors, successors, assigns, parents, subsidiaries, affiliates, related companies, predecessors-in-interest, companies, agents, employees, heirs, personal representatives, beneficiaries, relatives, and all other persons or entities acting or purporting to act for it or on its behalf, including but not limited to any corporation, partnership, proprietorship or entity of any type that is in any way affiliated or associated with Defendants or Defendants' representatives, agents, assigns, parent entities, employees, independent contractors, associates, servants, affiliated entities, and any and all persons and entities in active concert and participation with Defendants who receive notice of this Order, shall be and hereby are PERMANENTLY ENJOINED from:

> a.      purchasing, selling, unlocking, reflashing, altering, advertising, soliciting and/or shipping, directly or indirectly, any Sprint Nextel Handsets or "Activation Materials," which consist of SIM cards, activation codes, and/or other mechanism, process or materials used to activate service or acquire airtime in connection with a new activation;
>
> b.      purchasing, selling, unlocking, reflashing, altering, advertising, soliciting and/or shipping, directly or indirectly, any Sprint Nextel mobile device or SIM card that a Defendants knows or should know bears any Sprint Nextel Marks or any marks likely to cause confusion with the Sprint Nextel Marks, or any other trademark, service mark, trade name and/or trade

dress owned or used by Sprint Nextel now or in the future, including but not limited to Sprint, Boost Mobile, payLo, Assurance Wireless, and Virgin Mobile. Specifically, Defendants is enjoined from purchasing, selling, and/or shipping, directly or indirectly, all models of Sprint Nextel Prepaid Handsets and SIM cards currently offered for sale by Sprint Nextel or that may be offered for sale in the future, as listed and updated from time to time on the following websites: http://www.sprint.com, http://www.boostmobile.com, http://www.virginmobileusa.com, http://www.assurancewireless.com, and http://www.paylo.com, regardless of whether such devices are new or used, whether in or out of their original packaging, or whether "locked," "unlocked," or otherwise modified in any way by any person;

c.      unlocking of any Sprint Nextel Handset;

d.      accessing, altering, erasing, tampering with, deleting or otherwise disabling the software contained in any Sprint Nextel Handset;

e.      supplying Sprint Nextel Handsets or SIM cards to or facilitating or in any way assisting other persons or entities who Defendants knows or should know are engaged in unlocking Sprint Nextel Handsets and/or hacking, altering, erasing, tampering with, deleting or otherwise disabling the software installed in Sprint Nextel Handsets;

f.      supplying Sprint Nextel Handsets or SIM cards to or facilitating or in any way assisting other persons or entities who Defendants know or should know are engaged in any of the acts prohibited under this Permanent

Injunction, including, without limitation, the buying and/or selling of
locked or unlocked Sprint Nextel Handsets or SIM cards; and

g.  knowingly using the Sprint Nextel Marks or any other trademark, service
mark, trade name and/or trade dress owned or used by Sprint Nextel now
or in the future, or that is likely to cause confusion with Sprint Nextel's
Marks, without Sprint Nextel's prior written authorization.

8.  The purchase, sale or shipment of any Sprint Nextel Handsets or SIM cards
without Sprint Nextel's prior written consent within and/or outside of the continental United
States and/or the sale of Activation Materials is and shall be deemed a presumptive violation of
this permanent injunction.

9.  Mr. Pawan Sunny Manwani has entered an appearance in this action through
counsel, and has agreed to subject himself to the jurisdiction of this Court and to be bound to the
non-monetary portions of this Final Judgment and Permanent Injunction. The Court finds that
Mr. Pawan Sunny Manwani shall be and is hereby bound by each and every provision of this
Final Judgment and Permanent Injunction, with the exception of the financial provisions of
section 6 above.

10.  The address of Defendants LFE Distribution, Inc. and Amit Manwani, and Mr.
Pawan Sunny Manwani, is 216 Salinas Avenue Laredo, Texas 78040.

11.  The address of Plaintiff Sprint Nextel is 6200 Sprint Pkwy, Overland Park,
Kansas 66251.

12.  Defendants and Mr. Pawan Sunny Manwani waive their right of appeal from the
entry of this Final Judgment.

21614396.5                                      9

13.     The Court retains jurisdiction over this matter, over the parties to this action, and over Mr. Pawan Sunny Manwani, in order to enforce any violation of the terms of this Permanent Injunction by a finding of contempt and an order for payment of compensatory damages to Sprint Nextel in an amount of $5,000 for each Sprint Nextel Handset or item of Activation Material that a Defendant or Mr. Pawan Sunny Manwani is found to have purchased, sold or unlocked in violation of this Injunction.  The Court finds that these amounts are compensatory and will serve to compensate Sprint Nextel for its losses in the event Defendants violate the terms of this Order.

14.     The Court hereby finds, pursuant to Fed. R. Civ. P. 54(b), that there is no just reason for delay and orders that Judgment shall be entered against Defendants as set forth herein.

DONE AND ORDERED this 9TH day of February, 2012.

UNITED STATES DISTRICT JUDGE

Copies furnished to:

All Counsel of Record and pro se parties

1   Matthew A. Lesnick (SBN 177594)
    matt@lesnickprince.com
2   Andrew A. Cahill (SBN 233798)
    acahill@lesnickprince.com
3   **LESNICK PRINCE LLP**
    185 Pier Avenue, Suite 103
4   Santa Monica, CA 90405
    Telephone: 310-396-0964
5   Facsimile: 310-396-0963

6                                                                      JS-6
    James B. Baldinger (Florida Bar No. 869899)
7   jbaldinger@carltonfields.com
    David B. Esau (Florida Bar No. 650331)
8   desau@carltonfields.com
    **CARLTON FIELDS, P.A.**
9   CityPlace Tower
    525 Okeechobee Blvd, Suite 1200
10  West Palm Beach, FL 33401-6350
    Telephone:  (561) 659-7070
11  Facsimile:   (561) 659-7368
    *Attorneys for Plaintiffs*
12

13                  UNITED STATES DISTRICT COURT

14                  CENTRAL DISTRICT OF CALIFORNIA

15

16  SPRINT NEXTEL                     Case No.: 12-CV-0222-JFW (VBKx)
    CORPORATION, BOOST
17  WORLDWIDE, INC., AND              Judge: Hon. John F. Walter
    VIRGIN MOBILE USA, L.P.,          Courtroom: 16
18

19          Plaintiffs,              Complaint Filed: January 9, 2012
                                     Trial Date: January 29, 2013
20  v.

21  EZCOM, INC. d/b/a TRICOM
22  COMMUNICATIONS, and              **FINAL JUDGMENT AND PERMANENT**
    MICHAEL LI WU,                   **INJUNCTION AGAINST DEFENDANTS**
23                                   **EZCOM, INC. D/B/A TRICOM**
                                     **COMMUNICATIONS  AND MICHAEL LI**
24          Defendants.              **WU; DAMAGES AWARDED AGAINST**
                                     **DEFENDANT EZCOM, INC. D/B/A TRICOM**
25                                   **COMMUNICATIONS**
26

27

28

                                    1
                **FINAL JUDGMENT AND PERMANENT INJUNCTION**

Sprint Nextel Corporation, Boost Worldwide, Inc., and Virgin Mobile USA, L.P. ("Sprint Nextel"), brought the above-captioned lawsuit against Defendants EZCOM, Inc. d/b/a Tricom Communications and Michael Li Wu ("Defendants"), alleging that Defendants are engaged in an unlawful enterprise involving the acquisition, sale, and alteration of large quantities of Sprint Nextel, Boost Mobile, and Virgin Mobile wireless telephones designed for use on Sprint affiliated wireless service (collectively, "Sprint Nextel Handsets" or "Handsets") and activation materials, including but not limited to SIM cards, that causes substantial and irreparable harm to Sprint Nextel (the "Bulk Handset Trafficking and Activation Scheme"). Defendants perpetrate the Bulk Handset Trafficking and Activation Scheme by acquiring bulk quantities of Sprint Nextel Handsets, which often include Sprint Nextel SIM cards, from retail stores, such as Best Buy, Wal-Mart or Target. Defendants solicit others to purchase Sprint Nextel Handsets and SIM cards in bulk for their benefit. Defendants acquire the Sprint Nextel Handsets with the actual or constructive knowledge and intent that the Handsets will not be activated for use on the Sprint Nextel wireless network, but that the Handsets will be computer-hacked. The purpose of this hacking, known as "unlocking," is to erase, remove, and/or disable proprietary software installed in the Handset, which enables the use of the Sprint Nextel Handsets exclusively on Sprint Nextel's wireless system. The unlocked Handsets are then trafficked and resold overseas at a premium under the Sprint Nextel trademarks for unauthorized use outside of Plaintiff's wireless system,

2

and the SIM cards that come with the handsets are illicitly sold and/or fraudulently activated to misappropriate airtime.

Sprint Nextel Handsets are sold subject to terms and conditions ("Terms and Conditions") which conspicuously restrict and limit the sale and use of the Sprint Nextel Handsets. These Terms and Conditions are set forth in printed inserts that are included in the packaging with every Sprint Nextel Handset and are also available to the public on the Sprint Nextel websites. The Terms and Conditions are also referenced in printed warnings that are placed on the outside of the retail packaging of the Handsets. The Terms and Conditions and language on the packaging constitute a valid and binding contract.

Pursuant to the Terms and Conditions and the language on the packaging, purchasers of Sprint Nextel Handsets agree, among other things, not to resell Sprint Nextel products or services (including the Handsets), and not to use the Handsets for any purpose that could damage or adversely affect Sprint Nextel.

As a result of the Defendants' involvement in the Bulk Handset Trafficking and Activation Scheme, Sprint Nextel has asserted claims against Defendants for breach of contract, federal trademark infringement and false advertising under 15 U.S.C. § 1125(a)(1)(A) and (B), contributory trademark infringement, tortious interference with business relationships and prospective advantage, civil conspiracy, unjust enrichment, conspiracy to induce breach of contract, false advertising in violation of California Business & Professions Code § 17500 *et seq*., unfair

3

competition in violation of California Business & Professions Code § 17200 *et seq.*, harm to Sprint Nextel's goodwill and business reputation, and violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.* Based on the respective positions advocated by the parties, and having reviewed the Complaint and file and being otherwise duly and fully advised in the premises, it is hereby

**ORDERED**, **ADJUDGED** and **DECREED** that:

1.      This Court has jurisdiction over all the parties and all of the claims set forth in Sprint Nextel's Complaint.

2.      The Court finds that Sprint Nextel has the right to use and enforce said rights in the standard character marks Sprint, Boost Mobile, payLo, Assurance, and Virgin Mobile, and the stylized Sprint and Boost Mobile Marks (collectively, the "Sprint Nextel Marks"), as depicted below:





Sprint Nextel uses the Sprint Nextel Marks on and in connection with its telecommunications products and services. The Sprint Nextel Marks are valid,

4

FINAL JUDGMENT AND PERMANENT INJUNCTION

distinctive, protectable, famous, have acquired secondary meaning, and are associated exclusively with Sprint Nextel and Boost Mobile.

3.  The Court finds that the Terms and Conditions and the language in and on the packaging constitute a valid and binding contract enforceable against Defendants. The Court finds that (a) facilitating others to use Sprint Nextel Handsets in conjunction with service providers other than Sprint Nextel; (b) selling Sprint Nextel Handsets, and (c) tampering with or altering Sprint Nextel Handsets, SIM cards or the Handsets' software; and/or entering unauthorized activation codes in the Handsets for purposes of unlocking the Handsets or facilitating others in such acts, constitute independent breaches of contract for which Sprint Nextel is entitled to relief.

4.  The Court finds that the conduct set forth in the Complaint constitutes violations of 15 U.S.C. § 1125(a)(1)(A) and (B) (federal trademark infringement and false advertising). The Court further finds that the conduct constitutes contributory trademark infringement, tortious interference with business relationships and prospective advantage, civil conspiracy, unjust enrichment, conspiracy to induce breach of contract, false advertising in violation of California Business & Professions Code § 17500 *et seq*., unfair competition in violation of California Business & Professions Code § 17200 *et seq*., harm to Sprint Nextel's goodwill and business reputation, and violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq*., and has caused substantial and irreparable harm to Sprint Nextel, and

5

will continue to cause substantial and irreparable harm to Sprint Nextel unless enjoined.

5.      Sprint Nextel has suffered damages, including loss of goodwill and damage to its reputation, as a result of Defendants' conduct.   On review and consideration of all relevant factors, Sprint Nextel is entitled to damages and injunctive relief on the claims as set forth in the Complaint.

6.      Final judgment is hereby entered only against Defendant EZCOM, Inc. d/b/a Tricom Communications and in favor of the Plaintiff Sprint Nextel, on all of the claims set forth in Sprint Nextel's Complaint in the principal amount of Five Million Dollars and Zero Cents ($5,000,000.00 (U.S.)), which shall bear interest at the legal rate, for which let execution issue forthwith.

7.      Defendants and all of their past and present officers, directors, successors, assigns, parents, subsidiaries, affiliates, related companies, predecessors-in-interest, companies, agents, employees, heirs, personal representatives, beneficiaries, relatives, and all other persons or entities acting or purporting to act for it or on its behalf, including but not limited to any corporation, partnership, proprietorship or entity of any type that is in any way affiliated or associated with Defendants or Defendants' representatives, agents, assigns, parent entities, employees, independent contractors, associates, servants, affiliated entities, and any and all persons and entities in active concert and participation with Defendants who

6

receive notice of this Order, shall be and hereby are PERMANENTLY ENJOINED from:

    a.    purchasing, selling, unlocking, reflashing, altering, advertising, soliciting and/or shipping, directly or indirectly, any Sprint Nextel Handsets or "Activation Materials," which consist of SIM cards, activation codes, and/or other mechanism, process or materials used to activate service or acquire airtime in connection with a new activation;

    b.    purchasing, selling, unlocking, reflashing, altering, advertising, soliciting and/or shipping, directly or indirectly, any Sprint Nextel mobile device or SIM card that Defendants know or should know bears any Sprint Nextel Marks or any marks likely to cause confusion with the Sprint Nextel Marks, or any other trademark, service mark, trade name and/or trade dress owned or used by Sprint Nextel now or in the future, including but not limited to Sprint, Nextel, Boost Mobile, payLo, Assurance Wireless, and Virgin Mobile. Specifically, Defendants are enjoined from purchasing, selling, and/or shipping, directly or indirectly, all models of Sprint Nextel Handsets and SIM cards currently offered for sale by Sprint Nextel or that may be offered for sale in the future, as listed and updated from time to time on

the following websites: http://www.sprint.com, http://www.boostmobile.com, http://www.virginmobileusa.com, http://www.assurancewirelss.com, and http://www.paylo.com, regardless of whether such devices are new or used, whether in or out of their original packaging, or whether "locked," "unlocked," or otherwise modified in any way by any person;

c. unlocking of any Sprint Nextel Handset;

d. accessing, altering, erasing, tampering with, deleting or otherwise disabling the software contained in any Sprint Nextel Handset;

e. supplying Sprint Nextel Handsets or SIM cards to or facilitating or in any way assisting other persons or entities who Defendants knows or should know are engaged in unlocking Sprint Nextel Handsets and/or hacking, altering, erasing, tampering with, deleting or otherwise disabling the software installed in Sprint Nextel Handsets;

f. supplying Sprint Nextel Handsets or SIM cards to or facilitating or in any way assisting other persons or entities who Defendants know or should know are engaged in any of the acts prohibited under this Permanent Injunction, including, without limitation,

the buying and/or selling of locked or unlocked Sprint Nextel Handsets or SIM cards; and

g.    knowingly using the Sprint Nextel Marks or any other trademark, service mark, trade name and/or trade dress owned or used by Sprint Nextel now or in the future, or that is likely to cause confusion with Sprint Nextel's Marks, without Sprint Nextel's prior written authorization.

8.    The purchase, sale or shipment of any Sprint Nextel Handsets or SIM cards without Sprint Nextel's prior written consent within and/or outside of the continental United States and/or the sale of Activation Materials is and shall be deemed a presumptive violation of this permanent injunction.

9.    The address of Defendants is 1060 N. Hacienda Blvd., La Puente, CA 91744.

10.    The address of Plaintiff Sprint Nextel is 6200 Sprint Pkwy, Overland Park, Kansas 66251.

11.    Defendants waive their right of appeal from the entry of this Final Judgment.

12.    The Court retains jurisdiction over this matter and the parties to this action in order to enforce any violation of the terms of this Permanent Injunction by a finding of contempt and an order for payment of compensatory damages to Sprint Nextel in an amount of $5,000 for each Sprint Nextel Handset or item of Activation

Material that a Defendant is found to have purchased, sold or unlocked in violation of this Injunction. The Court finds that these amounts are compensatory and will serve to compensate Sprint Nextel for its losses in the event Defendants violate the terms of this Order.

13. The Court hereby finds, pursuant to Fed. R. Civ. P. 54(b), that there is no just reason for delay and orders that Judgment shall be entered against Defendants as set forth herein.

DONE AND ORDERED this 10th day of September, 2012.

_____
**HON. JOHN F. WALTER**
**UNITED STATES DISTRICT JUDGE**

"
  "

862 F.Supp.2d 1121
United States District Court,
W.D. Washington,
at Tacoma.

T–MOBILE USA, INC., a Delaware Corporation,
Plaintiff,
v.
Sherman TERRY, et al., Defendants.

No. 3:11–cv–5655–RBL. | April 23, 2012.

"

**U{pqruku**

**Dceni tqwpf<** Vgngeqo o wplecwkqpu eqo rcp{" dtqwijv" cevkqp" cmgi kpi " vtcfgo ctnl" kphtkpigo gpv" cpf " hcnug" cfxgtvkukpo gpv wpfgt"Ncpjco "Cev."xkqnxkqp"qh"Eqo rwugt" Htcwf "cpf "Cdwug"Cev"*EHCC±"cpf "xkqnxkqp"qh'l gqti kc' ncy 0'Eqo rcp{"o qxgf"hqt"rctvkcn'uwo o ct{"lwfi o gpv"cpf" rgtm cpgpv'kplwpevkqp0'

"

**Jqfi kpi u<** Vjg"Fkutkev'Eqwtv'Tqpcnf" D0'Ngki j vqp," LU0" j gnf "vjcv<"

[3]." fdhgpfcpvu" wprcyhwnl"wug" qh" vgngeqo o wplecwkqpu" eqo rcp{ou'o ctmu'eqpuwkwwgf "vtcfgo ctm'kphtkpigo gpv*

[4]." o kutgrtgugpvcvkqp"vj cv'fdhgpfcpv'y cu"cp"cwj qtkt{'cf " fgcngt" wgmikpi " vgngeqo o wplecwkqpu" eqo rcp{ou' i gpwkpg" rtqfwevu'uwrrdtvkdgu'eqpuwkwwgf 'hcnug'cfxgtvkukpi ±'

[5]." u{nqpo cvke" ceequp{"qh"vgngeqo o wplecwkqpu"eqo rcp{ou' rtqfwevf" eqo rwgtu.." y kvj qw" cwj qtk{ cwkqp." xkqnevgf" Eqo rwgt'Htcwf "cpf "Cdwug"Cev*EHCC±*

[6]." fdhgpfcpvu" cevkqpu" eqpuwwwgf " eqpurktce{" wpfgt" I gqti kc'ncy ±

[7]."rgm cpgpv'kplwpevkqp"y cu'y cttcpvgf ±'cpf'

[8]." cy ctf " qh" cwqtpg{" hggu" wpfgt " Ncpjco " Cev" y cu" y cttcpvgf 0'

"

O qvkqp'i tcpvgf 0'

"

**Cwqtpg{u'cpf 'Ncy 'Hkto u'**

[1] **I cki"Rqf qnml**."Ectmcp"Hkgnfu."RC."Cvmcpvc."I C."

Lco gu'D0'Dcnf kpi gt.."Ukceg{"M0'Uwwqp."Ectnvqp'Hkgrfu'u."RC." Y gpv'Rcro " Dgcej ." HN.." Lco gu'E0'I tcpv."Fcxku"Y tki j v'' Vtgo ckpg."Ugcwng."Y C.."hqt 'Rnckpvkhh0'

I gqti g'G0'Eqnrgw'Rctmapcl ."Y C.."rtq"ug0'

O cwj gy 'Eqnrgw'Vceqo c."Y C.."rtq"ug0'

O ctknqw'Eqnrgw'Vceqo c."Y C.."rtq"ug0'

Uctcj 'O 0'J qhho cp."Vceqo c."Y C.."rtq"ug0'

"
  "

**QTFGT'I TCPVKPI 'RCTVKCN'UWO O CT[ "**
**LWFI O GPV'CPF'GPVGTKPI 'RGTO CPGPV''**
**KPLWPEVKQP'CI CKPUV'FGHGPFCPV'I GQTI G''**
**EQNNGWW''**

TQP CNF 'D0'NGKI J VQP ."Fkuttkev'Lwfi g0'

, , 3" VJ KU'O CWWGT" ku'dghqtg'yj g'Eqwtv'qp"Rmckpvkhh" V6Ó qdkng"WUC.."Kpe0u'*6Ó qdkng±+'O qvkqp"hqt'Rctvkcn" Uwo o ct{"*Lwfi i o gpv'Ci ckpuv" F ghgpf cpv'I gqti g'Eqmgw" *O qvkqp 6 0'Fmv0'% 356 0'V6Ó qdkng"eqpvgpf u'yj cv'yj gtg" ctg"pq"o cvgtkcn'hceu'kp"f kurwg'cpf 'uq"o qxgu"qp"kw'Hgf gtcn" uj qwf" dg" i tcpvgf" kp" V6Ó qdkngou' hcxqt'' qp" kwu'Hgf gtcn" , 3347" Vtcf go ctm'kphtkpigo gpv'cpf 'Hcnug' Cf xgtvkukpi " *Eqwpv'Qpg±"*Vtchhkonmkpi "kp"Eqo o wpg'Rcuuyqtf u"*Eqwpv" Vj tgg±." Wpcwj qtkt{ gf " Ceeguu" W kj j " Kpvgpv'' vq " F ghtcwf " *Eqwpv'Hqwt±." Vj ghv'qh'Eqo rwgt'Fcvc"*Eqwpv'Hkxg±." Wpcwj qtkt{ gf " Ceeguu" *Eqwpv'Ukz±." Wpjchk" Eqo r gvkqp. QEEI (C0'Ë" 4564677"*Eqwpv'Gki j v±" Elxknl'Eqpurktce{ " *Eqwpvh'Vkpg±.'I gqti kc'Eqo rwgt'U{uwo u'Rtqegevkqp'Cev." QEEI (C0'Ë" 386; ; 5" *Eqwpv'Vj kvggp±" cpf" F gegrvkxg" Vtcf g'Rtcevkgu.'QEEI (C0'Ë" 32636594 "*Eqwpv'Hqwwggp±" encko u'"eqmgevkxgn{ ."V6Ó qdkngou'öEncko uö±0'V6Ó g'Eqwtv'' j cu'tgxkgy gf "yj g'ceug'hkmg." eqpukf gtgf 'yj g'gengxcpv' cpf " j gctf "cti wo gpv'hqt'cpf 'ci ckpuv'yj g'o qvkqp.'cpf 'dgkp" q{ gtrq' Hgf{ fwn"cpf "cuo tgxkgy "cpf "cuo i p'o vt'ti o." j qmquj kpi "tgcwpu.''vj g'Eqwtv'I TCP VU'yj g'O qvkqp"hqt" Rctkcn'Uwo o ct{ 'Lwfi i o gpv'Ci ckpuv'F ghgpf cpv'I gqti g' Eqmgw'cpf 'gpvgtu'c'rtgto cpgpv'kplwpevkqp0'

Vj g'Eqwtv'o cngu'yj g'hqmqy kpi 'hkpfkpi u<

"

Vj ku'Eqwtv'j cu'lwtkufkevkqp"qxgt'yj g'rctvkgu'cpf 'yj g'encko u" ugv'hqtyj "kp"V6Ó qdkngou'Ëo gpf gf 'Eqo rmckpv0'

"
  "

**C0'V6Ó qdkng'ou'Dwukpguu'O qf gn'**

T-Mobile USA, Inc. v. Terry, 862 F.Supp.2d 1121 (2012)

2012 WL 1409287, 103 U.S.P.Q.2d 1543

T-Mobile USA, Inc. v. Terry, 862 F.Supp.2d 1121 (2012)

2012 WL 1409287, 103 U.S.P.Q.2d 1543

T-Mobile USA, Inc. v. Terry, 862 F.Supp.2d 1121 (2012)

2012 WL 1409287, 103 U.S.P.Q.2d 1543

WestlawNext® © 2015 Thomson Reuters. No claim to original U.S. Government Works.

4

T-Mobile USA, Inc. v. Terry, 862 F.Supp.2d 1121 (2012)
2012 WL 1409287, 103 U.S.P.Q.2d 1543

ecwukpi "VóO qdkrg"vq"kpewt"vj g"equv"qh"kpxgunki cvkpi "cpf "
tgo gf {kpi "vj g"dtgcej gu'cpf"r'rc{kpi 'vj kcf/r ctv{"ecttlgtu'hqt"
tgco kpi "cpf "qxgtugcu"ecmu"°o cf g"qp"vj g"UKO " ectf ."
fknwkpi "vj g"VóO qdkrg"O ctmu."f gr tkxkpi "kv'qh'vj g"o gcpu'vq"
eqpvqrf"vj g"swcrkv{"qh"kmf"r tqf wev." j cto kpi "VóO qdkrg'u
dwukpguu''tgr wcvkqp''cpf "i qqf y kmf''cpf ''ngcf kpi ''vq''e''i tgcv'vt
nknqgnkj qqf"qh'eqphwukqp."o kncmg."cpf "f gcegr vkqp''cu''vq''vj g'
uqwtegl''qh''qtkj kp''qh''VóO qdkrg'u"r tqf wevu."cpf ''vj g'
VóO qdkrg''qh''vj g''qr r ctvwpkv{"vq''gctp''r tqhkwu'l'd''r'tqxkf kpi '
y ktgnguu''ugtxkeg''vq''ngi kko kko cvg''VóO qdkrg'eqpuwo gtu0'
"
Vj g'Eqvw'vhwvj yj gt 'hkpf u'vj cv'VóO qdkrg'j cu'u'ur gpv'kp''gzeguu'
qh' ¿7.222'' kpxgunki cvkpi "cpf " cuugunki " vj g" r quukdng'
ko rcko gpv'vq'vj g'i vj g'kpygi tkv{''qh''kuf''kuf''r tqt'tkgvct{''eqo r wvgt'
u{ugo "cpf " vj ktgnguu'' pgw'y qtm'' eqpf wewkpi '" e'' fco ci g'
cuuguuo gpv' tgi ct f kpi " F ghgpf cpvu'' eqngpwklqgp'' cpf "
fknuugo kpcvkqp''qh''f gcngt''eqf gu.''UKO ''ectf u''cpf "
 cktvko g.'' cpf '' vtcmkpi '' f qy p'' f gcevkxcvkpi '
ko r tqr rgtn{/ccvkxcvgf ''UKO ''ectf u0''
"
F ghgpf cpv'ku''cuuq{''xkqrcvkpi "3: "WLUE 0Ë 3252+°c+#4+#E+"
cpf 3252+°c+#7+#E+0'Wpf gt''3: "WLUE 0Ë 3252+°c+#4+#E+''ku''ku'
wprcy hwf''vq''kpvgpvkqpcmn{ ''ceeguu''e''r tqvgevgf''eqo r wvgt'
y kj qw'' cwj qtk{ cvkqp'' cpf '' vj gtgd {'' qdvckp'' kphqto cvkqp''
htqo '' vj g''r tqvgevgf'' eqo r wvgt0' Ugevkqp'' 3252+°c+#7+#E+''
o cmgu''kv''wprcy hwf''vq''kpvgpvkqpcmn{ ''ceeguu''e''r tqvgevgf''
eqo r wvgt''y kj qw'' cwj qtk{ cvkqp''cpf ''ecwug''f co ci g''cpf "
nquu0''Hqt''vj g''tgcuqpu''f kuewuugf'' cdqxg." F ghgpf cpv'j cu'
kpvgpvkqpcmn{ ''ceeguugf''VóO qdkrg'u'tqvgevgf ''eqo r wvgt'
y kj qw'' cwj qtk{ cvkqp0'' D{'' ceeguukpi '' vj g'' VóO qdkrg'
r tqr tkgvct{''f cvcdceg.''F ghgpf cpv'qdvckpgf ''kphqto cvkqp''vj cv'
cmqy'gf ''f gcngt''vq''eqpvkpwg''f kcevkxcvg''VóO qdkrg'u'r gwkpg'
VóO qdkrg'gu'tgvckngtu'0'VóO qdkrg''uwbhgtgf''nquu''
cpf "y cu''f co ci gf ''kp''vj g''r tqeguu0'cu''ugvhqtvj 'cdqxg0'
"

[33.]''F ghgpf cpv'ku''cuuq{''xkqrcvkpi "Ugevkqp''3252+°c+#8+''qh''vj g'
EHCC 0C''encko ''wpf gt'3: "WLUE 0Ë 3252+°c+#8+#tgs wktg''vj g'
hqrmwy kpi '' gngo gpvu<''#3+''vj g''F ghgpf cpv'' mpqy kpi n{ 'cpf '
vtchhkemgf''kp''#5+''c''eqo r wvgt'r tcuuy qtf''°#6+#'kp''c''o cppgt'
vj cv''chhgevu''r kpvgtuvcvg''eqo o gteg0'' eqo r wvgt'r tcuuy qtf''ku''
j kej ''ceeguu''vq''e''eqo r wvgt'j cu''dggp''uj ctgf ''eqo r wvgt'
cngy u''vj g''guggt''vq''cuuq''f cvc''cpf''cf f t0''UKO ''ectf u''cpf "
cpf '' ku''c''cuuq''cuuq''xkqrcvkpi ''UKO ''ectf u0''cpf "VóO qdkrg'u'
pcvkqpy kf g'{'ktgnguu'ujpgeqo o wpkecvkqpu'pgw qtp0'
"

[334.]'', : :"F ghgpf cpv''j cu''xkqrcvgf''vj g''EHCC ''cpf "
uwo o ct{''lwf i o gpv'ku''vj gtgf qt''kp''VóO qdkrg'u''hcxqt''qp''vj g''
EHCC''encko u0'
"
"

### E. F ghgpf cpv'Xkqrcvgf 'vj g'I gqt i kc''Eqo r wvgt 'U{ uvgo u''Rtqvgevkqp''Cev'

I gqt i kc''Ucwwg''Ë'386; ó; 5''r tqxkf gu''ekxknhtgo gf kgu''hqt''
vj qug''gpi ci kpi "kpo''eqo r wvgt''vj ghv'eqo r wvgt''vtgur cuu.''cpf "
eqo r wvgt''r cuuy qtf ''f kuenquwtg0''
"

[34.]'' F ghgpf cpv'' tgr gcvgf n{''eqo o kwgf '' eqo r wvgt'' vj ghv<''
eqo r wvgt''vtgur cuu''cpf ''eqo r wvgt''r cuuy qtf ''f kuenquwtg''d{'
kmgi cm''ceeguukpi '' VóO qdkrg''r tqr tkgvct{'' cpf ''f cvcdceg.''
wukpi .''cpf ''ugmkpi ''eqf gu''vj cv''cmqy''uj g''wgt''vq''ceeguu''
VóO qdkrg'r gwkpg''cpf '' r tqvg''cpf''r gwg''cpf''qtm ''cpf "
y kj qw'' tgo wpctcvkqp'' vq''VóO qdkrg0'' Cccqtf kpi n{.''
F ghgpf cpv'' xkqrcvgf '' vj g'' I gqt i kc''Eqo r wvgt '' U{ uvgo u''
Rtqvgevkqp''Cev.''cpf ''uwo o ct{''lwf i o gpv'ku''tcpvgf ''kp''
Rtckpvkhhu''hcxqt'y kj ''tgur gev'vq''vj ku''encko 0'
"

### F. F ghgpf cpv'uu''Wpny hwf'Cevkxkvkgu''ct g'Rct v 'qh''tj g''Kgpi ct l'Eqpur kt ce{''

[35.,136.]''Vq''r tqxg'eqpur kt ce{.''VóO qdkrg'öo wuv''uj qy ''uj cv'
vy q''qt''o qtg''r gtuqpu''eqo dkpgf ''gkej gt''vq''fq''uj g''wprcy hwf''
y j kej ''kuf'c''vqtv''qt''gng.''vq''fq''uqo g''r'ncy hwf'cev''d{''o gj qf u''
y j kej ''eqpuvkwvg''c''vqtv0''ö V/Ngt''x0'Vj qo cu''eqo r 0.''52: "I c0Ctr r 0'
443.''4466447.''929''U0G0f4''359.''363''*I c0Ev0Ctr r 0''4233+''
*kpvgtpcf''swcvcvkqpu''qo kwgf 0'0'Eqmpgw ''c'f o kv''vj cv''vj g'
cj kko co ''r cvog''d''tbt''"y qtmgf '' r y j ''i q''vj cv''p y 'j cr ''vj g''
Kpeq{pf'' Uj gt i o ''Vgtt{'' "q''gpi ci g''kp'' "c''xctkgw''qh ''xct kqwu''
eqphkev.''kpenwf kpi .''dwt''p qv ''nko kgf ''vq.''vtcf go ctm ''
kphtkpi go gpv.''hcnug'' cf xctkukpi .''eqo r wvgt''htcwf .''eqo r wvgt'
vj ghv.''eqo r wvgt''vtgur cuu.''cpf '' eqo r wvgt''r cuuy qtf ''
f kuenquwtg0Rctvkwct cvkqp''d{''wpcwj qtk{gf''r tqtgupqp''hnmg''O t0'
Eqmgw''kp''dw{kpi 'cpf''cpf ''i cpf''°nci g''nko kwkf''cpf ''cpf''vj g''
vjg ''eqo r wvgt'' vtgur cuu.''cpf '' eqo r wvgt''r cuuy qtf ''
f kuenquwtg0Rctvkwct cvkqp''d{''wpcwj qtk{gf''uj ct''i tqupqp''hnmg''O t0'
Eqmgw''cpf ''wp''cpf ''f gkphi''c''cpf ''Ugt i o ''°Eeegu.''vjg ''
y qtmgf ''cpf '' cpf ''°Uj i to ''cp''Vgtt{'''°q''ceeguu''c''VóO qdkrg''UKO ''
ectf 'u'qp''VóO qdkrg'u''pgwu qtm''pgw qtm0'Hvvwj i gto qtu.''vjg ''
Vgtt{''cf o kwgf '' vj cv''j g''y cu''uwkun''°wqpr qt''f gcmgt''eqf gu''vj cv'
j cw of ''cmqy gf ''VóO qdkrg'cpf '°cpf''°cpf''cpf''°cpf''xkqrcvkqp.''vjg ''
cevkxxcvg''ewuwqo gt '' ceeqwpvu0'' Dcuqf '' qp'' vj g''huti kpi ''
wpfkurwvgf ''gxkf gpeg.''uwo o ct{'', 3355''lwf i o gpv''kp''
VóO qdkrg'u''hcxqt''qp''vj ku''encko ''ku''cr r tqr tkcvg0''V/Ngt.''52: "
I c0Ctr r 0''cv'4466447.''929''U0G0f4''cv'3630''
"
"

### TGNKGH

### C0 Rgto cpgpv'Kpl wpevkqp'

[37.,138.]'' Qp''Cwi uu'''5. "4233.'c''r tgnko kpct {'' kpl wpevkqp''y cu''

T-Mobile USA, Inc. v. Terry, 862 F.Supp.2d 1121 (2012)

2012 WL 1409287, 103 U.S.P.Q.2d 1543

T-Mobile USA, Inc. v. Terry, 862 F.Supp.2d 1121 (2012)

2012 WL 1409287, 103 U.S.P.Q.2d 1543

T-Mobile USA, Inc. v. Terry, 862 F.Supp.2d 1121 (2012)

2012 WL 1409287, 103 U.S.P.Q.2d 1543

153

T-Mobile USA, Inc. v. Terry, 862 F.Supp.2d 1121 (2012)

2012 WL 1409287, 103 U.S.P.Q.2d 1543

154

**T-Mobile USA, Inc. v. Terry, 862 F.Supp.2d 1121 (2012)**

2012 WL 1409287, 103 U.S.P.Q.2d 1543

---

**End of Document**                                           © 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

The Honorable Ronald B. Leighton

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON, AT TACOMA

| | |
|---|---|
| T-MOBILE USA, INC., a Delaware Corporation, | )<br>)<br>) No. 3:11-cv-5655-RBL |
| Plaintiff, | )<br>) |
| v. | ) **FINAL JUDGMENT AND PERMANENT**<br>) **INJUNCTION AGAINST DEFENDANTS** |
| SHERMAN TERRY, et al., | )<br>) |
| Defendants. | )<br>)<br>)<br>) |

Plaintiff T-Mobile USA, Inc. ("T-Mobile"), brought the above-captioned lawsuit against Defendants Sherman Terry, Custom Access, Inc., Sandra Ortiz, George Collett, Marilou Collett, Mathew Collett and Sarah Hoffman ("Defendants"), alleging that Defendants are engaged in, and knowingly facilitate and encourage others to engage in the unlawful bulk purchase, computer hacking, and trafficking in T-Mobile-branded Subscriber Identity Module ("SIM") cards that have been improperly loaded with stolen airtime, trafficking in and/or using the confidential and proprietary T-Mobile codes that are required to access T-Mobile's proprietary activation system and wireless telecommunications network, selling methods and processes to defraud T-Mobile, and illegally accessing T-Mobile's computers for the purpose of defrauding T-Mobile. Plaintiff further alleges that this is part of a larger scheme involving the unauthorized and unlawful bulk purchase, trafficking, advertising, and resale of T-Mobile prepaid wireless telephones ("Prepaid Handsets" or

"Handsets"), including the resale of Handsets to buyers in foreign countries, unauthorized and unlawful computer unlocking of T-Mobile Prepaid Handsets, alteration of proprietary software computer codes installed in the Handsets to permit T-Mobile to subsidize the cost of the Handsets, and trafficking of the Handsets and SIM cards for profit (collectively, the "Subsidy Theft and Activation Fraud Scheme").

Defendants and their co-conspirators perpetrate the Subsidy Theft and Activation Fraud Scheme by acquiring large quantities of T-Mobile Prepaid Handsets including SIM cards, from retail stores, and by soliciting others ("Runners") to purchase T-Mobile Prepaid Handsets with SIM cards in large quantities. The T-Mobile Prepaid Handsets are then removed from their original packaging, along with the accessories, including copies of the written warranties and ownership manuals, and the Handsets are shipped, unlocked or to be unlocked, and the accompanying activation materials, including but not limited to SIM cards, are resold by Defendants and their co-conspirators at a substantial profit. The T-Mobile Prepaid Handsets are acquired with the knowledge and intent that they will not be activated for use on the T-Mobile prepaid wireless network, as required by the terms of the T-Mobile contracts. Instead, the T-Mobile Prepaid Handsets are computer-hacked. The purpose of this hacking, known as "unlocking," is to erase, remove, and/or disable the proprietary software installed in the Handsets by the manufacturers at the request and expense of T-Mobile, which enables the use of the T-Mobile Prepaid Handsets exclusively on T-Mobile's prepaid wireless system. The illegally unlocked Handsets are trafficked and resold as new by Defendants and their co-conspirators, at a premium, under the T-Mobile trademarks and the SIM cards are sold fraudulently activated or to be fraudulently activated on the T-Mobile network.

Defendants and their co-conspirators use confidential and proprietary materials to illegally access T-Mobile's secure computers to fraudulently activate SIM cards on T-Mobile's wireless telecommunications network. Defendants and their co-conspirators then traffic in the illegally-acquired airtime, the confidential and proprietary activation materials, and the methods and processes to defraud T-Mobile.

As a result of the Defendants' active participation in the Subsidy Theft and Activation Fraud Scheme, T-Mobile brought claims against Defendants for federal trademark infringement and false advertising under 15 U.S.C. § 1125(a)(1)(A) and (B); violations of the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.* and Georgia Statute § 16-9-93, Computer Systems Protection Act; contributory trademark infringement; common law fraud; unfair competition in violation of Georgia Statute § 23-2-55; deceptive trade practices in violation of Georgia statute § 10-1-374 *et seq.*; tortious interference with prospective business advantage; civil conspiracy; unjust enrichment; and conversion.

On April 23, 2012, the Court entered an Order Granting Partial Summary Judgment and Entering Permanent Injunction Against Defendant George Collett. (Dkt. #182). Subsequent to the Summary Judgment Order, the Court entered an Order striking George Collett's answer and entering default judgment on the claims not addressed in the Summary Judgment Order. The Court has also entered default judgment against Defendants Custom Access, Inc., Sherman Terry and Sandra Ortiz. With respect to Defendants Marilou Collett, Mathew Collett, and Sarah Hoffman, the Court has struck their answers and entered default judgments against them. Accordingly, pursuant to Federal Rules of Civil Procedure 8(b)(6), 54(b), 55(b), 56, 58 and 65, the Local Rules of the Court, the respective positions advocated by the parties and having reviewed the Complaint and file and being otherwise duly and fully advised in the premises, it is hereby

**ORDERED**, **ADJUDGED** and **DECREED** that:

1. This Court has jurisdiction over all the parties and all of the claims set forth in T-Mobile's Complaint. Venue is proper in this judicial District.

2. The Court finds that T-Mobile has the right to use and enforce said rights in the standard character mark T-Mobile and a stylized T-Mobile Mark (collectively, the "T-Mobile Marks"), as depicted below:

T-Mobile uses the T-Mobile Marks on and in connection with its telecommunications products and services. T-Mobile alleges that Defendants' use of the T-Mobile Marks without authorization in connection with the Subsidy Theft and Activation Fraud Scheme has caused, and will further cause, a likelihood of confusion, mistake and deception as to the source of origin of the counterfeit products, and the relationship between T-Mobile and Defendants. T-Mobile alleges that Defendants' activities constitute false designation of origin, false descriptions and representations, and false advertising in commerce in violation of § 43(a) of the Lanham Act, 15 U.S.C. §1125(a)(1)(A) and (B). T-Mobile alleges that Defendants knew or should have known that T-Mobile is the licensee of the T-Mobile Marks and that Defendants had no legal right to use the T-Mobile Marks on infringing products.

3. The Court finds that the conduct set forth in the Complaint constitutes violations of 15 U.S.C. § 1125(a)(1)(A) and (B) (federal trademark infringement and false advertising). The Court further finds that the conduct constitutes violations of the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq*. and Georgia Statute § 16-9-93, Computer Systems Protection Act; contributory trademark infringement; common law fraud; unfair competition in violation of Georgia Statute § 23-2-55; deceptive trade practices in violation of Georgia statute § 10-1-374 *et seq*.; tortious interference with prospective business advantage; civil conspiracy; unjust enrichment; and conversion, and has caused substantial and irreparable harm to T-Mobile, and will continue to cause substantial and irreparable harm to T-Mobile unless enjoined.

4. T-Mobile has suffered damages, including loss of goodwill and damage to its reputation, as a result of Defendants' conduct that far exceeds the $5,000 aggregate annual damages under the Computer Fraud and Abuse Act. On review and consideration of all relevant factors, T-Mobile is entitled to damages and injunctive relief on the claims as set forth in the Complaint.

5.      Final judgment is hereby entered against Defendants Sherman Terry, Custom Access, Inc., Sandra Ortiz, George Collett, Marilou Collett, Mathew Collett and Sarah Hoffman, jointly and severally, and in favor of the Plaintiff T-Mobile USA, Inc., on all of the claims set forth in T-Mobile's Complaint in the principal amount of One Million, Thirty-Four Thousand, Nine Hundred and Thirty-Eight Dollars and Sixteen Cents ($1,034,938.16 (U.S.)), which shall bear interest at the legal rate, for which let execution issue forthwith.

6.      Defendants Sherman Terry, Custom Access, Inc., Sandra Ortiz, George Collett, Marilou Collett, Mathew Collett and Sarah Hoffman, and each of their respective partners, agents, representatives, employees, servants, heirs, personal representatives, beneficiaries, relatives, contractors, companies, corporations, including, but not limited to, Custom Access, Inc. and Cell Phone George Inc., and each and all of Custom Access, Inc. and Cell Phone George Inc.'s past and present respective officers, directors, successors, assigns, parents, subsidiaries, affiliates, related companies, predecessors-in-interest, companies, respective agents, and employees, and all other persons acting on behalf of or for the benefit of any Defendant or who are in active concert or participation with any Defendant, including but not limited to any corporation, partnership, association, proprietorship or entity of any type that is in any way affiliated or associated with a Defendant or a Defendant's representatives, agents, assigns, employees, servants, affiliated entities, and any and all persons and entities in active concert and participation with any Defendant who receive notice of this Order, shall be and hereby are PERMANENTLY ENJOINED from:

a.      purchasing, selling, providing, altering, advertising, soliciting, using, and/or shipping, directly or indirectly, any T-Mobile "Activation Materials," which consist of SIM cards, PIN numbers, activation and proprietary codes, and/or other mechanism, process or materials

used to activate service or acquire airtime in connection with an activation on the T-Mobile network;

b.    purchasing, selling, unlocking, reflashing, altering, advertising, soliciting, using, and/or shipping, directly or indirectly, any T-Mobile products or services.

c.    purchasing, selling, unlocking, reflashing, altering, advertising, soliciting and/or shipping, directly or indirectly, any Activation Materials or T-Mobile mobile device that Defendants know or should know bears any T-Mobile marks or any marks likely to cause confusion with the T-Mobile marks, or any other trademark, service mark, trade name and/or trade dress owned or used by T-Mobile now or in the future;

d.    accessing, directly or indirectly, personally or through an agent or associate, any of T-Mobile's internal computers or computer systems;

e.    accessing, altering, erasing, tampering with, deleting or otherwise disabling the software contained in any T-Mobile mobile device;

f.    supplying T-Mobile Activation Materials or mobile device to or facilitating or in any way assisting other persons or entities who Defendants know or should know are engaged in selling SIM cards, Activation Materials, and/or methods or processes to defraud T-Mobile or are unlocking T-Mobile mobile device and/or hacking, altering, erasing, tampering with, deleting or otherwise disabling the software installed in T-Mobile mobile device;

g.    supplying T-Mobile Activation Materials or devices to or facilitating or in any way assisting other persons or entities who Defendants know or should know are engaged in any of the acts prohibited

under this Permanent Injunction, including, without limitation, the buying and/or selling of T-Mobile Activation Materials or mobile device; and

    h.    knowingly using the T-Mobile marks or any other trademark, service mark, trade name and/or trade dress owned or used by T-Mobile now or in the future, or that is likely to cause confusion with T-Mobile's marks, without T-Mobile's prior written authorization.

7.    The purchase, sale, trafficking, use, or shipment of any T-Mobile mobile device, SIM card, accessory, or Activation Materials without T-Mobile's prior written consent within and/or outside of the continental United States is and shall be deemed a presumptive violation of this permanent injunction.

8.    Pursuant to the Lanham Act, Defendants shall deliver and turn over all T-Mobile SIM cards, handsets, and products in their possession, or subject to their custody or control, bearing or infringing on any T-Mobile trademark or a confusingly similar copy thereof, to T-Mobile within 10 days of the date of this Final Judgment.

9.    The last known address of George Collett is 510 South 112th Street, Tacoma, WA 98444.

10.    The last known address of Marilou Collett is 8714 S. Asotin Street, Tacoma, WA 98444.

11.    The last known address of Matthew Collett is 1010 S. 21st Street, Tacoma, WA 98405.

12.    The last known address of Sarah Hoffman is 1010 S. 21st Street, Tacoma, WA 98405.

13.    The last known address of Defendant Sherman Terry is, c/o FPC Atlanta, P.O. Box 150160, Unit #G-11, Atlanta, Georgia 30315.

14.    The last known address of Defendant Sandra Ortiz is 84 Clantoy Street, Springfield, Massachusetts 01104.

15.     The last known address of Custom Access, Inc. is 60 Cliff View Dr, Covington, Georgia 30016.

16.     The address of Plaintiff, T-Mobile USA, Inc., is 12920 S.E. 38th Street, Bellevue, Washington 98006.

17.     The Court retains jurisdiction over this matter and the parties to this action to enforce any violation of the terms of this Permanent Injunction by a finding of contempt and an order for payment of compensatory damages to T-Mobile in an amount of $5,000 for each T-Mobile Prepaid Handset, accessory, or item of Activation Material that a Defendant is found to have purchased, sold, advertised, activated, used, provided or unlocked in violation of this Injunction.  The Court finds that these amounts are compensatory and will serve to compensate T-Mobile for its losses in the event any Defendant violates the terms of this Order.

18.     The Court hereby finds, pursuant to Fed. R. Civ. P. 54(b), that there is no just reason for delay and orders that Judgment shall be entered against Defendants as set forth herein.

DONE AND ORDERED this 17th day of July, 2012.

———

Ronald B. Leighton
United States District Judge

Copies furnished to:

All Counsel of Record and pro se parties

23314722.3
Final Judgment and Permanent Injunction Against Defendants
(3:11-cv-5655-RBL) — 8

163

**T-MOBILE USA, INC., a Delaware corporation,**

-vs-                                                      Case No.  2:11-cv-35-FtM-29SPC

**PETER BRONSON, MAX RAY, JOHN DOES 1-
10, XYZ COMPANIES 1-10,**

                    **Defendants.**
_____

## AMENDED JUDGMENT IN A CIVIL CASE

　　　**IT IS ORDERED AND ADJUDGED** pursuant to the order entered July
26, 2011, the Plaintiff's Motion for Entry of Final Judgment and
Permanent Injunction Against Max Ray and Peter Bronson (Doc. #25)
is **GRANTED** in favor of plaintiff and against defendants Max Ray and
Peter Bronson. Default Judgment is entered as follows:
　　　A.　Plaintiff, T-Mobile USA, Inc. is awarded damages in the
principal amount of Three Million Five Hundred Forty Two Thousand
Five Hundred Twenty Dollars and Zero Cents **($3,542,520.00 U.S.) for
monetary and exemplary damages** against Defendants May Ray and Peter
Bronson, jointly and severally, which shall bear interest at the
legal rate, for which let execution issue forthwith.
　　　B.　Defendants May Ray and Peter Bronson, and each and all of
their past and present companies, agents, employees, heirs, personal
representatives, beneficiaries, and all other persons or entities
acting or purporting to act 1.　Plaintiff's Motion for Entry of
Final Judgment and Permanent Injunction Against Max Ray and Peter
Bronson (Doc. #25) is **GRANTED** in favor of plaintiff and against
defendants Max Ray and Peter Bronson and the Clerk shall enter a
default judgment as follows:
　　　A.　Plaintiff, T-Mobile USA, Inc. is awarded damages in the
principal amount of Three Million Five Hundred Forty Two Thousand
Five Hundred Twenty Dollars and Zero Cents **($3,542,520.00 U.S.) for
monetary and exemplary damages** against Defendants May Ray and Peter
Bronson, jointly and severally, which shall bear interest at the
legal rate, for which let execution issue forthwith.
　　　B.　Defendants May Ray and Peter Bronson, and each and all of
their past and present companies, agents, employees, heirs, personal
representatives, beneficiaries, and all other persons or entities
acting or purporting to  for them or on their behalf, including but

not limited to any corporation, partnership, association, proprietorship or entity of any type that is in any way affiliated or associated with either Defendant or one of the Defendant's representatives, agents, assigns, employees, servants, affiliated entities, and any and all persons and entities in active concert and participation with either Defendant who receive notice of this Order, shall be and hereby are **PERMANENTLY ENJOINED** from:

    i.    purchasing, selling, altering, advertising, soliciting, using, transferring, trafficking, and/or shipping, directly or indirectly, any T-Mobile "Activation Materials," which consist of SIM Cards, PIN numbers, dealer activation and/or proprietary codes, and/or other mechanism, process or materials used to activate service or acquire airtime in connection with a new activation on the T-Mobile network;

    ii.    posting, displaying, blogging, and/or discussing, personally or through an agent, friend, employee, associate or any other third party, any information regarding T-Mobile Activation Materials, methods by which to defraud T-Mobile, and/or the Subsidy Theft, Dealer Code and FlexPay Fraud Scheme on the Internet or through any other digital and non-digital medium, including, but not limited to, the www.ypaymor.info website;

    iii.    purchasing, selling, unlocking, reflashing, altering, advertising, soliciting, using, and/or shipping, directly or indirectly, any T-Mobile Prepaid Phones.

    iv.    purchasing, selling, unlocking, reflashing, altering, advertising, soliciting and/or shipping, directly or indirectly, any Activation Materials or T-Mobile mobile device that Defendant knows or should know bears any T-Mobile marks or any marks likely to cause confusion with the T-Mobile marks, or any other trademark, service mark, trade name and/or trade dress owned or used by T-Mobile now or in the future;

    v.    accessing, directly or indirectly, personally or through an agent or associate, any of T-Mobile's internal computers or computer systems;

    vi.    unlocking of any T-Mobile Phones;

    vii.    accessing, altering, erasing, tampering with, deleting or otherwise disabling the software contained in any T-Mobile Prepaid Phones;

    viii.    supplying T-Mobile Activation Materials or Phones to or facilitating or in any way assisting other persons or entities who Defendant knows or should know are engaged in selling SIM cards, Activation Materials, and/or methods or processes to defraud T-Mobile or unlocking T-Mobile Phones and/or hacking, altering,

-2-

erasing, tampering with, deleting or otherwise disabling the software installed in T-Mobile Handsets;

    ix.   supplying T-Mobile Activation Materials or Phones to or facilitating or in any way assisting other persons or entities who Defendant knows or should know are engaged in any of the acts prohibited under this Preliminary Injunction, including, without limitation, the buying and/or selling T-Mobile Activation Materials or Phones; and

    x. knowingly using the T-Mobile Marks or any other trademark, service mark, trade name and/or trade dress owned or used by T-Mobile now or in the future, or that is likely to cause confusion with T-Mobile's Marks, without T-Mobile's prior written authorization.

C.  The purchase, sale, trafficking, use, or shipment of any T-Mobile Phones, SIM cards, or Activation Materials without T-Mobile's prior written consent within and/or outside of the continental United States is and shall be deemed a presumptive violation of this Permanent Injunction.

D.  Pursuant to the Lanham Act, Defendants shall deliver and turn over all T-Mobile SIM cards and products in their possession, or subject to their custody or control, bearing or infringing on any T-Mobile trademark or a confusingly similar copy thereof, to T-Mobile within **10 DAYS** of the date of this Final Judgment. The address of Plaintiff, T-Mobile USA, Inc. is 12920 S.E. 38th Street, Bellevue, Washington 98006.

E.  The Court retains jurisdiction over this matter and the parties to this action in order to enforce any violation of the terms of this Permanent Injunction, including by a finding of contempt and an order for payment of compensatory damages to T-Mobile in an amount of $5,000 for each T-Mobile prepaid handset or item of Activation Material that a Defendant is found to have purchased, sold, advertised or unlocked in violation of this Injunction. The Court finds that these amounts are compensatory and will serve to compensate T-Mobile for its losses in the event a Defendant violates the terms of this Order and the Court finds a Defendant in contempt.

Additionally, pursuant to plaintiff's Notice of Voluntary Dismissal Without Prejudice of Does 1-10 and XYZ Companies 1-10 (Doc. #26), Defendants John Does 1-10 and XYZ Companies 1-10 are dismissed without prejudice.

Date: July 27, 2011

                SHERYL L. LOESCH, CLERK

                By: /s/ Regina Thompson, Deputy Clerk

-3-

c:  All parties and counsel of record

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

**Case Number: 08-20637-CIV-MORENO**

AT&T MOBILITY LLC and AT&T MOBILITY
II LLC,

       Plaintiffs,

vs.



MIRANDA HOLDINGS CORP. d/b/a
INCOMTEL; HOME SECRETS CORP.; JOSUE
LEON; JOHN DOES 1-50; XYZ COMPANIES
1-50,

       Defendants.



_____/

**FINAL JUDGMENT AND PERMANENT INJUNCTION AGAINST DEFENDANTS**

THIS CAUSE came before the Court upon the Parties' Stipulation for Entry of Final

Judgment and Permanent Injunction Against Defendants (**D.E. No. 50**), filed on **July 1, 2008**.

Plaintiffs AT&T Mobility LLC and AT&T Mobility II LLC (collectively "AT&T"), brought the

above-captioned lawsuit against Defendants Miranda Holdings Corp., a Florida corporation, d/b/a

Incomtel, Jeremy Lara, individually and d/b/a Incomtel, Home Secrets Corp., and Josue Leon

(collectively referred to as "Defendants"), alleging that Defendants are engaged in an unlawful

enterprise involving the acquisition, sale, and alteration of large quantities of AT&T and

GoPhone® branded wireless telephones ("GoPhones" or "Phones") purchased from retail outlets,

the solicitation and payment of others to bulk purchase Phones for Defendants' benefit, computer

hacking and erasing or otherwise disabling software installed in the Phones essential for

consumers to access AT&T's prepaid wireless network, or selling the Phones to others who

disable the software, and ultimately selling or facilitating the ultimate sale of the altered Phones as new under the AT&T trademarks for unauthorized use outside of the AT&T wireless system for profit (the "Bulk Resale Venture").

AT&T GoPhones are sold subject to terms and conditions ("Terms and Conditions") which conspicuously restrict and limit the sale and use of the GoPhones. These Terms and Conditions are set forth in printed inserts that are included in the packaging with every AT&T GoPhone and are posted on AT&T's website. The Terms and Conditions and language on the GoPhone packaging constitute a valid binding contract.

AT&T asserts that Defendants have violated the Terms and Conditions by, *inter alia*, purchasing AT&T GoPhones with the intent that such phones will not be activated and used on AT&T's service, but instead with the intent to improperly unlock, repackage, and resell the phones, and by otherwise using the GoPhones.

As a result of Defendants' alleged involvement in the Bulk Resale Venture, AT&T asserted claims for breach of contract; federal trademark infringement and false advertising under 15 U.S.C. § 1125(a)(1)(A) and (B); unfair competition under Florida common law; contributory trademark infringement; tortious interference with business relationships and prospective advantages; unfair competition, unconscionable acts or practices, and/or unfair or deceptive acts or practices in violation of section 501.204, Florida Statutes; civil conspiracy; unjust enrichment; and conspiracy to induce breach of contract. As to Defendant Leon, AT&T does not allege intentional acts.

Based on the respective positions advocated by the parties and having reviewed the Complaint and file and being otherwise duly and fully advised in the premises, it is hereby

-2-

**ORDERED**, **ADJUDGED** and **DECREED** that:

1.     This Court has jurisdiction over all the parties and all of the claims set forth in AT&T's complaint.

2.     The Court finds that AT&T has the right to use and enforce said rights in the stylized AT&T and GOPHONE marks, which are used in connection with telecommunications products and services, as depicted below:



AT&T uses the AT&T Marks on and in connection with its telecommunications products and services. The AT&T and GOPHONE marks are valid, distinctive, protectable, famous, have acquired secondary meaning, and are associated exclusively with AT&T.

3.     The Court finds that Defendants' involvement in the Bulk Resale Venture constitutes breach of contract; federal trademark infringement under 15 U.S.C. § 1125(a)(1)(A) and (B); unfair competition under Florida common law; contributory trademark infringement; tortious interference with business relationships and prospective advantages; unfair competition, unconscionable acts or practices, and/or unfair or deceptive acts or practices in violation of section 501.204, Florida Statutes; civil conspiracy; unjust enrichment; and conspiracy to induce breach of contract.

4.     The Court finds that the Terms and Conditions and the language on the GoPhone packaging constitute a valid binding contract enforceable against Defendants. The Court finds that (a) facilitating others to use GoPhones in conjunction with service providers other than AT&T,

-3-

and (b) tampering with or altering, or facilitating or assisting others to tamper with or alter, GoPhones or the GoPhones' software constitute independent breaches of contract for which AT&T is entitled to relief.

5. The Court further finds that Defendants' participation in the Bulk Resale Venture has caused substantial and irreparable harm to AT&T for which there is no adequate remedy at law, and will continue to cause substantial and irreparable harm to AT&T unless enjoined.

6. On review and consideration of all relevant factors, AT&T is entitled to damages and injunctive relief on the claims as set forth in the Complaint.

7. Final judgment is hereby entered, jointly and severally, against Defendants Miranda Holdings Corp., a Florida corporation, d/b/a Incomtel, Jeremy Lara, individually and d/b/a Incomtel, Home Secrets Corp., and Josue Leon and in favor of the Plaintiffs AT&T Mobility LLC and AT&T Mobility II LLC, on all claims as set forth in AT&T's complaint in the principal amount of FIVE MILLION DOLLARS AND ZERO CENTS ($5,000,000.00), which shall bear interest at the legal rate, for which let execution issue forthwith. Judgment against Josue Leon does not include a finding of intent or malice and does not include any claim for an intentional tort.

8. If, after the Judgment is satisfied, it is discovered that the parties to this action have violated the terms of this Permanent Injunction, the Court will order the payment of compensatory damages to AT&T in the amount of FIVE THOUSAND DOLLARS AND ZERO CENTS ($5,000.00) for each AT&T handset that a Defendant is found to have purchased, sold or unlocked in violation of the Injunction. The Court finds that these amounts are compensatory and reasonable estimations of the minimum damages suffered by AT&T for such a breach and will serve to compensate AT&T for its losses in the event a Defendant violates the terms of this

-4-

Permanent Injunction after the monetary portion set forth in paragraph 6 of this Final Judgment has been satisfied.

   9.     Miranda Holdings Corp. d/b/a Incomtel, Jeremy Lara, individually and d/b/a Incomtel, Home Secrets Corp., and Josue Leon, and each and all of his, her and its past and present respective officers, directors, successors, assigns, parents, subsidiaries, affiliates, related companies, predecessors-in-interest, agents, employees, heirs, personal representatives, beneficiaries, relatives, and all other persons or entities acting or purporting to act for him/her/it or on his/her/its behalf, including but not limited to any corporation, partnership, proprietorship or entity of any type that is in any way affiliated or associated with any Defendant or any Defendant's representatives, agents, assigns, parent entities, employees, independent contractors, associates, servants, affiliated entities, and any and all persons and entities in active concert and participation with any Defendant who receive notice of this Order, shall be and hereby are PERMANENTLY ENJOINED from:

   a.   purchasing and/or selling any wireless mobile phone that they know or should know bears any AT&T or GoPhone Trademark, any other trademark owned or used by AT&T.  Specifically, unless expressly authorized by AT&T in writing, Defendants are enjoined from purchasing and/or selling, directly or indirectly, all models of GoPhones currently offered for sale by AT&T or that may be offered for sale in the future, as listed and updated from time to time on AT&T's website: http://www.att.com, regardless of whether such devices are in or out of their original packaging, or whether "locked," "unlocked," or otherwise modified in any

-5-

way by any person except for Phones that were legitimately purchased at an AT&T or manufacturer auction.

b. unlocking of any GoPhone;

c. accessing, altering, erasing, tampering with, deleting or otherwise disabling the software contained in any GoPhone;

d. facilitating or in any way assisting other persons or entities who Defendants know or should know are engaged in unlocking GoPhones and/or hacking, altering, erasing, tampering with, deleting or otherwise disabling the software installed in GoPhones;

e. facilitating or in any way assisting other persons or entities who Defendants know or should know are engaged in any of the acts prohibited under this Permanent Injunction, including, without limitation, the buying and/or selling of unlocked GoPhones; and

f. knowingly using the AT&T or GoPhone Marks or any mark owned or used by AT&T, or that is likely to cause confusion with AT&T's marks, without AT&T's prior written authorization.

10. The address of Defendant Miranda Holdings Corp., a Florida corporation, d/b/a Incomtel is 10900 NW 21st Street, Suite 170, Miami, Florida 33172.

11. The address of Defendant Jeremy Lara, individually and d/b/a Incomtel is 10900 NW 21st Street, Suite 170, Miami, Florida 33172.

12. The address of Defendant Home Secrets Corporation, a Florida corporation, is 7962 N.W. 116th Street, Miami, Florida 33178.

-6-

13.     The address of Defendant Josue Leon is 7962 NW 16th Street, Miami, FL 33178.

14.     The address of Plaintiffs AT&T Mobility LLC and AT&T Mobility II LLC is 5565 Glenridge Connector, Suite 1700, Atlanta, GA  30342.

15.     The Court retains jurisdiction over this matter and the parties to this action in order to enforce any violation of the terms of this Permanent Injunction by a finding of contempt and an order for payment of compensatory damages to AT&T in accordance with paragraph 7 of this Judgment.

16.     The prevailing party in any proceeding to enforce compliance with the terms of this Permanent Injunction shall be entitled to an award of its attorneys' fees and costs.

17.     This case is now CLOSED.  All pending motions are DENIED as moot.


DONE AND ORDERED in Chambers at Miami, Florida, this 9th day of July, 2008.


_____
FEDERICO A. MORENO
UNITED STATES DISTRICT JUDGE


Copies provided to:

Counsel of Record

-7-

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

TRACFONE WIRELESS, INC., a Delaware  :
Corporation,

         Plaintiff,  :

     -against-  :

KAMLASH RANI a/k/a Rani Kamlash,  :
individually; RAJNI RANI, individually;
PARVEEN K. KUNDRA, individually; DK  :
WIRELESS INC., a New York Corporation,
d/b/a Wireless Touch and Talk 2 Me;  :
ADVANTAGE WIRELESS, INC., a New York  :
Corporation; MOHINDER SINGH,
individually; FRIENDLY CELLULAR, INC., a
New York Corporation; IA
COMMUNICATION, INC., a New York
Corporation; AJAY MEHTA, individually;
VINNY PATEL, individually; JOHN DOES 1-
50; and XYZ COMPANIES 1-50,

         Defendants.

**FILED**
IN CLERK'S OFFICE
U S DISTRICT COURT E.D.N.Y
★    FEB 1 1 2009    ★

P.M.
TIME A.M.

**INDEX NO. 1:08-CV-00707-DLI-RLM**

## AMENDED FINAL JUDGMENT AND PERMANENT
## INJUNCTION AGAINST DEFENDANTS MOHINDER SINGH,
## KAMLASH RANI, RAJNI RANI AND FRIENDLY CELLULAR, INC.

Plaintiff, TracFone Wireless, Inc. ("TracFone"), brought the above-captioned lawsuit

against Defendants Mohinder Singh, individually ("Singh"), Kamlash Rani, individually, Rajni

Rani, individually, and Friendly Cellular, Inc. ("Friendly"), (collectively "Defendants") alleging

that Defendants are engaged in an unlawful enterprise involving the acquisition, sale and

alteration of large quantities of TracFone and TracFone's NET10 branded prepaid wireless

telephones ("TracFone/NET10 Prepaid Phones" or "Phones") purchased from various retail

outlets such as Wal-Mart, Target and Sam's Club, the solicitation and payment of others to bulk

purchase TracFone/NET10 Prepaid Phones for Defendants' benefit, computer hacking and

erasing or otherwise disabling the prepaid software ("TracFone/NET10 Prepaid Software") installed in the Phones essential for consumers to access TracFone's prepaid wireless network, or reselling the Phones to others who disable the software, and ultimately selling the altered Phones as new under TracFone's trademarks for the unauthorized use outside of the TracFone prepaid wireless system for profit (the "Bulk Resale Scheme").

As a result of Defendants' alleged involvement in the Bulk Resale Scheme, TracFone asserted claims against the Defendants for federal trademark infringement under 15 U.S.C. § 1114; federal unfair competition under 15 U.S.C. § 1125(a); contributory trademark infringement; copyright infringement under Title 17 of the United States Code; circumvention of technological measures that control access to copyrighted software and trafficking in services that circumvent technological measures protecting copyrighted software under 17 U.S.C. § 1201, *et. seq.* as a violation of the Digital Millennium Copyright Act ("DMCA"); breach of contract; tortious interference with prospective contractual relationships; common law unfair competition; dilution of TracFone's trademarks under N.Y. Gen. Bus. Law § 360-l; unjust enrichment; and deceptive trade practices under N.Y. Gen. Bus. Law § 349. Accordingly, it is hereby,

### ORDERED, ADJUDGED and DECREED that:

1. This Court has jurisdiction over all the parties and all of the claims set forth in TracFone's complaint.

2. The Court finds that TracFone owns all right, title, and interest in and to Incontestable United States Trademark Registration No. 2,114,692, issued November 18, 1997, for TracFone and Incontestable United States Trademark Registration No. 2,71,017, issued September 9, 2003, for TracFone (the "TracFone Trademarks"). The TracFone Trademarks are valid, incontestable, distinctive, protectable, famous, have acquired secondary meaning and are

associated exclusively with TracFone. TracFone also holds a valid copyright on the TracFone Prepaid Software.

3.      The Court finds that the Defendant's alleged involvement in the Bulk Resale Scheme, if proven, constitutes federal trademark infringement under 15 U.S.C. § 1114; federal unfair competition under 15 U.S.C. § 1125(a); contributory trademark infringement; copyright infringement under Title 17 of the United States Code; circumvention of technological measures that control access to copyrighted software and trafficking in services that circumvent technological measures protecting copyrighted software under 17 U.S.C. § 1201, *et. seq.* as a violation of the DMCA; breach of contract; tortious interference with prospective contractual relationships; common law unfair competition; dilution of TracFone's trademarks under N.Y. Gen. Bus. Law § 360-1; unjust enrichment; and deceptive trade practices under N.Y. Gen. Bus. Law § 349.

4.      The Court further finds that Defendants' alleged participation in the Bulk Resale Scheme, if proven, has caused substantial and irreparable harm to TracFone, and will continue to cause substantial and irreparable harm to TracFone unless enjoined.

5.      TracFone is entitled to injunctive relief and damages on the claims set forth in the Amended Complaint.

6.      On November 27, 2006, the Librarian of Congress, upon the recommendation of the Register of Copyrights, issued a Final Rule setting forth six (6) classes of copyrighted works that are exempt from the provisions of the DMCA, including:

> Computer programs in the form of firmware that enable wireless telephone handsets to connect to a wireless telephone communication network, when circumvention is accomplished for the sole purpose of lawfully connecting to a wireless telephone communication network.

71 Fed. Reg. 68472 (Nov. 27, 2006) (amending 37 C.F.R. § 201.40(b)). The Court finds that this new exemption does not absolve the Defendant of liability for his violations of the DMCA as alleged in TracFone's complaint, because Defendants' conduct as alleged in this case does not come within the scope of the new exemption. Defendants' purchase and resale of the TracFone handsets was for the purpose of reselling those handsets for a profit, and not "for the sole purpose of lawfully connecting to a wireless telephone communication network." Because the exemption does not apply to the conduct alleged in this case, there is no need for the Court to address the validity of the exemption or the circumstances surrounding its enactment.

7.      Final judgment is hereby entered against Defendants Mohinder Singh, individually ("Singh"), Kamlash Rani, individually, Rajni Rani, individually, and Friendly Cellular, Inc. ("Friendly"), (collectively "Defendants"), and in favor of the Plaintiff, TracFone Wireless, Inc., on all of the claims set forth in TracFone's complaint. Final judgment is hereby entered against Defendants Singh, individually, Kamlash Rani, individually, and Friendly, and in favor of the Plaintiff, TracFone Wireless, Inc., in the principal amount of FIVE MILLION DOLLARS AND ZERO CENTS ($5,000,000.00), which shall bear interest at the legal rate, for which let execution issue forthwith.

8.      Defendants and each and all of their representatives, agents, employees, independent contractors, relatives, associates, servants and any and all persons and entities in active concert and participation with them who receive notice of this order shall be and hereby are PERMANENTLY ENJOINED from:

a. purchasing and/or selling any wireless mobile phone that they know or should know bears any TracFone Trademark, any other trademark owned or used by TracFone, or any other model of wireless mobile phone sold or marketed by

TracFone ("TracFone/NET10 Handsets"). Specifically, Defendants are enjoined from purchasing and/or selling all models of TracFone/NET10 Handsets currently offered for sale by TracFone, or that may be offered for sale in the future, as listed and updated from time to time on TracFone's and NET10's websites, http://tracfone.com/activation_pick_brand.jsp and www.net10.com, including without limitation the following TracFone/NET10 handsets:

| | | |
|---|---|---|
| Motorola W370 | Nokia 2126 | LG 3280 |
| Motorola C261 | Nokia 2126i | LG CG225 |
| Motorola C139 | Nokia 2600 | LG 1500 |
| Motorola V176 | Nokia 1100 | |
| Motorola V170 | Nokia 1112 | |
| Motorola V171 | Nokia 1600 | |
| Motorola C155 | Nokia 2285 | |
| Motorola C343 | | |

b. reflashing and/or unlocking of any TracFone/NET10 Handset;

c. accessing, altering, erasing, tampering with, deleting or otherwise disabling TracFone's proprietary prepaid cellular software contained within any and all models of TracFone/NET10 Handsets;

d. facilitating or in any way assisting other persons or entities who Defendant knows or should know are engaged in reflashing and/or unlocking TracFone/NET10 Handsets and/or hacking, altering, erasing, tampering with, deleting or otherwise disabling the software installed in TracFone/NET10 Handsets;

e. facilitating or in any way assisting other persons or entities who Defendant knows or should know are engaged in any of the acts prohibited under this permanent injunction including, without limitation, the buying and/or selling of unlocked TracFone/NET10 Handsets; and

    f.   knowingly using the TracFone Trademarks or any other trademark owned or used by TracFone, or that is likely to cause confusion with TracFone's Trademarks, without TracFone's prior written authorization.

9.    The last known address of Defendant Mohinder Singh is 4 Crescent Street, Hicksville, New York 11426.

10.    The last known address of Defendant Kamlash Rani is 4 Crescent Street, Hicksville, New York 11426.

11.    The last known address of Defendant Rajni Rani is 4 Crescent Street, Hicksville, New York 11426.

12.    The last known address of Defendant Friendly Cellular, Inc. is 4 Crescent Street, Hicksville, New York 11426.

13.    The address of Plaintiff, TracFone Wireless, Inc. is 9700 N.W. 112th Avenue, Miami, Florida 33178.

14.    The Court retains jurisdiction over this matter and the parties to this action in order to punish any violation of the terms of this Permanent Injunction by a finding of contempt and a payment of damages to TracFone Wireless, Inc. in an amount of $5,000 for each TracFone/NET10 Handset that Defendant is found to have purchased, sold, or unlocked in violation of this injunction, or $1,000,000.00, whichever is greater.

15.    The prevailing party in any proceeding to enforce compliance with the terms of this Permanent Injunction shall be entitled to an award of its attorneys' fees and costs.

16.    This case remains pending against the other defendants named in TracFone's pleadings. The Court finds that there is no just reason for delay of the entry of judgment against Defendants Mohinder Singh, individually, Kamlash Rani, individually, Rajni Rani, individually

and Friendly Cellular, Inc., and therefore directs the Clerk to enter Judgment as set forth herein.

*See* Fed. R. Civ. P. 54(b).

**DONE AND ORDERED** in Brooklyn, New York, this ___ day of _____, 200__.

_____
THE HONORABLE DORA L. IRIZARRY
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel and pro se litigants of record.

*Pursuant to the Court's order of February 4, 2009, amended judgment is hereby entered as described above.*

*S/RCH* *,Clerk*

*By S/TV*
*Chief Deputy 2/11/09*



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. 06-20011-CIV-ALTONAGA/Turnoff

------------------------------------------------------x
NOKIA CORPORATION,                    :
a Finnish corporation,                :
                                      :
                     *Plaintiff*,     :
                                      :
          v.                          :
                                      :
SOL WIRELESS GROUP, INC.,             :
a Florida corporation, CARLOS PINO,   :
an individual,  and JORGE ROMERO,     :
an individual,                        :
                                      :
                     *Defendants*.    :
------------------------------------------------------x

## FINAL JUDGMENT AND PERMANENT INJUNCTION

Plaintiff Nokia Corporation ("Nokia"), filed a Complaint on January 4, 2006 asserting

that Defendants Sol Wireless Group, Inc., Carlos Pino, and Jorge Romero (collectively "the

Sol Wireless Defendants") are purchasing NOKIA 1100 and 2600 TracFone prepaid wireless

telephones from retail stores such as Wal-Mart, Target or Sam's Club, hacking into and

erasing or disabling the TracFone proprietary prepaid software that enables consumers to

access TracFone's prepaid wireless service, and then reselling the wireless telephones as new

for use on other wireless carriers' networks/systems and, in some cases, re-packaging the

phones in packaging bearing the NOKIA trademark that is intended for use solely in the

Latin American market.  Based on that conduct, the Complaint asserts claims against the Sol

Wireless Defendants for federal trademark infringement and unfair competition under the

Trademark Act of 1946, as amended, 15 U.S.C. § 1051, *et seq.*, injury to business reputation

and dilution of mark under Fla. Stat. § 495.151 *et seq.*, and unfair competition and deceptive

trade practices under Fla. Stat. § 501.204 *et seq.* Together with the filing of the Complaint, on January 4, 2006, Nokia filed a motion for preliminary injunction and expedited discovery with supporting declarations and exhibits and accompanying memoranda of law. The Sol Wireless Defendants have denied the allegations of Nokia's Complaint. The Court having considered the Complaint, declaration and exhibits, memoranda of law, and further evidence submitted therewith, it is hereby:

**ORDERED, ADJUDGED, and DECREED** that:

1.   This Court has jurisdiction over all the parties and all of the claims for trademark counterfeiting, trademark infringement, false designation of origin, and trademark dilution under the Trademark Act of 1946, as amended, 15 U.S.C. § 1051, *et seq.*; and the related causes of action under the common law and statutory law of the State of Florida, namely, Fla. Stat. § 495.151 *et seq.*, and Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.204 *et seq.*, asserted in the above action.

2.   Plaintiff owns all right, title, and interest in and to the trademark NOKIA, including U.S. Trademark Registration Nos. 2,676,153 and No. 1,570,492 for the mark NOKIA, among other registrations.

3.   Defendants and any of their representatives, subsidiaries, related or affiliated entities, agents, servants, and employees, and any and all persons and entities in active concert and participation with them who receive notice of this order by personal service or otherwise, shall be and hereby are permanently enjoined from:

        i.   engaging in the alteration or unlocking of any new wireless mobile phone manufactured by Nokia ("Nokia phone");

2

ii.     facilitating or in any way assisting other persons or entities that the Sol

Wireless Defendants knew or should have known were engaged in

altering or unlocking any new Nokia wireless phone;

iii.    using the trademark NOKIA, or any other mark that is likely to cause

confusion therewith, without authorization;

iv.     misrepresenting the nature or quality of any Nokia products offered,

marketed, or sold by the Sol Wireless Defendants;

v.      selling used and/or reconditioned Nokia mobile phones that do not

comply with the legal parameters set forth in *Prestonettes, Inc. v. Coty*,

264 U.S. 359 (1924) and its progeny, to wit: the packaging and/or

labeling for the used and/or reconditioned phones must clearly state (1)

that the trademarked product has been re-packed; (2) that the re-packer

is wholly separate and distinct from the original manufacturers; (3) the

name of the re-packer; and (4) that the label not emphasize the original

manufacturer's trademark.  Sol Wireless shall be deemed to have

complied with this section (v) by affixing to each used and/or

reconditioned phone and the packaging in which they are sold and/or

shipped a label that contains the following language:

> "*This package contains used/re-conditioned phones that have been re-packaged by Sol Wireless, Inc. who is not affiliated with the manufacturer or authorized by the manufacturer to resell these phones. No manufacturers' warranties of any kind are provided with any of the phones contained herein.*"

3

      vi.    misrepresenting any used products as new or in any way infringing on Nokia's trademarks or misrepresenting that Nokia warrants the used and/or re-conditioned phones.

    4.    This Court hereby retains jurisdiction over this matter and the parties to this action in order to punish any violations of the terms of this Final Judgment and Permanent Injunction by a finding of contempt and a payment of damages to Nokia in an amount of not less than $5,000.00 for each wireless phone that the Sol Wireless Defendants are found to have purchased, sold, or unlocked in violation of this injunction.

    5.    The prevailing party in any proceeding to enforce compliance with the terms of this Final Judgment and Permanent Injunction shall be entitled to an award of its attorneys' fees and costs incurred thereby.

    **DONE AND ORDERED** in chambers at Miami, Florida, this _____ day of _____, 2006.

                                             **HON. CECILIA M. ALTONAGA**
                                            **United States District Judge**

4

# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| VIRGIN MOBILE USA, LLC, } | |
| } | |
| *Plaintiff,* } | |
| } | |
| v. } | CIVIL ACTION NO. H-06-2444 |
| } | |
| WORLD MMP INC., conducting business as } | |
| UNICOMM WIRELESS, MUHAMMAD } | |
| "Mubi" MUBASHIR, ABDUL QADIR } | |
| PAREKH, and ABDUL WAHAB MOOSA, } | |
| } | |
| *Defendants.* } | |

## **MEMORANDUM OPINION AND ORDER OF CONTEMPT**

The issue before the court is whether Defendants should be held in civil contempt for violating the Court's August 10, 2006, Order of Final Judgment and Agreed Permanent Injunction ("Permanent Injunction Order") (Doc. 22).  For the reasons set out below,[1] the court finds the clear and convincing evidence shows Defendants acted in direct violation of the Permanent Injunction Order.  The court, therefore, holds all Defendants in civil contempt.

I.          Background and Relevant Facts

In early 2006, Plaintiff Virgin Mobile USA, LLC ("Virgin Mobile") discovered numerous third parties engaging in the unlawful sale of its cellular phone handsets.  The basic scheme involved purchasing Virgin Mobile handsets in bulk at a preferential price, disabling certain security features, reselling the handsets at retail value or higher, and then pocketing the difference.  During the course of its investigation, Virgin Mobile learned that Defendants World MMP Inc., conducting business as Unicomm Wireless, Muhammad "Mubi" Mubashir, Abdul Quadir Parekh, and Abdul Wahab Moosa (collectively, "Defendants" or "Unicomm") were engaged in the same scheme involving Virgin Mobile's Kyocera K10 Royale handsets. Virgin

---

[1] Pursuant to Fed. R. Civ. P. 52(a), this memorandum opinion and order constitutes the court's findings of fact and conclusions of law.

-1-

EXHIBIT G

Mobile filed suit seeking injunctive relief and damages.  Within weeks of the suit's initiation, the parties agreed to a permanent injunction  barring Defendants from dealing in Virgin Mobile products.  Accordingly, the court issued its order of permanent injunction, enjoining Defendants

> from purchasing, offering to purchase, reselling, *offering to resell*, shipping, and tampering with the software, of or inducing or soliciting any other person or entity to purchase, offer to purchase, resell, *offer to resell*, ship, and tamper with the software, of any Virgin Mobile wireless handset, including without limitation the Kyocera K10 wireless handset.

Permanent Injunction Order (Doc. 22) (emphasis added).  The permanent injunction constituted the final judgment in this action, and the court expressly retained jurisdiction to enforce the injunction.  *Id*.

Subsequently, Virgin Mobile enlisted the aid of expert fraud investigators to discover additional bulk schemes and to monitor compliance with this and other relevant permanent injunctions.[2]  The fraud team posted online advertisements that purported to seek purchase of the (unlawfully) sold handsets.  On December 7, 2006, a Virgin Mobile fraud analyst posted an ad entitled "WTB[3] Kyocera New."  The  ad included the message, "Buying Kyocera New Stock," with instructions  to call or e-mail regarding the "inventory available."  *See* Pl. Hr'g. Ex. 1.  The very same day, Defendant Abdul Quadir Parekh ("Parekh"), operating as Unicomm Wireless, contacted the agent about the ad.  Parekh claimed to "[h]ave in stock 300 pcs[4] [in] bulk packaging [for] $29.00" and inquired into the buyer's interest in "other phones."  Pl. Hr'g. Ex. 2. Using the pseudonym "Daniel Mergan," the fraud investigator replied to Parekh's email to determine the model for sale.  *See* Pl. Hr'g. Ex. 3.  Apologizing for forgetting the "main thing,"

---

[2] There have been a myriad of permanent injunctions issued across the United States relating to other parties engaged in similar conduct  *See, e.g, Virgin Mobile USA, LLC v. SNS Comm'cns*, No. 06-Civ-5060 (S.D. N. Y.); *Virgin Mobile USA v. EMYC USA, Corp*., No. 06-21787-CIV-DLF (S.D. Fla); *Virgin Mobile USA, LLC v. Solarcomm Wireless*, No. CV-06-1861 (D. Ariz.); *Virgin Mobile USA, LLC v. Iser*, No 06-cv0434 (N.D. Okla.); *Virgin Mobile USA, LLC v. Houston Teklink Inc.*, NO. 06-cv-02766 (S.D. Tex.); *Virgin Mobile USA, LLC v. Trade Vision, Inc.*, No. H-06-cv-2960 (S.D. Tex.); *Virgin Mobile USA, LLC v. Thirwani*, Civ. A. No. 2:06-cv-2504 (D. Ariz.); *Virgin Mobile, LLC v. Chapman*, Civ. A. No. 2:06-cv-2664 (D. Ariz.); *Virgin Mobile USA, LLC v. Freelance Marketing, Inc.*, No. 3:06-cv-0217 (S.D. Ohio); *Virgin Mobile USA, LLC v. TXT Technology, Inc.*, No. 06-7485 (C.D. Cal.); and *Virgin Mobile USA, LLC v. Van Loc Dealer, et al.*, No.06-1039 (W.D. Wash).

[3] "WTB" is apparently the accepted parlance for "want to buy."

[4] Pieces

–2–

Parekh wrote back and declared the inventory was "K9 Virgin Mobile Oyester [sic]." Pl. Hr'g Ex. 4. The investigator feigned interest and asked if the price could be negotiated to $28.00. Pl. Hr'g. Ex. 5. Parekh replied that he could "do $28.00" but was "sold out" of that particular Virgin Mobile model; however, he claimed that 200-300 more were arriving the following week. Pl. Hr'g Ex. 6. The investigator and Parekh exchanged several more emails before the "deal" was terminated and the ruse revealed.

Plaintiff immediately requested entry of an order to show cause why Defendants should not be held in contempt (Doc. 23) for violating the Permanent Injunction Order. On January 23, 2007, a show cause hearing was held and evidence heard on the matter. Defendants did not and could not dispute the exchange of emails; however, Muhammad "Mubi" Mubashir ("Mubi"), Abdul Wahab Moosa ("Moosa"), and Parekh each testified in turn to clarify the situation. Mubi, former president of Unicomm claimed he had sold his shares on September 24, 2006, and was no longer affiliated with the company. Moosa, current president of Unicomm, testified unequivocally that Unicomm had not purchased or sold any Virgin Mobile product. Moreover, he claimed the "simple explanation" for the emails is that they constituted a sales technique to "lure" the customer in and offer "other products." He dismissed Parekh's emails as "mere puffing" and not a true "offer to sell" any Virgin Mobile products. Parekh corroborated Moosa's testimony. Parekh explained he did not "offer to sell" any Virgin Mobile products because Unicomm no longer carried such products. Because he never intended to actually sell any Virgin Mobile products, he believed that no "offer to sell" had been made. According to his testimony, Parekh just "wanted to give the impression of legitimacy" and to "probe" the buyer's interest.

Plaintiff argues that the Permanent Injunction Order prohibited "offering to resell" any Virgin Mobile product without limitation or qualification. As such, Defendants are in direct violation of a court order and subject to civil contempt. The court agrees.

II.      Legal Standard on Civil Contempt

– 3 –

A party moving for civil contempt must demonstrate by clear and convincing evidence: (1) that a valid court order was in effect; (2) that the order required certain conduct by the respondent; and (3) that the respondent failed to comply with the court's order. *F.D.I.C. v. LeGrand*, 43 F.3d 163, 170 (5th Cir. 1995) (citing *Martin v. Trinity Indus., Inc.*, 959 F.2d 45, 47 (5th Cir. 1992)); *see also Piggly Wiggly Clarksville, Inc. v. Mrs. Baird's Bakeries*, 177 F.3d 380, 382 (5th Cir. 1999). In the civil contempt context, clear and convincing evidence requires proof "so clear, direct, weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts of the case." *United States v. Cornerstone Wealth Corp.*, No. 3:98-cv-0601-D, 2006 U.S. Dist. LEXIS 8294, at *5-6 (N.D. Tex. March 3, 2006) (quoting *Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995).

III.     <u>Analysis</u>

Under the "clear, direct, weighty and convincing" evidence, the Defendants have acted in direct contradiction of the court's order. Even crediting Defendants' testimony concerning Unicomm not having purchased, tampered, or resold any Virgin Mobile handset since the permanent injunction, the totality of the evidence indicates Parekh's exchange with the undercover agent constituted an "offer of sale." Parekh initiated the contact. He declared the inventory was "K9 Virgin Mobile Oyester [sic]," and he negotiated a price ($28.00). Moreover, Parekh and Moosa's arguments to the contrary are unpersuasive. Parekh's intent, whether to probe the buyer's interest or to fraudulently misrepresent, is not determinative. A finding of contempt is not predicated on the willfulness of the contemnor's actions. *See Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 581 (5th Cir. 2000). Rather, the court must examine whether the contemnor actually failed to comply with the court's order. *Id.* When Parekh, of his own volition, initiated contact with a potential buyer and offered to sell "new Kyocera" in bulk, he and Unicomm were directly violating the Permanent Injunction Order.

Mubi claims he is no longer associated with Unicomm and should not be liable for the violation of the court's order. Mubi testified that he had resigned as CEO and sold his one-third interest in Unicomm for about $40,000 or $50,000 on September 24, 2006. Payment was due

–4–

in installments, but Mubi received all the checks (postdated the 15th and the 30th of every month) in September. Therefore, asserts Mubi, his ties with Unicomm were broken well before any violation. The court does not agree. By his own admission, Mubi deposited the last postdated check on December 30, 2006, proving the existence of a financial link between himself and Unicomm past the December 7th violation. Unicomm's own website continues to list Mubi as "Management," and other selling websites provide similar information. *See* Pl. Hr'g. Exs. 12 and 13. The link between Mubi and Unicomm is not as tenuous as Mubi alleges. Moreover, the court doubts the December 7th violation was an isolated incident. The evidence supports a finding Parekh's "sales technique" was common at Unicomm. This fact implies that violations of the court's order occurred numerous times between August 10th and December 7th, while Mubi was still president of Unicomm. Like Parekh and Moose, Mubi has failed to provide an adequate defense to the direct violations of the Permanent Injunction Order.

IV.        Conclusion

         Accordingly, it is hereby

         **ORDERED** that all Defendants are held in contempt of the Court's Order of Final Judgment and Agreed Permanent Injunction (Doc. 22);

         **ORDERED** that Defendants comply with the Court's Order of Final Judgment and Agreed Permanent Injunction (Doc. 22);

         **ORDERED** that Defendants provide a complete accounting of net profits, if any, derived from the sell of Virgin Mobile handsets since the entry of permanent injunction on August 10, 2006. This accounting will be made no later than 20 days following entry of this order of contempt;

         **ORDERED** that Defendants deliver to Plaintiff all Virgin Mobile handsets in Defendants' possession. Delivery of the Virgin Mobile handsets, if any, will occur no later than 10 days following entry of this order of contempt;

         **ORDERED** that Defendants pay the direct, out-of-pocket costs, including attorney's fees, associated with Plaintiff's efforts to enforce the permanent injunction. Plaintiff

– 5 –

will file an itemized list of its costs within 10 days following entry of this order. These costs will be taxed against Defendants upon final approval by the court; It is further

        **ORDERED** that the parties shall withdraw from the Clerk the evidence and shall maintain it for purposes of appeal.

        **SIGNED** at Houston, Texas, this 29th day of January, 2007.


                                _____
                                     MELINDA HARMON
                        UNITED STATES DISTRICT JUDGE

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| VIRGIN MOBILE USA, LLC, | } | |
| | } | |
| *Plaintiff*, | } | |
| v. | } | Civil Case No. 4:06-cv-2444 |
| | } | |
| WORLD MMP INC., conducting business as | } | |
| UNICOMM WIRELESS, MUHAMMAD | } | |
| "Mubi" MUBASHIR, ABDUL QADIR | } | |
| PAREKH, and ABDUL WAHAB MOOSA, | } | |
| | } | |
| *Defendants*. | } | |

## **ORDER**

This Court has reviewed the United States' Application to Hold Muhammad "Mubi" Mubashir in Criminal Contempt of Court (Doc. 52) and finds that reasonable cause exists for believing Muhammad "Mubi" Mubashir is guilty of criminal contempt of court, in violation of Title 18, United States Code, Section 401(3). Accordingly, it is hereby

ORDERED that Muhammad "Mubi" Mubashir shall appear before this Court on the 7th day of December 2007, at 1:30 p.m., in Courtroom 9C, at the United States Courthouse located at 515 Rusk Avenue, Houston, Texas to show cause why he should not be held in criminal contempt. It is further

ORDERED that the jury trial on civil and criminal contempt was previously set for the 3rd day of January 2008, at 9:00 a.m., in Courtroom 9C, at the United States Courthouse located at 515 Rusk Avenue, Houston, Texas. This date shall remain in effect until this Court orders otherwise.

SIGNED at Houston, Texas, this 26th day of November, 2007.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE

1 / 1

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

IN RE                §
                   §     **CASE NO. H-06-2444**
**MUHAMMAD "MUBI" MUBASHIR**    §

## UNITED STATES' APPLICATION TO HOLD
## MUHAMMAD "MUBI" MUBASHIR IN CRIMINAL CONTEMPT OF COURT

The United States of America, through Donald J. DeGabrielle, Jr., United States Attorney for the Southern District of Texas, applies to the court, pursuant to the provisions of Rule 42(b) of the federal Rules of Criminal Procedure, to find MUHAMMAD "MUBI" MUBASHIR in criminal contempt of court, in violation of Title 18, United States Code, Section 401(3), for the following reasons:

1.       On July 24, 2006 a complaint was filed in the United States District Court for the Southern District of Texas by Virgin Mobile USA, LLC (Virgin Mobile), against World MMP, Inc., Muhammad Mubi Mubashir (Mubashir), Abdul Qadir Parekh, and Abdul Wahab Moosa. The case was assigned to United States District Judge Melinda Harmon under this case number. The complaint essentially alleged that the defendants were acquiring, for unauthorized, non-personal use, significant quantities of Virgin Mobile wireless handsets sold through retail stores at prices below their cost for the benefit of Virgin Mobile's customers. The complaint then alleged that the defendants would resell the handsets, which bear the Virgin Mobile logo, in bulk to customers both in the United States and abroad. As part of this scheme, copyrighted locking software that is installed in each handset to limit its use to Virgin Mobile service- which enables Virgin Mobile to offer the handsets at substantially lower prices than it would otherwise be able to offer, is hacked into and modified, erased, or otherwise altered so that the handsets will operate on wireless services other

than Virgin Mobile's, in contravention of the terms governing the handsets purchase, and in violation of the Digital Millenium Copyright Act, 17 U.S.C. Section 1201, et. seq.

2.    On August 10, 2006 a Final Judgment and Agreed Permanent Injunction was entered in the case.  The court ordered that the defendants, including MUBASHIR, were permanently enjoined from purchasing, offering to purchase, reselling, offering to resell, shipping, and tampering with the software, or of inducing or soliciting any other person or entity to purchase, offer to purchase, resell, offer to resell, ship, and tamper with the software of any Virgin Mobile wireless handset, including without limitation the Kyocera K10 wireless handset.

3.    On January 29, 2007, after a hearing, the court held the defendants in contempt of the court's previously entered Final Judgement and Agreed Permanent Injunction.  The defendant was present with counsel at the hearing.  Specifically, the court found that the defendants, operating as Unicomm Wireless, posted online advertisements seeking to purchase Virgin Mobile handsets in violation of the court's orders.  The court further found that the defendants violated the order and injunction by offering to sell the handsets to an undercover investigator that feigned interest in the defendants' offers.

4.     On the afternoon of May 9, 2007, SA Overholt and CBP Officer Edward DeGout examined a shipment at Eagle Global Logistics (EGL) being exported by AMERICAS WIRELESS (MUBASHIR) to Yeng Fung Trading Company in Hong Kong. Examination revealed that the shipment contained forty-six (46) Virgin Mobile cellular phones, Nokia model 2115i. The phones displayed the Virgin Mobile name and logo. The shipment was placed on hold.

5.     On May 10, 2007, SA Overholt, TFO Robertson, CBP Officers DeGout and Mark Moralez picked up the shipment containing Virgin Mobile phones from EGL and transported them

2

to the CBP Air Cargo Office for inventory. Inventory of the shipment and review of the documents revealed forty-six Nokia 2115i (Virgin Mobile) cellular phones were purchased on 4-1-07 by AMERICAS WIRELESS (MUBASHIR) from Marivel YACOUB, 10503 Elderpond, San Antonio, TX 78254, telephone 210-771-2912 for $35.00 each for a total of $1,610.00. Other cellular phones were purchased on the same invoice for a grand total of $38,218.00.

6.      On June 7, 2007, MUBASHIR contacted SA Overholt in reference to the shipment detained on May 10, 2007. SA Overholt and MUBASHIR went over the invoices he provided for the shipment. SA Overholt went down the list of phone models from Invoice #279, dated April 11, 2007. SA Overholt asked MUBASHIR who the providers were for each phone model, which he provided. When it came to the NK 2115, MUBASHIR advised that the carrier was Metro PCS and Virgin Mobile. SA Overholt advised MUBASHIR that the Nokia website identifies Virgin Mobile as the exclusive carrier for the NK2115. MUBASHIR was advised that the possession or distribution of Virgin Mobile phones is in violation of the court order obtained by Virgin Mobile. MUBASHIR advised that it was a mistake that those 46 Virgin Mobile phones were in the shipment. SA Overholt asked MUBASHIR where he obtained the phones and he advised that he purchased them from Marivel YACOUB in San Antonio and that YACOUB brought the shipment to his residence. MUBASHIR requested that SA Overholt only seize the 46 Virgin Mobile phones out of the shipment of 4,000 so that he could forward the remaining phones to Hong Kong. SA Overholt advised MUBASHIR that he would be notified when the shipment is seized.

7.      On June 28, 2007, SA Overholt and ACTF Officer Robertson interviewed MUBASHIR and Muhammad FURKAN at AMERICAS WIRELESS' new location, 12763 Capricorn Drive, Suite 700, Sugar Land, Texas 77477. AMERICAS WIRELESS was not identified

3

on the front of the building. Officers drove around the building and observed the overhead door open for Suite 700. Two unidentified men were seen working in the warehouse, which contained numerous boxes. Officers entered the warehouse and requested to speak to MUBASHIR or FURKAN. One of the unidentified men entered the office area and returned with FURKAN. FURKAN escorted officers to a room he described as his and MUBASHIR'S office. FURKAN contacted MUBASHIR via cellular telephone at his residence. MUBASHIR advised that he would be at the office in approximately 15 minutes.

8.      While waiting for MUBASHIR, officers spoke with FURKAN about the initial shipment containing 1654 Virgin Mobile handsets that were seized by CBP Officer Taylor on July 20, 2006. FURKAN advised that several runners purchase the phones and sell them to him. FURKAN accessed his laptop computer to provide information on the runners, whom he has previously and currently conducts business with on a regular basis. FURKAN was asked if he had any unlocking devices that he could show officers. FURKAN replied that they do not have any, because they don't do that anymore.

9.      When MUBASHIR entered the office, FURKAN closed his laptop. MUBASHIR advised officers that FURKAN had nothing to do with unlocking the phones from the first seized shipment and that it was done at UNICOMM. MUBASHIR was asked how long it would take to unlock a phone. He stated that it would take 3 to 5 minutes to re-flash a normal phone and 15 to 20 minutes for a Blackberry. MUBASHIR advised that they never re-flashed phones at home or at the Regency Square office location. The re-flashing occurred at the Parkersburg location (UNICOMM).

10.     MUBASHIR was asked to explain how the unlocking devices work on handsets. MUBASHIR directed FURKAN to get the unlocking device. FURKAN retrieved a black device off

4

of the top of his desk that was covered by documents. The device was a cable, approximately 12 inches long and split off into a Y at one end. The label on the device identified SKYSTAR. MUBASHIR advised that they are only in the process of unlocking Cingular phones. FURKAN left the office and returned moments later with a flip phone that he identified as a Cingular phone. FURKAN turned the phone on, connected the cable to the phone and stated, "it's done". FURKAN advised that the new technology unlocks the phones automatically. Officers asked to photograph the unlocking device, but MUBASHIR replied "no".

11.    Officers discussed the recent shipment of handsets being exported to Hong Kong. MUBASHIR advised that the phones were delivered to his residence at 15706 Springfield Drive, Sugar Land, TX 77478. MUBASHIR stated that he orders specific phones and that the vendors sometimes bring others he didn't order. The latest shipment, which included the Virgin Mobile phones, was ordered from the ICE STATION/PLO WIRELESS in San Antonio. The owners were identified as Shiraz and Marivel YACOUB. YACOUB delivered the phones to MUBASHIR'S brother, Iqbal Jever MUDASIR. MUBASHIR advised that all of the phones were supposed to be new, not used. MUBASHIR advised YACOUB that he did not want the Virgin Mobile phones and stated that YACOUB dropped them off at his house and then came by the office to collect a check.

12.    While talking to officers about the current shipment, MUBASHIR accessed his computer and printed a letter that he sent to PLO Wireless, 10503 Elderpond, San Antonio, TX 78254. The letter is advising PLO that AMERICAS WIRELESS has checked the phones and batteries that they delivered to them and that the quality was not as good as expected. MUBASHIR advised that he agreed to buy brand new phones and that AMERICAS WIRELESS has stopped payment on check #2249 issued on 6/15/07 in the amount of $7282.50.

5

13.     The invoice from YACOUB to AMERICAS WIRELESS, dated 4/1/2007, lists 46 Nokia 2115 at $35.00 each, for a total of $1,610.00. The invoice from AMERICAS WIRELESS to YEN FUNG TRADING COMPANY, dated 04/11/2007, identifies these phones as 46 NK 2115 at $42.00 each, for a total of $1,932.00.

14.     MUBASHIR stated he didn't want the phones and that he wasn't going to sell them. He stated that there were only 46 phones and that he would make enough money from the others to make up for the cost. MUBASHIR advised that he intended to discard the phones, but FURKAN packed the shipment and included them without his knowledge. FURKAN advised that he had to pack the shipment in a hurry because the EGL driver was en-route to pick it up.

15.     On July 16, 2007, CBP Officer Taylor effected a seizure of 46 used Virgin Mobile cellular phones. Some of the phones were re-programmed for use on service providers other than Virgin Mobile.

16.     On July 27, 2007, MUBASHIR appeared at the ACTF office to pick up eleven (11) boxes of T-mobile and Verizon cellular phones and three (3) boxes of ear buds. These items were not seized, just detained for investigation.

17.     On September 18, 2007, a deposition was taken by Tracfone, in which MUBASHIR stated that AMERICAS WIRELESS owns one (1) desktop and two (2) laptop computers that are used to conduct daily business, such as accounting and invoicing.  Also at that deposition MUBASHIR admitted that he was responsible for sales at AMERICAS WIRELESS.

18.     The United States contends that Muhammad "Mubi" Mubashir should be held in criminal contempt of court pursuant to Title 18, United States Code, Section 401(3) because the shipment that he ordered to be sent to Yeng Fung Trading Company in Hong Kong, China on May

6

9, 2007 violated the court's order issued on August 10, 2006 by United States District Judge Melinda Harmon in H-06-CV-2444. Specifically, the United States submits that Mubashir violated the court's order by purchasing, selling, offering to resell, shipping and tampering with the 46 Virgin mobile cell phones that the defendant received from PLO Wireless in San Antonio, Texas. Finally, the United States contends that the defendant violated the provisions of Title 17, United States Code, Section 1201, et. seq., and Title 18, United States Code, Section 2, by attempting to ship modified or "reflashed" Virgin Mobile telephones to Hong Kong. Finally, since the conduct committed by the defendant that violated the court's order is contemptible and violates the criminal laws of the United States, the government contends that the defendant should be punished by the court for the contempt consistent with the penalty provisions of 17 U.S.C. 1201, et. seq., which provides for a range of punishment of not more than 5 years imprisonment and/or a fine not to exceed $500,000 or twice the amount of the gain/loss, followed by a term of supervised release of up to 3 years.

The United States respectfully requests that this court issue an order to MUBASHIR requiring him to personally appear, and that the United States Marshal for the Southern District of Texas be directed to bring MUBASHIR before this court to show cause why he should not be punished for criminal contempt, in violation of Title 18, United States Code, Section 401(3).

Respectfully submitted,

DONALD J. DeGABRIELLE, JR.
United States Attorney

_____

Jay Hileman
Assistant United States Attorney
(713)567-9391

7

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

IN RE                 §

                      §     **CASE NO. H-06-2444**

**MUHAMMAD "MUBI" MUBASHIR**     §

## ORDER TO APPEAR AND SHOW CAUSE

The court reviewed the United States' Application to Hold Muhammad "Mubi" Mubashir in Criminal Contempt and finds that reasonable cause exists for believing Mubashir is guilty of criminal contempt of court, in violation of Title 18, United States Code, Section 401(3).

It is ordered that Mubashir be brought before the court on _____ to show cause why he should not be held in criminal contempt.

Signed at Houston, Texas on _____, 2007.


                                _____

                                United States District Judge

AO 245B    (Rev. 08/05) Judgment in a Criminal Case *of Criminal Contempt of Court in a Civil Case*
           Sheet 1

# UNITED STATES DISTRICT COURT
## Southern District of Texas
### Holding Session in Houston

UNITED STATES OF AMERICA

**JUDGMENT IN A ~~CRIMINAL~~ CASE** *of Criminal Contempt of Court* — *CIVIL*

v.

## MUHAMMAD MUBASHIR
#### A/K/A Mubi

CASE NUMBER: **4:06CV02444-001**

USM NUMBER: 66745-179

☐ See Additional Aliases.

William M. Stradley
Defendant's Attorney

**THE DEFENDANT:**

☒ pleaded guilty to count(s)    1 on May 16, 2008.

☐ pleaded nolo contendere to count(s)
which was accepted by the court.

☐ was found guilty on count(s)
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| **Title & Section** | **Nature of Offense** | **Offense Ended** | **Count** |
|---|---|---|---|
| 18 U.S.C. § 401(3) | Criminal contempt | 05/09/2007 | 1 |

☐ See Additional Counts of Conviction.

The defendant is sentenced as provided in pages 2 through 6 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

October 31, 2008
Date of Imposition of Judgment

*Melinda Harmon* (signature)
Signature of Judge

**MELINDA HARMON**
**UNITED STATES DISTRICT JUDGE**
Name and Title of Judge

*November 7, 2008*
Date

MRO | GAW

AO 245B    (Rev. 08/05) Judgment in a Criminal Case
           Sheet 2 -- Imprisonment

DEFENDANT:   **MUHAMMAD MUBASHIR**
CASE NUMBER:   **4:06CV02444-001**

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of _____ 57 months.

This term consists of FIFTY-SEVEN (57) MONTHS as to Count 1.

☐  See Additional Imprisonment Terms.

☒  The court makes the following recommendations to the Bureau of Prisons:
     That the defendant be designated to a facility as close to Houston, Texas, as possible.

☐  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:
     ☐  at _____  ☐ a.m.  ☐ p.m.  on _____ .
     ☐  as notified by the United States Marshal.

☒  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:
     ☐  before 2 p.m. on _____ .
     ☒  as notified by the United States Marshal.
     ☐  as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

_____
_____
_____

Defendant delivered on _____ to _____

at _____, with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B     (Rev. 08/05) Judgment in a Criminal Case
           Sheet 3 -- Supervised Release

DEFENDANT:   **MUHAMMAD MUBASHIR**
CASE NUMBER:   **4:06CV02444-001**

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of:   <u>3 years.</u>
      This term consists of THREE (3) YEARS as to Count 1.

☐  See Additional Supervised Release Terms.

     The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court. *(for offenses committed on or after September 13, 1994)*

     ☐  The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future
         substance abuse. (Check, if applicable.)

☒  The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. (Check, if applicable.)

☒  The defendant shall cooperate in the collection of DNA as directed by the probation officer. (Check, if applicable.)

☐  The defendant shall register with the state sex offender registration agency in the state where the defendant resides, works,
     or is a student, as directed by the probation officer. (Check, if applicable.)

☐  The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)

     If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance
with the Schedule of Payments sheet of this judgment.

     The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions
on the attached page.

# STANDARD CONDITIONS OF SUPERVISION

☒  See Special Conditions of Supervision.

1)  the defendant shall not leave the judicial district without the permission of the court or probation officer;

2)  the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of
     each month;

3)  the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)  the defendant shall support his or her dependents and meet other family responsibilities;

5)  the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other
     acceptable reasons;

6)  the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7)  the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any
     controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8)  the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)  the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of
     a felony, unless granted permission to do so by the probation officer;

10)  the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any
      contraband observed in plain view of the probation officer;

11)  the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)  the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the
      permission of the court; and

13)  as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal
      record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the
      defendant's compliance with such notification requirement.

AO 245B    (Rev. 08/05) Judgment in a Criminal Case
           Sheet 3C -- Supervised Release

DEFENDANT:    **MUHAMMAD MUBASHIR**
CASE NUMBER:    **4:06CV02444-001**

# SPECIAL CONDITIONS OF SUPERVISION

If deported, the defendant is not to re-enter the United States illegally. If the defendant is deported during the period of probation or the supervised release term, supervision by the probation office becomes inactive. If the defendant returns, the defendant shall report to the nearest U.S. Probation Office immediately. Supervision by the probation officer reactivates automatically upon the defendant's reporting.

The defendant is prohibited from employment that has any relationship to cellular phones.

AO 245B     (Rev. 08/05) Judgment in a Criminal Case
Sheet 5 -- Criminal Monetary Penalties

Judgment -- Page 5 of 6

DEFENDANT: **MUHAMMAD MUBASHIR**
CASE NUMBER: **4:06CV02444-001**

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | **Assessment** | **Fine** | **Restitution** |
|---|---|---|---|
| **TOTALS** | $100 |  |  |

☐   See Additional Terms for Criminal Monetary Penalties.

☐   The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐   The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal payees must be paid before the United States is paid.

| **Name of Payee** | **Total Loss\*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
|  |  |  |  |

☐   See Additional Restitution Payees.

| **TOTALS** | $     0.00 | $     0.00 |
|---|---|---|

☐   Restitution amount ordered pursuant to plea agreement $ _____

☐   The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐   The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐   the interest requirement is waived for the ☐ fine    ☐ restitution.

    ☐   the interest requirement for the ☐ fine    ☐ restitution is modified as follows:

☐   Based on the Government's motion, the Court finds that reasonable efforts to collect the special assessment are not likely to be effective. Therefore, the assessment is hereby remitted.

\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B    (Rev. 08/05) Judgment in a Criminal Case
           Sheet 6 -- Schedule of Payments

DEFENDANT:    **MUHAMMAD MUBASHIR**
CASE NUMBER:   **4:06CV02444-001**

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties are due as follows:

A  ☒  Lump sum payment of $ ___100___ due immediately, balance due

      ☐  not later than _____ , or
      ☒  in accordance with  ☐ C,  ☐ D,  ☐  E, or  ☒  F below; or

B  ☐  Payment to begin immediately (may be combined with  ☐ C,      ☐ D, or  ☐ F below); or

C  ☐  Payment in equal _____ installments of $ _____ over a period of _____ , to commence _____ days
      after the date of this judgment; or

D  ☐  Payment in equal _____ installments of $ _____ over a period of _____ , to commence _____ days
      after release from imprisonment to a term of supervision; or

E  ☐  Payment during the term of supervised release will commence within _____ days after release from imprisonment. The court
      will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F  ☒  Special instructions regarding the payment of criminal monetary penalties:
      Make all payments payable to: U.S. District Clerk, Attn: Finance, P.O. Box 61010, Houston, TX 77208.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

**Case Number**
**Defendant and Co-Defendant Names**                                                            **Joint and Several**      **Corresponding Payee,**
**(including defendant number)**              **Total Amount**              **Amount**           **if appropriate**

☐  See Additional Defendants and Co-Defendants Held Joint and Several.

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

☐  See Additional Forfeited Property.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 8, 2009

Charles R. Fulbruge III
Clerk

———————

No. 08-20731
Summary Calendar

———————

VIRGIN MOBILE USA, L.L.C.

Plaintiff

v.

MUHAMMAD MUBI MUBASHIR

Defendant-Appellant

v.

UNITED STATES OF AMERICA

Appellee

———————

Appeal from the United States District Court for the
Southern District of Texas, Houston
(4:06-CV-24440

———————

Before WIENER, STEWART, and CLEMENT, Circuit Judges..

PER CURIAM:[*]

Defendant-Appellant Muhammad Mubi Mubashir appeals his sentence
imposed after being found guilty of criminal contempt of court in an underlying
civil lawsuit, pursuant to 18 U.S.C. § 401(3).   Mubashir contends that the

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

No. 08-20731

sentencing court misapplied the guidelines by (1) committing a procedural error in the application of relevant conduct based on the Presentence Investigation Report, and (2) applying the guideline applicable to the closest "analogous offense" rather than relating back to the charge of criminal contempt.

We have reviewed all the applicable law and facts as revealed by the record on appeal and the briefs of the parties, and are convinced that the district court committed no reversible error. The judgment of the district court is, in all regards,

AFFIRMED.

# EXHIBIT H

8/13/2014    FBI — Mustafa Family Crime Ring Indicted for Using Thousands of Stolen Identities to Steal Cellular Telephones and Tablet Devices Worth Millions of D…

Case 3:16-cv-00008-DMS-KSC   Document 1   Filed 01/14/16   Page 218 of 275





*Minneapolis Division*

Home • Minneapolis • Press Releases • 2014 • Mustafa Family Crime Ring Indicted for Using Thousands of Stolen Identities to Steal Cellular Telephones and Tablet…

## Mustafa Family Crime Ring Indicted for Using Thousands of Stolen Identities to Steal Cellular Telephones and Tablet Devices Worth Millions of Dollars

*Mustafa Family Trafficked Stolen Mobile Devices Throughout United States and Overseas*

| U.S. Attorney's Office | District of Minnesota |
|---|---|
| August 12, 2014 | (612) 664-5600 |

United States Attorney Andrew M. Luger today announced the indictment of 20 members of the Mustafa Family (The Organization), a Twin Cities-based criminal organization, for trafficking stolen and fraudulently obtained mobile telephones and tablets. The Organization, led by JAMAL TALAL MUSTAFA, a/k/a "Jimmy," primarily obtained devices by robbery, burglary, identity theft, and contract-fraud schemes. JAMAL MUSTAFA, KANAN M T MUSTAFA, a/k/a "Kenny," NASER MOHAMAD MUSTAFA, a/k/a "Nasty Nas," EDWAN T MUSTAFA, a/k/a "Eddy," NIZER M MUSTAFA, a/k/a "Shaggy," a/k/a "Mike," BILAL MUHAMMED MUSTAFA, a/k/a "Billy," TALAL M MUSTAFA, a/k/a "Tommy," MOISES NAVARRO CAZALES, AHMED RD SUNOQROT, a/k/a "Abu Shanab," CEDRIC CHAPPELL, DEANTRE RICKEY-RENE SQUALLS, BLANYON TOE DAVIES, VICTOR TOMBEKAI DOE, YOLANDA COOMBS, CASWANA MILES, MARCUS PHILLIP COLEMAN, ROBERT RICHARD COLEMAN, DANIELLE YVONNE COLEMAN, MARQUIS TERELL MAGGIESFIELD, a/k/a "Kenny," and TIARA LIGON, are each charged in U.S. District Court with Conspiracy to Engage in Interstate Transportation of Stolen Goods.

"Identity theft rings are the modern face of organized crime," said U.S. Attorney Luger. "Identity thieves often use fraudulent identities to obtain goods, which they can sell for cash. These defendants are charged with obtaining stolen cell phones through identity theft and fraud, and then selling them for exorbitant profits. It is only through close collaboration and cooperation between each of the law enforcement agencies involved in this case that we are able to stand here today having taken out one of the largest criminal enterprises in the Twin Cities."

St. Paul Police Department Assistant Chief Bill Martinez said: "We want our communities to understand that this isn't just about someone simply swiping the phones we hold in our hands. These are not petty crimes. Those thefts and robberies filtered into other crimes."

United States Secret Service Special Agent in Charge Louis Stephens said: "Today is a very good day for the people of Minnesota. A significant organized crime network is no longer at work. Today's success is the result of the close and collaborative working relationships between local, state and federal law enforcement agencies, and federal prosecutors. When we combine our resources, leverage our various areas of expertise, and work as one, we make big things happen and significant crime is stopped in its tracks."

Minnesota Bureau of Criminal Apprehension Superintendent Wade Setter said: "Today's indictments in this complicated case are truly the product of investigative partnerships. The Minnesota Financial Crimes Task Force worked this case along with the U.S. Secret Service and the St. Paul Police Department in a multi-jurisdictional approach necessary to investigate this type of crime."

University of Minnesota Assistant Vice President and Chief of Police Gregory S. Hestness said: "Last fall a wave of robberies targeted University of Minnesota students and their cell phones in campus area neighborhoods. Officers of the University of Minnesota Police Department worked literally thousands of hours in robbery suppression, and we saw results. However, without addressing the underlying criminal enterprise creating a market for these phones, we were not doing everything possible to protect our students. UMPD was honored to contribute to this critical major investigation. Today's successes are remarkable, but also emblematic of the strong partnership of Minnesota law enforcement at the local, state, and federal levels."

According to the indictment and documents filed in court, from at least 2006 through 2014, JAMAL MUSTAFA directed the Organization to use stolen identity information to obtain cellular telephones and other mobile devices for the purpose of trafficking them throughout the United States and internationally. JAMAL MUSTAFA, KANAN MUSTAFA, NASER MUSTAFA, EDWAN MUSTAFA, NIZER MUSTAFA, BILAL MUSTAFA, TALAL MUSTAFA, and MOISES NAVARRO-CAZALES, owned and operated 13 mobile device stores in the Twin Cities

Minneapolis Division Links

Minneapolis Home

Contact Us
- Overview
- Territory/Jurisdiction

News and Outreach
- Press Room | Stories
- In Your Community

About Us
- Our People & Capabilities
- What We Investigate
- Our Partnerships
- Minneapolis History

Wanted by the FBI - Minneapolis

FBI Jobs

EXHIBIT H

metropolitan area. The Organization used these storefronts to buy devices that they knew had been illegally obtained, including purchasing thousands of cellular phones from runners and other persons who got the phones through robberies, burglaries, shoplifting, and fraud and identity-theft schemes.

With the assistance of AHMED SUNOQROT, the Organization moved inventory and money between their stores, which the Organization used as fronts to funnel the illicit proceeds of their criminal activity.

According to the indictment, the Organization paid runners who stole mobile devices or obtained them fraudulently by other means. CEDRIC CHAPPELL, DEANTRE-RICKEY-RENE SQUALLS, BLANYON TOE DAVIES, VICTOR TOMBEKAI DOE, YOLANDA COOMBS, CASWANA MILES, TIARA LIGON, MARQUIS TERELL MAGGIESFIELD, MARCUS PHILLIP COLEMAN, ROBERT RICHARD COLEMAN, and DANIELLE YVONNE COLEMAN, were each paid by the Mustafas to steal or fraudulently obtain mobile devices by contract or subscription fraud. They targeted stores like Best Buy, WalMart, Verizon outlets, T-Mobile stores, and online Apple stores.

As charged, various members of the Mustafa Family provided stolen or fraudulent identity information to the runners, including names, dates of birth, social security numbers, credit card numbers, passport information, and driver's license numbers of victims. Some of the runners operated solely within Minnesota, while others travelled to Arizona, Idaho, North Dakota, Iowa, Wisconsin, Illinois, and Utah to obtain devices. The Organization arranged out-of-state travel for the runners and paid their expenses. One runner was arrested in Utah in 2013 with more than 80 counterfeit identification documents and genuine victim-information documents. This runner used those documents to open lines of credit at various retail outlets to make fraudulent device purchases.

The runners were instructed by the Mustafas to obtain phones by contract-fraud and subscription-fraud schemes. In such schemes, runners used real stolen identities to obtain cell phone contracts. At times, the runners obtained "family plans" or "business accounts." In so doing, runners were sold phones at deeply discounted prices by the legitimate retailers. The full retail price of an iPhone 5s in the United States is approximately $648. Under a two-year contract, the same phone is sold for approximately $200. Runners then opened accounts entitling them to obtain as few as one discounted phone, and as many as 30. The runners then shipped or delivered the phones back to the Mustafas, via one of the thirteen Twin Cities storefronts, or shipped the phones to wholesalers in other states for sale overseas. A new iPhone 5s retails for between $1,000 and $1,200 overseas.

Other runners engaged in street-level violence or burglary to obtain phones. The Sunrise Group, a burglary ring that traveled throughout the Upper Midwest for the purpose of breaking into WalMart stores to steal cell phones, iPads, and other electronic devices, provided electronic devices to the Mustafa Family on several occasions. The Mustafa Family made requests of the Sunrise Group for large quantities of new phones, and would act as a fence for the stolen merchandise.

Assistant U.S. Attorney Karen Schommer, Chief of the Major Crimes Section; Assistant U.S. Attorney Steven Schleicher, Chief of the Special Prosecution Section; and Assistant U.S. Attorney John Marti are handling the prosecution of this case.

U.S. Attorney Luger thanked the St. Paul Police Department, United States Secret Service, University of Minnesota Police Department, Minnesota Department of Public Safety and Bureau of Criminal Apprehension, Minnesota Financial Crimes Task Force, United States Postal Inspection Service, Internal Revenue Service Criminal Investigations, Homeland Security Investigations, Edina Police Department, Minneapolis Police Department, Plymouth Police Department, Federal Bureau of Investigation, and the United States Marshal's Service for their assistance in the investigation.

Defendant Information:

- JAMAL TALAL MUSTAFA, a/k/a "Jimmy," D.O.B. 6/17/1972 Apple Valley, MN Charges: Conspiracy to Engage in Interstate Transportation of Stolen Goods, 1 count
- KANAN M T MUSTAFA, a/k/a "Kenny," D.O.B. 6/16/1977 Rosemount, MN Charges: Conspiracy to Engage in Interstate Transportation of Stolen Goods, 1 count
- NASER MOHAMAD MUSTAFA, a/k/a "Nasty Nas," D.O.B. 1/6/1991 Rosemount, MN Charges: Conspiracy to Engage in Interstate Transportation of Stolen Goods, 1 count
- EDWAN T MUSTAFA, a/k/a "Eddy," D.O.B. 11/14/1974 Apple Valley, MN Charges: Conspiracy to Engage in Interstate Transportation of Stolen Goods, 1 count
- NIZER M MUSTAFA, a/k/a "Shaggy," a/k/a "Mike," D.O.B. 8/27/1978 Savage, MN Charges: Conspiracy to Engage in Interstate Transportation of Stolen Goods, 1 count
- BILAL MUHAMMED MUSTAFA, a/k/a "Billy," D.O.B. 6/25/1984 Minneapolis, MN Charges: Conspiracy to Engage in Interstate Transportation of Stolen Goods, 1 count
- TALAL M MUSTAFA, a/k/a "Tommy," D.O.B. 4/19/1971 Burnsville, MN Charges: Conspiracy to Engage in Interstate Transportation of Stolen Goods, 1 count
- MOISES NAVARRO CAZALES, D.O.B. 11/15/1992 Bloomington, MN Charges: Conspiracy to Engage in Interstate Transportation of Stolen Goods, 1 count
- AHMED RD SUNOQROT, a/k/a "Abu Shanab," D.O.B. 6/2/1955 St. Paul, MN Charges: Conspiracy to Engage in Interstate Transportation of Stolen Goods, 1 count
- CEDRIC CHAPPELL, D.O.B. 2/17/1971 Minneapolis, MN Charges: Conspiracy to Engage

8/13/2014    FBI — Mustafa Family Crime Ring Indicted for Using Thousands of Stolen Identities to Steal Cellular Telephones and Tens of Millions of D…

Case 0:16-cr-00093-DWF-KMM   Document 1   Filed 01/14/16   Page 220 of 275

in Interstate Transportation of Stolen Goods, 1 count

- DEANTRE RICKEY-RENE SQUALLS, D.O.B. 9/6/1990 Brooklyn Center, MN Charges: Conspiracy to Engage in Interstate Transportation of Stolen Goods, 1 count
- BLANYON TOE DAVIES, D.O.B. 8/8/1993 Unknown Charges: Conspiracy to Engage in Interstate Transportation of Stolen Goods, 1 count
- VICTOR TOMBEKAI DOE, D.O.B. 2/1/1991 Unknown Charges: Conspiracy to Engage in Interstate Transportation of Stolen Goods, 1 count
- YOLANDA COOMBS, D.O.B. 2/23/1987 Oakdale, MN Charges: Conspiracy to Engage in Interstate Transportation of Stolen Goods, 1 count
- CASWANA MILES, D.O.B. 8/10/1988 Unknown Charges: Conspiracy to Engage in Interstate Transportation of Stolen Goods, 1 count
- MARCUS PHILLIP COLEMAN, D.O.B. 11/5/1991 St. Paul, MN Charges: Conspiracy to Engage in Interstate Transportation of Stolen Goods, 1 count
- ROBERT RICHARD COLEMAN, D.O.B. 5/3/1984 St. Paul, MN Charges: Conspiracy to Engage in Interstate Transportation of Stolen Goods, 1 count
- DANIELLE YVONNE COLEMAN, D.O.B. 12/1/1985 St. Paul, MN Charges: Conspiracy to Engage in Interstate Transportation of Stolen Goods, 1 count
- MARQUIS TERELL MAGGIESFIELD, a/k/a "Kenny," D.O.B. 5/9/1986 Unknown Charges: Conspiracy to Engage in Interstate Transportation of Stolen Goods, 1 count
- TIARA LIGON, D.O.B. Unknown St. Paul, MN Charges: Conspiracy to Engage in Interstate Transportation of Stolen Goods, 1 count

This content has been reproduced from its original source.

Accessibility | eRulemaking | Freedom of Information Act | Legal Notices | Legal Policies and Disclaimers | Links | Privacy Policy | USA.gov | White House
FBI.gov is an official site of the U.S. government, U.S. Department of Justice

Close

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>1. JAMAL TALAL MUSTAFA,<br>   a/k/a "Jimmy",<br>2. KANAN T. MUSTAFA,<br>   a/k/a "Kenny",<br>3. NASER MOHAMAD MUSTAFA,<br>   a/k/a "Nasty Nas",<br>4. EDWAN T. MUSTAFA,<br>   a/k/a "Eddy",<br>5. NIZER M. MUSTAFA,<br>   a/k/a "Shaggy",<br>   a/k/a "Mike",<br>6. BILAL MUHAMMED MUSTAFA,<br>   a/k/a "Billy",<br>7. TALAL M. MUSTAFA,<br>   a/k/a "Tommy",<br>8. MOISES NAVARRO-CAZALES,<br>   a/k/a "Moises Navarro",<br>9. AHMED RD SUNOQROT,<br>   a/k/a "Abu Hasan",<br>10. CEDERIC CHAPPELL,<br>11. DEANTRE RICKEY-RENE SQUALLS,<br>12. BLANYON TOE DAVIES,<br>13. VICTOR TOMBEKAI DOE,<br>14. YOLANDA COOMBS,<br>15. CASWANA MILES,<br>16. TIARA LIGON,<br>17. MARQUIS TERELL MAGGIESFIELD,<br>   a/k/a "Kenny",<br>18. MARCUS PHILLIP COLEMAN,<br>19. ROBERT RICHARD COLEMAN, and<br>20. DANIELLE YVONNE COLEMAN,<br><br>Defendants. | CR 14-261 JRT/JSM<br><br><br><br><br><br>**INDICTMENT**<br><br>18 U.S.C. § 371<br>18 U.S.C. § 981(a)(1)(C)<br>18 U.S.C. § 2314<br>21 U.S.C. § 853(p)<br>28 U.S.C. § 2461(c) |

SCANNED
AUG 1 1 2014
U.S. DISTRICT COURT MPLS

United States v. Jamal Mustafa, et al.

THE UNITED STATES GRAND JURY CHARGES THAT:

## COUNT 1
(Conspiracy to Engage in Interstate Transportation of Stolen Goods)

At all times relevant to this Indictment:

### THE DEFENDANTS AND THEIR ROLES

1.      Defendants **JAMAL MUSTAFA, KANAN MUSTAFA, NASER MUSTAFA, EDWAN MUSTAFA, NIZAR MUSTAFA, BILAL MUSTAFA, TALAL MUSTAFA, MOISES NAVARRO-CAZALES** and others (hereinafter the "Mustafa Organization"), owned and operated mobile device stores ("Wireless Stores") in the Twin Cities metropolitan area. The Mustafa Organization regularly transferred inventory and equipment and co-mingled proceeds between their Wireless Stores. The Mustafa Organization conducted criminal activity, including trafficking stolen and fraudulently obtained wireless cellular telephones and tablets (hereinafter "devices"), through and using their Wireless Stores.

2.      Defendant **AHMED SUNOQROT** was an associate of the Mustafa Organization who assisted the organization in its criminal activity by, among other things, trafficking in stolen and fraudulently obtained devices and engaging in financial transactions with proceeds of illegal activity.

3.      Defendants **CEDRIC CHAPPELL, DEANTRE-RICKEY-RENE SQUALLS, BLANYON TOE DAVIES, VICTOR TOMBEKAI DOE, YOLANDA COOMBS, CASWANA MILES, TIARA LIGON, MARQUIS TERELL**

2

**MAGGIEFIELD, MARCUS PHILLIP COLEMAN, ROBERT RICHARD COLEMAN,** and **DANIELLE YVONNE COLEMAN,** (hereinafter "Runners,") acquired devices using theft and fraud, and then provided the devices to the Mustafa Organization for their eventual resale.

**THE CONSPIRACY**

4.    From in or about 2006 and continuing through in or about 2014, in the State and District of Minnesota and elsewhere, the defendants,

**JAMAL TALAL MUSTAFA,**
a/k/a "Jimmy",
**KANAN T. MUSTAFA,**
a/k/a "Kenny",
**NASER MOHAMAD MUSTAFA,**
a/k/a "Nasty Nas",
**EDWAN T. MUSTAFA,**
a/k/a "Eddy",
**NIZER M. MUSTAFA,**
a/k/a "Shaggy",
a/k/a "Mike",
**BILAL MUHAMMED MUSTAFA,**
a/k/a "Billy",
**TALAL M. MUSTAFA,**
a/k/a "Tommy",
**MOISES NAVARRO-CAZALES,**
a/k/a "Moises Navarro",
**AHMED RD SUNOQROT,**
a/k/a "Abu Hasan",
**CEDERIC CHAPPELL,**
**DEANTRE RICKEY-RENE SQUALLS,**
**BLANYON TOE DAVIES,**
**VICTOR TOMBEKAI DOE,**
**YOLANDA COOMBS,**
**CASWANA MILES,**
**TIARA LIGON,**
**MARQUIS TERELL MAGGIESFIELD,**
a/k/a "Kenny",
**MARCUS PHILLIP COLEMAN,**

3

**ROBERT RICHARD COLEMAN, and**
**DANIELLE YVONNE COLEMAN,**

knowingly and willfully conspired and agreed with each other and with other persons both known and unknown to the grand jury to commit an offense against the United States, that is, to knowingly and intentionally transport and transfer in interstate commerce, goods, wares, and merchandise of the value of $5000.00 or more, knowing the same to have been stolen, converted, and taken by fraud in violation of Title 18, United States Code, Section 2314.

## PURPOSE OF THE CONSPIRACY

5.     The purpose of the criminal agreement was to obtain stolen and fraudulently obtained devices in Minnesota and other states, and to sell and transport those devices to buyers for exorbitant profits.

## MANNER AND MEANS OF THE CONSPIRACY

6.     Members of the Mustafa Organization would purchase goods that they knew had been illegally obtained by the seller, including by purchasing thousands of cellular phones from the Runners and other persons who obtained the phones through and during robberies, burglaries, shoplifting, and fraud and identity theft schemes.

7.     Members of the Mustafa Organization would recruit and pay the Runners and other persons to travel in Minnesota and other states to steal and

fraudulently obtain cellular telephones using stolen personal identity information and false and fraudulent identification documents.

8.    At times members of the Mustafa Organization would provide the Runners with stolen identity information, and transport and arrange transportation for the Runners to retail stores to obtain cellular telephones through theft and through false and fraudulent statements and representations.

9.    Members of the Mustafa Organization would sell the stolen and fraudulently obtained cellular phones to persons located in Minnesota and other states for substantial profits.

10.    Members of the Mustafa Organization would distribute the funds among themselves using jointly accessed bank accounts, or by bartering and exchanging other goods or services.

### OVERT ACTS IN FURTHERANCE OF THE CONSPIRACY

11.    In furtherance of the conspiracy and to effect the objects of the conspiracy, the following overt acts, among others, were committed in the District of Minnesota and elsewhere:

a. From in or about 2006 through in or about 2014, defendants **JAMAL MUSTAFA, KANAN MUSTAFA, NASER MUSTAFA, EDWAN MUSTAFA, NIZAR MUSTAFA, BILAL MUSTAFA, and**

5

TALAL MUSTAFA operated approximately thirteen wireless stores in the Twin Cities area.

b. From in or about 2006 through in or about 2014, defendants **JAMAL MUSTAFA** and **KANAN MUSTAFA** repeatedly provided Runners and other persons with stolen personal identification information of other individuals and counterfeit identification documents to be used to obtain devices by means of contract fraud with telephone service providers.

c. From in or about 2006 through in or about 2013, defendants **JAMAL MUSTAFA** and **KANAN MUSTAFA** instructed Runners and other persons to travel to retail stores in Minnesota and other states, to obtain the devices, and then to mail those devices to a business for forwarding to locations outside Minnesota and the United States;

d. From in or about 2009 through in or about 2014, defendants **NASER MUSTAFA** and **EDWAN MUSTAFA** purchased stolen and fraudulently obtained devices and other electronics;

e. From in or about 2012 through in or about 2013, defendant **NIZAR MUSTAFA** obtained stolen devices by placing advance orders from a group of shoplifters which stole devices from retailers in Minnesota and other states;

f. From in or about 2012 through in or about 2013, the group of shoplifters delivered stolen devices across state lines to defendants

6

NIZAR MUSTAFA at the Mustafa Organization's Wireless Stores located in St. Paul, Minnesota;

g. In or about 2013, defendant **BILAL MUSTAFA** provided a Runner with stolen personal identification information of other individuals to be used to conduct fraudulent on-line purchases of iPhones from Apple and Best Buy;

h. From in or about 2006 through in or about 2014, defendant **TALAL MUSTAFA** received stolen devices from Runners;

i. From in or about 2006 through in or about 2014, defendants **MOISES NAVARRO-CAZALES** and **AHMED SUNOQROT** received and delivered devices they knew to have been stolen or obtained through fraud to other defendants and persons;

j. From in or about 2006 through in or about 2014, defendants **MOISES NAVARRO-CAZALES** and **AHMED SUNOQROT** made deposits of checks and currency into bank accounts under the control of members of the Mustafa Organization;

k. From in or about 2006 through in or about 2014, defendants **CEDRIC CHAPPELL, DEANTRE RICKEY-RENE SQUALLS, MARQUIS TERELL MAGGIEFIELD, MARCUS PHILLIP COLEMAN, ROBERT RICHARD COLEMAN,** and **DANIELLE YVONNE COLEMAN,** stole and fraudulently obtained devices for

7

and at the direction of the Mustafa Organization by using stolen personal identification information;

l. From in or about 2012 through in or about 2013, defendants **BLANYON TOE DAVIES** and **VICTOR TOMBEKAI DOE** obtained devices for the Mustafa Organization by burglarizing Verizon stores; and

m. From in or about 2012 through in or about 2013, defendants **YOLANDA COOMBS, CASWANA MILES** and **TIARA LIGON** stole devices for the Mustafa Organization by shoplifting from retailers in Minnesota and other states.

12. All in violation of Title 18, United States Code, Sections 371 and 2314.

## FORFEITURE ALLEGATIONS

13. Count 1 of this Indictment is hereby realleged and incorporated as if fully set forth herein by reference, for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

14. As the result of the offenses alleged in Count 1 of this Indictment, the defendants shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the violations of Title 18, United States Code, Sections 371 and 2314.

8

United States v. Jamal Mustafa, et al.

    15.    If any of the above-described forfeitable property is unavailable for forfeiture, the United States intends to seek the forfeiture of substitute property as provided for in Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

A TRUE BILL

_____    _____

UNITED STATES ATTORNEY       FOREPERSON

9



# StarTribune

## Feds bust worldwide smartphone theft ring based in Twin Cities

Article by: Paul McEnroe

Star Tribune

August 12, 2014 - 11:41 PM

A Twin Cities family directed thieves to steal tens of thousands of smartphones nationwide and then sold them to buyers in the black markets of the Middle East and China, federal authorities said Tuesday following the indictments of 20 people involved in the organized crime ring.

Authorities say that the "Mustafa Organization" used runners to fly across the country to steal phones outright or to buy them from retailers with false identities under bogus server contracts. The phones would then be resold overseas under the cover of the wireless phone stores the family owned, federal authorities say.

Authorities estimate that the family made upward of $4 million selling stolen phones over the past eight years. They say the profit on the resale of each stolen phone was $500 to $1,000. One defendant who cooperated with federal agents said that he had sold more than 9,000 stolen phones since 2006, most of them ending up in the hands of the Mustafa family crime ring, according to search warrant affidavits filed in federal court by a U.S. Secret - Service agent.

"Identity theft rings are the modern face of organized crime," said U.S. Attorney Andy Luger. "Identity thieves often use fraudulent identities to obtain goods, which they can sell for cash. These defendants are charged with obtaining stolen cellphones through identity theft and fraud, and then selling them for exorbitant profits.



U.S. Attorney Andrew Luger at the news conference at his office in Minneapolis where he announced the breakup of a mobile device theft ring based in the Twin Cities.

*Jeff Wheeler, Star Tribune*



U.S. Attorney Andrew Luger announced the indictment of 20 members of the Twin Cities-based Mustafa family, charged with organizing a cellphone and identity theft ring in several U.S. states and serving black markets in the Middle East and China.

*JEFF WHEELER • jeff.wheeler@startribune.com,*

"We are able to stand here today having taken out one of the largest criminal enterprises in the Twin Cities," Luger said. "We put everything we had into this."

Measures to fight thefts

Smartphone thefts have become so endemic nationwide that in the past year law enforcement has been pressuring manufacturers to help them thwart thieves who focus specifically on ripping off phones.

The Federal Communications Commission estimates that 40 percent of thefts in major U.S. cities now involve cellphones. Luger said that an estimated 3 million mobile devices were stolen in the United States last year. He issued a strong warning to consumers to "be on the lookout" for persons seeking personal information. "Don't give out any of your information to anyone you can't verify," Luger said.

Earlier this year, Minnesota became the first state to require smartphone manufacturers to include a "kill switch" that would allow users to disable their phones if lost or stolen. A similar bill is awaiting the signature of California Gov. Jerry Brown.

Providers banded together

To head off such measures, the nation's four major wireless providers — Verizon Wireless, AT&T, T-Mobile and Sprint — agreed to begin sharing a database of serial numbers tied to stolen phones. By the end of this year, a phone reported stolen will, theoretically, no longer function on any of the provider networks.

But that doesn't address the overseas black market because foreign wireless carriers are not participating in the anti-theft campaign. The current price for a new iPhone 5 in the Middle East is between $1,000 and $1,200, according to authorities. Domestically, the iPhone sells for about $648 retail, or less if the buyer signs a contract with a service provider.

At least seven of those indicted are members of the Mustafa family with ties to the ownership of 13 phone stores in the metro area. Eleven people indicted were reportedly hired as runners to steal the phones, and two associates were responsible for moving money from the operation, authorities say.

About 300 law enforcement personnel from various agencies were involved, including 100 U.S. Secret Service analysts and agents who came in from across the country to aid local law enforcement in a coordinated series of arrests that took place starting at 3 a.m. Tuesday. Arrests and searches were carried out in 23 different locations. Eighteen of the 20 people indicted are in custody pending a bond hearing, one is overseas and one remains a fugitive at large.

The Mustafa family members are Jamal, Kanan, Edwan, Talal, Bilal, Naser and Nizar, according to the affidavit. The family members own wireless stores in Minneapolis, St. Paul and Robbinsdale, records show. Authorities say that the family operates these stores, ostensibly as a single unit — transferring cellphone inventory and allegedly commingling illicit profits with legitimate sales.

Jamal Mustafa, who operates six cellular phone stores in the metro, is considered the patriarch of the family and the "apparent leader of the conspiracy," according to authorities. An unidentified co-defendant told law enforcement that Jamal Mustafa paid runners for their travel, provided stolen and counterfeit identification used to obtain phones by contract fraud.

When the defendant was arrested last year in Utah, he was carrying more than 80 counterfeit identification documents used to open lines of credit at various retail stores, according to the affidavit.

Scope began to grow

The runners, most of whom were kept isolated from the Mustafa leadership in order to ensure security, worked primarily in 10 states. After successfully buying a phone server contract using a fake identity, Luger said that the runners were able to obtain up to 30 phones under a single user account.

The stolen phones were then moved quickly into the family stores or to international shippers based in Texas, New York and Florida, federal agents said.

In May 2013, St. Paul police began investigating a group tied to stealing phones by theft, fraudulent identification and check schemes. Those officers, part of the Organized Retail Crimes Unit, soon realized the scope of the identification-phone fraud and began working with various state and federal law enforcement across Minnesota and Wisconsin, investigating a shoplifting ring — known as the "Sunrise Group" — that specifically targeted Wal-Mart stores. They found that the Sunrise Group got its name from the Mustafa family's stores, many of which are under the same name.

The investigation widened last fall when University of Minnesota campus police were confronted with more than two dozen reports on thieves who were bent on stealing cellphones, campus Chief of Police Greg Hestness said.

His officers soon hooked up to coordinate leads with other agencies — among them the Minnesota Bureau of Criminal Apprehension's Financial Crimes Task Force, the Internal Revenue Service and the FBI.

Paul McEnroe • 612-673-1745

© 2014 Star Tribune

State *of* California ≈ Department *of* Justice

# OFFICE *of the* ATTORNEY GENERAL

### KAMALA D. HARRIS

# Attorney General Kamala D. Harris Files Criminal Charges in $4 Million International Stolen Smart Phone Ring

Tuesday, March 12, 2013
Contact: (415) 703-5837

SACRAMENTO -- Attorney General Kamala D. Harris today announced the arraignment of two individuals who allegedly bought large numbers of stolen smartphones in California for resale in Hong Kong, raking in nearly $4 million in less than a year. The arraignment follows a six-month, multi-state investigation into the trafficking of stolen smart phones by the California Attorney General's eCrime Unit.

"This international theft ring used fraud and deceit to steal smartphones and exploit the homeless," said Attorney General Harris. "I applaud the hard work of our Special Agents whose tenacious investigation put an end to this criminal enterprise."

Defendants Shou Lin Wen, 39, of Sacramento, and Yuting Tan, 27, of Sacramento, were arrested on March 6 and arraigned today on eight felony counts of money laundering, grand theft, possession of stolen property and conspiracy. They are being held in Sacramento County Jail on $1 million bail each.

According to the arrest warrant, co-conspirators in the scheme enlisted individuals from homeless shelters to purchase multiple smart phones such as the Apple iPhone, Samsung Galaxy and Blackberry from cell phone carriers. Carriers allow individuals to purchase up to five phones in their name under one plan at a discounted rate. The straw purchasers then delivered the phones to the co-conspirators for a nominal payment. It is alleged that the straw purchasers never intended to follow through with paying for the phones' contracts which, under California law, constitutes committing theft by false pretenses and designates the phones as stolen property.

Hundreds of stolen phones were then bundled from across the country by middlemen and sent to Wen and Tan, the scheme's ringleaders, in California. Wen and Tan profited by shipping the stolen phones to Hong Kong, where iPhones can go for as much as $2,000.

Special Agents with the eCrime Unit conducted surveillance operations and tracked parcels across the country to identify the ringleaders. According to the arrest warrant, agents intercepted four of the 110 parcels shipped by Wen and Tan to Hong Kong during the past 12 months. The 412 phones seized from these packages were traced back to phony customers as far away as North Carolina.

During an eight-month period, the defendants' business self-reported gross sales of $3,948,485.

On March 6, Special Agents with the eCrime Unit conducted an undercover operation in the Sacramento West Marine parking lot, during which they offered to sell 408 "stolen" iPhone 4s and iPhone 5s to Wen and Tan. The defendants agreed to pay $60,600 in cash for 163 phones and were arrested after producing the cash.

In 2011, Attorney General Harris created the eCrime Unit to investigate and prosecute identity theft crimes, cyber crimes and other crimes involving the use of technology.

Photos, and the complaint are attached to the electronic version of this release at: http://oag.ca.gov/news

# # #

<< Back



# ACE Wholesale stores raided in Taylor and Troy

*Posted: Aug 21, 2012 12:51 PM EDT*
*Updated: Aug 21, 2012 10:24 PM EDT*

**By myFOXDetroit.com Staff**



SOUTHFIELD, Mich. (WJBK) - SWAT teams raid two local electronics stores. The agents were spotted Tuesday at ACE Wholesale in Taylor and Troy.



The company is known for buying and selling electronics in large volume.

Witnesses told us the feds actually backed the truck into the Taylor office and smashed through the windows.

The raids came as a complete shock to employees.

Homeland Security raids ACE Wholesale in Taylor (Credit: WJBK | myFOXDetroit.com)

Mike, an employee of ACE Wholesale, was asked whether he suspected something illegal might be going on.

"No. I had no idea at all, and I still don't think there is," he said. "I don't know what the basis of this raid is. I can't fathom why they're even here."

Offices in Atlanta and Chicago were also raided Tuesday.

Homeland Security is not commenting on why ACE Wholesale was targeted.

224

## The Detroit News

AUGUST 22, 2012

# Feds raid business in Taylor, Troy

Homeland Security says search part of criminal investigation

BY TOM GREENWOOD AND MIKE MARTINDALE  / THE DETROIT NEWS

*Taylor* — Agents from Homeland Security conducted raids on an electronics business in Taylor and Troy on Tuesday morning.

Khaalid Walls, a spokesman for U.S. Immigration and Customs Enforcement and Homeland Security, confirmed the raids by federal agents took place Tuesday. He would not elaborate on why they were carried out.

"This is part of an ongoing Homeland Security criminal investigation, and we have executed search warrants at two businesses in Troy and Taylor beginning about 8 a.m. (Tuesday)," he said. "No one has been arrested, and I cannot comment on what, if anything, has been taken out of any of the buildings."

Walls said all documents related to the search warrants have been sealed through the U.S. Attorney's Office.

In Taylor, authorities swooped in on Ace Wholesale Inc., on the 7800 block of Telegraph in Taylor, reportedly breaking windows and a front door during the search.

No one answered phone calls Tuesday afternoon at the Ace Wholesale location in the 100 block of East Big Beaver in Troy. Employees did not return messages left for comment.

Jason Floarea, who is listed as CEO of Ace Wholesale on the company's website, could not be reached for comment. A woman reached at a West Bloomfield Township address who identified herself as his wife refused to speak with a reporter.

Art Northrop, acting manager of Mattress World, next to the Ace location in Taylor, said he became aware of the raid when he heard some noises.

"Just after 9 a.m., I heard glass breaking, and I thought it might be a robbery so I called 911," he said. "Then I looked out the window and saw these militia-type guys out there and what looked like a big armored vehicle — some kind of a large carrier."

Northrop ventured outside and asked what was going on.

"All they said was they were conducting a raid and would be boarding up the store and cleaning up the area in the afternoon."

Northrop — who was temporarily filling in for another employee at the store — said he didn't know much about Ace.

"We're going to remain open, but I hope this doesn't affect business," Northrop said. "Today is 'Two for One Tuesday' here at Mattress World."

225



September 2, 2013



iTHEFT
INSIDE THE GLOBAL BLACK MARKET FOR STOLEN iPHONES

 Gerry Smith Gerald.Smith@huffingtonpost.com

# Inside The Massive Global Black Market For Smartphones

Posted: 07/13/2013 2:56 pm EDT  |  Updated: 07/22/2013 5:34 pm EDT

**Want More? Download Our New Weekly Magazine:**



*This article is part of a Huffington Post series exploring the global underground trade in stolen smartphones. Previous stories in the series can be found here.*

Before a federal SWAT team descended last summer, one storefront in a Detroit suburb attracted so many people bearing shopping bags stuffed with iPhones and iPads that managers installed a port-a-potty on the sidewalk.

Once inside, people deposited their electronic wares into a rotating drawer below a bulletproof glass window and waited for the cashier to deliver stacks of cash.

So much money changed hands in this fashion at the Ace Wholesale storefront in Taylor, Mich., that an armored truck arrived each morning to deliver fresh bundles of cash, according to an undercover investigator for the wireless company Sprint and an employee at the Mattress World outlet next door.

"It was like Fort Knox over there," said the Mattress World employee, who asked not to be named for fear of making enemies inside what police say was a locus of criminal activity.

Many of the mobile devices swapped for cash at Ace Wholesale had been stolen at gunpoint in an escalating wave of gadget-related robberies, police say. Ace Wholesale had become a key broker in the underground trade of stolen phones, a global enterprise that often connects violent street thieves in American cities with buyers as far away as Hong Kong, according to law enforcement and the wireless industry.

"These companies fence the stolen phones for them, no questions asked," said Jerry Deaven, an agent with the Department of Homeland Security, which is tasked with preventing the trafficking of stolen goods. "You can walk right into one of these storefronts and sell all the phones at once and walk out with $20,000."

Deaven told The Huffington Post that such traffickers are responsible for "a tremendous amount of phones being shipped out of the country," adding that "some organizations are shipping a couple million dollars worth of phones per month."

Deaven declined to comment specifically about Ace Wholesale, which he said is now under federal investigation. Last August, federal agents armed with search warrants raided the company's locations in suburban Detroit, Atlanta and Chicago, and the owner's home in Taylor, Mich., according to a DHS spokesman.

Ace Wholesale's owner, Jason Floarea, has not been charged with a crime. He did not respond to requests for comment. His attorney, Jim Thomas, who has represented high-profile clients including former Detroit Mayor Kwame Kilpatrick, declined to comment.

The case against Ace Wholesale sheds light on what law enforcement and wireless providers portray as a shadowy world of smartphone trafficking. At the center of this trade is a crucial layer of middlemen: bulk purchasers who buy devices from thieves and con artists before exporting them to customers around the world.



*Ace Wholesale's storefront in Taylor, Mich.*

In 2009, federal agents charged Hezbollah operatives in Philadelphia with attempting to buy thousands of stolen cell phones and ship them to Hong Kong and the United Arab Emirates to finance the Shiite militant organization, which the United States considers a terrorist group.

Earlier this year, a woman's iPhone stolen at a bar in San Francisco turned up a few days later in Lima, Peru, according to San Francisco police.

Last fall, American and Mexican wireless carriers began collaborating to address the cross-border trade in stolen phones after learning that Mexican drug cartels were using them to communicate with kidnapping victims' relatives without being traced. But American wireless companies lack similar arrangements with other countries, allowing international phone trafficking to flourish.

Phones stolen in the United States have been located "on all continents except Antarctica," said Marci Carris, vice president of customer finance services at Sprint.

226

The global nature of the trade stems in part from measures that law enforcement and wireless carriers have imposed to make it harder to resell stolen phones in the United States, prompting criminals to forge new markets abroad.

"Once it gets overseas, it's virtually impossible to track a phone back here to the person who committed the crime," Deaven said.

But phone trafficking is driven largely by the massive profits made by exploiting the price difference between smartphones sold in the U.S. and overseas. Americans who agree to two-year service contracts with their cell phone company can buy the latest iPhones for about $200 -- a price subsidized by the carrier. In Hong Kong, an iPhone can be sold for as much as $2,000.

This equation helps explain why more than 1.6 million Americans were victims of smartphone theft last year and why thefts of mobile devices now make up 40 percent of all robberies in major American cities. The rising street crime is exacting a heavy toll on consumers who spend an estimated $30 billion each year replacing lost and stolen devices, according to Lookout, a San Francisco-based mobile security firm.

Smartphone-related crime has also turned increasingly violent. Last month, a 24-year-old man was shot in Philadelphia after police say he would not give up his cell phone to a thief. Last year, 26-year-old Hwangbum Yang of New York City and 23-year-old Megan Boken of suburban Chicago were shot and killed during separate iPhone robberies, police say.

In response to the crime wave, state and city law enforcement officials are investigating smartphone makers for their failure to adopt measures that would render their devices inoperable when stolen. New York Attorney General Eric Schneiderman pressed smartphone manufacturers in May to create "kill switch" technology to undercut the black market, noting that "foreign trafficking of stolen devices has proliferated."

Phone trafficking also costs the wireless industry "hundreds of millions of dollars a year," said James Baldinger, an attorney for Sprint. One alleged phone trafficker, Hassan Essayli, admitted in 2008 that his company, Platform Enterprises, shipped 30,000 phones from California to other countries in just two months, according to his testimony in a lawsuit filed by TracFone Wireless.

"I'm seeing thousands and thousands of phones being resold overseas," Baldinger said. "The numbers are so big, but a lot of time it flies under the radar."

Over the last eight years, wireless companies have filed more than 200 lawsuits against alleged phone traffickers, but no case has bigger stakes than the federal lawsuit Sprint filed last summer against Ace Wholesale, Baldinger said. Sprint has accused Ace of buying thousands of Sprint phones and reselling them overseas, thereby depriving the wireless company of revenue from monthly phone bills.

"As far as we know," Baldinger said, "Ace is the biggest phone trafficker in the country."

Founded four years ago, Ace Wholesale was the brainchild of Jason Floarea, a Detroit area entrepreneur who opened his first wireless retail outlet when he was only 16, according to the company's website. He says on the site that he started the company to help consumers purchase top quality smartphones at discount prices.

Now 27, Floarea is a married father of three and an ordained minister. He aims to open his own church focused on outreach to convicts, alcoholics and the homeless, the site says.

Local law enforcement, however, accuse him of less savory activities: acting as a well-known buyer of smartphones and tablets stolen in burglaries and armed robberies.

In January 2010, Dearborn, Mich., police pulled over Floarea in his wife's silver Lexus and found two handguns, more than 30 cell phones, marijuana, a bottle of prescription drugs and more than $40,000 in cash, according to a local police report obtained by The Huffington Post through the Freedom of Information Act. He was arrested on charges of possession of marijuana, possession with intent to distribute narcotics and possession of a firearm in commission of a crime, the report says. Police later returned the phones and all but $4,200 in cash to Floarea per a court judgment.

A search of court records found no evidence of the case and both prosecutors and Floarea's attorney declined to comment on it. In Michigan, some defendants have been sentenced under statutes that prevent their cases from being disclosed publicly, according to a Michigan Department of Corrections spokesman.

While it remains unclear how profitable Floarea's business has become, he appears to be making a comfortable living. Early last year, he purchased a five-bedroom house in West Bloomfield, Mich., for $1.4 million, according to the town assessor's office. Even Ace Wholesale's low-level associates say they are well-compensated. One person who buys and sells phones for the company told Sprint's investigator that he makes $3,000 per week, court documents show.

Deaven said he recently interviewed a man who claimed to supply phones to traffickers and boasted about how his work supported his lavish lifestyle.

"He said, 'I drink nothing but top-shelf liquor and get all the girls,'" Deaven recalled. "'I make more money than the dope man, but have none of the risk.'"

**'A VERY LUCRATIVE CRIME'**

The underground market transporting iPhones and other gadgets around the world began with a different form of theft.

For years, traffickers have hired teams of so-called "runners" or "credit mules" to buy discounted phones in bulk from retailers by agreeing to long-term service contracts. These runners simply stop paying the bills and sell the devices to traffickers who export them overseas.

In March, the California Attorney General charged two people -- Shoulin Wen, 38, and Yuting Tan, 27 -- with recruiting runners from homeless shelters to buy iPhones and Samsung Galaxy phones. The pair shipped the phones to Hong Kong -- a scheme that the attorney general says netted them nearly $4 million in less than a year.

227

But recently, thefts have become bolder and more violent: Traffickers have been acquiring phones through a growing number of cell phone store robberies, according to local and federal law enforcement officials.

"A guy can go into a cell phone store and steal 30 or 40 phones and get a lot more than if he hit a bank," said Deaven, the Homeland Security agent. "It's just a very lucrative crime."

In Houston's Harris County last year, thieves robbed at least a dozen cell phone stores -- sometimes at gunpoint -- during a two-month period, prompting the police department to establish a special task force to investigate the burglaries.

At one store in Houston, three men crashed a truck through the front window and stole dozens of cell phones before speeding away. At another store last year, a thief lowered himself through the ceiling, grabbed as many handsets as he could, then climbed back through the ceiling to escape.

Last July, Anthony Riopelle, 22, was working at a Meijer department store in Taylor, Mich., when two men approached and started asking about iPads. Suddenly, one man punched Riopelle in the face, knocking him to the ground, while the other grabbed more than a dozen tablets and fled the store, according to police.

"They said, 'If you move, we're going to kill you,'" Riopelle told HuffPost.

Police said they later found the stolen iPads behind the bulletproof glass window at Ace Wholesale. The two thieves were never caught.

It was not the only time police tracked stolen mobile devices to Ace Wholesale. In August, Taylor police arrested a man in the company's parking lot shortly after he had stolen iPhones from several victims at gunpoint in Detroit.

"Ace Wholesale made it very easy for people who were obtaining phones from robberies and retail fraud to go there and sell them," Taylor police Chief Mary Sclabassi told HuffPost. "It brought a large crime element to the city."

Dozens of other companies around the country have played a similar role, Sprint says.

Sprint's investigators discovered hundreds of stolen iPhones stored in a suburban Baltimore warehouse owned by a company called Wireless Buybacks, according to a lawsuit Sprint filed against the company in February. Wireless Buybacks says it buys used phones and resells them to large retailers, which in turn issue them to customers who have insurance policies and need a replacement phone.

In its lawsuit, Sprint claims that a company associated with Wireless Buybacks tried to sell 800 iPhones to its undercover investigator for more than $400,000. A sample of serial numbers revealed that "the vast majority" of phones were stolen or obtained through fraud, the suit says.

In February, agents from the FBI, the Secret Service and the Bureau of Alcohol, Tobacco and Firearms raided Wireless Buybacks' warehouse in Elkridge, Md., and found the facility was being used to store stolen phones, according to Sprint. Law enforcement declined to comment about the raid, citing an ongoing investigation.

In court documents, Wireless Buybacks said it "does not knowingly transact business with anyone involved in burglaries or armed robberies" and conducts "a rigorous screening process" to ensure it doesn't buy stolen phones.

Kevin Lowe, co-founder of Wireless Buybacks, has said that his company supplies phones to "some of the largest retailers in the country." The company generates most of its revenue from a contract to supply cell phones to Best Buy worth about $45 million each year, the company said in court documents.

Best Buy has no plans to cut ties with Wireless Buybacks. "At this point, these are accusations that haven't been substantiated," a company spokesman said.

But Baldinger, Sprint's attorney, said the lawsuit reveals how many U.S. consumers are unwittingly buying stolen phones.

"There are lots of consumers walking around with phones they think they got legitimately from a national retailer," he said, "when in fact the phones were stolen during armed robberies."

**'TONY BUY iPHONE'**

The middlemen at the center of the global trade in stolen smartphones organize themselves into distinct roles.

Many hire hackers who use special software to "unlock" the devices, enabling them to connect with wireless networks around the world, according to Lt. Ed Santos of the San Francisco Police Department, which has created a special task force focused on combating smartphone thefts. Then, they erase the data on the handsets, often within an hour after the device is stolen.

"They completely erase them so the phones can't be identified by who they belong to," Santos told HuffPost. "They want to sell a clean phone that can't be traced."

Traffickers later repackage phones in boxes with the manufacturer's logo, power chargers and instruction manuals in the native language of their destinations, according to Sprint.

Finally, they ship them overseas, mostly to Hong Kong, where they are distributed across Southeast Asia, said Baldinger, Sprint's attorney. Many phones are also shipped to Dubai, Israel and Latin America.

In 2011, Ace Wholesale shipped dozens of iPhones and Samsung Nexus phones to Go Telecom HK and Mobile Planet HK, according to invoices obtained by Sprint. These two companies listed addresses in Kowloon, a district of Hong Kong that is thick with electronics merchants.

Most traffickers ship phones in large cardboard boxes via FedEx and UPS, according to Deaven, the Homeland Security agent. The destination of stolen phones often depends on the provenance of the traffickers.

"Here in San Francisco, a lot of people have ties to Mexico," San Francisco police Sgt. Josh Kumli said. "A lot of phones are going to Mexico because that is where they have contacts."

Until December of last year, two brothers, Henry and Victor Gamboa, drove thousands of stolen phones and other electronics by truck from the Bay Area to Mexico every two weeks, Santos said. The two brothers are now in jail after being convicted of running a massive stolen electronics fencing ring.

Thuc Ngo told Sprint's lawyers that he smuggled iPhones from California to his native Vietnam, where his siblings helped him find buyers, according to a deposition from a Sprint lawsuit against him.

Ngo said he obtained phones through his business, which he called "Tony Buy iPhone." He drove a white Dodge Ram 3500 van emblazoned with an advertisement -- "We Buy Used Iphone" -- listing his phone number and website, the lawsuit claims. He met customers at Starbucks coffee shops around the Bay Area and paid between $220 and $330 for each iPhone. Some of the iPhones had been reported stolen, he confessed, according to his deposition.

He regularly flew to Vietnam to sell his inventory, stuffing the phones in his pockets and strapping them to his waist beneath his clothing with plastic wrap -- a technique he used to bypass Vietnamese customs at the airport and avoid paying taxes, the deposition says. In this way, he carried 11 iPhones at a time.

"That's the most I can hide on my body," he said, the deposition notes.

And yet it was never enough.

"Every time I was there, people would tell me, 'Oh, next time, I want such and such phone and if you come back, you know, sell it to me,'" he said.

Earlier this year, a judge in San Francisco barred Ngo from buying and selling phones manufactured for use on Sprint's network. Ngo could not be reached for comment.



*Thuc Ngo drove this van to meet people and buy iPhones that he smuggled to Vietnam, according to Sprint.*

## A 'SECRETIVE' STOREFRONT

Ace Wholesale acquired phones by advertising on Craigslist and websites like thewirelessbuzz.com and wirelessdealers.com. One ad read: "Buying Apple iPhone 4S!! Must Be Brand New!!..Will Buy any Quantity!!" Another read: "Ace Will Buy Your Smartphone For Top Dollar!!!!!!!"

The company listed the price it paid for each model on the walls of its stores. The latest iPhones still sealed in their original packaging commanded the highest prices. One employee told Sprint's undercover investigator that he was buying the iPhone 4S for $430.

At the Ace storefront in Taylor, Mich., the Mattress World employee next door said he saw "the same people every day" arriving with bags full of iPhones and other high-end phones and tablets. Mirrored windows prevented passersby from seeing inside. The company hired a security guard to sit in a car in the parking lot. Sometimes, people bought phones from others in the parking lot, then resold them inside Ace.

At another Ace Wholesale location in Troy, Mich., the company replaced the glass front door with a metal door featuring a peephole and buzzer, according to Scott Zochowski, an attorney who works in the building.

"They were very secretive and kept very strange hours," Zochowski told HuffPost. "I've always been very suspicious about what the heck was going on in there."

With so much valuable inventory moving through its operation, Ace Wholesale itself became a target for robberies, police say. In February 2011, Floarea, the store's owner, told police that four masked men broke into his store and stole 258 cell phones worth about $140,000. One month later, police say six men wearing masks broke into Ace Wholesale again and stole smartphones and tablets worth $173,000.

229

Last July, a man reported to police that he was robbed at gunpoint in the parking lot of Ace Wholesale after he sold 25 iPads for $15,000. The gunman grabbed the cash, which was in a black duffel bag, and ran away, according to a police report.

Some Ace Wholesale associates have criminal records. At the Atlanta location, the company paid $800 to Barney Gunn for two iPhones, Sprint says. Gunn, 46, who goes by the streetname "Spook," has served multiple prison sentences since the early 1990s for drug and weapons charges, Georgia court records show.

One morning last August, a SWAT team and agents from the Department of Homeland Security busted through the front window at Ace Wholesale's location in Taylor, leaving behind piles of shattered glass. The storefront is now occupied by a company that sells outdoor pools and jacuzzis. Federal agents spent six hours removing boxes and surveillance cameras from inside Ace Wholesale's location in Troy, Zochowski said.

In court documents, Ace Wholesale said the raids forced the company to shut down its business. Its website says its inventory is now "entirely online" and being carried by its sister company, Electronics Direct, which is also owned by Floarea.

Baldinger, of Sprint, said the raid against Ace Wholesale caused "a short-lived drop" in the number of phones being shipped overseas.

But in the increasingly competitive underground smartphone trade, shutting down one operation -- even a major one -- left plenty of others waiting in the wings, Baldinger added.

"There are so many other players out there," he said. "The raid provided an opportunity for a lot of other traffickers to step up and fill the void."

*This story appears in Issue 59 of our weekly iPad magazine,* Huffington, *in the iTunes App store, available Friday, July 26.*

*Watch the video below to see federal agents raiding Ace Wholesale in Taylor, Mich.*





UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**F I L E D**

OCT 1 6 2014

CLERK'S OFFICE
U.S. DISTRICT COURT
EASTERN MICHIGAN

| | |
|---|---|
| UNITED STATES OF AMERICA, | Criminal No. 14-20614 |
| Plaintiff, | HON. NANCY G. EDMUNDS |
| -vs- | OFFENSE: Interstate Transportation of Stolen Property |
| D-1 JASON FLOAREA, | MAXIMUM PENALTIES: 10 Years Imprisonment |
| Defendant. | MAXIMUM FINE: $250,000 |

_____/

## RULE 11 PLEA AGREEMENT

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, defendant JASON FLOAREA and the government agree as follows:

**1.    GUILTY PLEA**

**A.    Count(s) of Conviction**

Defendant will waive indictment and enter a plea of guilty to the Information which charges Interstate Transportation of Stolen Property.

**B.    Elements of Offense**

The elements of the offense are:

1.) Defendant caused goods to be transported or transmitted in foreign commerce having a value of $5,000 or more; and

2.)    Defendant did so knowing the goods to have been stolen or taken by fraud.

## C.    Factual Basis for Guilty Plea

The parties agree that the following facts about defendant's crimes constitute a sufficient basis for defendant's guilty plea as required by Fed.R.Crim.P. 11(b)(3). On May 7, 2012, JASON FLOAREA caused ten boxes to be shipped via Federal Express from Romulus, Michigan to several addresses in Hong Kong, China.   The shipment was not entered into the Automated Export System as required by law. During an outbound border search inspection, Homeland Security Investigations (HSI) agents discovered that the ten boxes contained a total of three hundred (300) cellular telephones.   Based upon the IMEI identification numbers from the telephones, HSI agents determined that the above referenced telephones were obtained by fraud, using what is known as credit muling tactics.   Credit muling occurs when street vendors solicit persons to purchase cellular telephones in bulk by entering into cellular telephone contracts which they have no intention of fulfilling.    The telephones are then sold.    FLOAREA caused the above-referenced telephones to be shipped in foreign commerce knowing they were stolen or obtained by fraud.

- 2 -

2.    <u>SENTENCING GUIDELINES</u>

A.    <u>**Standard of Proof**</u>

The Court will find sentencing factors by a preponderance of the evidence.

B.    <u>**Agreed Guideline Range**</u>

There are no sentencing guideline disputes. Except as provided below, defendant's statutorily restricted guideline range is **12 to 18 months**, as set forth on the attached worksheets.   If the Court finds:

a) that defendant's criminal history category is higher than reflected on the attached worksheets, or

b) that the offense level should be higher because, after pleading guilty, defendant made any false statement to or withheld information from his probation officer; otherwise demonstrated a lack of acceptance of responsibility for his offense(s); or obstructed justice or committed any crime,

and if any such finding results in a guideline range higher than **12 to 18 months**, the higher guideline range becomes the agreed range.    However, if the Court finds that defendant is a career offender, an armed career criminal, or a repeat and dangerous sex offender as defined under the sentencing guidelines or other federal law, and that finding is not already reflected in the attached worksheets, this paragraph does *not* authorize a corresponding increase in the agreed range.

- 3 -

Neither party may take a position concerning the applicable guidelines that is different than any position of that party as reflected in the attached worksheets, except as necessary to the Court's determination regarding subsections a) and b).

3. <u>SENTENCE</u>

The Court will impose a sentence pursuant to 18 U.S.C. §3553, and in doing so must consider the sentencing guideline range.

A. **Imprisonment**

Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), the parties agree that any sentence of imprisonment in this case may not exceed **18 months**.

B. **Supervised Release**

A term of supervised release, if imposed, follows the term of imprisonment. There is no agreement on supervised release. In other words, the Court may impose any term of supervised release up to the statutory maximum term, which in this case is **3 years**. The agreement concerning imprisonment described above in Paragraph 3A does not apply to any term of imprisonment that results from any later revocation of supervised release.

C. **Special Assessment**

Defendant will pay a special assessment of **$100** and must provide the government with a receipt for the payment before sentence is imposed.

- 4 -

**D.**    <u>Fine</u>

Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), the parties agree that any fine in this case may not exceed <u>**$50,000**</u>.

**E.**    <u>Restitution</u>

The Court shall order restitution to every identifiable victim of defendant's offense(s) and all other relevant conduct.

**F.**    <u>Forfeiture</u>

As part of this agreement, pursuant to 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c), and Federal Rule of Criminal Procedure 32.2, the defendant agrees to forfeit his interest in all property, real and personal, which constitutes or is derived, directly or indirectly, from gross proceeds traceable to the defendant's violation of 18 U.S.C. § 2314, as charged in Count One of the Information.

<u>Criminal Forfeiture</u>:    Property subject to forfeiture in these criminal proceedings includes, but is not limited to, the following forfeiture money judgment representing the total value of the property subject to forfeiture for defendant's violation of Count One of the Information:

**A Forfeiture Money Judgment In The Amount of One Hundred Twenty Thousand Dollars ($120,000)**

Defendant agrees that the forfeiture money judgment may be satisfied, to whatever extent possible, from any property owned or under the control of

- 5 -

defendant. Defendant explicitly agrees to the forfeiture of any assets he has now, or may later acquire, as substitute assets under 21 U.S.C. § 853(p)(2) and waives and relinquishes his rights to oppose the forfeiture of substitute assets under 21 U.S.C. § 853(p)(1) or otherwise.

To satisfy the money judgment, defendant agrees that at or before the plea hearing, or within sixty (60) days thereafter, he will deliver to the United States Attorney's Office a cashier's check, or other certified funds, payable to the "United States of America" in the amount of $120,000.

Other Judicial Forfeiture: Defendant hereby agrees to forfeit to the United States and abandon any and all right, title and interest he and, as its President and authorized representative, ACE Wholesale, Inc. may possess in each of the assets listed below at items "a" through "ee" ("Subject Property"). Defendant agrees that neither he or ACE Wholesale Inc. will challenge the forfeiture of any of the Subject Property in any administrative or judicial forfeiture proceeding, whether criminal or civil, state or federal, including the presently pending federal civil forfeiture case in the Northern District of Georgia (*United States of America v. $248,820.00 in U.S. Currency*, 13 cv 02612 (N.D. Ga.)). Defendant further agrees that if he is presented by the government with a stipulated consent judgment or settlement agreement regarding the forfeiture of any or all of the Subject Property, the Defendant will sign and return the document within fourteen (14) days of his receipt

- 6 -

of the document. Any stipulated consent judgment or settlement agreement will be signed by Defendant on his own behalf and on behalf of ACE Wholesale, Inc. The Subject Property to be forfeited is identified as the following:

<u>United States Currency</u>

a.    Two Hundred Fifty Nine Thousand Seven Hundred Ninety Seven Dollars and Sixty Cents ($259,797.60) in U.S. Currency from Sun Trust Bank Account No. 1000147564909;

b.    Sixty Nine Thousand Dollars ($69,000) in U.S. Currency from Comerica Bank Account No. 1850867696;

c.    Eighteen Thousand Eight Hundred Sixty Dollars and Thirty Six Cents ($18,860.36) in U.S. Currency from Comerica Bank Account No. 1852705407;

d.    Six Thousand Five Hundred Eighteen Dollars and Two Cents ($6,518.02) in U.S. Currency from Comerica Bank Account No. 06823066516;

e.    Five Thousand Fifty Two Dollars and Eighty Cents ($5,052.80) in U.S. Currency from Comerica Bank Account No. 9412768583;

f.    Two Hundred Forty Eight Thousand Eight Hundred Twenty Dollars ($248,820.00) in U.S. Currency seized at 3350 Chamblee Tucker Road, Suite F located in Atlanta, Georgia;

g.    One Hundred Fifty Thousand Dollars ($150,000) in U.S. Currency seized at 12886 Westmore located in Livonia, Michigan;

h.    One Hundred Eighty Thousand Dollars ($180,000) in U.S. Currency seized at 12886 Westmore located in Livonia, Michigan;

i.    Fourteen Thousand Three Hundred Sixty Dollars ($14,360) in U.S. Currency seized at 7821 Telegraph Road located in Taylor, Michigan;

- 7 -

j.      Seven Thousand Four Hundred Dollars ($7,400) in U.S. Currency seized at 69XX Falcon Court located in West Bloomfield, Michigan;

k.      Two Thousand Five Hundred Dollars ($2,500) in U.S. Currency seized at 100 E. Big Beaver Road #905 located in Troy, Michigan;

Electronics

l.      Three Thousand Four Hundred Forty-Nine (3,449) Assorted Cellular Telephones seized at 7821 Telegraph Road located in Taylor, Michigan;

m.     One Thousand Ninety Five (1,095) Assorted Electronic Equipment Items seized at 7821 Telegraph Road located in Taylor, Michigan;

n.      Fifty Nine (59) Assorted Cellular Telephones seized at the Detroit Metropolitan Airport Cargo Office located in Romulus, Michigan;

o.      Fifteen (15) Assorted Electronic Equipment Items seized at 69XX Falcon Court located in West Bloomfield, Michigan;

p.      Two (2) Assorted Cellular Telephones seized at 69XX Falcon Court located in West Bloomfield, Michigan;

q.      One (1) T-Mobile Blackberry "Bold" model seized at 69XX Falcon Court located in West Bloomfield, Michigan;

r.      Forty Two (42) Assorted Electronic Equipment Items seized at 100 E. Big Beaver Road #905 located in Troy, Michigan;

s.      Nine (9) Assorted Cellular Telephones seized at 100 E. Big Beaver Road #905 located in Troy, Michigan;

t.      Nine (9) Assorted Blackberry models seized at 100 E. Big Beaver Road #905 located in Troy, Michigan;

u.      Eleven (11) Assorted Electronic Equipment Items seized at 20755 Island Lake located in Taylor, Michigan;

- 8 -

v.      Two (2) Assorted Cellular Telephones seized at 20755 Island Lake located in Taylor, Michigan;

w.      One (1) Blackberry Model 9870 seized at 20755 Island Lake located in Taylor, Michigan; and

Firearms/Ammunition

x.      Two (2) Assorted Firearms seized at 69XX Falcon Court located in West Bloomfield, Michigan;

y.      Nineteen (19) Rounds of Assorted Ammunition seized at 6974 Falcon Court located in West Bloomfield, Michigan;

z.      One (1) Ammunition Magazine seized at 69XX Falcon Court located in West Bloomfield, Michigan;

aa.     Ninety (90) Rounds of Assorted Ammunition seized at 100 E. Big Beaver Road #905 located in Troy, Michigan;

bb.     One (1) Ammunition Magazine seized at 100 E. Big Beaver Road #905 located in Troy, Michigan;

cc.     Two (2) Assorted Firearms seized at 20755 Island Lake located in Taylor, Michigan.

Miscellaneous Items

dd.     Thirteen (13) Franklin Gun Safe(s) seized at 7821Telegraph Road located in Taylor, Michigan;

ee.     Forty (40) Assorted Household Items/Tools seized at 7821 Telegraph Road located in Taylor, Michigan;

The defendant also agrees that he shall assist the United States in all proceedings, whether administrative or judicial, involving the forfeiture,

- 9 -

disgorgement, transfer or surrender of all rights, title, and interest, regardless of their nature or form, in the assets which the defendant has agreed to forfeit, disgorge, transfer, abandon or surrender, and any other assets, including real and personal property, cash and other monetary instruments, wherever located, which the defendant or others to his knowledge have accumulated as a result of illegal activities. Such assistance will involve an agreement on defendant's part to the entry of an order enjoining the transfer or encumbrance of assets which may be identified as being subject to forfeiture, disgorgement, transfer or surrender, including but not limited to the specific property set forth above. He also agrees to undergo any polygraph examination the Government may choose to administer concerning such assets.

The defendant agrees to consent to the entry of orders of forfeiture for all property to be forfeited and waives the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. Defendant acknowledges that he understands that the forfeiture of assets is part of the sentence that may be imposed in this case and waives any failure by the court to advise him of this, pursuant to Rule 11(b)(1)(J), at the time his guilty plea is accepted.

10

The defendant further agrees to waive all constitutional and statutory challenges in any manner (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the forfeiture constitutes an excessive fine or punishment. The defendant agrees to take all steps as requested by the United States to pass clear title to forfeitable assets to the United States, including taking whatever steps are necessary to ensure that assets subject to forfeiture are not sold, disbursed, wasted, hidden or otherwise made unavailable for forfeiture. The Defendant further agrees that he will not assist any third party in asserting a claim to the forfeited assets in any judicial forfeiture proceeding and that he will testify truthfully in any such proceeding if called upon to testify. If any other person or entity has any interest in the property covered by this plea agreement, Defendant will assist in obtaining a release of interest from any such other person or entity.

Defendant further agrees to hold the United States, its agents and employees harmless from any claims whatsoever in connection with the seizure or forfeiture of property referenced in this Plea Agreement.

<u>Non-Abatement of Forfeiture</u>: Defendant agrees that the forfeiture provisions of this plea agreement are intended to, and will, survive him, notwithstanding the abatement of any underlying criminal conviction after the execution of this agreement. The forfeitability of any particular property pursuant

11

to this agreement shall be determined as if Defendant had survived, and that determination shall be binding upon Defendant's heirs, successors and assigns until the agreed forfeiture, including any agreed money judgment amount, is collected in full. Any amount remaining to be paid to the forfeiture money judgment may be collected from Defendant's estate in accordance with the Federal Debt Collection Procedures Act until the forfeiture money judgment is collected in full.

**4. EACH PARTY'S RIGHT TO WITHDRAW FROM THIS AGREEMENT**

The government may withdraw from this agreement if the Court finds the correct guideline range to be different than is determined by Paragraph 2B.

Defendant may withdraw from this agreement, and may withdraw his guilty plea, if the Court decides to impose a sentence higher than the maximum allowed by Part 3. This is the only reason for which defendant may withdraw from this agreement. The Court shall advise defendant that if he does not withdraw his guilty plea under this circumstance, the Court may impose a sentence greater than the maximum allowed by Part 3.

˅ 12 ˅

## 5. WAIVER OF APPEAL

Defendant waives any right he may have to appeal his conviction. If the sentence imposed does not exceed the maximum allowed by Part 3 of this agreement, defendant also waives any right he may have to appeal his sentence. If the sentence imposed is within the guideline range determined by Paragraph 2B the government agrees not to appeal the sentence, but retains its right to appeal any sentence below that range.

## 6. CONSEQUENCES OF WITHDRAWAL OF GUILTY PLEA/ VACATION OF CONVICTION

If defendant is allowed to withdraw his guilty plea(s) or if any conviction entered pursuant to this agreement is vacated, the Court shall, on the government's request, reinstate any charges that were dismissed as part of this agreement. If additional charges are filed against defendant within six months after the date the order vacating defendant's conviction or allowing his to withdraw his guilty plea(s) becomes final, which charges relate directly or indirectly to the conduct underlying the guilty plea(s) or to any conduct reflected in the attached workheets, defendant waives his right to challenge the additional charges on the ground that they were not filed in a timely manner, including any claim that they were filed after the limitations period expired.

˅ 13 ˅

## 7. PARTIES TO PLEA AGREEMENT

Unless otherwise indicated, this agreement does not bind any government agency except the United States Attorney's Office for the Eastern District of Michigan.

## 8. SCOPE OF PLEA AGREEMENT

This agreement, which includes all documents that it explicitly incorporates, is the complete agreement between the parties. This agreement supersedes all other promises, representations, understandings and agreements between the parties concerning the subject matter of this plea agreement that were made at any time before the guilty plea is entered in court. Thus, no oral or written promises made by the government to defendant or to the attorney for the defendant at any time before defendant pleads guilty are binding except to the extent they have been explicitly incorporated into this agreement.

Notwithstanding the previous paragraph, if defendant has entered into a proffer agreement in writing or a cooperation agreement in writing with the government, this plea agreement does not supersede or abrogate the terms of any such prior written agreement.

This agreement also does not prevent any civil or administrative actions against defendant, or any forfeiture claim against any property, by the United States or any other party.

˅ 14 ˅

## 9. ACCEPTANCE OF AGREEMENT BY DEFENDANT

This plea offer expires unless it has been received, fully signed, in the Office of the United States Attorney by **5:00 P.M. on October 6, 2014.** The government reserves the right to modify or revoke this offer at any time before defendant pleads guilty.

BARBARA L. MCQUADE
United States Attorney


GJON JUNCAJ
ASSISTANT UNITED STATES ATTORNEY

KENNETH R. CHADWELL
ASSISTANT UNITED STATES ATTORNEY


BY SIGNING BELOW, DEFENDANT ACKNOWLEDGES THAT HE HAS READ (OR BEEN READ) THIS ENTIRE DOCUMENT, UNDERSTANDS IT, AND AGREES TO ITS TERMS. HE ALSO ACKNOWLEDGES THAT HE IS SATISFIED WITH HIS ATTORNEY'S ADVICE AND REPRESENTATION. DEFENDANT AGREES THAT HE HAS HAD A FULL AND COMPLETE OPPORTUNITY TO CONFER WITH HIS LAWYER, AND HAS HAD ALL OF HIS QUESTIONS ANSWERED BY HIS LAWYER.


JAMES C. THOMAS
ATTORNEY FOR DEFENDANT

JASON FLOAREA
DEFENDANT


DATED: OCTOBER 16, 2014

DATED: OCTOBER 16, 2014

˘ 15 ˘

| Defendant: | Jason Floarea | Count: | 1 |
|---|---|---|---|
| Docket No.: | 14-20614 | Statute(s): | 18 U.S.C. sec 2314 |

## WORKSHEET A (Offense Levels)

Complete one Worksheet A for each count of conviction (taking into account relevant conduct and treating each stipulated offense as a separate count of conviction) before applying the multiple-count rules in U.S.S.G. ch. 3, pt. D. However, in any case involving multiple counts of conviction, if the counts of conviction are all "closely related" to each other within the meaning of U.S.S.G. § 3D1.2(d), complete only a single Worksheet A.

1.   BASE OFFENSE LEVEL AND SPECIFIC OFFENSE CHARACTERISTICS (U.S.S.G. ch. 2)

| Guideline Section | Description | Levels |
|---|---|---|
| 2B1.1(a)(2) | Transportation of Stolen Property | 6 |
| 2B1.1(b)(1)(E) | Loss Exceeded $70,000 | 8 |
| 2B1.1(b)(4) | Business of Receiving Stolen Property | 2 |
| | | |
| | | |

2.   ADJUSTMENTS (U.S.S.G. ch. 3, pts. A, B, C)

| Guideline Section | Description | Levels |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

A-1

| Defendant: | Jason Floarea | Count: | 1 |
|---|---|---|---|
| Docket No.: | 14-20614 | Statute(s): | 18 U.S.C. sec 2314 |

## 3. ADJUSTED OFFENSE LEVEL

Enter the sum of the offense levels entered in Items 1 and 2. If this Worksheet A does not cover every count of conviction (taking into account relevant conduct and treating each stipulated offense as a separate count of conviction), complete one or more additional Worksheets A and a single Worksheet B.

$$\boxed{16}$$

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*If this is the only Worksheet A, check this box and skip Worksheet B.*

*If the defendant has no criminal history, check this box and skip Worksheet C.*



A-2

| Defendant: | Jason Floarea | Count: | 1 |
|---|---|---|---|
| Docket No.: | 14-20614 | Statute(s): | 18 U.S.C. sec 2314 |

# **WORKSHEET D (Guideline Range)**

**1.** **(COMBINED) ADJUSTED OFFENSE LEVEL**
Enter the adjusted offense level entered in Item 3 of Worksheet A or the combined adjusted offense level entered in item 8 of Worksheet B.

> **16**

**2.** **ADJUSTMENT FOR ACCEPTANCE OF RESPONSIBILITY (U.S.S.G. § 3E1.1)**

> **-3**

**3.** **TOTAL OFFENSE LEVEL**

Enter the difference between Items 1 and 2.

> **13**

**4.** **CRIMINAL HISTORY CATEGORY**

Enter "I" if the defendant has no criminal history. Otherwise, enter the criminal history category entered in Item 6 of Worksheet C.

> **I**

**5.** **CAREER OFFENDER/CRIMINAL LIVELIHOOD/ARMED CAREER CRIMINAL/DANGEROUS SEX OFFENDER (U.S.S.G. ch. 4, pt. B)**
  a. Total Offense Level: If the career offender provision (U.S.S.G. § 4B1.1), the criminal livelihood provision (U.S.S.G. § 4B1.3), the armed career criminal provision (U.S.S.G. § 4B1.4), or the dangerous sex offender provision (U.S.S.G. § 4B1.5) results in a total offense level higher than the total offense level entered in Item 3, enter the higher offense level total.

> [ ]

  b. Criminal History Category: If the career offender provision (U.S.S.G. § 4B1.1), the armed career criminal provision (U.S.S.G. § 4B1.4), or the dangerous sex offender provision (U.S.S.G. § 4B1.5) results in a criminal history category higher than the criminal history category entered in Item 4, enter the higher criminal history category.

> [ ]

**6.** **GUIDELINE RANGE FROM SENTENCING TABLE (U.S.S.G. CH. 5, PT. A)**
Enter the guideline range in the Sentencing Table (*see* U.S.S.G. ch. 5, pt. A) produced by the total offense level entered in Item 3 or 5.a and the criminal history category entered in Item 4 or 5.b.

> **12-18**

> months

| Defendant: | Jason Floarea | Count: | 1 |
|---|---|---|---|
| Docket No.: | 14-20614 | Statute(s): | 18 U.S.C. sec 2314 |

7. **STATUTORY RESTRICTIONS ON OR SUPERSESSION OF GUIDELINE RANGE**
If the maximum sentence authorized by statute is below, or a minimum sentence required by statute is above, the guideline range entered in Item 6, enter either the guideline range as restricted by statute or the sentence required by statute. (*See* U.S.S.G. § 5G1.1.) If the sentence on any count of conviction is required by statute to be consecutive to the sentence on any other count of conviction, explain why.

☐

months

D-2

| Defendant: | Jason Floarea | Count: | 1 |
|---|---|---|---|
| Docket No.: | 14-20614 | Statute(s): | 18 U.S.C. sec 2314 |

# WORKSHEET E (Authorized Guideline Sentences)

1. **PROBATION**
   a. <u>Imposition of a Term of Probation</u> (U.S.S.G. § 5B1.1)

   [×]     1. Probation is not authorized by the guidelines (minimum of guideline range ≥ 10 months or statute of conviction is a Class A or a Class B felony). If this box is checked, go to Item 2 (Split Sentence).

   [ ]     2. Probation is authorized by the guidelines (minimum of guideline range = zero months).

   [ ]     3. Probation is authorized by the guidelines, provided the court imposes a condition or combination of conditions requiring intermittent confinement, community confinement, or home detention satisfying the minimum of the guideline range (minimum of guideline range > 0 months but ≤ 9 months).

   b. <u>Length of Term of Probation</u> (U.S.S.G. § 5B1.2)

   [ ]     1. At least 1 year but not more than 5 years (total offense level ≥ 6)
       2. No more than 3 years (total offense level < 6).

   c. <u>Conditions of Probation</u> (U.S.S.G. § 5B1.3)

2. **SPLIT SENTENCE (U.S.S.G. § 5C1.1(C)(2), (D)(2))**

   [ ]   a. A split sentence is not authorized (minimum of guideline range = 0 months or ≥ 15 months).

   [×]   b. A split sentence is authorized (minimum of guideline range > 0 months but ≤ 12 months). The court may impose a sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention for imprisonment, provided that at least one-half of the minimum of the guideline range is satisfied by imprisonment (if the minimum of the guideline range is 10 or 12 months), or that at least one month is satisfied by imprisonment (if the minimum of the guideline range is 1, 2, 3, 4, 6, 8, or 9 months). The authorized length of the term of supervised release is set forth below in Item 4.b.

3. **IMPRISONMENT (U.S.S.G. CH. 5, PT. C)**
   A term of imprisonment is authorized by the guidelines if it is within the applicable guideline range (entered in Item 6 of Worksheet D). (*See* U.S.S.G. § 5C1.1.)

E-1

| Defendant: | Jason Floarea | Count: | 1 |
|---|---|---|---|
| Docket No.: | 14-20614 | Statute(s): | 18 U.S.C. sec 2314 |

**4.   SUPERVISED RELEASE (U.S.S.G. ch 5., pt. D)**

a. <u>Imposition of a Term of Supervised Release</u> (U.S.S.G. § 5D1.1)

The court must impose a term of supervised release if it imposes a term of imprisonment of more than one year, or if it is required to do so by statute. The court may impose a term of supervised release if it imposes a term of imprisonment of one year or less.

b. <u>Length of Term of Supervised Release</u> (U.S.S.G. § 5D1.2)

☐   1. At least 2 years but not more than 5 years, where the count of conviction is a Class A or a Class B felony, i.e., an offense carrying a maximum term of imprisonment ≥ 25 years.

☒   2. At least 1 year but not more than 3 years, where the count of conviction is a Class C or a Class D felony, i.e., an offense carrying a maximum term of imprisonment ≥ 5 years but < 25 years.

☐   3. 1 year, where the count of conviction is a Class E felony or a Class A misdemeanor, i.e., an offense carrying a maximum term of imprisonment > 6 months but < 5 years.

☐   4. The statute of conviction requires a minimum term of supervised release of _____ months.

c. Conditions of Supervised Release  (U.S.S.G. § 5D1.3)

The court must impose certain conditions of supervised release and may impose other conditions of supervised release.

**5.   RESTITUTION (U.S.S.G. § 5E1.1)**

☐   1. The court *must* order full restitution to the victim(s) of the offense(s) of conviction. (*See* 18 U.S.C. §§ 3556, 3663A, 3664.)  The court will determine who the victims are and their restitution amounts.

☐   2. The court *must* order full restitution to the victim(s) of the offense(s) of conviction. (*See* 18 U.S.C. §§ 3556, 3663A, 3664)  The parties agree that full restitution is $_____.

E-2

| Defendant: | Jason Floarea | Count: | 1 |
|---|---|---|---|
| Docket No.: | 14-20614 | Statute(s): | 18 U.S.C. sec 2314 |

☒  3.  The parties agree that the court *may* order restitution to the victim(s) of the offense(s) of conviction in any amount up to and including $_____. (*See* 18 U.S.C. §§ 3663(a)(3), 3664.)

☐  4.  The parties agree that the court ***may also*** order restitution to persons other than the victim(s) of the offense(s) of conviction in any amount up to and including $_____. (*See* 18 U.S.C. §§ 3663(a)(1)(A), 3663A(a)(3), 3664.)

☐  5.  Restitution is not applicable.

## 6. FINE (U.S.S.G. § 5E1.2)

a.  <u>Fines for Individual Defendants</u>

The court must impose a fine unless "the defendant establishes that he [or she] is unable to pay and is not likely to become able to pay any fine." (*See* U.S.S.G. § 5E1.2(a).) Generally, the fine authorized by the guidelines is limited to the range established in the Fine Table. (*See* U.S.S.G. § 5E1.2(b).) However, there are exceptions to this general rule. (*See* U.S.S.G. § 5E1.2(b), (c)(4).)

b.  <u>Fine Range from Fine Table (U.S.S.G. § 5E1.2(c)(3))</u>

| <u>Minimum Fine</u> | <u>Maximum Fine</u> |
|---|---|
| $5,000 | $50,000 |

E-3

| Defendant: | Jason Floarea | Count: | 1 |
|---|---|---|---|
| Docket No.: | 14-20614 | Statute(s): | 18 U.S.C. sec 2314 |

### 7. SPECIAL ASSESSMENT(S) (U.S.S.G. § 5E1.3)

The court must impose a special assessment on every count of conviction. The special assessments for individual defendants are:

- $100.00 for every count charging a felony ($400 for a corporation),
- $25.00 for every count charging a Class A misdemeanor ($125 for a corporation),
- $10.00 for every count charging a Class B misdemeanor ($50 for a corporation), and
- $5.00 for every count charging a Class C misdemeanor or an infraction ($25 for a corporation).

The defendant must pay a special assessment or special assessments in the total amount of $ 100.00  .

### 8. FORFEITURE (U.S.S.G. § 5E1.4)

| ☒ | Assets of the defendant will be forfeited. | ☐ | Assets of the defendant will not be forfeited. |
|---|---|---|---|

### 9. ADDITIONAL APPLICABLE GUIDELINES, POLICY STATEMENTS, AND STATUTES

List any additional applicable guideline, policy statement, or statute.

_____

_____

### 10. UPWARD OR DOWNWARD DEPARTURE (U.S.S.G. ch. 5, pts. H & K)

List any applicable aggravating or mitigating circumstance that might support a term of imprisonment above or below the applicable guideline range.

_____

_____

_____

Rev. 07/13

E-4

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

|  |  |
|---|---|
| SPRINT NEXTEL CORPORATION, *et al.*, | * |
|  | * |
| Plaintiffs, | * |
|  | * |
| v. | *  CIVIL NO.: CCB-13-0617 |
|  | UNDER SEAL |
| SIMPLE CELL, INC., *et al.*, | * |
|  | * |
| Defendants. | * |
|  | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

TEMPORARY RESTRAINING ORDER

Sprint Nextel Corporation and Sprint Communications
Company, L.P. (collectively, "Sprint") sued Simple Cell Inc. and
others[1] (collectively, the "Defendants") for trademark
infringement and other claims. ECF No. 1.  On March 1, 2013,
Sprint filed an emergency motion for (1) a writ of possession to
seize the Sprint phones in the Defendants' possession; and (2) a
temporary restraining order ("TRO") enjoining, *inter alia*, the

---

[1] The other defendants are Wireless Buybacks Holdings, LLC;
Wireless Buybacks, LLC (together, the "Wireless Defendants");
Vaughn Solutions, LLC; Halo Branded Solutions, Inc.; Marsha
Lavaige; Melissa Lavaige; Kevin A. Lowe; Christopher E. Metzger;
Kevin Edward Salkeld; Brendan T. Skelly; Shannon A. Skelly;
Nicholas F. Skelly; and Brett Vaughn.  Compl.  The individual
defendants are employed by the entity defendants and/or are
alleged to have participated in the improper conduct.  *See id.*
¶¶ 19-23, 25, 26, 28.  Each defendant has been served with the
summons, complaint, and emergency motion.  However, defense
counsel have appeared only for the Wireless Defendants, Lowe,
Salkeld, and Brendan Skelly.  *See* docket; Hr'g.

Defendants' "unlawful business practices" involving the
"unauthorized and deceptive" bulk purchase and resale of stolen
and unlawfully obtained Sprint wireless telephones.  ECF No. 9-1
at 7.  A hearing was held on Monday, March 4, 2013 ("Hr'g").

The Defendants allegedly fraudulently resell and advertise
stolen Sprint phones in bulk quantities.  *E.g.*, Compl. ¶¶ 1-2,
48.  According to the complaint, the Defendants are engaged in a
"scheme" whereby they acquire[2] large numbers of Sprint phones
from Sprint and/or authorized dealers and retailers.  *Id.* ¶ 3.[3]
Allegedly, the Defendants acquire these phones "with the
knowledge and intent" that the phones will be computer-hacked by
the Defendants or their coconspirators.  *Id.* ¶ 5.[4]  The
Defendants then traffic the unlocked phones, the "vast majority"
of which are resold as new overseas where the phones are not
subsidized[5] by wireless carriers.  *Id.* ¶¶ 3, 5.  By selling the

---

[2] Including through burglaries and armed robberies.  Compl. ¶¶ 4,
49.

[3] According to Sprint, the Defendants have "circumvent[ed]"
Sprint's policies limiting the number of phones a person may
purchase daily, by employing large numbers of "Runners" who make
multiple purchases for the Defendants.  *Id.* ¶ 8.

[4] The purpose of the hacking, also known as "unlocking," is to
disable proprietary software installed in the phones by the
manufacturers, which prevent the phones from being used outside
the Sprint network.  *Id.* ¶¶ 5, 38.

[5] Sprint subsidizes its customers' purchase of Sprint phones by
selling them for less than they cost Sprint.  *Id.* ¶ 35.  Sprint
recoups the subsidy through profits earned on the sale of Sprint

2

phones in foreign countries where wireless providers do not subsidize mobile phones, the Defendants have been able to sell the phones below market prices.  *Id.* ¶ 6.

At the hearing, Sprint relied on declarations, attached exhibits, and testimony by Sprint's Fraud Management Department Project/Program Manager IV Clint Breithaupt, ECF No. 9-2, and Stumar Investigations's ("Stumar")[6] Telecommunications Department Lead Investigator Hal Leshner, ECF No. 9-3.  The Wireless Defendants, Lowe, Salkeld, and Brendan Skelly relied on a declaration by Skelly.  ECF No. 37-1.

At the hearing, Leshner testified that he began investigating the Defendants last year.  Hr'g Tr. at 36:14-15.  While investigating Marsha Lavaige, she forwarded Leshner an email from Vaughn that contained about 100 ESNs[7] out of 700 phones available for sale.  *Id.* at 36:24-25, 37:1-6, 16-19.  Vaughn told Leshner the phones were clean and currently in Wireless Buybacks's warehouse in Elkridge, Maryland.  *Id.* at 37:23-25,

---

service, which is required to make and receive calls and text messages on, and transmit data through, its phones.  *Id.*  Sprint can offer the reduced prices only if the phones are used as intended on the Sprint wireless network.  *Id.*

[6] Stumar Investigations is a private investigative firm based in Pennsylvania, with regional offices in Florida, Pennsylvania, New Jersey, Delaware, Maryland, and New York.  ECF No. 9-3 (Leshner Decl.) ¶ 3.  Stumar has worked for Sprint for about two years.  Hr'g Tr. at 26:1-2.

[7] An ESN is a unique identification number embedded in every wireless phone.

38:1-2, 39:16-19.  Leshner gave the list to Sprint.  *Id.* at

39:2-5.  Of this first list, attached as Exhibit A-6 to

Breithaupt's declaration, Breithaupt determined[8] that 22 of the

phones were acquired through burglary of either a Sprint or

Radio Shack store,[9] and about 23 were acquired through

equipment[10] or subscription[11] fraud.  ECF No. 9-2 at 95-96; Hr'g

Tr. at 18:16-25, 19:1-7, 20:16-19, 39:11-15.  One was acquired

through "mule" activity.[12]  ECF No. 9-2 at 95.

On Monday, February 25, 2013, federal agents raided

Wireless Buybacks's warehouse facility at 6679 Santa Barbara

Drive, Suite D, Elkridge, MD 21077, pursuant to a search

warrant.  No. 13-mj-0395-SAG, ECF No. 6 (SEALED) at 2.  The

agents apparently seized hundreds of cell phones.  *See id.* at 4-

47 (listing ESNs of seized phones).  Breithaupt testified that

---

[8] Breithaupt used Sprint's internal billing system, "Ensemble," to obtain the history of each ESN.  Hr'g Tr. at 26:18-25, 27:1-4.

[9] Sprint retains ownership of phones on display for sale at Radio Shack.  *Id.* at 20:20-25.

[10] In "equipment fraud," a criminal orders a phone and bills it to a legitimate customer's account.  *Id.* at 17:7-10.

[11] In "subscription fraud," like identity theft, a criminal uses someone else's identity to activate an account, acquires phones under that account, and sells the phones on the black market.  *Id.* at 16:21-25, 17:1-2.

[12] In "mule activity," a "handler" recruits people ("mules") to apply for Sprint service and purchase phones at the subsidized price; the phones are then delivered to the handler.  *Id.* at 17:14-25.

he was "not sure" whether Sprint representatives had examined
the ESNs of the phones located at Wireless Buybacks's warehouse.
Hr'g Tr. at 31:2-5. Similarly, Leshner did not know whether any
of the phones taken in the raid included the 700 iPhones offered
by Vaughn for purchase. *Id.* at 55:1-9.

After the raid, Vaughn emailed Leshner to reiterate his
interest in selling 700 Sprint iPhone 5s. Hr'g Tr. at 41:18-
23.[13] Vaughn gave Leshner a second list of sample ESNs; Leshner
forwarded the list to Sprint. *Id.* at 44:1-16. Of this second
list, attached as Exhibit A-7 to Breithaupt's declaration, at
least 28 phones were acquired through burglary. ECF No. 9-2 at
98-99; Hr'g Tr. at 22:3-14, 44:1-14. As before, Vaughn told
Leshner that the phones were in Elkridge, Maryland. *Id.* at
45:9-10.[14]

The standard for granting a temporary restraining order
under Fed. R. Civ. P. 65(b) is the same as that for a

---

[13] By then, Stumar had identified a person in North Carolina who
was offering to sell 700 iPhone 5s from a Baltimore, Maryland
location. Hr'g Tr. at 42:1-3. That person directed
investigators back to Vaughn, who advised that the phones were
in Elkridge, Maryland. *Id.* at 42:3-5.

[14] Leshner's transaction with Vaughn was never consummated. *Id.*
at 46:11-14. Leshner purchased from Simple Cell a Sprint
Samsung Galaxy SIII, which had been obtained through fraud. *Id.*
at 46:20-25. Leshner testified that Simple Cell and Wireless
Buybacks are related, based in part on his belief that Simple
Cell's owner Nicholas Skelly and Wireless Buybacks's CEO Brendan
Skelly are brothers. *Id.* at 47:10-18. Leshner has not had any
contact with Lowe, Salkeld, or Wireless Buybacks. *Id.* at 53:8-
12.

preliminary injunction,[15] which requires the movant to
demonstrate that: (1) he is likely to succeed on the merits; (2)
he is likely to suffer irreparable harm absent preliminary
relief; (3) the balance of equities favors it; and (4) an
injunction is in the public interest.[16]

As Sprint has shown that stolen phones have been recovered
from Wireless Buybacks's warehouse, it has shown a likelihood of
success on the merits of its conversion and replevin claims
(Counts Fifteen and Sixteen), which allege that the Defendants
are unjustly detaining stolen property.  Compl. at 40-41.
Wireless Buybacks contends that it innocently acquired the
stolen phones, but acknowledges that it has no right to retain
stolen Sprint property.  Sprint will suffer irreparable harm if
stolen phones are sold, because it will not be able to determine
that the phones were stolen; it will also be unable to seek
damages for the theft or recover the phones.  The balance of the
equities tips in favor of a narrow TRO,[17] which takes into

---

[15] *See, e.g., Montgomery v. Housing Auth. of Balt. City*, 731 F.
Supp. 2d 439, 441 (D. Md. 2010); *Ficker v. Tuohy*, 305 F. Supp.
2d 569, 571 (D. Md. 2004).

[16] *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20
(2008); *Real Truth About Obama, Inc. v. Fed. Election Comm'n*,
575 F.3d 342, 346 (4th Cir. 2009), *vacated on other grounds*, 130
S. Ct. 2371 (2010), *reinstated in relevant part on remand*, 607
F.3d 355 (4th Cir. 2010) (per curiam).

[17] Sprint's motion for writ of possession will be denied, because
the Court has not found that Sprint is entitled to all 700

account Sprint's rights to its stolen phones and the Defendants' rights to conduct their lawful business.  Finally, it is in the public interest to return stolen merchandise to its rightful owner.

For the reasons stated above and on the record during the hearing, it is, this 5th day of March 2013, ORDERED that:

1.  The Plaintiffs' Motion for a Writ of Possession and Temporary Restraining Order (ECF No. 9) BE, and HEREBY IS, GRANTED in part and DENIED in part:

    a. The motion for writ of possession is DENIED;

    b. The motion for a TRO is GRANTED:

        i.   By midday on Thursday, March 7, 2013, defense counsel shall provide to plaintiffs' counsel a computer-manipulable list of ENSs of all new, non-refurbished, iPhone 5s and Samsung Galaxy IIIs in his clients' inventory.  Sprint will compare these ESNs with its list of ESNs of stolen phones.

        ii.  By close of business on Friday, March 8, 2013, plaintiffs' counsel shall report to the Court which phones, if any, Sprint has identified as "stolen."[18]

---

phones which it wants to seize.  Fed. R. Civ. P. 64; Md. Rule 12-601; see ECF No. 9-1 at 21.

[18] For purposes of this order, a "stolen" phone is a phone obtained through burglary, subscription fraud, and equipment fraud, as those terms have been defined herein.

      iii.  The Defendants are RESTRAINED from selling new, non-refurbished, iPhone 5s and Samsung Galaxy IIIs through and including March 8, 2013, except that the Defendants are permitted to fulfill such orders with phones Sprint has determined, by ESN comparisons, are not stolen.

2.  The Plaintiffs shall post a $100 bond;

3.  The prevailing party in any proceeding to enforce compliance with the terms of this Order shall be entitled to an award of its attorney's fees and costs incurred thereby; and

4.  The Clerk of the Court shall send copies of this Order to counsel for the parties.

_____
William D. Quarles, Jr.
United States District Judge

You are currently browsing the ADL archive website.
Consider visiting our new website !



**Four Men Indicted in Philadelphia for Attempting to Support Hezbollah**

Four men have been indicted in Philadelphia for attempting to provide Hezbollah with a cache of weapons and funds.

An indictment unsealed in a Philadelphia federal court on November 24, 2009, charged Moussa Ali Hamdan, Hassan Hodroj, Dib Hani Harb and Hasan Antar Karaki with conspiring to provide material support to Hezbollah. Hamdan, a naturalized U.S. citizen from Lebanon, was arrested in Paraguay in June 2010 while the other three suspects remain at large.  They face sentences ranging from 15 to 30 years in prison if convicted.

"The allegations contained in this complaint demonstrate how terrorist organizations rely on a variety of underlying criminal activities to fund and arm themselves," said David Kris, Assistant Attorney General for National Security.

The indictment alleges that Hodroj and Harb, both of Beirut, attempted to export machine guns from the U.S. to the Port of Latakia, Syria. Hodroj is reportedly a member of Hezbollah's political council and Harb is his son-in-law.

In June 2009, Harb arranged a meeting between an informant, based in Philadelphia, and an unnamed Hezbollah official to discuss selling firearms to the Lebanese terrorist organization, according to the indictment. After Harb and Hodroj agreed to purchase approximately 1,200 M-4s, Harb allegedly claimed that the Hezbollah official, who was currently in Iran, "emphasized the need for quick delivery of the machineguns."

Harb allegedly told the informant that the Islamic Republic of Iran manufactured "high-quality counterfeit U.S. currency for the benefit of Hezbollah." The indictment alleges that Harb, as well as Hamdan and Karaki, of Beirut, sold the informant almost ten thousand dollars of counterfeit money, the proceeds of which they supposedly planned to send to Hezbollah.

In a meeting with the informant in Florida in April 2009, Harb allegedly explained that Hezbollah representatives had been working approximately 20 hours a day to make counterfeit currencies, including those of the U.S., European Union, Kuwait and Saudi Arabia. The indictment further alleged that, in September 2009, Harb mailed a package to the informant containing approximately $9,200 in counterfeit U.S. currency hidden inside a photo album.

The indictment also charged that the men attempted to generate funds for Hezbollah by selling stolen money and fake passports. Harb allegedly told the informant in December 2008 that stolen U.S. currency packaged inside wedding albums was mailed to him. The following February, Karaki described the stolen money as "blood money" that Hezbollah had apparently received from Iran. During Harb's Florida meeting with the informant, according to the indictment, he negotiated the sale of U.S. currency stolen by Hezbollah supporters and smuggled into Lebanon as a "fund-raising tool" for Hezbollah.

Six others named in the indictment were charged with several counts of transporting stolen and counterfeit

goods and making false statements to government officials. Since 2007, the six other defendants – Hamze El-Najjar of Brooklyn, Moustafa Habib Kassem of Staten Island, Latif Kamel Hazime (a.k.a. Adanan) of Brooklyn, Alla Allia Ahmed Mohamed of Brooklyn, Maoda Kane of the Bronx and Michael Katz of New Jersey – allegedly purchased and transported stolen goods, including cell phones, laptops, Sony PlayStations and automobiles.

The men do not face Hezbollah-related charges. Five are in custody in Philadelphia while Hazime is still at large.

The indictment followed a separate investigation in which at least 12 men attempted to transfer stolen goods and send anti-aircraft missiles to Lebanon by way of Syria or Iran. According to court documents, Lebanese national Dani Nemr Tarraf, the apparent ringleader of the group, paid an undercover operative $20,000 for machine guns and Stinger missiles.

Following his November 21, 2009, arrest in Philadelphia, Tarraf allegedly told federal authorities that he was conspiring to acquire a large quantity of weapons for Hezbollah. Court documents further purported that Tarraf admitted that he was a member of Hezbollah and had previously received military training from the Lebanese terrorist organization.

In addition to Hamdan, Hodroj, Harb and Karaki, several others have been indicted or convicted in the U.S. on terrorism charges relating to Hezbollah. The following is a sampling of those arrested or convicted in the U.S. for Hezbollah-related activities:

- Patrick Nayyar of Queens, New York, was indicted in October 2009 for attempting to provide weapons, ammunition and vehicles to Hezbollah. Nayyar, an Indian national residing in the U.S. illegally, has pleaded not guilty to all counts.

- In August 2009, three Yemeni men from Rochester, New York – Yehia Ali Ahmed Alomari, Mohamed Al Huraibi and Saleh Mohamed Taher Saeed – pleaded guilty to illegally transferring more than $100,000 to overseas accounts they thought were controlled by Hezbollah.

- In June 2009, Javed Iqbal and Saleh Elahwal were sentenced in a Manhattan federal court to nearly six years in prison and 17 months in prison, respectively, for distributing broadcasts of Al Manar, Hezbollah's TV station, and providing material support to Hezbollah.

- Fawzi Mustapha Assi, an automobile engineer from Dearborn, was sentenced to 10 years in prison in December 2008 for providing night vision equipment and GPS technology to Hezbollah.

- A group of approximately 20 men ran a criminal enterprise in Dearborn, Michigan of trafficking contraband cigarettes, cigarette papers and Viagra, as well as stolen infant formula and toilet paper. Prosecutors contend that the ring diverted some of the funds to Hezbollah. Naturalized U.S. citizen Karim Hassan Nasser pleaded guilty to racketeering charges in September 2006, as did Theodore Schenk of Miami Beach, Florida and Imad Hamadeh of Dearborn Heights.

- Yousef Kourani, a Lebanese man living in Dearborn, Michigan, was sentenced in June 2005 to four and a half years in prison for raising money for Hezbollah to purchase technology equipment.

- In 2005, at least 125 people were arrested in Los Angeles for selling counterfeit goods including designer handbags, DVDs and tobacco, in order to raise money for Hezbollah, according to Los Angeles County Sheriff's Department. A total of $16 million in knock-off items was seized, as well as $3.5 million in cash.

- Dearborn resident Elias Mohamad Akhdar was sentenced in January 2004 to nearly six years in prison for his role in a cigarette smuggling ring designed to finance Hezbollah. Another Dearborn resident, Hassan M. Makki, received a sentence of nearly five years in prison in connection with the scheme.

- In 2002, Dearborn resident Ali Boumelhem was sentenced to 44 months in prison for trying to send weapons and ammunition to Hezbollah.

- At least three naturalized U.S. citizens – Said Mohamad Harb, Bassam Youssef Hamood and Hussein

http://archive.adl.org/NR/exeres/682EEB77-966A-416D-9CD0-FBD53CCEE094,8C8C25...   5/16/2013

Chahrour – and U.S. citizen Angela Georgia Tsioumas are among a group of nine individuals who bought cigarettes in North Carolina, shipped them to Michigan and sold them at a price lower than the tax-inflated Michigan price. From 1995 to 2000, the scheme generated over $7 million used to procure dual-use technologies for Hezbollah. Items were reportedly purchased for Hezbollah in both the U.S. and Canada, including goggles, global positioning systems, stun guns, naval equipment, nitrogen cutters and laser range finders.

http://archive.adl.org/NR/exeres/682EEB77-966A-416D-9CD0-FBD53CCEE094,8C8C25...   5/16/2013



**Miami Coupons** 1 ridiculously huge coupon a day. It's like doing Miami at 90% off! www.Groupon.com/Miami

**The New Google Nexus S** Gingerbread is Here. Be The First To Own The Fastest Nexus Yet! www.google.com/

**Laptops Sold for $33.33** Today: All HP Laptops are Sold for up to 98% Off. Buy Yours Today? QuiBids.com

Original URL: http://www.theregister.co.uk/2010/12/01/dmca_unlocking/

# Hezbollah sting bust sees first phone-unlock DMCA conviction
**Mass terrorist jailbreaking not same as fanboi freedom**

By **Bill Ray**

Posted in Mobile, 1st December 2010 12:15 GMT

Free whitepaper – The Register Guide to Enterprise Virtualization

A Philadelphia federal court has accepted a guilty plea from one Mohamad Majed, who admitted breaching the Digital Millennium Copyright Act in unlocking thousands of phones for resale.

The phones were locked to TracFone, a virtual operator in the US which specialises in pre-paid connections and heavily-subsidised handsets. TracFone has pursued mass unlockers before, but this is the first time anyone has been convicted of breaching the DMCA by unlocking a phone.

---

Whitepapers - Free to Download

SC10 Student Cluster Competition

Google innovates on the idea of an upgrade

Is there a (Blue) Cheetah in your future?

Google Apps: City of Los Angeles Case Study

Google Apps: Motorola Case Study

---

The DMCA makes the act of circumventing protection techniques against the law, even if not for commercial gain. That law was clarified earlier this year to exempt subsidised phones that had been used on the subsiding operator's network.

Jailbreaking your own phone was declared legal [1] in July this year, despite Apple's objections.

Not that it was unlocked phones that attracted the authorities. Their attention was grabbed by a "suspicious loading of carpets late at night", which was reported by a nearby curtain-twitcher and resulted in a sting operation that exposed a Hezbollah funding operation and led to 16 arrests [2] - that story is at the *Philadelphia Inquirer* and makes interesting reading.

But almost a year later one of the accused has pled guilty to breaching the DMCA by unlocking phones prior to shipping them abroad. This still isn't grounds to panic in normal circumstances - personal unlocking for use beyond the subsidised period is still exempted - but if you're shipping thousands of handsets abroad with a view to funding a designated terrorist organisation, take heed. ®

**Links**

1. http://www.theregister.co.uk/2010/07/26/dmca_exemptions/
2. http://www.allbusiness.com/crime-law-enforcement-corrections/criminal-offenses/13779661-1.html

## Related stories

World of Warcraft bot ban ticks off world of critics (15 December 2010)
http://www.theregister.co.uk/2010/12/15/world_of_warcraft_bot_ban/

Xbox modder can't claim fair use, says judge (24 November 2010)
http://www.theregister.co.uk/2010/11/24/xbox_modder_trial/

US legalizes jailbroken iPhones (26 July 2010)
http://www.theregister.co.uk/2010/07/26/dmca_exemptions/

Judge blames RealNetworks for DVD-ripping ban (12 January 2010)
http://www.theregister.co.uk/2010/01/12/realnetworks_realdvd_antitrust_dismissal/

© Copyright 1998–2011